## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CHARLES M. KUPPERMAN )<br><br>*Plaintiff*, )<br>v. )<br><br>UNITED STATES HOUSE OF )<br>REPRESENTATIVES, *et al.* )<br><br>*Defendants.* ) | Civil Action No.  1:19-cv-3224 (RJL) |

## DEFENDANT PRESIDENT DONALD J. TRUMP'S MOTION
## TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

President Donald J. Trump, in his official capacity as President of the United States, hereby respectfully moves to dismiss Plaintiff's complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure or for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The relevant facts, authority, and arguments supporting Defendant's motion are set forth in the accompanying (i) Memorandum of Points and Authorities in Support of Defendant President Donald J. Trump's Motion to Dismiss or, in the Alternative, for Summary Judgment, (ii) Declaration of Matthias J. Mitman, and (iii) Defendant President Donald J. Trump's Statement of Material Facts Not in Dispute.  A proposed Order is attached.

Dated:  November 14, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

JAMES J. GILLIGAN

Special Litigation Counsel

/s/ *Andrew M. Bernie*
ANDREW M. BERNIE (DC Bar No. 995376)
CRISTEN HANDLEY (MO Bar No. 69114)
STEVEN A. MYERS (NY Bar No. 4823043)
SERENA M. ORLOFF (CA Bar No. 260888)
Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
P.O.  Box 883
Washington, D.C.  20044
Telephone:  (202) 616-8488
Fax:          (202) 616-8470
Email:       andrew.m.bernie@usdoj.gov

*Attorneys for President Trump*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                                        )
CHARLES M. KUPPERMAN,                                   )
                                                        )
                        *Plaintiff,*                    )
                                                        )
            v.                                          )
                                                        )        No. 1:19-cv-03224 (RJL)
U.S. HOUSE OF REPRESENTATIVES,                          )
    *et al.*,                                           )
                                                        )
                        *Defendants.*                   )
                                                        )
———————————————————————

**MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF DEFENDANT PRESIDENT DONALD J. TRUMP'S**
<u>**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**</u>

Dated:  November 14, 2019

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

JAMES J. GILLIGAN
Special Litigation Counsel

ANDREW M. BERNIE (DC Bar No. 995376)
CRISTEN HANDLEY (MO Bar No. 69114)
STEVEN A. MYERS (NY Bar No. 4823043)
SERENA M. ORLOFF (CA Bar No. 260888)
Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Tel:      (202) 616-8488
Fax:      (202) 616-8470
E-mail:   andrew.m.bernie@usdoj.gov

*Counsel for President Trump*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 5

LEGAL STANDARD.......................................................................................... 7

ARGUMENT ...................................................................................................... 8

I.   THE COURT LACKS JURISDICTION TO ADJUDICATE THIS CASE. ......................... 8

   A.   Dr. Kupperman's Claims Are Barred by Presidential and Sovereign Immunity............... 8

   B.   Dr. Kupperman Lacks Standing.................................................................... 10

      1.   Dr. Kupperman Faces No Credible Threat of Prosecution by the Executive Branch... 13

      2.   Dr. Kupperman Faces No Credible Threat of Inherent Contempt.............................. 15

      3.   Dr. Kupperman Faces No Credible Threat of a Justiciable Civil Enforcement Suit by the House. ........................................................................................................ 16

   C.   In Any Event, This Case is Moot..................................................................... 25

II.   DR. KUPPERMAN IS ABSOLUTELY IMMUNE FROM PROCESS COMPELLING HIM TO TESTIFY BEFORE CONGRESS ABOUT HIS OFFICIAL DUTIES. ......................... 27

   A.   Congress May Not Compel the President's Immediate Advisors to Testify About Their Official Duties.............................................................................................. 27

   B.   Dr. Kupperman Was an Immediate Advisor to the President to Whom Testimonial Immunity Applies. ........................................................................................ 36

   C.   Dr. Kupperman Remains Immune From Compelled Congressional Testimony About His Duties. ....................................................................................................... 39

   D.   Individualized Assertions of Executive Privilege Are Not a Substitute for Testimonial Immunity...................................................................................................... 40

III.   DR. KUPPERMAN FAILS TO STATE A CAUSE OF ACTION. ................................... 42

   A.   Dr. Kupperman Fails to State a Claim in Interpleader...................................... 42

   B.   The Declaratory Judgment Act Does Not Supply a Cause of Action.............................. 44

CONCLUSION................................................................................................... 45

# TABLE OF AUTHORITIES

*The authorities upon which we chiefly rely are marked with asterisks.*

## CASES

*Al-Aulaqi v. Obama,*
  727 F. Supp. 2d 1 (D.D.C. 2010) ............................................................................ 10

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) .............................................................................................. 24

*Ali v. Rumsfeld,*
  649 F.3d 762 (D.C. Cir. 2011) .......................................................................... 5, 44

*Allstate Assignment Co. v. Cervera,*
  2014 WL 12496902 (W.D. Tex. 2014) .................................................................. 43

*Application of the U.S. Senate Permanent Subcomm. on Investigations,*
  655 F.2d 1232 (D.C. Cir. 1981) ............................................................................ 42

*Armstrong v. Executive Office of the President,*
  1 F.3d 1274 (D.C. Cir. 1993) ................................................................................ 32

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................................ 7

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,*
  997 F.2d 898 (D.C. Cir. 1993) .............................................................................. 30

*Barnes v. Kline,*
  759 F.2d 21 (D.C. Cir. 1984) ................................................................................ 19

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................................ 7

*Bilski v. Kappos,*
  561 U.S. 593 (2010) .............................................................................................. 23

*Bowsher v. Synar,*
  478 U.S. 714 (1986) .............................................................................................. 31

*Buckley v. Valeo,*
  424 U.S. 1 (1976) .................................................................................................. 19

*Burke v. Barnes,*
    479 U.S. 361 (1987)..........................................................................................19

*C & E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.,*
    310 F.3d 197 (D.C. Cir. 2002)................................................................5, 44

*Campbell v. Clinton,*
    52 F. Supp. 2d 34 (D.D.C. 1999).......................................................................19

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)...........................................................................................7

*CF 135 Flat LLC v. Triadou SPV S.A.,*
    No. 15-CV-5345 (AJN), 2016 WL 1109092 (S.D.N.Y. Mar. 18, 2016)................43

*\*Cheney v. U.S. Dist. Court for the Dist. of Columbia,*
    542 U.S. 367 (2004)........................................................................27, 29, 30, 41

*City of L.A. v. Lyons,*
    461 U.S. 95 (1983)...........................................................................................12

*\*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)...........................................................................2, 11, 12, 17

*Clinton v. Jones,*
    520 U.S. 681 (1997)...........................................................................................29

*Comm. on Oversight & Gov't Reform v. Holder,*
    979 F. Supp. 2d 1 (D.D.C. 2013)......................................................................24

*Comm. on the Judiciary of the U.S. House of Representatives v. Miers,*
    542 F.3d 909 (D.C. Cir. 2008)...........................................................................29

*Comm. on the Judiciary of the U.S. House of Representatives v. Miers,*
    558 F. Supp. 2d 53 (D.D.C. 2008)...........................................................24, 28, 38

*Commercial Union Ins. Co. v. United States,*
    999 F.2d 581 (D.C. Cir. 1993)...........................................................................42

*\*Cox v. Louisiana,*
    379 U.S. 559 (1965)........................................................................................3, 14

*Ctr. for Arms Control & Non-Proliferation v. Pray,*
    531 F.3d 836 (D.C. Cir. 2008)......................................................................30, 33

*Ctr. for Biological Diversity v. McAleenan*,
  2019 WL 4228362 (D.D.C. Sept. 4, 2019) ............................................................. 7

*\*DeFunis v. Odegaard*,
  416 U.S. 312 (1974) ............................................................................................. 26

*Dugan v. Rank*,
  372 U.S. 609 (1963) ............................................................................................. 10

*\*Estate of Heiser v. Islamic Republic of Iran*,
  807 F. Supp. 2d 9 (D.D.C. 2011) ..................................................................... 5, 43

*Fid. Brokerage Servs., LLC v. Bank of China*,
  192 F. Supp. 2d 173 (S.D.N.Y. 2002) ................................................................. 42

*\*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ..................................................................................... 8, 9, 10

*Glenclova Inv. Co. v. Trans-Res., Inc.*,
  874 F. Supp. 2d 292 (S.D.N.Y. 2012) ................................................................. 43

*\*Gravel v. United States*,
  408 U.S. 606 (1972) ....................................................................................... 35, 36

*Grupo Mexicano de Desarrolo, S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) ............................................................................................. 25

*Hall v. CIA*,
  437 F.3d 94 (D.C. Cir. 2006) ............................................................................... 26

*\*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ....................................................................................... passim

*Howard v. Pritzker*,
  775 F.3d 430 (D.C. Cir. 2015) ............................................................................. 22

*Hunter v. Federal Life Ins. Co.*,
  111 F.2d 551 (8th Cir. 1940) ............................................................................... 11

*In re Application of the U.S. Senate Permanent Subcomm. on Investigations*,
  655 F.2d 1232 (D.C. Cir. 1981) ..................................................................... 22, 23

*\*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) .......................................................................... passim

*\*Jesner v. Arab Bank, PLC*,
  138 S. Ct. 1386 (2018) ......................................................................................... 25

*John Doe v. U.S. Parole Comm'n*,
  602 F. App'x 530 (D.C. Cir. 2015)...........................................................44

*Judicial Watch, Inc. v. Dep't of Justice*,
  365 F.3d 1108 (D.C. Cir. 2004)...............................................................28

*Judicial Watch, Inc. v. U.S. Secret Serv.*,
  726 F.3d 208 (D.C. Cir. 2013) ...........................................27, 28, 39, 32

*Kennametal v. Int'l Union, United Auto., Aircraft & Agricultural
  Implement Workers of Am.*,
  161 F. Supp. 362 (W.D. Pa. 1958)..........................................................44

*Larsen v. United States Navy*,
  525 F.3d 1 (D.C. Cir. 2008)....................................................................25

*Larson v. Domestic & Foreign Commerce Corp.*,
  337 U.S. 682 (1949)................................................................................10

*Loving v. Dep't of Def.*,
  550 F.3d 32 (D.C Cir. 2008)...................................................................28

*Loving v. United States*,
  517 U.S. 748 (1996)................................................................................33

*Lovitky v. Trump*,
  No. 19-1454, 2019 WL 3068344 (D.D.C. July 12, 2019) ........................9

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803)..................................................................28

*McGrain v. Daugherty*,
  273 U.S. 135 (1927)................................................................................18

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007)................................................................................12

*Metro. Life Ins. Co. v. Jacques*,
  396 F. App'x 709 (2d Cir. 2010) .............................................................43

*Mississippi v. Johnson*,
  71 U.S. (4 Wall) 475 (1866) .....................................................................8

*Mistretta v. United States*,
  488 U.S. 361 (1989)................................................................................29

*Moore v. U.S. House of Representatives*,
  733 F.2d 946 (D.C. Cir. 1984) ........................................................... 19

*Nat'l Treas. Employees Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ............................................................. 9

*NBC-USA Hous., Inc., Twenty-Six v. Donovan*,
  674 F.3d 869 (D.C. Cir. 2012) ...................................................... 25, 26

*Newdow v. Bush*,
  391 F. Supp. 2d 95 (D.D.C. 2005) ........................................................ 9

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ........................................................ 8, 9

*Nixon v. Adm'r of Gen. Servs.*,
  433 U.S. 425 (1977) ...................................................... 28, 30, 39, 41

*\*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) .............................................................. *passim*

*Nixon v. Sirica*,
  487 F.2d 700 (D.C. Cir. 1973) ...................................................... 18, 30

*People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*,
  285 F. Supp. 3d 307 (D.D.C. 2018) ...................................................... 41

*Powell v. McCormack*,
  395 U.S. 486 (1969) ........................................................................ 25

*Prop. of the People, Inc. v. Office of Mgmt. & Budget*,
  394 F. Supp. 3d 39 (D.D.C. 2019) .............................................. 27, 28, 37

*\*Raines v. Byrd*,
  521 U.S. 811 (1997) .............................................................. *passim*

*\*Reed v. Cty. Comm'r of Del. Cty., Pa.*,
  277 U.S. 376 (1928) ........................................................................ 24

*Republic of Philippines v. Pimentel*,
  553 U.S. 851 (2008) ........................................................................ 42

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
  366 F. Supp. 51 (D.D.C. 1973) .......................................................... 21

*Senate Select Committee on Presidential Campaign Activities v. Nixon*,
　498 F.2d 725 (D.C. Cir. 1974) ............................................................................ 20, 41

*Sierra Club v. Jackson*,
　648 F.3d 848 (D.C. Cir. 2011) .................................................................................. 25

*Simon v. Eastern Ky. Welfare Rights Organization*,
　426 U.S. 26 (1976) ....................................................................................................... 8

*Skelly Oil Co. v. Phillips Petroleum Co.*,
　339 U.S. 667 (1950) .................................................................................................... 44

*State Farm Fire & Cas. Co. v. Tashire*,
　386 U.S. 523 (1967) .................................................................................................... 43

*Steel Co. v. Citizens for a Better Env't*,
　523 U.S. 83 (1998) ...................................................................................................... 20

*Stone v. Holder*,
　859 F. Supp. 2d 48 (D.D.C. 2012) ........................................................................... 10

*Susan B. Anthony List v. Driehaus*,
　573 U.S. 149 (2014) .................................................................................................... 12

*Swan v. Clinton*,
　100 F.3d 973 (D.C. Cir. 1996) ................................................................................... 9

*U.S. Ecology, Inc. v. U.S. Dep't of Interior*,
　231 F.3d 20 (D.C. Cir. 2000) ..................................................................................... 7

*\*U.S. House of Representatives v. Mnuchin*,
　379 F. Supp. 3d 8 (D.D.C. 2019) ..................................................................... *passim*

*U.S. Parole Comm'n v. Geraghty*,
　445 U.S. 388 (1980) .................................................................................................... 26

*United States v. AT&T*,
　551 F.2d 384 (D.C. Cir. 1976) ................................................................................. 20

*United States v. Barry Fischer Law Firm, LLC*,
　No. 10 Civ. 7997 (TPG), 2011 WL 31545 (S.D.N.Y. Jan. 5, 2011) ....................... 43

*United States v. Johnson*,
　383 U.S. 169 (1966) .................................................................................................... 39

*United States v. Mitchell*,
　463 U.S. 206 (1983) .................................................................................................... 10

*United States v. Nixon,*
  418 U.S. 683 (1974)............................................................................... 27, 29, 30, 34

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,*
  454 U.S. 464 (1982)......................................................................................... 11

*Vanderlinden v. Metro. Life Ins. Co.,*
  137 F. Supp. 2d 1160 (D. Neb. 2001)............................................................... 43

*Viewhaven, Inc. v. Danon,*
  No. 85 Civ. 9603 (LLS), 1986 WL 6779 (S.D.N.Y. June 12, 1986)....................... 42

*Walker v. Cheney,*
  230 F. Supp. 2d 51 (D.D.C. 2002)............................................................... 18, 19

*Walton v. Fed. Bureau of Prisons,*
  533 F. Supp. 2d 107 (D.D.C. 2008)................................................................. 10

*Water & Sewer Auth.,*
  310 F.3d 197 (D.C. Cir. 2002)...................................................................... 5, 44

*Watkins v. United States,*
  354 U.S. 178 (1957)...................................................................................... 18

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990)......................................................................... 4, 12, 14

*Zaidan v. Trump,*
  317 F. Supp. 3d 8 (D.D.C. 2018)..................................................................... 10

*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017).................................................................................. 25

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 6.................................................................................... 35

U.S. Const. art. II, § 3 .................................................................................. 31

U.S. Const. art. II, § 4 .................................................................................. 31

## STATUTES AND LEGISLATIVE MATERIALS

2 U.S.C. § 192 ........................................................................................................... 3, 13, 22

2 U.S.C. § 194 ................................................................................................................... 13

2 U.S.C. § 288d ................................................................................................................. 24

28 U.S.C. § 1331 ....................................................................................................... *passim*

28 U.S.C. § 1335 ............................................................................................................... 42

*28 U.S.C. § 1365 ............................................................................................... 21, 22, 23, 24

*28 U.S.C. § 2201 ...................................................................................................... 5, 10, 44

28 U.S.C. § 2202 ............................................................................................................... 10

Pub. L. No. 93-190, 87 Stat. 736 (Dec. 18, 1973) ......................................................... 21

Pub. L. No. 94-574, 90 Stat. 2721 (Oct. 21, 1976) ......................................................... 21

Pub. L. No. 96-486, 94 Stat. 2369 (Dec. 1, 1980) .......................................................... 21

*Pub. L. No. 104-292, 110 Stat. 3459 (Oct. 11, 1996) ..................................................... 21

H.R. Rep. No. 94-1656 (1976) ......................................................................................... 22

H.R. Rep. No. 95-1756 (1978) ......................................................................................... 23

S. Rep. No. 95-170 (1977) ............................................................................................... 22

## RULES

Fed. R. Civ. P. 12 .......................................................................................................... 7, 42

Fed. R. Civ. P. 22 ............................................................................................... 4, 41, 42, 43

Fed. R. Civ. P. 56 ............................................................................................................... 7

## EXECUTIVE MATERIALS

*Testimonial Immunity Before Congress of the Former Counsel to the President*,
   https://www.justice.gov/olc/opinion/file/1215066/download ............................................ *passim*

*Immunity of the Assistant to the President and Dir. of the Office of Political Strategy &
  Outreach from Cong. Subpoena,
  38 Op. O.L.C. ___ (July 15, 2014) ................................................................... passim

*Whether the Department of Justice May Prosecute White House Officials for Contempt of
  Congress,
  32 Op. O.L.C. 65 (2008) ................................................................................ 13, 14

Assertion of Exec. Privilege with Respect to Clemency Decision,
  23 Op. O.L.C. 1 (1999) ......................................................................................... 31

Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges,
  19 Op. O.L.C. 350 (1995) .............................................................................. 13, 14

Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a
  Claim of Executive Privilege,
  8 Op. O.L.C. 101 (1984) .......................................................................... 13, 14, 15

Exec. Order No. 8248, 4 Fed. Reg. 3864 (Sept. 12, 1939) ......................................... 32

## OTHER AUTHORITIES

Charles Alan Wright & Arthur R. Miller,
  Fed. Prac. & Proc. Civ. § 1714 (3d ed. 2018) ......................................................... 42

Cong. Research Serv., Cong.'s Contempt Power and the Enforcement of Cong. Subpoenas
  (2017), https://fas.org/sgp/crs/misc/RL34097.pdf ................................................. 15

Cong. Research Serv., Cong.'s Contempt Power and the Enforcement of Cong. Subpoenas
  (2012), https://crsreports.congress.gov/product/pdf/RL/RL34097 ......................... 24

Harold C. Relyea,
  The Executive Office of the President: A Historical, Biographical, and Bibliographical Guide
  6 (Harold C. Relyea, ed. 1997) ............................................................................. 32

John R. Steelman & H. Dewayne Kreager, The Exec. Office as Admin. Coordinator,
  21 L. & Contemp. Probs. 688 (1956) .................................................................... 32

Wright & Miller, Fed. Prac. & Proc. Civ. § 1705 ...................................................... 44

**INTRODUCTION**

Dr. Charles Kupperman seeks an opinion from this Court on whether the President's senior-most advisors share the President's absolute immunity from testimonial compulsion by Congress. Although the answer to that critical question is undoubtedly "yes," Dr. Kupperman has no business asking this Court to answer it.

To start, this *sui generis* action—an attempt to leverage an inter-branch dispute into an interpleader action—rests on a false premise: Although Dr. Kupperman claims that he needs this Court's guidance as to whether he should comply with the House's attempt to subpoena his testimony, he already knows the answer. He should follow the directive of his former employer (the President) to not testify pursuant to the President's invocation of Dr. Kupperman's absolute immunity from testimonial compulsion. Just as the President controls the exercise of executive privilege for information that Dr. Kupperman possesses, he was also the decision-maker on whether the immunity would be invoked. And now that the President has made the decision to invoke the immunity and directed Dr. Kupperman accordingly, the proper course is to abide by that direction rather than ask this Court what he is supposed to do.

In any event, Dr. Kupperman needs no confirmation from this Court that his decision was appropriate. Never before in our Nation's history has a senior White House official testified before Congress pursuant to judicial compulsion. That is no accident. Leaving the President's senior-most aides open to compelled congressional testimony would allow Congress to encroach upon the independence and autonomy of the Presidency by publicly interrogating the President's closest advisors to reveal the President's thinking or influence his decision-making on sensitive or controversial matters. Just as Congress could not circumvent a constitutional bar on compelling Article III judges to testify by subpoenaing their law clerks to testify about their work on cases, it

cannot circumvent the President's immunity by summoning his closest aides to testify about their official duties.

In addition, permitting such compulsion at the whim of congressional committees poses a grave threat to the President's ability to keep his internal deliberations confidential. As one of the White House's top national security aides, Dr. Kupperman worked closely with the President on matters of foreign affairs—an area "so sensitive as to require a total shield" from inquiry. *Harlow v. Fitzgerald*, 457 U.S. 800, 813 (1982) (civil suits). Subjecting Dr. Kupperman to congressional interrogation would similarly pose an unacceptable risk of inadvertent disclosure of privileged information in that sphere. He thus properly adhered to the President's directive not to testify.

Setting this fundamental issue aside, Dr. Kupperman has not established any basis for federal jurisdiction over his claims. To start, he has sued the President (along with various congressional actors) and this Court lacks jurisdiction to issue declaratory relief against the President. Nor has Dr. Kupperman identified any waiver of sovereign immunity that allows him to proceed against the United States by suing the President in his official capacity. His Complaint against the President should therefore be dismissed.

Beyond that, it is clear that Dr. Kupperman does not have standing to pursue his claims. "Article III's standing requirements are 'built on separation-of-powers principles' and serve 'to prevent the judicial process from being used to usurp the power of the political branches.'" *U.S. House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8, 12 (D.D.C. 2019) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)), *appeal pending*, No. 19-05176 (D.C. Cir.). They are thus especially important in this case, where Dr. Kupperman has sought to raise important constitutional questions about the allocation of powers between the political branches. And yet Dr. Kupperman has established no cognizable injury. He suffers no current injury because, among other reasons, he does not allege any independent interest in providing (or not providing)

testimony, and indeed disclaims any personal stake in how this Court resolves the merits.  However sincerely held, Dr. Kupperman's concern about "inflict[ing] grave Constitutional injury on either the House or the President[,]" Compl. ¶ 2, is not the sort of concrete injury that can support an Article III case or controversy.

Nor is there any prospect of Dr. Kupperman being injured in the future.  The date the House asked him to testify has come and gone, no consequences have befallen him, and indeed the House has now withdrawn his subpoena.  Dr. Kupperman claims to fear "potential criminal liability for contempt of Congress."  *Id.* (citing 2 U.S.C. § 192).  But he faces no "potential criminal liability" regardless of how the House proceeds because his failure to appear could not ever constitute a crime.  The Office of Legal Counsel ("OLC") has repeatedly concluded—formally and on behalf of the entire Executive Branch—that an official "may not constitutionally be penalized, civilly or criminally, for following" a Presidential directive not to appear based on the official's absolute immunity from compelled congressional testimony.  *Testimonial Immunity Before Congress of the Former Counsel to the President*, Slip Op. at 19, https://www.justice.gov/olc/opinion/file/1215 066/download.  Dr. Kupperman's failure to comply with the House's subpoena could thus never give rise to the "criminal liability" he fears.  And even if some future Attorney General sought to disavow the Executive Branch's formal view and attempt to prosecute Dr. Kupperman, the Constitution would prohibit any such effort.  *See, e.g., Cox v. Louisiana*, 379 U.S. 559 (1965).  It would violate due process to prosecute a current or former Executive Branch official for contempt of Congress based on conduct undertaken pursuant to the President's directive and in reliance on the Executive Branch's formal assurances that such conduct is not illegal.  In other words, as a matter of law, following the President's directive to not comply with a House subpoena on the basis of an OLC opinion could never be prosecuted as a violation of 2 U.S.C. § 192.

Nor are there any other plausible future consequences, much less ones that are "certainly impending," as Article III requires.  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (citation omitted).  There is no serious chance that the House will use whatever "inherent contempt" powers it might possess against Dr. Kupperman.  The House has not deployed "inherent contempt" in nearly a century and any effort to revive that authority against Dr. Kupperman for his failure to appear would be barred by the same considerations that preclude applying the contempt statute against an assertion of immunity.  Nor is it plausible the House would take that extreme step, having (among other things) disclaimed any intent to reissue Dr. Kupperman's subpoena, much less make him its first target for inherent contempt since the Great Depression.  Any effort by the House to judicially enforce its subpoena against Dr. Kupperman is also implausible, given its rescission of his subpoena.  Allowing this suit to proceed would also just trade the remote possibility of an extremely unlikely suit in the future for the certainty of a suit now, which hardly redresses any Article III injury Dr. Kupperman might have.  But even putting this aside, and even if the House reversed course and sued Dr. Kupperman, such a suit by the House would not be justiciable for a host of reasons detailed below.  The possibility of a nonjusticiable future lawsuit cannot support jurisdiction here, either.  In any event, none of these hypothetical possibilities— involving future actions *Congress* could theoretically take—supports allowing this lawsuit to proceed against the *President*.

Finally, in addition to the absence of jurisdiction over this suit, Dr. Kupperman does not have a cause of action.  Federal Rule of Civil Procedure 22 (pertaining to interpleader) does not create a cause of action because (1) Dr. Kupperman's request for an advisory legal opinion about his obligations far exceeds the nature of an interpleader suit, which is to resolve competing claims for the same money or property, and (2) even if he could overcome that defect, he fails to demonstrate that the conflict he faces is real or substantial.  "Interpleader requires real claims, or

4

at least the threat of real claims—not theoretical, polemical, speculative, or I'm-afraid-it-might-happen-someday claims." *Estate of Heiser v. Islamic Republic of Iran*, 807 F. Supp. 2d 9, 24 (D.D.C. 2011) (citation omitted). That is not the situation here. Dr. Kupperman also cannot rely on the Declaratory Judgment Act, 28 U.S.C. § 2201, Compl. ¶ 49, because the Declaratory Judgment Act does not *itself* "provide a cause of action[,]" *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011). The Declaratory Judgment Act provides additional remedies for cases that can *already* be litigated in federal court; it does not furnish a vehicle for bringing cases that could not otherwise be heard. As the D.C. Circuit has explained, "the availability of relief" under the Declaratory Judgment Act "presupposes the existence of a judicially remediable right." *C & E Servs., Inc. of Wash. v. D.C.  Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) (citation omitted). No such right exists here, and the Act is thus not available.

For all these reasons, the Court should dismiss Dr. Kupperman's Complaint or, in the alternative, grant the President summary judgment. The President's authority to invoke immunity over Dr. Kupperman's testimony is clear and his directive that Dr. Kupperman not testify was lawful and appropriate. Dr. Kupperman has no basis for inviting this Court to disturb it.

## BACKGROUND

Dr. Kupperman served as Deputy National Security Advisor to President Trump from January 9 to September 20, 2019 (and as Acting National Security Advisor from September 10 through 20, 2019). Compl. ¶ 13. In that capacity, Dr. Kupperman held the title of Assistant to the President, designating him as one of the President's most senior aides. He met with the President several times per week to provide counsel and advice on a wide range of foreign policy and national security matters and also attended the President's daily intelligence briefing and participated in meetings of the National Security Council during the frequent periods when the

National Security Advisor was traveling.  *Id.*; *see also* Defendant President Donald J. Trump's Statement of Material Facts Not in Dispute ¶¶ 11-13 ("Def. SOMF").

On Friday, October 25, 2019, the House Permanent Select Committee on Intelligence ("HPSCI") issued a subpoena to Dr. Kupperman directing him to appear before HSPCI the following Monday, October 28, 2019, to testify as "part of the House's impeachment inquiry" into matters relating to foreign policy with Ukraine.  Compl. Ex. A at 1.  Because HPSCI's inquiry was focused on presidential communications, internal Executive Branch deliberations, and diplomatic communications pertaining to U.S. foreign relations with Ukraine, Dr. Kupperman, through his attorney, sent a copy of the subpoena to the Counsel to the President, Pat Cipollone, requesting that Mr. Cipollone notify him of the President's position concerning the subpoena.  Compl. ¶ 17. Mr. Cipollone, on behalf of the President, promptly sought the advice of the Department of Justice's OLC, which issued a letter opinion stating its longstanding view that "Congress may not constitutionally compel the President's senior advisers to testify about their official duties."  *Id.* Ex. B at 3.  OLC concluded that Dr. Kupperman qualified as such an advisor and was thus absolutely immune from compelled testimony before Congress regarding his official duties.  *Id.* at 3-5.  Accordingly, on October 25, Mr. Cipollone informed Dr. Kupperman, through counsel, that the President had invoked absolute immunity and directed Dr. Kupperman "not to appear at the Committee's scheduled hearing on Monday, October 28, 2019."  *Id.* at 2.

Dr. Kupperman filed this lawsuit later that day.  His Complaint names as defendants the House of Representatives, House Speaker Nancy Pelosi, HPSCI Chairman Adam Schiff, Chairman of the House Committee on Foreign Affairs Eliot Engel, and Acting Chair of the House Committee on Oversight and Reform Carolyn Maloney (the "House defendants"), and the President.  The Complaint asserts a single claim "in the nature of interpleader" seeking a declaratory judgment as

to whether Dr. Kupperman is required to comply with the subpoena in light of the conflicting directions from the President and HPSCI.  *See generally* Compl.

On October 31, 2019, the Court held a status conference and entered an expedited briefing schedule.  *See* Minute Entry dated Oct. 31, 2019.  On November 4, 2019, the Court modified the scheduling order to clarify that defendants' briefing "should raise all arguments—including both arguments relating to the justiciability of plaintiff's claims and arguments relating to the merits of plaintiff's claims—that they contend provide a basis for resolving plaintiff's claims as a matter of law."  ECF No. 19.  On November 5 and 6, 2019, respectively, HSPCI withdrew its subpoena to Dr. Kupperman and moved to vacate the briefing schedule.  ECF No. 22.  The Court denied that request during a telephonic status conference held on November 6, 2019.  In addition to withdrawing the subpoena, HPSCI, in a recent filing, has flatly stated that "given the status of the House's impeachment inquiry, the House defendants have determined that they will not reissue a subpoena to Kupperman."  ECF No. 29 at 1.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a plaintiff seeking to invoke the jurisdiction of a federal court bears the burden of establishing that the court has jurisdiction to hear its claims.  *See U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000). Under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Under Federal Rule of Civil Procedure 56, a court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The question whether the Constitution grants the Executive or

Legislative Branches "the power to act in a certain way is a pure question of law." *Ctr. for Biological Diversity v. McAleenan*, 2019 WL 4228362, at *8 (D.D.C. Sept. 4, 2019).

## ARGUMENT

## I.   THE COURT LACKS JURISDICTION TO ADJUDICATE THIS CASE.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (*quoting Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 37 (1976)). This novel lawsuit suffers from several fundamental jurisdictional defects. Foremost, Dr. Kupperman has attempted to sue the President (the only named Executive Branch defendant) directly. That effort is barred by the President's absolute immunity from civil litigation related to his official responsibilities and by sovereign immunity more generally. And even setting aside that threshold defect, Dr. Kupperman's Complaint would still not present a cognizable Article III case or controversy because Dr. Kupperman would still not have standing to bring his claims, and his claims would still be moot. The Court should thus dismiss his Complaint.

### A.   Dr. Kupperman's Claims Are Barred by Presidential and Sovereign Immunity.

Absolute immunity precludes Dr. Kupperman's attempt to bring this interpleader action against the President. That is true both because the President is generally immune from civil lawsuits relating to his official responsibilities and because the United States has not waived its sovereign immunity under the circumstances presented here.

*First*, courts lack jurisdiction to enter declaratory relief against the President. The Supreme Court has long held that courts may not issue injunctive relief against the President. *See Mississippi v. Johnson*, 71 U.S. (4 Wall) 475, 501 (1866) (courts lack jurisdiction "to enjoin the President in the performance of his official duties"); *see also Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992). The D.C. Circuit has extended that principle to declaratory judgments. *Newdow*

*v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (plaintiff failed to show redressability where the "only apparent avenue of redress for plaintiffs' claimed injuries would be injunctive or declaratory relief against . . . the President himself" and "courts . . . have never submitted the President to declaratory relief"); *Swan v. Clinton*, 100 F.3d 973, 976 n.1 & 977 (D.C. Cir. 1996) (holding that while the discussion in *Franklin* was "couched in terms of [the court's] ability to grant injunctive relief against the President, similar considerations regarding a court's power to issue relief against the President himself apply to [the plaintiffs'] request for a declaratory judgment").

Several courts in this district have thus concluded that the President cannot be sued for declaratory relief. *See, e.g.*, *Lovitky v. Trump*, 2019 WL 3068344, at *10 (D.D.C. July 12, 2019) ("[T]he Court takes Supreme Court and recent Circuit decisions as supplying enough direction: This Court should not grant mandamus, injunctive, or declaratory relief against a sitting President to require performance of a ministerial duty."); *Newdow v. Bush*, 391 F. Supp. 2d 95, 106-07 (D.D.C. 2005) (to hold that a court could enter declaratory or injunctive relief against the President "would be to render meaningless the words of the Supreme Court and the D.C. Circuit that injunctions and declaratory judgments may not be issued against the President").[1]  This Court should do the same.  At the very least, in light of the serious separation-of-powers concerns associated with such relief—and consistent with constitutional avoidance principles—Congress must expressly authorize suit against the President before a court may consider entertaining such a claim.  *Cf. Franklin*, 505 U.S. at 800-01 ("Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA.  We would require an express statement by Congress

---

[1]  Once, forty-five years ago, the D.C. Circuit issued a declaratory judgment against a sitting President, *see Nat'l Treas. Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974), but that decision predates both *Franklin* and *Swan*.  Recent Circuit precedent makes clear that "[a] court— whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions." *Newdow*, 603 F.3d at 1012.

before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion."); *Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982) (holding "that the President is absolutely immune from civil damages liability for his official acts in the absence of explicit affirmative action by Congress").

*Second*, Dr. Kupperman fails to identify any waiver of sovereign immunity that would permit this suit. "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Yet Plaintiff has pointed to no waiver of sovereign immunity. The federal-question statute, 28 U.S.C. § 1331, does not waive the United States' sovereign immunity, *see Stone v. Holder*, 859 F. Supp. 2d 48, 51 (D.D.C. 2012), nor does the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, *see, e.g.*, *Walton v. Fed. Bureau of Prisons*, 533 F. Supp. 2d 107, 114 (D.D.C. 2008). And because the President is not an "agency," *see Franklin*, 505 U.S. at 800-01, the Administrative Procedure Act's waiver of sovereign immunity (which Dr. Kupperman has not even invoked) is not available, either. *See, e.g.*, *Zaidan v. Trump*, 317 F. Supp. 3d 8, 22 (D.D.C. 2018); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 41 (D.D.C. 2010).[2]

### B.      Dr. Kupperman Lacks Standing.

Immunity issues aside, Article III requires that Dr. Kupperman "establish that [he] ha[s] standing to sue." *Raines*, 521 U.S. at 818. "Article III's standing requirements are 'built on separation-of-powers principles' and serve 'to prevent the judicial process from being used to usurp the power of the political branches.'" *U.S. House of Representatives*, 379 F. Supp. 3d at 12

---

[2]  Though Dr. Kupperman does not assert it, it is likewise clear that the Supreme Court's *Larson-Dugan* exception to sovereign immunity—which applies in certain circumstances where an officer is acting unconstitutionally or pursuant to an unconstitutional grant of power—does not apply here. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949); *Dugan v. Rank*, 372 U.S. 609 (1963). Even assuming that this doctrine could ever be available against the President, Dr. Kupperman makes no argument that the President is engaged in an ongoing violation of federal law or that Dr. Kupperman is seeking to cease such an alleged violation.

(quoting *Amnesty Int'l*, 568 U.S. at 408).   Rigorous adherence to these requirements is thus particularly essential in a case like this, where Dr. Kupperman is attempting to hale the two political branches into court against the will of both.   Dr. Kupperman must allege a "*personal injury*" that is "legally and judicially cognizable," and the dispute must be one "traditionally thought to be capable of resolution through the judicial process."   *Raines*, 521 U.S. at 818-19 (internal quotation marks and citation omitted).

Dr. Kupperman has not established standing.   Dr. Kupperman's Complaint does not suggest that he has any independent interest in providing (or not providing) testimony, and he disclaims any interest in how this Court resolves the merits.   In his words:  "Plaintiff takes no position on whether the command of the Legislative Branch or the command of the Executive Branch should prevail."   Compl. ¶ 49.   Indeed, Dr. Kupperman has made clear that he does not even intend to *brief* the merits.   ECF No. 20 ¶ 3.   And although Dr. Kupperman expresses concern about the implications of this matter for the separation of powers between Congress and the Executive Branch, *see* Compl. ¶ 2 ("Absent a definitive judgment from the Judicial Branch, . . . [Plaintiff] will inflict grave Constitutional injury on either the House or the President."), those abstract concerns do not themselves supply the sort of personal injury that Article III requires.  *See, e.g.*, *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 479 (1982) (federal court is not "a forum in which to air [a litigant's] generalized grievances about the conduct of government or the allocation of power in the Federal System").

To be sure, in true interpleader actions, the plaintiff likewise may not have any interest in which defendant receives the property at issue.   But in such cases, the plaintiff's Article III interest is in avoiding the prospect of multiple liability in suits brought by the defendants claiming a right to money or property.   *See Hunter v. Federal Life Ins. Co.*, 111 F.2d 551, 555 (8th Cir. 1940). Here, by contrast, Dr. Kupperman has no reason to fear any suit by any of the defendants in this

case.  The date by which the subpoena purported to require Dr. Kupperman's testimony has come and gone, with the House having neither rescheduled the hearing nor indicated any intent to do so, especially now that it has withdrawn the subpoena and represented that it will not reissue it.

Accordingly, Dr. Kupperman is suffering from no current injury.  OLC's legal conclusion that Dr. Kupperman is absolutely immune from compelled congressional testimony both forecloses future criminal prosecution and negates any hypothetical criminal liability based on his failure to appear in the first place.  *See* pp. 13-14, *infra*.  He thus does not face any conflicting legal obligation arising out of the House's issuance of the subpoena to him, even in the abstract (and even putting aside that the subpoena has now been withdrawn).

As a result, the only way that Dr. Kupperman could even conceivably establish injury would be to rely on the risk of *future* enforcement.  But a plaintiff relying on future injury must show more than a "possible future injury"; he must show that harm is "certainly impending." *Whitmore*, 495 U.S. at 158.  Neither conjectural future injuries nor alleged fear of such injuries is sufficient.  *See Amnesty Int'l*, 568 U.S. at 409; *City of L.A. v. Lyons*, 461 U.S. 95, 107 n.8 (1983).

Dr. Kupperman cannot establish any "certainly impending" future injury.  Foremost, there is no threat—much less a credible threat—that Dr. Kupperman will someday be prosecuted by the Executive Branch for failing to appear in response to the subpoena.  Nor does he face any credible threat of enforcement action by the House.  Indeed, the House almost certainly could not resort to any enforcement process without, at the very least, reinstating the subpoena to Dr. Kupperman first.  And if Dr. Kupperman's only possible injury were potential future enforcement activities initiated by the *House*, that would not be a basis for suing the *Executive*.

But even putting these threshold defects aside, no such credible threat exists.[3]

---

[3] Although we address the absence of a credible threat in terms of Dr. Kupperman's standing, the result would be the same if the issue were analyzed under ripeness principles.  *See, e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007) (explaining that, in that case in

**1.     Dr. Kupperman Faces No Credible Threat of Prosecution by the Executive Branch.**

The only potential future enforcement action the Complaint references is "potential criminal liability for contempt of Congress." Compl. ¶ 2 (citing 2 U.S.C. § 192). Even if the House were pursuing such a course against Dr. Kupperman—which it plainly is not, having withdrawn the relevant subpoena—the House cannot prosecute such a contempt on its own. Instead, once it has authorized enforcement of a particular subpoena, it must certify the matter for prosecution by the appropriate United States Attorney as a contempt of Congress, 2 U.S.C. § 194, at which point it is up to the Executive Branch to determine whether and how to proceed.

In light of OLC's conclusion that Dr. Kupperman is absolutely immune from compelled congressional testimony and that the subpoena issued to him is therefore void, the Executive Branch will not—indeed, cannot—prosecute Dr. Kupperman for his failure to appear. OLC has repeatedly and unambiguously concluded that "[t]he prosecution of a senior presidential adviser who has lawfully invoked her constitutional immunity from compelled congressional testimony would . . . be inconsistent with the Constitution." *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 69 (2008); *see also Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350, 356 (1995) (stating that "the criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege"); *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 101-102 (1984) (finding that "the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official" who followed presidential instructions to "assert[] the President's claim of executive privilege").

---

which injury was alleged based on possible future enforcement, "standing and ripeness boil down to the same question"); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014) (same).

These OLC opinions are not mere statements of enforcement discretion.   Rather, they represent the formal, longstanding view of the Executive Branch that reliance on an assertion of privilege negates any criminal liability that could otherwise attach in this context.  Put simply, Dr. Kupperman's conduct was not criminal and could never be prosecuted by the Department of Justice even if a future Attorney General for some reason sought to prosecute him.  As Assistant Attorney General Olson explained during the Reagan Administration, "the Constitution does not permit Congress to make it a crime for an official to assist the President in asserting a constitutional privilege that is an integral part of the President's responsibilities under the Constitution." *Prosecution for Contempt*, 8 Op. O.L.C. at 140; *see also Application of 28 U.S.C. § 458*, 19 Op. O.L.C. at 356 (same, per Assistant Attorney General Dellinger during the Clinton Administration). The same principles apply to an official who does not appear based on an Executive Branch directive that the official is absolutely immune from compelled congressional testimony.  *See, e.g.*, *Testimonial Immunity Before Congress of the Former Counsel to the President*, Slip Op. at 19; *Whether the Dep't of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. at 67.

Moreover, even if that insuperable obstacle to any hypothetical prosecution did not exist, Dr. Kupperman would *still* face no realistic prospect of criminal liability.  The Constitution would forbid any effort to prosecute Dr. Kupperman's failure to testify following a directive from the President to not appear backed by an OLC opinion finding that Dr. Kupperman was absolutely immune from appearing.  Prosecuting a current or former Executive Branch official in those circumstances would violate due process.  *See, e.g.*, *Cox*, 379 U.S. 559.  Dr. Kupperman thus could not be prosecuted for the conduct at issue as a matter of law.

For all of these reasons, Dr. Kupperman does not face any threat whatsoever of criminal prosecution.  The non-existent prospect of such a prosecution imposes no future injury, much less

a "certainly impending" one.  *Whitmore*, 495 U.S. at 158.   It thus cannot supply the basis for standing that Dr. Kupperman requires to bring this action.

### 2.      Dr. Kupperman Faces No Credible Threat of Inherent Contempt.

Nor is there any credible threat that Dr. Kupperman will be subjected to inherent contempt proceedings arising out of his failure to appear in response to the subpoena—an issue Dr. Kupperman does not raise.

As explained by the Congressional Research Service, "[u]nder the inherent contempt power the individual is brought before the House or Senate by the Sergeant-at-Arms, tried at the bar of the body, and can be imprisoned or detained in the Capitol or perhaps elsewhere."  Cong. Research Serv., *Cong.'s Contempt Power and the Enforcement of Cong. Subpoenas* 10 (2017), https://fas.org/sgp/crs/misc/RL34097.pdf.  There is no inherent contempt power expressly granted to Congress, however, by the Constitution.   And while the Supreme Court has recognized the inherent contempt power based on history and tradition, there is virtually no such history or tradition of using that power against *executive* officials as opposed to private parties.  In any event, neither chamber of Congress has even attempted to use this asserted power in nearly a century against anyone, *see Cong.'s Contempt Power* at 12 (last used in 1935), and the House has nowhere suggested reviving it here.[4]  It is thus exceedingly safe to assume that this "long dormant," *id.* at 1, process will not be revived against Dr. Kupperman for the first time since before World War II.

---

[4] OLC has consistently concluded that the same considerations barring application of the contempt statute against an assertion of executive privilege foreclose resort to any inherent contempt powers as well.  *See, e.g.*, *Testimonial Immunity Before Congress*, Slip Op. at 20-21 (concluding that "[w]e similarly believe that Congress could not lawfully exercise any inherent contempt authority against Mr. McGahn for asserting immunity," because such an exercise would impermissibly burden the President's ability to assert the privilege and carry out his functions); *Prosecution for Contempt*, 8 Op. O.L.C. at 140 n.42 (similar).  Given the considerations above, however, the Court need not rely on OLC's views on this subject to conclude that Dr. Kupperman faces no credible threat of inherent contempt.

### 3. Dr. Kupperman Faces No Credible Threat of a Justiciable Civil Enforcement Suit by the House.

That leaves only the hypothetical possibility of a civil enforcement suit by the House. Such a suit is not a basis for a standing here for at least two reasons.

*First*, this suit would not actually redress any injury stemming from a hypothetical suit later brought by Congress. Quite the contrary: if allowed to proceed with this lawsuit, Dr. Kupperman is simply trading a highly unlikely (at best) suit in the future for a certain suit now. If anything, this *creates* rather than *redresses* Article III injury.

*Second*, there appears to be no credible threat that the House would even attempt such a suit. While the House has filed suit against the former White House Counsel—a suit that is not justiciable for the reasons detailed below—it did not hold Dr. Kupperman in contempt of Congress or threaten to do so, the date and time for Dr. Kupperman's deposition has passed, and the subpoena has now been withdrawn. *See* p. 7, *supra*. The House may not seek to enforce a withdrawn subpoena, judicially or otherwise. Moreover, the House has stated that it does not intend to resort to litigation to try to compel testimony as part of its "impeachment inquiry"— instead relying on a political and public-relations strategy of characterizing failures to appear "as a basis for drawing an adverse inference against the President." ECF No. 22-1 at 2. The Executive Branch will not attempt to characterize the House's future intentions, but, as a matter of law, the House's conduct simply does not support the sort of credible threat of future enforcement that could supply standing.

*Third*, and more fundamentally, Plaintiff's standing cannot be premised on a hypothetical future civil suit that federal courts would lack jurisdiction to entertain. The House could not invoke federal jurisdiction to sue Dr. Kupperman as a matter of both Article III and statutory subject-matter jurisdiction, and it would further lack a cause of action for such a suit. Because the House

would not have authority to maintain a future civil subpoena enforcement suit against Dr. Kupperman, that hypothetical suit cannot support Dr. Kupperman's standing to bring this one.

**a)**      **The House Could Not Enforce a Subpoena to Dr. Kupperman Under Article III.**

At the outset, a subpoena-enforcement suit brought by the House would not present a case or controversy under Article III.  "Article III's standing requirements are 'built on separation-of-powers principles' and serve 'to prevent the judicial process from being used to usurp the power of the political branches.'"  *Amnesty Int'l*, 568 U.S. at 408.  To have standing, a plaintiff must allege a "*personal injury*" that is "legally and judicially cognizable," and the dispute must be one "traditionally thought to be capable of resolution through the judicial process."  *Raines*, 521 U.S. at 818-19.  Any hypothetical subpoena-enforcement suit would not be a suit to vindicate a "private right" (like a Representative's lost wages) "to which [the House] *personally* [is] entitled."  *Id.* at 812, 821.  Instead, such a suit would seek to vindicate solely an asserted "institutional injury" to the House as a whole at the hands of the Executive Branch.  *Id.*; *accord id.* at 829.

*Raines* underscores the importance of historical practice in determining whether a dispute is capable of judicial resolution.  In *Raines*, six Members of Congress brought suit seeking to declare the Line Item Veto Act unconstitutional.  521 U.S. at 814-16. The Court held that the legislators lacked a judicially cognizable injury.  *Id.* at 818, 829-30.  Critical to its analysis was the absence of any "historical practice" supporting adjudication of such a suit.  *Id.* at 826.  "It is evident from several episodes in our history," the Court observed, "that in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power."  *Id.*

With respect to litigation concerning Congress's access to information held by the Executive Branch, the history is clear:  for two hundred years after the Founding, such suits simply did not exist, even though disputes between the Legislative and Executive Branches over

17

congressional requests for information have arisen since the beginning of the Republic.  These disputes date at least as far back as President Washington's 1792 refusal to provide the House certain records relating to a failed military expedition, *see Nixon v. Sirica*, 487 F.2d 700, 733-34 (D.C. Cir. 1973) (MacKinnon, J., concurring and dissenting in part), and they include a number of disputes concerning Congress's attempts to obtain testimony from close Presidential advisors.  But while these disputes are commonplace in our history, for nearly two hundred years Congress never sought to invoke the power of the Judiciary to decide which side should prevail.  "In the end, given that the Article I and Article II Branches have been involved in disputes over documents for more than two hundred years, what is most striking about the historical record is the paucity of evidence that the instant lawsuit is 'of the sort traditionally amenable to, and resolved by, the judicial process.'"  *Walker v. Cheney*, 230 F. Supp. 2d 51, 73-74 (D.D.C. 2002) (citation omitted).

This history also reflects that any asserted "injury" flowing from refusal to testify in response to a subpoena is not "legally and judicially cognizable" under Article III.  Congress has no cognizable institutional interest in obtaining information for its own sake.  Though an "implied" power "to secure needed information" is an "attribute of [Congress's] power to legislate," *McGrain v. Daugherty*, 273 U.S. 135, 161, 175 (1927), the power is an "auxiliary" one that exists only as "necessary and appropriate to make [Congress's] express powers effective," *id.* at 173. "[T]here is no congressional power to expose for the sake of exposure," *Watkins v. United States*, 354 U.S. 178, 200 (1957).  "No [congressional] inquiry is an end in itself."  *Id.* at 187.  To establish standing in a subpoena-enforcement suit, the House would need to rely on an injury to one or more of its express legislative functions.  But as the Supreme Court held in *Raines*, "abstract dilution of institutional legislative power" is insufficiently "concrete and particularized" to sustain standing. 521 U.S. at 819, 821, 825-26.[5]

---

[5] Any assertion of injury in a subpoena-enforcement suit would be even more attenuated than the assertion rejected in *Raines*.  The House could not claim in such a suit that the effectiveness of

Subpoena-enforcement suits against Executive Branch officials, moreover, threaten the separation of powers and its system of checks and balances that has served the Nation well for 230 years.  The Supreme Court made clear in *Raines* that our constitutional system contemplates a "restricted role for Article III courts," which is to protect "'the constitutional rights and liberties of individual citizens and minority groups against oppressive or discriminatory government action.'"  *Id.* at 828-29 (citation omitted).  "'It is this role, not some amorphous general supervision of the operations of government, that has maintained public esteem for the federal courts and has permitted the peaceful coexistence of the counter-majoritarian implications of judicial review and the democratic principles upon which our Federal Government in the final analysis rests.'"  *Id.* Were it otherwise, the federal courts would have long ago become "not the last but the first resort," *Barnes v. Kline*, 759 F.2d 21, 53 (D.C. Cir. 1984) (Bork, J., dissenting), *vacated sub nom. Burke v. Barnes*, 479 U.S. 361 (1987), such that "the system of checks and balances" meant to govern the relations between the political Branches would have been "replaced by a system of judicial refereeship," *Moore v. U.S. House of Representatives*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring), *abrogated on other grounds by Raines*, 521 U.S. 811.[6]

As the Supreme Court has observed, the "power to seek judicial relief . . . cannot possibly be regarded as . . . in aid of the legislative function."  *Buckley v. Valeo*, 424 U.S. 1, 138 (1976). Any other conclusion would invite Congress to use the courts—rather than its Article I tools—to

---

its Members' *votes* had been impaired, but at most could only argue that the Executive had to some unspecified degree impaired the ability of its Members to formulate sound legislative judgments. That hypothetical assertion of injury falls at least one step short of even the claimed dilution of legislative power that *Raines* rejected as insufficiently concrete.

[6] The opinions of Judge Bork in *Barnes* and then-Judge Scalia in *Moore* have been cited as early expressions, prior to *Raines*, of the "view[ ] that the role of the judiciary is properly limited to the adjudication of individual rights."  *Walker*, 230 F. Supp. 2d at 72 n.18.  Indeed, one court in this district has explained that, "[f]or all intents and purposes, the strict legislative standing analysis suggested by Justice Scalia in [*Moore*], now more closely reflects the state of the law."  *Campbell v. Clinton*, 52 F. Supp. 2d 34, 40 (D.D.C. 1999), *aff'd*, 203 F.3d 19 (D.C. Cir. 2000).

Case 1:19-cv-03224-RJL   Document 40   Filed 11/14/19   Page 33 of 58

resolve disagreements with the Executive Branch at the expense of the Constitution's carefully wrought framework. *See, e.g.*, *House of Representatives*, 379 F. Supp. 3d at 22. Moreover, if Congress could sue the Executive Branch based on a claimed loss of political power, then there is little question that the Executive Branch would be equally entitled to sue Congress. *See Raines*, 521 U.S. at 828. Yet the House has vociferously contended that allowing suits against it "at the behest of the President" would "rais[e] glaring separation of powers concerns," and is "precisely what the Framers of the Constitution wished to guard against." *Trump v. Comm. on Ways & Means*, No. 1:19-cv-2173, ECF No. 22, at 3 (D.D.C. July 30, 2019). It cannot be that the House may enlist the Judiciary in its attacks on the Executive Branch, while "glaring separation of powers concerns" forbid the Executive Branch from doing the same in return. Subpoena-enforcement suits by Congress against the Executive Branch are beyond the province of Article III. [7]

---

[7] Prior to the Supreme Court's decision in *Raines*, the D.C. Circuit occasionally suggested that Congress might have standing to seek judicial enforcement of subpoenas against the Executive Branch. In particular, in *United States v. AT&T, Inc.*, 551 F.2d 384 (D.C. Cir. 1976) ("*AT&T I*"), the Executive Branch brought suit against a private telephone company to prevent the release of national-security information subpoenaed by a House subcommittee, and the House, by resolution, designated the subcommittee chairman to intervene on behalf of the House and appeal the judgment. *Id.* at 391. The Court of Appeals opined in a single sentence, without citation, that "the House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf." *Id.* And in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc), the Court of Appeals reached the merits of a Senate committee suit against the President to compel the production of tape recordings, without addressing, much less deciding, whether the Senate committee had standing. *Id.* at 729-32. Neither case discusses the jurisdictional limits imposed by Article III, and the Supreme Court has made clear that "drive-by jurisdictional rulings of this sort . . . have no precedential effect." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998). Moreover, to the extent *AT&T I* and *Senate Select Committee* suggest that Congress has standing to sue the Executive Branch, those decisions do not survive *Raines*. But even if *AT&T I* survived *Raines*, it is distinguishable. Although the court characterized the case as a "clash of the powers of the legislative and executive branches," the suit was brought by the Executive Branch against a private entity concerning the latter's "legal duty" as the recipient of a congressional subpoena. 551 F.2d at 389. Thus, *AT&T I* involved "at most," *Raines*, 521 U.S. at 823, whether the House could appeal from a district court order invalidating its request for information in a case that was otherwise properly in court.

   **b)** **The Court Would Lack Statutory Subject-Matter Jurisdiction over a House Subpoena-Enforcement Suit Against Dr. Kupperman.**

Even if the House could seek enforcement of its subpoenas under Article III, that would not by itself furnish the House with authority to bring such a suit.  While Article III sets the Constitutional outer bounds of federal-court jurisdiction, lower federal courts may exercise only the jurisdiction that Congress confers on them by statute.  *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 366 F. Supp. 51, 55 & n.5 (D.D.C. 1973).  Regardless of what the Constitution might theoretically allow, no act of Congress confers jurisdiction to hear House subpoena-enforcement suits against Executive Branch officials.  In particular, the federal-question statute, 28 U.S.C. § 1331, does not apply to that type of extraordinary inter-Branch litigation.  Rather, Congress has elsewhere enacted other provisions purporting to provide carefully delineated subject-matter jurisdiction over certain informational disputes between Congress and the Executive Branch.  Those statutes do not encompass such House subpoena-enforcement suits.

Most notably, 28 U.S.C. § 1365 purports to create jurisdiction over certain Senate subpoena-enforcement actions, but excludes cases concerning "any subp[o]ena or order issued to an officer or employee of the executive branch of the Federal Government acting within his or her official capacity, . . . if the refusal to comply is based on . . . a governmental privilege or objection the assertion of which has been authorized by the executive branch of the Federal Government."  *See also* Pub. L. No. 93-190, 87 Stat. 736 (Dec. 18, 1973) (jurisdiction for the Senate Select Committee investigating the Watergate scandal to judicially enforce its subpoenas).  In 1996, Congress amended 28 U.S.C. § 1365 to add language providing that the statute would confer jurisdiction in cases in which an executive official's refusal to comply was based upon a *personal* privilege.  *See* Pub. L. No. 104-292, § 4, 110 Stat. 3459 (Oct. 11, 1996).

Congress enacted that amendment some twenty years *after* it had amended 28 U.S.C. § 1331 to eliminate the amount-in-controversy requirement for suits against the government and government officials, *see* Pub. L. No. 94-574, 90 Stat. 2721 (Oct. 21, 1976), and some sixteen years *after* it had amended § 1331 to remove the amount-in-controversy requirement for all federal-question cases, *see* Pub. L. No. 96-486, § 2(a), 94 Stat. 2369 (Dec. 1, 1980).   If § 1331 already conferred plenary jurisdiction for suits by Congress seeking to enforce demands for information, then § 1365 and its 1996 amendments would all be entirely superfluous.   But this provision and its amendments were not superfluous, because the specific provisions addressing federal subject-matter jurisdiction over congressional suits for information control over the general federal-question statute.   *See, e.g., Howard v. Pritzker*, 775 F.3d 430, 441 (D.C. Cir. 2015) ("[S]pecific terms prevail over the general in the same or another statute which otherwise might be controlling." (citation omitted)).   Indeed, in a 1977 Senate Report—issued the year after Congress removed the amount-in-controversy requirement from § 1331 for actions brought against the United States and its officials—Congress freely acknowledged that it still lacked general authority to enforce subpoenas via civil actions filed in district court.   *See* S. Rep. No. 95-170, at 16 (1977) ("Presently, Congress can seek to enforce a subp[o]ena only by use of criminal [contempt] proceedings [under 2 U.S.C. § 192] or by the impractical procedure of conducting its own trial before the bar of the House of Representatives or the Senate.").[8]

---

[8] That acknowledgment comes as no surprise:  the 1976 removal of an amount-in-controversy requirement was not intended to vest the courts with plenary authority to hear disputes between Congress and the Executive Branch; rather, it was meant to remove a "technical barrier[] to the consideration on the merits of *citizens'* complaints against the Federal Government," H.R. Rep. No. 94-1656, at 3 (1976) (emphasis added), which had precluded "aggrieved *private* persons" from bringing their claims, *id.* at 15 (emphasis added).   Neither of the reports accompanying the legislation suggested it dealt with congressional subpoena-enforcement actions.   Indeed, the Senate report recognized that "a future statute" might be needed to "specifically give the courts jurisdiction to hear a civil legal action brought by Congress to enforce a subp[o]ena against an executive branch official."   S. Rep. No. 95-170, at 89; *see also In re Application of the U.S. Senate Permanent Subcomm. on Investigations*, 655 F.2d 1232, 1238 (D.C. Cir. 1981) ("Prior to 1978

Legislative history, moreover, confirms that the choice to exclude House subpoena-enforcement actions from the 1978 enactment of 28 U.S.C. § 1365 was deliberate.  A previous Senate bill would have conferred jurisdiction to enforce subpoenas issued by either the Senate *or* the House.  *See* S. Rep. No. 95-170 at 91 (Senate bill creates jurisdiction "over any civil action brought on behalf of Congress, a House of Congress or a committee of Congress to enforce a subp[o]ena or order issued by that entity").  But although the Senate bill would have created jurisdiction to enforce subpoenas issued by *both* houses of Congress, the corresponding House bill did not include such a jurisdictional grant for *either* house of Congress.  In conference, the two houses compromised by agreeing that only the Senate would be given jurisdiction to enforce its subpoenas.  *See* H.R. Rep. No. 95-1756 at 80 (1978) (Conf. Rep.) ("The appropriate committees in the House also have not considered the Senate's proposal to confer jurisdiction on the courts to enforce subp[o]enas of House and Senate committees.  The Senate has twice voted to confer such jurisdiction on the courts and desires at this time to confer jurisdiction on the courts to enforce Senate subp[o]enas.").  This shows that show that Congress did not just forget to confer jurisdiction for the House—it actively chose not to.

In providing jurisdiction over some congressional subpoena-enforcement actions but not others, Congress has confirmed that a specific grant of jurisdiction is necessary before an organ of Congress can bring a subpoena-enforcement suit.  Reading the general federal-question statute to authorize House subpoena-enforcement suits would render pointless the entirety of 28 U.S.C. § 1365 and would override the precise jurisdictional limitations established therein.  That result not only cannot be squared with "the canon against interpreting any statutory provision in a manner that would render another provision superfluous," *Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010),

---

Congress had only two means of enforcing compliance with its subpoenas: a statutory criminal contempt mechanism and the inherent congressional contempt power."  (footnotes omitted)).

but would cause the general language of § 1331 to override the careful political compromise embodied in § 1365 and make a mockery of that provision's carefully drafted 1996 amendment. There is thus no source of statutory subject-matter jurisdiction for House subpoena-enforcement suits.[9]  *See In re Application of the U.S. Senate Permanent Subcomm.*, 655 F.2d at 1238 & n.28 (explaining that § 1365 is "relatively simple" and "does not . . . include civil enforcement of subpoenas by the House of Representatives"); Cong. Research Serv., Cong.'s Contempt Power and the Enforcement of Cong. Subpoenas 22-23 (2012), https://crsreports.congress.gov/product/pdf/RL/RL34097 ("Although the Senate has existing statutory authority to pursue such an action, there is no corresponding provision applicable to the House."  (footnote omitted)).[10]

**c)**      **The House Would Lack a Cause Of Action To Enforce a Subpoena.**

Even beyond the jurisdictional problems in any hypothetical subpoena-enforcement action that the House might bring, such a suit would also fail for lack of a cause of action.  "[R]ights of action to enforce federal law must be created by Congress," *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), and Congress has never enacted a cause of action that would permit the *House* to

---

[9]  The D.C. Circuit noted in *AT&T I* that jurisdiction existed under § 1331.  But the procedural posture of *AT&T I* makes it inapposite: it was a suit brought by the Executive against a private party, not a suit brought by Congress against the Executive Branch that can be heard, if at all, only under the specific jurisdictional provisions that Congress has enacted to govern such disputes. That decision was also based on an entirely different statute than exists today—§ 1331 on its own without any other provisions addressing subpoena enforcement.  Congress enacted § 1365 and its careful limitations two years later, making completely clear that the general jurisdictional grant in § 1331 does not encompass subpoena-enforcement suits.

[10]  The Executive Branch acknowledges that two post-*Raines* decisions from this Court have nevertheless held that subpoena-enforcement suits are justiciable.  *See Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008); *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013).  For the reasons stated above, Defendant Trump respectfully submits that those cases were incorrectly decided.  *See also Comm. on the Judiciary v. McGahn*, No. 1:19-cv-2379 (KBJ), ECF No. 32 at 48-52 (Mem. at 35-39) (setting forth further argument on this point).

24

enforce its subpoenas in federal court.  *Cf.* 2 U.S.C. § 288d (purporting to create a cause of action for the *Senate*).  While there is a history and tradition of the House issuing subpoenas and using its own powers to enforce them, the Supreme Court has squarely held that there is a critical difference between the authority to issue subpoenas and the authority to enforce them *in court.* *See Reed v. Cty. Comm'r of Del. Cty.*, 277 U.S. 376, 389 (1928) ("Authority to exert the powers of [Congress] to compel production of evidence differs widely from authority to invoke judicial power for that purpose.").  There is no historical tradition of federal courts enforcing legislative subpoenas, and so it would be particularly inappropriate for a federal court to infer a cause of action permitting such enforcement under Article I.  *See, e.g.*, *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1398 (2018) (where "litigation implicates serious separation-of-powers . . . concerns," recognizing a right to bring such litigation must be "subject to vigilant doorkeeping"); *Ziglar v. Abbassi*, 137 S. Ct. 1843, 1857 (2017) (similar); *see also Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999) (federal courts' equitable powers may be exercised only when "the relief . . . requested was traditionally accorded by courts of equity").

* * *

Because Congress would not have authority to seek civil enforcement of its (now-withdrawn) subpoena to Dr. Kupperman—a suit the House appears to have no intention of filing—Dr. Kupperman does not face a credible threat of civil enforcement.  For that reason, too, his suit should be dismissed.

### C.  In Any Event, This Case is Moot.

Even if Dr. Kupperman had standing at one point, his case is now moot.  Specifically, Dr. Kupperman's request depends on a purported injury—his alleged uncertainty as to whether he is obligated to appear at a deposition as instructed in the House Committees' subpoena—that no longer exists, assuming it ever did.

Mootness derives from Article III's case-or-controversy limitation.  *See Sierra Club v. Jackson*, 648 F.3d 848, 852 (D.C. Cir. 2011).  "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Powell v. McCormack*, 395 U.S. 486, 496 (1969).  With respect to requests for declaratory relief, "[w]here an intervening event renders the underlying case moot, a declaratory judgment can no longer 'affect[] the behavior of the defendant towards the plaintiff,' and thus 'afford[s] the plaintiff no relief whatsoever.'"  *NBC-USA Hous., Inc., Twenty-Six v. Donovan*, 674 F.3d 869, 873 (D.C. Cir. 2012) (citations omitted); *see also Larsen v. United States Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) ("[A]ny injunction or order declaring [the challenged practice] illegal would accomplish nothing— amounting to exactly the type of advisory opinion Article III prohibits.").  Here, Dr. Kupperman seeks an order declaring whether he must comply with the House defendants' subpoena, which purported to require him to appear for a deposition on October 28, 2019.  *See* Compl. Prayer for Relief ¶ A; *see also* Compl. Ex. A at 1.  Yet the scheduled date of his deposition has come and gone, with no apparent consequence to Dr. Kupperman for not appearing.  And now, the House has withdrawn the relevant subpoena and represented that it will not be reissued.  Although we obviously cannot speak definitively to the House's future intentions, "it has been the settled practice of the [Supreme] Court, in contexts no less significant, fully to accept representations such as these as parameters for decision."  *DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974).  Thus, "intervening event[s]" have overcome any present or cognizable risk of injury to Dr. Kupperman.  *See NBC-USA Hous.*, 674 F.3d at 873.

Entering declaratory relief in these circumstances would be tantamount to an advisory opinion on abstract questions of law that mootness principles forbid.  *See, e.g.*, *Hall v. CIA*, 437 F.3d 94, 99 (D.C. Cir. 2006).  For that reason, too, dismissal of Dr. Kupperman's Complaint is the proper course.  *See also, e.g.*, *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980).

## II.   DR.   KUPPERMAN   IS   ABSOLUTELY   IMMUNE   FROM   PROCESS COMPELLING   HIM   TO   TESTIFY   BEFORE   CONGRESS   ABOUT   HIS OFFICIAL DUTIES.

This Court lacks jurisdiction to resolve this dispute for the reasons explained above, but should the Court disagree and reach the merits, it should enter a judgment upholding the President's invocation of absolute immunity as to Dr. Kupperman.  As an immediate advisor and Deputy National Security Advisor to the President, Dr. Kupperman is immune from compulsory process seeking to require his testimony before Congress about his official duties.  That conclusion flows from fundamental separation-of-powers principles that protect the independence and autonomy of the Presidency, the compelling interest in preserving the confidentiality of Presidential communications, and the reality that the autonomy and confidentiality essential to effective functioning of the Presidency could not be preserved if the President's closest advisors did not share in his immunity from compelled testimony before Congress.

### A.   Congress May Not Compel the President's Immediate Advisors to Testify About Their Official Duties.

"Since the beginnings of our nation, executive officials have claimed a variety of privileges to resist disclosure of information the confidentiality of which they felt was crucial to fulfillment of the unique role and responsibilities of the executive branch of our government."  *In re Sealed Case*, 121 F.3d 729, 736 (D.C. Cir. 1997).  Courts have long agreed that such privileges are necessary to "preserve the President's access to candid advice" and prevent "interfer[ence] with his ability to exercise control over the executive branch."  *Id.* at 746; *see also id.* at 736-38 (describing privileges and immunities); *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 224 (D.C. Cir. 2013) ("[T]he Executive has a constitutional prerogative to maintain the autonomy of its office and safeguard the confidentiality of its communications." (cleaned up) (citing *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 385 (2004)).

Chief among these privileges is a "presidential communications privilege" rooted in the need "for confidentiality to ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge" and to promote a candid and "comprehensive exploration of all policy alternatives before a presidential course of action is selected." *In re Sealed Case*, 121 F.3d at 750 (citing *United States v. Nixon*, 418 U.S. 683, 708 (1974)); *see also, e.g.*, *Prop. of the People, Inc. v. Office of Mgmt. & Budget*, 394 F. Supp. 3d 39, 43 (D.D.C. 2019) ("[T]he presidential communications privilege 'preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions.'" (quoting *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008)). The presidential communications privilege protects both "'communications directly involving and documents actually viewed by the President' during th[e] process of shaping policies and making presidential decisions" as well as "communications 'solicited and received' by 'immediate White House advisers'—those with 'broad and significant responsibility for investigating and formulating the advice to be given to the President.'" *Prop. of the People*, 394 F. Supp. 3d at 43 (quoting *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004)); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977); *Loving*, 550 F.3d at 37 (quotation marks and ellipses omitted). The privilege serves to protect against "intru[sion] 'into the secrets of the cabinet'" and "the appearance of 'intermeddling with the prerogatives of the executive.'" *In re Sealed Case*, 121 F.3d at 739 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803)); *see also Judicial Watch*, 726 F.3d at 224 (Congress cannot "authorize[] intrusion in the confidentiality of [the President's] communications").

In light of these privilege principles, as well as the independence-and-autonomy principles discussed below, the longstanding position of the Executive Branch, reaffirmed by administrations of both political parties for nearly half a century, is that the President's immediate advisors are absolutely immune from compelled testimony before committees of Congress. *See Testimonial*

*Immunity of the Former Counsel to the President*, Slip Op. at 3 & n.1; *Immunity of the Assistant to the President and Dir. of the Office of Political Strategy & Outreach from Cong. Subpoena*, 38 Op. O.L.C. ___, Slip. Op. at 1-2 (July 15, 2014) ("*Immunity of the Assistant to the President*"). Although Presidents from time to time have *voluntarily* made senior advisors available for testimony before Congress (even while asserting their legal authority not to do so), *see Testimonial Immunity of the Former Counsel*, Slip Op. at 7-12, at no time in the Nation's history has a senior advisor to the President been *compelled* to give public testimony before Congress pursuant to a subpoena enforced by an Article III court.[11]

The testimonial immunity of the President's immediate advisors is not simply a matter of unbroken tradition.  It flows directly from essential separation-of-powers principles that safeguard the independence and autonomy of the Presidency within our system of government, as well as the confidentiality without which the President could not effectively carry out the many vital functions for which he is constitutionally responsible as head of the Executive Branch.   While the Branches of the Federal Government need not be "entirely separate and distinct[,]" each "must remain entirely free from the control or coercive influence, direct or indirect, of either of the others[.]" *Mistretta v. United States*, 488 U.S. 361, 380 (1989) (citation omitted).  The Supreme Court thus has been "vigilan[t]" to ensure that exertions of power by one Branch do not "undermine the authority and independence of one or another coordinate Branch," *id.* at 383-84, or "impair another [Branch] in the performance of its constitutional duties," *Cheney*, 542 U.S. at 382 (quoting *Clinton v. Jones*, 520 U.S. 681, 701 (1997)).

---

[11] In *Committee on the Judiciary of the U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008), a judge of this Court issued an order declaring that the former White House Counsel was required to testify pursuant to a subpoena issued by the House Judiciary Committee. But the D.C. Circuit stayed that decision pending appeal.  542 F.3d 909, 910-11 (D.C. Cir. 2008). Following a change of Administration, the case was settled pursuant to an agreement under which Ms. Miers sat for a private transcribed interview and the case was dismissed.  *See* Unopposed Mot. for Voluntary Dismissal, No. 1:08-cv-0409 (JDB) (D.D.C.), ECF Nos. 68, 68-1.

The testimonial immunity of the President and his advisors arises, in particular, out of the respect that separation-of-powers principles demand for the President's "unique position in the constitutional scheme" as "the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Nixon*, 457 U.S. at 749-50; *see also Cheney*, 542 U.S. at 382. The same respect is owed for the "singularly unique role under Art. II of a President's communications and activities, related to the performance of duties under that Article." *Nixon*, 418 U.S. at 715. "[S]pecial considerations control when the [Presidency's] interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Cheney*, 542 U.S. at 385; *see also Judicial Watch*, 726 F.3d at 226 (same).

Owing to the President's unique status as the single individual in whom the Constitution vests all authority of a separate, co-equal Branch of the Federal Government, the Constitution's separation of powers protects the President from congressional encroachments on the independence and autonomy of his Office. As noted above, the President is also "entitled to confidentiality in the performance of his 'responsibilities' and 'his office,' and 'in the process of shaping policies and making decisions.'" *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) ("*AAPS*") (quoting *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 449 (1977) ("*Nixon v. GSA*")). Both the Supreme Court and the D.C. Circuit have repeatedly emphasized the manifest importance "to the operation of Government" of allowing the President to keep his communications confidential. *Nixon*, 418 U.S. at 705-06, 708; *In re Sealed Case*, 121 F.3d at 742 (reaffirming the "great public interest in preserving the confidentiality of conversations that take place in the President's performance of his official duties because such confidentiality is needed to protect the effectiveness of the executive decision-making process") (quotation marks omitted) (quoting *Sirica*, 487 F.2d at 717); *AAPS*, 997 F.2d at 909-10 (acknowledging the

President's "great need to receive advice confidentially" from those in "operational proximity" to him "as an important condition to the exercise of executive power"); *see also Ctr. for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836, 843 (D.C. Cir. 2008).

For these reasons, the President himself is absolutely immune from testimonial compulsion by Congress or its committees.  A committee of Congress could not, consistent with the separation of powers, hale the President before it and compel him to testify under oath, any more than the President may "compel congressmen to appear before him."  *See Assertion of Exec. Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) (Opinion of Attorney General Reno). "[A]llowing Congress to subpoena the President to appear and testify would 'promote a perception'"—and, eventually, the expectation—"'that the President is subordinate to Congress, contrary to the Constitution's separation of governmental powers into equal and coordinate branches.'"  *Testimonial Immunity of the Former Counsel*, Slip Op. at 4 (citation omitted).  The President would no longer be the head of "a separate and wholly independent Executive Branch," *Bowsher v. Synar*, 478 U.S. 714, 722 (1986), but rather a subordinate answering to superiors.[12] The Framers plainly did not contemplate that Congress, like the British Parliament, would possess the authority to demand that the Chief Executive appear and answer questions at any time suitable to the Legislature.  "[U]nlike parliamentary systems, the President, under Article II, is responsible not to the Congress but to the people."  *Id.* at 722 (citing U.S. Const. art. II, § 4).

For the President's immunity to be effective, and for the underlying separation-of-powers principles to be adequately protected, his closest and most immediate advisors must also be free from compelled congressional testimony.  "The demands of the office require the President to rely

---

[12] The Constitution recognizes only a limited Presidential obligation to report to Congress, providing that the President shall "from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient."  U.S. Const. art. II, § 3.

on senior advisers who serve as [his] alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Testimonial Immunity of the Former Counsel*, Slip Op. at 5 (internal quotation marks and citations omitted); *see also In re Sealed Case*, 121 F.3d at 750 ("The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers."); *AAPS*, 997 F.2d at 909 (noting importance "to the exercise of executive power" of the President's ability to consult confidentially with his advisors).   Presidents have long relied on this nucleus of confidential White House advisors, even more than their Cabinets, to obtain advice and assistance.[13]   As a result, unique among Executive Branch personnel, the President's immediate advisors "provide assistance of the most intimate sort to the President in carrying out the responsibilities of his office."   John R. Steelman & H. Dewayne Kreager, The Exec. Office as Admin. Coordinator, 21 L. & Contemp. Probs. 688, 689 (1956).

Because Congress cannot compel the appearance of the President himself, the President's most immediate advisors would become the next most "easily identifiable target[s]" for congressional inquiry, *see Fitzgerald*, 457 U.S. at 753, were they not immune from congressional process.  Authorizing dozens of congressional committees to compel the President's immediate advisors to appear and testify at the times and places of the committees' choosing would allow

---

[13]  *See* Harold C. Relyea, *The Executive Office of the President: A Historical, Biographical, and Bibliographical Guide* 6 (Harold C. Relyea, ed. 1997).  Upon enactment of the Reorganization Act of 1939, one of the components of the newly created Executive Office of the President was the "White House Office," also known as the "Office of the President," which was intended "to serve the President in an intimate capacity in the performance of the many detailed activities incident to his immediate office."  4 Fed. Reg. 3864, Exec. Order No. 8248 (Sept. 12, 1939).  The President's advisors within the Office of the President—including the National Security Advisor and his Deputy—continue to serve in this capacity.  *See Judicial Watch*, 726 F.3d at 216 (the staff and units within the Executive Office of the President whose "sole function is to advise and assist the President" are referred to collectively as the "Office of the President"); *Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1295 (D.C. Cir. 1993).

those committees to "wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." *Testimonial Immunity of the Former Counsel*, Slip Op. at 5 (citation omitted).

Congress could also attempt to exert undue influence over the President's decision-making by using questioning to expose matters that are sensitive and ongoing, or by demanding that his advisors justify or explain Executive actions and decisions. Defending against such a probing inquiry would force the Office of the President to divert substantial time and attention from its official duties at the whim of congressional committees in order to protect the President's compelling interests in preserving the autonomy and confidentiality of his Office.

In short, subordinating immediate Presidential advisors to public interrogation would "risk significant congressional encroachment on, and interference with, the President's prerogatives and his ability to discharge his duties with the advice and assistance of his closest advisers," *id.* (internal quotation marks and citation omitted), as well as promote a perception of Presidential subordination to Congress. *Immunity of the Assistant to the President*, Slip Op. at 3. Thus, "[g]iven the close working relationship that the President must have with his immediate advisors as he discharges his constitutionally assigned duties," "[s]ubjecting [those advisors] to the congressional subpoena power would be"—in terms of its consequences for Presidential autonomy and independence, and the intended balance of constitutional power between the elected branches— "akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Id.* (alterations in original; citation omitted). Allowing Congress to exert such authority and influence over the President's conduct of his duties and responsibilities by wielding compulsory power over his closest advisors would thus violate the separation of powers. *See Loving v. United States*, 517 U.S. 748, 757 (1996)

("[T]he separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties."); *Ctr. for Arms Control*, 531 F.3d at 843 ("When the Legislature purports to affect the prerogatives of the President *or his subordinates*, we must ask whether it 'impermissibly undermines the powers of the Executive Branch, or . . .  prevent[s] [it] from accomplishing its constitutionally assigned functions.'")  (citation omitted; emphasis added).

In addition to protecting the independence and autonomy of the Presidency, the Constitution accords the President's immediate advisors testimonial immunity to ensure that the President can obtain sound and candid advice.  "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately."  *Nixon*, 418 U.S. at 708.  "If presidential advisors must assume they will be held to account publicly for all approaches that were advanced, considered but ultimately rejected, they will almost inevitably be inclined to avoid serious consideration of novel or controversial approaches to presidential problems."  *In re Sealed Case*, 121 F.3d at 750.  The resulting detriment to "the effectiveness of the executive decision-making process," *id.* at 742, would thus frustrate the President's interest in obtaining the sort of candid counsel that is possible only in a confidential setting and undermine the constitutional objectives that the separation of powers is meant to promote.

Compelled congressional testimony of the President's closest advisors also would "create an inherent and substantial risk of inadvertent or coerced disclosure of confidential information." *Immunity of the Assistant to the President*, Slip Op. at 4.  Given the nature of the relationship between the President and his closest aides, a committee's examination of those advisors almost certainly would include "a wide range of unanticipated and hostile questions about highly sensitive deliberations," *Testimonial Immunity of the Former Counsel*, Slip Op. at 6 (internal quotation marks and citation omitted), seeking to gain insight into the President's thinking or future

34

decisions.   Asserting executive privilege on a question-by-question basis could not adequately safeguard against that risk.   Under intense public questioning by highly adversarial, even coercive committee members, a President's advisors might succumb to demands to reveal details of sensitive matters discussed with him.   *Id.*   Without time for reflection, a witness "may be unable to confine [his or her] remarks only to those which do not impair the deliberative process."   *Id.* (internal quotation marks and citation omitted); *see generally* Part II.D, *infra*.

These same considerations led the Supreme Court to extend to congressional aides the same immunity that is afforded to Members of Congress themselves under the Speech and Debate Clause, U.S. Const., art. I, § 6, cl. 1, even though the Clause makes no reference to legislative aides.   *Gravel v. United States*, 408 U.S. 606, 616-17 (1972).   The Court reasoned in *Gravel* that

> it is literally impossible, in view of the complexities of the modern legislative process . . . for Members of Congress to perform their legislative tasks without the help of aides and assistants; that the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos; and that if they are not so recognized, the central role of the Speech or Debate Clause— to prevent intimidation of legislators by the Executive and . . . a possibly hostile judiciary . . . —will inevitably be diminished and frustrated.   [*Id.*]

The testimonial immunity of the President's immediate advisors is also supported by the Supreme Court's decision in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).   In that case, the Court held "that Presidential aides, like Members of the Cabinet, *generally* are entitled only to a qualified immunity" against suits for civil damages arising out of their official acts.   *Id.* at 809 (emphasis added).   But the Court also held more specifically that "[f]or aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy, absolute immunity might well be justified to protect the unhesitating performance of functions vital to the national interest."   *Id.* at 812.   In reaching this conclusion, the *Harlow* Court cited *Gravel* as support for the proposition that "some aides are assigned to act as Presidential 'alter egos' in the exercise of

functions for which absolute immunity is 'essential for the conduct of public business.'" *Id.* at 812 n.19 (citing *Gravel*, 408 U.S. at 616-17, 620).

The logic employed in *Gravel* and *Harlow* dictates the similar conclusion that the President's immediate advisors must share in his absolute immunity from compelled congressional testimony. Because the President's immediate advisors are his "alter egos," whose function is to carry out on his behalf the countless responsibilities of his Office that "it is literally impossible" for him to perform alone, *Gravel*, 408 U.S. at 616-17, the power to compel their testimony before committees of Congress would, as discussed above, risk significant Legislative Branch encroachment on and interference with Presidential decision-making, create a perception (and expectation) of Presidential subjugation to the Legislature, and reduce the President's access to sound and candid advice. The resulting impairment of the President's "ability to carry out the functions entrusted to him by the Constitution" would "'diminish[ ] and frustrate[ ]' the purpose of the President's own absolute immunity from such process," *Immunity of the Assistant to the President*, Slip Op. at 5 (quoting *Gravel*, 408 U.S. at 617), and violate the Constitutional separation of powers.

## B. Dr. Kupperman Was an Immediate Advisor to the President to Whom Testimonial Immunity Applies.

Dr. Kupperman qualifies as an immediate Presidential advisor to whom absolute immunity from congressional testimonial process applies, particularly because he was a senior "aide[ ] entrusted with discretionary authority in [the] sensitive areas [of] national security [and] foreign policy." *Harlow*, 457 U.S. at 812. He held the post of Assistant to the President, a title bestowed on only the President's most senior aides. Declaration of Matthias J. Mitman (filed herewith) ("Mitman Decl.") ¶ 9. He served as deputy to the National Security Advisor ("NSA"), *id.* ¶ 10, traditionally the President's "most important source of policy advice on foreign and national security policy." John P. Burke, Baker Inst. For Pub. Policy, "The National Security Advisor and

Staff," at Executive Summary (2017), *available at* http://whitehousetransitionproject.org/wp-content/uploads/2016/03/WHTP2017-24-National-Security-Advisor.pdf; *see also id.* at 23 (describing the National Security Advisor as "a daily barometer of presidential inclination, intention, and policy will" regarding national security and foreign affairs matters). Dr. Kupperman served directly beneath Mr. Bolton and stepped into his shoes as Acting NSA for a short period before Dr. Kupperman's departure from office in September 2019.  Mitman Decl. ¶¶ 8, 10.

Moreover, unlike other National Security Advisors, who retained a number of deputies with different portfolios, Mr. Bolton chose to lodge responsibility for those myriad important functions in only a single deputy—Dr. Kupperman.  *Id.* ¶ 11; *see also* Def. SOMF ¶ 6.  "Dr. Kupperman's portfolio therefore included all issues of national-security arising during his tenure, not just specific subsets of issues or particular geographic areas."  Mitman Decl. ¶ 11; Def. SOMF ¶ 6.

As Deputy NSA, Dr. Kupperman worked in close operational proximity to the President, meeting with him several times per week, attending the President's meetings and phone calls with foreign leaders, traveling internationally with the President on multiple occasions, and attending meetings of the NSC Principals Committee chaired by the President.  Mitman Decl. ¶¶ 8, 14-17; Def. SOMF ¶¶ 11-16.  He spent the majority of his time advising or preparing advice for the President on matters of national security.  Mitman Decl. ¶ 12; Def. SOMF ¶ 7.  With few exceptions, all national-security issues presented to the President for decision during Dr. Kupperman's tenure would first be raised with both Dr, Kupperman and NSA Bolton, for assessment of the relevant facts, information, and policy considerations, and the formulation of appropriate advice.  Mitman Decl. ¶ 13; Def. SOMF ¶ 8.  Dr. Kupperman was tasked with responsibility for amassing and integrating information and advice from all pertinent Executive Branch agencies and officials, and making recommendations to NSA Bolton and/or the President,

on virtually all issues of national security requiring resolution by the President.  Mitman Decl. ¶ 13; Def. SOMF ¶ 9.  He was also frequently tasked with communicating the President's decisions to responsible agencies and officials, and ensuring thereafter that the President's directives were appropriately implemented in a coordinated fashion and in accordance with U.S. law and policy and national-security objectives.  Mitman Decl. ¶ 13; Def. SOMF ¶ 10.

Moreover, the National Security Council "is, by its nature, a body whose sole purpose is to advise the President" regarding national security policy.  *Prop. of the People*, 394 F. Supp. 3d at 44; *see also id.* at 48-49; Mitman Decl. ¶ 5.  Consequently, "any NSC meeting . . . is a communication 'solicited and received' by the President's immediate advisers."  *Prop. of the People*, 394 F. Supp. 3d at 44.  And "the National Security Advisor, his Deputy, and the NSC Legal Advisor are the only officials within the NSC that hold the title of Assistant to the President." Mitman Decl. ¶ 9.  For all these reasons, Dr. Kupperman therefore possessed "responsibilities of utmost discretion and sensitivity" and acted directly on the President's behalf in all realms of national security, and foreign affairs.  *Fitzgerald*, 457 U.S. at 749-50; *see also Miers*, 558 F. Supp. 2d at 55 (recognizing that Presidential assertions of absolute immunity may apply if the testimony sought implicates national security or foreign affairs).

Finally, the HPSCI subpoena seeks to compel Dr. Kupperman to testify about precisely those national security functions he performed for the President as Deputy and Acting National Security Advisor.  The focal point of HPSCI's inquiry is the President's diplomatic interactions with Ukraine.  HPSCI plainly does not need Dr. Kupperman's testimony to obtain basic factual information in this inquiry.  More than a dozen current and former Executive Branch officials have already testified before HPSCI, and the President has taken the extraordinary measure of declassifying and publicly releasing the transcript of the July 25 telephone call after obtaining permission from President Zelensky to do.  Because it is obvious that HPSCI seeks Dr.

Kupperman's testimony in order to gain insight into the President's own state of mind and deliberative process regarding that foreign policy, Dr. Kupperman should be held to be absolutely immune from that effort.  *See Harlow*, 457 U.S. at 812 (absolute immunity even from civil suit may extend to close Presidential aides "in such sensitive areas as national security or foreign policy").

      **C.**    **Dr. Kupperman Remains Immune From Compelled Congressional Testimony About His Duties.**

Dr. Kupperman also retains his testimonial immunity as an immediate Presidential advisor even though he has left office.  The same separation-of-powers principles that confer his immunity dictate that former advisors remain immune from compelled congressional testimony about official matters that occurred during their tenure.

While a President no longer depends on the daily advice and assistance of a former advisor, the risk to Presidential autonomy posed by compelling that advisor to testify at a committee hearing continues even after the conclusion of the advisor's time in office.  *Testimonial Immunity of the Former Counsel*, Slip Op. at 16; *see also United States v. Johnson*, 383 U.S. 169 (1966) (applying the Speech or Debate Clause to a former Member of Congress).  The public spectacle of haling former advisors to a sitting President before a committee of Congress could just as effectively promote a perception of Executive subservience to the Legislature as would haling current advisors.  And if the immunity dissipated as soon as Presidential advisors left office, the knowledge that they could be subjected to politically hostile and accusatory public questioning by legislators on account of advice they may have given to the President, or actions taken on his behalf, would surely have a chilling effect on their conduct in office, and could adversely affect the quality and candor of the counsel they offered him.  The effectiveness of the Executive decision-making process would be substantially impaired, and the purpose of recognizing testimonial immunity in the first place would be eviscerated.

The confidentiality interests in the advice furnished by former advisors also remain just as strong, and the protection afforded to those interests by testimonial immunity would be just as weakened if the immunity evaporated with staff turnover. *See id.* (citation omitted).   As the Supreme Court has observed, "[t]he confidentiality necessary" to a President's receipt of "full and frank submissions of facts and opinions" from his advisors "cannot be measured by the few months or years between the submission of the information and the end of the President's tenure." *See Nixon v. GSA*, 433 U.S. at 449-50.   Nor can it be measured by the tenure of his advisors.

### D. Individualized Assertions of Executive Privilege Are Not a Substitute for Testimonial Immunity.

The House has suggested that absolute immunity is not appropriate because separation-of-powers concerns can be addressed "through a case-specific assertion of executive privilege and weighing of competing interests" on a "question-by-question basis." *See* Pl.'s Mem. in Supp. of Mot. for Summ. J., *U.S. House Committee on the Judiciary v. Donald F. McGahn II*, No. 19-cv-2379, ECF No. 22-1, at 32-33, 42.  That simply is not so, especially in the case of Dr. Kupperman.

First, the option of invoking executive privilege offers no protection against the potential use of compulsory testimonial process to harass or retaliate against the President's immediate advisors.   Such efforts to improperly influence or interfere with Presidential decision-making encroach directly on the autonomy of the Executive Branch.  *Immunity of the Assistant to the President*, Slip Op. at 3.  They undermine the Branch's ability to function just as profoundly as the disclosure of privileged information.

Second, reliance on executive privilege to decline to answer specific questions at a committee hearing would be insufficient to eliminate the threat to the President's constitutionally protected interests in confidentiality.  That is particularly clear here, where HPSCI has sought Dr. Kupperman's testimony for the very purpose of probing Presidential deliberations and intentions, and where HSPCI has refused to allow Executive Branch counsel—who, unlike Dr. Kupperman

or his attorneys, can assert executive privilege on behalf of the President—to participate in proceedings. Accordingly, there is a high likelihood that Dr. Kupperman would be asked "a wide range of . . . . hostile questions" about highly delicate matters (including foreign policy with Ukraine and the motivation therefor), and "[i]n the heat of the moment, without opportunity for careful reflection," he could inadvertently reveal sensitive information. *Testimonial Immunity of the Former Counsel*, Slip Op. at 6.

Third, even the "prospect of compelled interrogation by a potentially hostile congressional committee about communications with the President . . . could chill [future national security advisors] from providing unpopular advice or from fully examining an issue," *id.*, thus impeding the flow of information and advice that the President requires for sound decision-making and effective governance. *See also Senate Select Committee on Presidential Campaign Activities*, 498 F.2d at 729-30 (observing that the guarantee of confidentiality necessary to the Presidential decision-making process could be threatened even by case-by-case judicial weighing of the claimed need for "confidentiality against countervailing public interests of the moment").

Fourth, given the predictable frequency with which committee questions posed to immediate Presidential advisors would intrude on matters falling within the scope of executive privilege (in Dr. Kupperman's case, a near certainty), each appearance would entail scores of individual claims of privilege, presumably to be resolved, at least in the Committee's estimation, by the federal courts via yet more suits litigating those privilege invocations. That vision of recurrent inter-Branch litigation over claims of executive privilege is at war with the Supreme Court's stern admonition in *Cheney* that the "constitutional confrontation[s] between the . . . branches" occasioned by assertions of executive privilege "should be avoided whenever possible." 542 U.S. at 389-90 (internal quotation marks and citation omitted).

### III.   DR. KUPPERMAN FAILS TO STATE A CAUSE OF ACTION.

Dr. Kupperman's Complaint also should be dismissed under Federal Rule of Civil Procedure 12(b)(6) because he lacks a cause of action.  He relies on the device of interpleader created under Federal Rule of Civil Procedure 22, Compl. at 2, and the Declaratory Judgment Act, *id.* ¶ 4, but neither confers authority on this Court to adjudicate this inter-Branch dispute.

### A.   Dr. Kupperman Fails to State a Claim in Interpleader.

Under Federal Rule of Civil Procedure 22, "[p]ersons with claims that may expose a plaintiff to double or multiple liability may be joined as defendants and required to interplead." Fed. R. Civ. P. 22(a)(1).[14]  But before a court can reach the merits of an interpleader claim, the plaintiff has the burden to demonstrate that an "interpleader action is appropriate and the stakeholder is entitled to bring the action[.]"  *See Fid. Brokerage Servs., LLC v. Bank of China*, 192 F. Supp. 2d 173,177–78 (S.D.N.Y. 2002); Charles Alan Wright & Arthur R. Miller, 7 Fed. Prac. & Proc. Civ. § 1714, at 626 (3d ed. 2018).  Dr. Kupperman fails to carry his burden for two independent reasons.

First, interpleader is not proper because Dr. Kupperman's novel request for an advisory opinion about his obligation to respond to a subpoena far exceeds the nature of an interpleader, which is to resolve competing claims for the same money or property.  "Requisite to the maintenance of an interpleader action is that the stakeholder be subject to multiple adverse claims against a *single fund* or *liability*."  *Viewhaven, Inc. v. Danon*, No. 85 Civ. 9603 (LLS), 1986 WL

---

[14] Interpleader suits may be brought either directly under Rule 22, in which case a plaintiff must identify a separate source of subject-matter jurisdiction, or under 28 U.S.C. § 1335, which creates a cause of action and subject-matter jurisdiction for interpleader cases involving money, property, or other financial obligations exceeding $500.  *See Commercial Union Ins. Co. v. United States*, 999 F.2d 581, 584 (D.C. Cir. 1993) (discussing difference between "statutory interpleader" and "rule interpleader").  As there is no money, property, or other financial obligation at issue here, and no amount-in-controversy between the President and Congress, Dr. Kupperman appears to be proceeding on a theory of rule interpleader.

6779, at *2 (S.D.N.Y. June 12, 1986) (emphasis added); *see, e.g.*, *Republic of Philippines v. Pimentel*, 553 U.S. 851, 872 (2008) (explaining that the "purpose of interpleader . . . is to prevent a stakeholder from having to *pay* two or more parties for one claim" (emphasis added)); *Allstate Assignment Co. v. Cervera*, 2014 WL 12496902, at *2 (W.D. Tex. Dec. 8, 2014) (interpleader proper only where multiple "claims expose the plaintiff to double *payment* on a single liability" (emphasis added)); *United States v. Barry Fischer Law Firm, LLC,* No. 10 Civ. 7997 (TPG), 2011 WL 31545, at *3 (S.D.N.Y. Jan. 5, 2011) ("[T]he purpose of an interpleader action is to allow the stakeholder, the interpleader plaintiff, to establish proper ownership of some property.").  Indeed, the text of Rule 22 itself assumes that an interpleader dispute will concern competing claims to money or property.  *See* Fed. R. Civ. P. 22(a)(1)(A) (referring specifically to "the *titles* on which [defendants'] claims depend") (emphasis added); *see also Metro. Life Ins. Co. v. Jacques*, 396 F. App'x 709, 710 (2d Cir. 2010) (unpublished) (a claimant in an interpleader action must "establish[] his right to the property"); *Glenclova Inv. Co. v. Trans-Res., Inc.*, 874 F. Supp. 2d 292, 302 (S.D.N.Y. 2012) ("quintessential" interpleader action involves "an insurer . . . faced with rival claims which exceed the amount held in a limited fund").  Here, there is no money or property at issue.  Interpleader simply is not "an all-purpose bill of peace," and it "cannot be used to solve all the vexing problems of multiparty litigation."  *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 535 (1967).  "[I]t is not . . . for the Court to redesign the interpleader rule in order for it to accommodate this unusual lawsuit."  *CF 135 Flat LLC v. Triadou SPV S.A.*, No. 15-CV-5345 (AJN), 2016 WL 1109092, at *5 (S.D.N.Y. Mar. 18, 2016) (quotation marks omitted).

Second, even if Dr. Kupperman could overcome that fact, he fails to demonstrate that the conflict he faces is real or substantial.  "Interpleader requires real claims, or at least the threat of real claims—not theoretical, polemical, speculative, or I'm-afraid-it-might-happen-someday claims."  *Estate of Heiser*, 807 F. Supp. at 24 (citation omitted).  The entire basis for Dr.

43

Kupperman's suit—the alleged conflict between a House subpoena purporting to require his testimony and the President's order not to comply, *see* Compl. ¶ 2—has dissipated.  The deadline to testify has passed and no consequence has befallen Dr. Kupperman; indeed, the House has withdrawn its subpoena.  *See* p. 7, *supra*.  Dr. Kupperman thus faces no threat of *any* liability, much less the competing liabilities required to invoke interpleader.  *See Vanderlinden v. Metro. Life Ins. Co.*, 137 F. Supp. 2d 1160, 1163 (D. Neb. 2001) (interpleader not proper when one putative claimant has "disavowed any interest" in the fund or property); *see also Kennametal v. Int'l Union, United Auto., Aircraft & Agricultural Implement Workers of Am.*, 161 F. Supp. 362 (W.D. Pa. 1958) (no interpleader when one party had abandoned its claim to the disputed property); Wright & Miller, Fed. Prac. & Proc. Civ. § 1705.

## B.      The Declaratory Judgment Act Does Not Supply a Cause of Action.

Dr. Kupperman also cannot rely on the Declaratory Judgment Act, 28 U.S.C. § 2201, as a cause of action.  *See* Compl. ¶ 4.  The Declaratory Judgment Act does not itself "provide a cause of action."  *Ali*, 649 F.3d at 778.  Rather, the Declaratory Judgment Act simply "enlarge[s] the range of remedies available in the federal courts" for cases that already can be litigated there. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950).  A "cause of action," by contrast, confers the legal authority allowing a plaintiff to "'*enforce in court* the . . . rights and obligations' identified in his complaint" and is "analytically distinct and prior to the question of what relief, if any, [he] may be entitled to receive."  *John Doe v. U.S. Parole Comm'n*, 602 F. App'x 530, 532 (D.C. Cir. 2015) (citations omitted).  As the Supreme Court and this Circuit have long held, "the availability of relief" under the Declaratory Judgment Act "presupposes the existence of a judicially remediable right."  *Schilling v. Rogers*, 363 U.S. 666, 677 (1960); *C & E Servs.*, 310 F.3d at 201.  There being none here, the Act, on its own, offers no separate vehicle for bringing this case into court.

## CONCLUSION

For the reasons stated above, the Court should dismiss this case or, in the alternative, enter summary judgment upholding the President's invocation of absolute immunity as to Dr. Kupperman.  The proper course for Dr. Kupperman is the one other senior aides have followed— abide by the President's invocation of absolute immunity from compelled testimony and heed his directive to not testify.  There is no basis for the Court to disturb that established practice here.


Dated:  November 14, 2019                    Respectfully submitted,

                                             JOSEPH H. HUNT
                                             Assistant Attorney General

                                             JAMES M. BURNHAM
                                             Deputy Assistant Attorney General

                                             ELIZABETH J. SHAPIRO
                                             Deputy Director

                                             JAMES J. GILLIGAN
                                             Special Litigation Counsel

                                             /s/ *Andrew M. Bernie*
                                             ANDREW M. BERNIE (DC Bar No. 995376)
                                             CRISTEN HANDLEY (MO Bar No. 69114)
                                             STEVEN A. MYERS (NY Bar No. 4823043)
                                             SERENA M. ORLOFF (CA Bar No. 260888)
                                             Trial Attorneys

                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             P.O.  Box 883
                                             Washington, D.C.  20044
                                             Telephone:  (202) 616-8488
                                             Fax:        (202) 616-8470
                                             Email:      andrew.m.bernie@usdoj.gov

                                             *Attorneys for President Trump*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                                            )
CHARLES M. KUPPERMAN,                )
                                                            )
                    *Plaintiff,*                           )
                                                            )
            v.                                              )
                                                            )          No. 1:19-cv-03224 (RJL)
U.S. HOUSE OF REPRESENTATIVES,   )
    *et al.*,                                              )
                                                            )
                    *Defendants.*                       )
———————————————————————)

**DEFENDANT PRESIDENT DONALD J. TRUMP'S**
**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

1.        Plaintiff Charles M. Kupperman ("Dr. Kupperman") served as Deputy National Security Advisor from January 9, 2019, to September 20, 2019.  Decl. of Matthias J. Mitman ("Mitman Decl.") (filed herewith) ¶ 10.

2.        Dr. Kupperman also served as Acting National Security Advisor from September 10, 2019, to September 20, 2019, after Mr. Bolton's departure from office.  *Id.*

3.        The National Security Advisor is a senior aide in the Executive Office of the President who serves as the principal in-house advisor to the President on domestic, foreign, economic, and military issues, whether discrete or far-reaching, affecting national security.  *Id.* ¶ 7.

4.        The Deputy National Security Advisor is a direct report to the National Security Advisor who works in close operational proximity to the President.  *Id.* ¶ 8.

5.      Like the National Security Advisor, the Deputy National Security Advisor holds the title of Assistant to the President, which designates him or her as one of the President's most senior aides.  *Id.* ¶ 9.

6.      During his tenure as Deputy National Security Advisor, Dr. Kupperman was the sole deputy to then-National Security Advisor Bolton, and thus Dr. Kupperman's portfolio as Deputy National Security Advisor included all issues of national security arising during his tenure, and was not limited to specific subsets of issues or particular geographic areas.  *Id.* ¶ 11.

7.      Dr. Kupperman spent the majority of his time as Deputy National Security Advisor advising or preparing advice for the President, and ensuring appropriate implementation of the President's decisions by responsible agencies and officials.  *Id.* ¶ 12

8.      With rare exceptions, during Dr. Kupperman's tenure, all national-security issues presented to the President for decision would first be raised with both then-National Security Advisor Bolton and Dr. Kupperman, as the Deputy National Security Advisor, for assessment of the relevant facts, information, and policy considerations, and formulation of appropriate advice. *Id.* ¶ 13.

9.      Dr. Kupperman was responsible for amassing and integrating information and advice from all pertinent Executive Branch agencies and officials, and making recommendations to NSA Bolton and/or the President, on virtually all issues of national security requiring decision-making by the President.  *Id.*

10.     He was also frequently tasked with responsibility for communicating the President's decisions to responsible Executive Branch agencies and officials, and ensuring thereafter that the President's directives were appropriately implemented in a coordinated fashion and in harmony with U.S. law and policy and national-security objectives.  *Id.*

2

11.    As Deputy National Security Advisor, Dr. Kupperman met with the President multiple times per week, generally to advise on national-security issues, and he regularly participated in Oval Office meetings pertaining to foreign policy.  *Id.* ¶ 14.

12.     Dr. Kupperman was also one of approximately a half-dozen close aides generally present at the President's meetings with foreign leaders and on Head of State calls, and he was a central participant in the Presidential briefings that often preceded such communications.  *Id.* ¶ 15.

13.    Dr. Kupperman regularly attended meetings of the National Security Council Principals Committee (the Cabinet-level interagency forum for the consideration of national-security policy issues) also attended by the President's senior-most advisors, including Cabinet Secretaries, and National Security Council Meetings chaired by the President.  *Id.* ¶ 16.

14.    Dr. Kupperman also chaired meetings of the Deputies Committee, the senior sub-cabinet forum for consideration of national-security policy issues, regularly attended by the Deputy Secretaries of State, Treasury, Defense, Energy, and Homeland Security, and the Deputy Attorney General.  *Id.*

15.    As National Security Advisor, Mr. Bolton typically traveled at least once per month and usually for multiple days at a time.  *Id.* ¶ 17.  When Mr. Bolton traveled, Dr. Kupperman stepped directly into his shoes and served as the President's primary point of contact on all national security matters.  *Id.*  During these occasions, Dr. Kupperman met with the President with increased frequency and attended the Presidential Daily Brief on intelligence matters.  *Id.*

16.    Dr. Kupperman also traveled internationally with the President on multiple occasions, including when Mr. Bolton was traveling separately.  *Id.*

17.    On October 25, 2019, the House Permanent Select Committee on Intelligence ("HPSCI") issued a subpoena to Dr. Kupperman directing him to appear at a deposition before the

Committee on October 28, 2019, "as part of the House's impeachment inquiry" into matters relating to foreign policy with Ukraine. Complaint, Ex. A, ECF No. 1-1 at 2.

18.     On October 25, 2019, the President, through counsel and on advice of the Department of Justice Office of Legal Counsel ("OLC") that Dr. Kupperman is absolutely immune from compelled congressional testimony with respect to matters related to his service as a senior advisor to the President, directed Dr. Kupperman not to appear at the October 28 deposition. *Id.* Ex. B, ECF No. 1-2 at 2-3.

19.     Dr. Kupperman did not appear at the October 28 deposition. *See* ECF No. 22 ¶ 1. The deposition has not been rescheduled.

20.     HPSCI withdrew the subpoena to Dr. Kupperman that is the subject of this suit on November 5, 2019, *id.* ¶ 2; *see also* ECF No. 22-1 at 2, and the House Defendants subsequently notified the Court that they "have determined that they will not reissue a subpoena to Kupperman," ECF No. 29 at 1. Accordingly, no consequences have befallen Dr. Kupperman—or are reasonably likely to befall him—as a result of his failure to appear at the scheduled deposition.

Dated:  November 14, 2019

                                                    Respectfully submitted,

                                                    JOSEPH H. HUNT
                                                    Assistant Attorney General

                                                    JAMES M. BURNHAM
                                                    Deputy Assistant Attorney General

                                                    ELIZABETH J. SHAPIRO
                                                    Deputy Branch Director

                                                    JAMES J. GILLIGAN
                                                    Special Litigation Counsel

                                                     */s/ Andrew M. Bernie*
                                                    ANDREW BERNIE (DC Bar No. 995376)
                                                    CRISTEN HANDLEY (MO Bar No. 69114)
                                                    STEVEN A. MYERS (NY Bar No. 4823043)

4

SERENA M. ORLOFF (CA Bar No. 260888)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Tel:        (202) 616-8488
Fax:        (202) 616-8470
E-mail:     andrew.m.bernie@usdoj.gov

*Counsel for President Trump*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHARLES M. KUPPERMAN,

            *Plaintiff,*

                    v.                                            No. 19-cv-3224 (RJL)

U.S. HOUSE OF REPRESENTATIVES, *et al.*,

            *Defendants.*

## DECLARATION OF MATTHIAS J. MITMAN

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.      I serve as Deputy Assistant to the President and Executive Secretary of the National Security Council ("NSC"), a position I have held since October 29, 2019.  I am a career member of the Senior Foreign Service, class of Minister-Counselor.

2.      I have previously served as Senior Duty Officer in the White House Situation Room and Director for Iraq within the NSC, as well as Chief of Staff to the Presidential Envoy for Hostage Affairs, and in diplomatic postings in Saudi Arabia, Iraq, Honduras, Greece, and Russia. I graduated from the National War College with distinction in 2006.

3.      I make this declaration in support of the President's motion to dismiss or, in the alternative, for summary judgment in the above-captioned case.  The statements made herein are based on my personal knowledge or on information made available to me in the course of performing my responsibilities as Executive Secretary of the NSC.

A.      **The National Security Council, National Security Advisor, and Deputy National Security Advisor**

4.      The NSC is the President's principal forum for considering matters of national security and foreign policy. Its function is to advise and assist the President on national-security and foreign-policy matters, and to serve as the President's principal arm for coordinating and integrating domestic, foreign, military, and economic policies across the Executive Branch relating to national security.

5.      Organizationally, the NSC staff is a component of the Executive Office of the President ("EOP"). EOP is comprised of a number of offices and agencies the function of which is to provide the President with the support and information he needs to perform his constitutionally assigned functions and govern effectively.

6.      NSC meetings are chaired by the President with the assistance of the Assistant to the President for National Security Affairs ("NSA") and his Deputy. The regular attendees of NSC meetings also include the Vice President, the Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the Attorney General, the Secretary of Energy, the Homeland Security Advisor, and the Representative of the United States to the United Nations. The Chief of Staff to the President, Counsel to the President, and the Deputy Counsel to the President for National Security Affairs are invited to all NSC meetings, and the Assistant to the President for Economic Policy attends when international economic issues are on the meeting's agenda.

7.      The NSA is a senior aide in the Executive Office of the President who serves as the principal in-house advisor to the President on domestic, foreign, military, and economic issues, whether discrete or far-reaching, affecting national security. The NSA offers daily advice to the President on the formulation and implementation of Presidential policy concerning matters of national security. He is responsible for the synthesis of knowledge and advice from agencies and

officials throughout the Executive Branch required for informed Presidential decision-making on such matters. And he is responsible in turn for ensuring that the President's decisions on matters of national security are communicated to the necessary agencies and officials and that his policies are appropriately implemented by them. In support of these responsibilities, the NSA participates in meetings of the NSC, chairs meetings of the NSC Principals Committee (the Cabinet-level interagency forum for the consideration of national-security policy issues), and determines agendas for meetings of the NSC and the Homeland Security Council (the EOP entity tasked with advising the President on policy matters affecting homeland security).

8.      The Deputy NSA is a direct report to the NSA and is assigned an office on the first floor of the West Wing of the White House, reflecting the Deputy NSA's close operational proximity to the President in his or her own right.

9.      Like the NSA, the Deputy NSA holds the title of Assistant to the President, designating him as one of the President's most senior aides. The National Security Advisor, his Deputy, and the NSC Legal Advisor are the only officials within the NSC that hold the title of Assistant to the President. The NSA, Deputy NSA, and NSC Legal Advisor are also the only Assistants to the President who focus exclusively on national-security and foreign-policy matters.

**B.      Dr. Kupperman's National Security Functions and Relationship to the President**

10.      Dr. Kupperman served as Deputy NSA from January 9, 2019 to September 20, 2019. Dr. Kupperman also served as Acting NSA from September 10, 2019, to September 20, 2019, after Mr. Bolton's departure.

11.      Dr. Kupperman was the sole deputy to NSA Bolton, in contrast to some prior NSAs who have had more than one deputy. Dr. Kupperman's portfolio included all issues of national-security arising during his tenure, not just specific subsets of issues or particular geographic areas.

12.     As Deputy NSA, Dr. Kupperman spent the majority of his time advising or preparing advice for the President, and ensuring appropriate implementation of the President's decisions by responsible agencies and officials.   Dr. Kupperman provided this advice to the President either through Mr. Bolton or directly to the President (when Mr. Bolton was out of the office, traveling, or when Dr. Kupperman accompanied NSA Bolton to meetings with the President).

13.     With rare exceptions, during Dr. Kupperman's tenure all national-security issues presented to the President for decision would first be raised with both NSA Bolton and Dr. Kupperman, as the Deputy NSA, for assessment of the relevant facts, information, and policy considerations, and formulation of appropriate advice.   Dr. Kupperman was responsible for amassing and integrating information and advice from all pertinent Executive Branch agencies and officials, and making recommendations to NSA Bolton and/or the President, on virtually all issues of national security requiring decision-making by the President.   He was also frequently tasked with responsibility for communicating the President's decisions to responsible Executive Branch agencies and officials, and ensuring thereafter that the President's directives were appropriately implemented in a coordinated fashion and in harmony with U.S. law and policy and national-security objectives.

14.     During his tenure as Deputy NSA, Dr. Kupperman was one of the President's closest advisors.   He met with the President multiple times per week, generally to advise on national-security issues, and he regularly participated in Oval Office meetings pertaining to foreign policy.

15.     Dr. Kupperman was also one of approximately a half-dozen close aides generally present at the President's meetings with foreign leaders and on Head of State calls, and he was a central participant in the Presidential briefings that often preceded such communications.

16.     Dr. Kupperman regularly attended the Principals Committee meetings attended by the President's senior-most advisors, including Cabinet Secretaries, and National Security Council Meetings chaired by the President.  He also chaired meetings of the NSC Deputies Committee, the senior sub-cabinet forum for consideration of national-security policy issues, regularly attended by the Deputy Secretaries of State, Treasury, Defense, Energy, and Homeland Security, and the Deputy Attorney General..  These meetings consider issues that affect the national-security and foreign-policy interests of the United States for purposes, among others, of formulating national-security and foreign-policy advice on issues requiring decision by the President.  For many issues, the Deputies Committee is the senior-most level of interagency coordination.

17.     The responsibilities of the NSA entail a significant amount of travel, and Mr. Bolton travelled more frequently than many previous NSAs, typically at least once a month and usually for multiple days at a time.  When Mr. Bolton travelled, Dr. Kupperman stepped directly into his shoes and served as the President's primary point of contact on all national-security matters. During these occasions, Dr. Kupperman met with the President with increased frequency and attended the Presidential Daily Brief on intelligence matters. Dr. Kupperman also travelled internationally with the President on multiple occasions, including occasions when Mr. Bolton was traveling separately.  And as noted above, Dr. Kupperman served as Acting National Security Advisor from September 10, 2019, to September 20, 2019.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 14, 2019.

MATTHIAS J. MITMAN

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                          )
CHARLES M. KUPPERMAN                )
                                                          )
                        *Plaintiff,*                      )
v.                                                        )          Civil Action No.  1:19-cv-3224 (RJL)
                                                          )
UNITED STATES HOUSE OF                )
REPRESENTATIVES, *et al.*                 )
                                                          )
                        *Defendants.*                  )
_____)

**[PROPOSED] ORDER**

UPON CONSIDERATION of Defendant President Donald J. Trump's motion to dismiss

or for summary judgment, the parties' oppositions and replies, and the entire record herein, it is

hereby ORDERED that the President's motion is GRANTED.

**IT IS SO ORDERED.**


Date:  _____                          _____
                                                           HON. RICHARD J. LEON
                                                           United States District Judge