**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHARLES M. KUPPERMAN,<br><br>        *Plaintiff*,<br><br>    v.<br><br>UNITED STATES HOUSE OF<br>        REPRESENTATIVES, *et al.*,<br><br>        *Defendants*. | No. 19-cv-3224 (RJL) |

## <u>HOUSE DEFENDANTS' MOTION TO DISMISS</u>

Defendants the United States House of Representatives; Nancy Pelosi, the Speaker of the House; Adam B. Schiff, Chairman of the House Permanent Select Committee on Intelligence; Eliot L. Engel, Chairman of the House Committee on Foreign Affairs; and Carolyn B. Maloney, Acting Chair of the House Committee on Oversight and Reform (collectively, House Defendants), through their undersigned counsel, respectfully move the Court to dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  A memorandum of law accompanies this motion.

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (DC Bar No. 253492)
    *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
    *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854)
    *Associate General Counsel*
Josephine Morse (DC Bar No. 1531317)
    *Associate General Counsel*
Adam A. Grogg (DC Bar No. 1552438)
    *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, DC  20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

*Counsel for the House Defendants*

November 14, 2019

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHARLES M. KUPPERMAN,

       *Plaintiff*,

   v.

UNITED STATES HOUSE OF
     REPRESENTATIVES, *et al.*,

       *Defendants*.

No. 19-cv-3224 (RJL)

**MEMORANDUM OF LAW**
**IN SUPPORT OF HOUSE DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 2

ARGUMENT ......................................................................................................................... 4

I.     This Court Lacks Jurisdiction Because This Case Is Moot ................................................. 5

II.    This Court Lacks Jurisdiction over the House Defendants Because Their Sovereign
       Immunity Has Not Been Waived ....................................................................................... 8

III.   This Court Lacks Jurisdiction over the House Defendants Under the Speech or Debate
       Clause ............................................................................................................................... 9

IV.    The President's Directive That Kupperman Not Testify Has No Basis in Law ............... 15

       A.     No Legal Authority Supports Absolute Immunity for Presidential Advisors ....... 15

       B.     The Executive's Position Contravenes Precedent Rejecting Absolute Immunity
              in Similar Contexts ..................................................................................................... 17

       C.     The Executive's Position Is Even Weaker as to Former Presidential Advisors ... 24

       D.     Absolute Immunity Would Violate Separation-of-Powers Principles ................. 25

CONCLUSION .................................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Alcoa Power Generating Inc. v. FERC*,
    643 F.3d 963 (D.C. Cir. 2011) .................................................................................8

*Am. Petroleum Inst. v. EPA*,
    683 F.3d 382 (D.C. Cir. 2012) .................................................................................8

*Barker v. Conroy*,
    921 F.3d 1118 (D.C. Cir. 2019) ..............................................................................7

*Bogan v. Scott-Harris*,
    523 U.S. 44 (1998) ................................................................................................11

*Butz v. Economou*,
    438 U.S. 478 (1978) ..............................................................................................22

*Chafin v. Chafin*,
    568 U.S. 165 (2013) ................................................................................................8

*Clark v. Library of Cong.*,
    750 F.2d 89 (D.C. Cir. 1984) ..................................................................................9

*Clarke v. United States*,
    915 F.2d 699 (D.C. Cir. 1990) .............................................................................7, 8

*Clinton v. Jones*,
    520 U.S. 681 (1997) ..................................................................................18, 25, 27

*Cofield v. United States*,
    64 F. Supp. 3d 206 (D.D.C. 2014) ..........................................................................9

\* *Comm. on the Judiciary v. Miers*,
    558 F. Supp. 2d 53 (D.D.C. 2008) ................................................................ *passim*

\* *Decker v. Nw. Envtl. Def. Ctr.*,
    568 U.S. 597 (2013) ................................................................................................5

*Dellums v. Powell*,
    561 F.2d 242 (D.C. Cir. 1977) ..............................................................................18

*Diffenderfer v. Cent. Baptist Church of Miami, Fla., Inc.*,
    404 U.S. 412 (1972) ................................................................................................6

*Doe v. Gates*,
    828 F. Supp. 2d 266 (D.D.C. 2011) ...........................................................................6

*Doe v. McMillan*,
    412 U.S. 306 (1973)................................................................................10, 11

*Dombrowski v. Eastland*,
    387 U.S. 82 (1967)..........................................................................................10

* *Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975).................................................................................. *passim*

*Genesis Healthcare Corp. v. Symczyk*,
    569 U.S. 66 (2013)............................................................................................5

*Gordon v. Lynch*,
    817 F.3d 804 (D.C. Cir. 2016) ........................................................................7

*Gravel v. United States*,
    408 U.S. 606 (1972)................................................................................. *passim*

*Ha v. U.S. Dep't of Educ.*,
    680 F. Supp. 2d 45 (D.D.C. 2010) .............................................................4, 5

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982)................................................................................. *passim*

*Hastings v. U.S. Senate, Impeachment Trial Comm.*,
    716 F. Supp. 38 (D.D.C. 1989)......................................................................12

*In re Kessler*,
    100 F.3d 1015 (D.C. Cir. 1996) .....................................................................22

*In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of
    Evidence to the House of Representatives*,
    370 F. Supp. 1219 (D.D.C. 1974) ..................................................................26

*In re Request for Access to Grand Jury Materials Grand Jury No. 81-1, Miami*,
    833 F.2d 1438 (11th Cir. 1987) .....................................................................12

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997).................................................................18, 19

*Jerome Stevens Pharms., Inc. v. FDA*,
    402 F.3d 1249 (D.C. Cir. 2005)........................................................................5

*Keener v. Congress*,
 467 F.2d 952 (5th Cir. 1972) ...................................................................8

*Kokkonen v. Guardian Life Ins. Co.*,
 511 U.S. 375 (1994)..............................................................................4

*Lane v. Peña*,
 518 U.S. 187 (1996)..............................................................................9

*Los Angeles Cty. v. Davis*,
 440 U.S. 625 (1979)..............................................................................6

*Loving v. United States*,
 517 U.S. 748 (1996)......................................................................20, 25

*McLean v. United States*,
 566 F.3d 391 (4th Cir. 2009) ..................................................................8

*Medellin v. Texas*,
 552 U.S. 491 (2008)............................................................................25

*MINPECO, S.A. v. Conticommodity Servs., Inc.*,
 844 F.2d 856 (D.C. Cir. 1988) .........................................................11, 13

*Mistretta v. United States*,
 488 U.S. 361 (1989)............................................................................21

*Mont. Shooting Sports Ass'n, Inc. v. Norton*,
 355 F. Supp. 2d 19 (D.D.C. 2004) ............................................................7

*Nat'l Black Police Ass'n v. Dist. of Columbia*,
 108 F.3d 346 (D.C. Cir. 1997).............................................................5, 6

*Nixon v. Adm'r of Gen. Servs.*,
 433 U.S. 425 (1977)............................................................................25

*Nixon v. Fitzgerald*,
 457 U.S. 731 (1982)......................................................................22, 27

*Nixon v. Sirica*,
 487 F.2d 700 (D.C. Cir. 1973)...............................................18, 19, 20, 26

*PETA v. U.S. Dep't of Agric. & Animal & Plant Health Inspection Serv.*,
 918 F.3d 151 (D.C. Cir. 2019) .................................................................7

\* *Porteous v. Baron*,
729 F. Supp. 2d 158 (D.D.C. 2010) ............................................................................ *passim*

*Rangel v. Boehner*,
785 F.3d 19 (D.C. Cir. 2015) ............................................................10, 11, 13, 14

*Rockefeller v. Bingaman*,
234 F. App'x 852 (10th Cir. 2007) .......................................................................9

*Senate Permanent Subcomm. on Investigations v. Ferrer*,
856 F.3d 1080 (D.C. Cir. 2017) ..........................................................................10

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
498 F.2d 725 (D.C. Cir. 1974) ........................................................17, 18, 19, 26

*Shuler v. United States*,
531 F.3d 930 (D.C. Cir. 2008) ............................................................................8

*Sossamon v. Lone Star State of Texas*,
560 F.3d 316 (5th Cir. 2009) .............................................................................7

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ......................................................................................5, 15

*Sun Oil Co. v. United States*,
514 F.2d 1020 (Ct. Cl. 1975) .............................................................................18

*Trump v. Mazars USA, LLP*,
940 F.3d 710 (D.C. Cir. 2019) ............................................................................4

*United States v. Brewster*,
408 U.S. 501 (1972) ..........................................................................................9

*United States v. Burr*,
25 F. Cas. 1987 (C.C. Va. 1807) .......................................................................17

\* *United States v. Nixon*,
418 U.S. 683 (1974) ................................................................................. *passim*

*Worth v. Jackson*,
451 F.3d 854 (D.C. Cir. 2006) ............................................................................6

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ...................................................................................21, 25

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017) ............................................................................23

**Constitution**

U.S. Const., Art. I, § 2 .................................................................1, 14 ,26

U.S. Const., Art. I, § 3 .................................................................................13

U.S. Const., Art. I, § 5 .................................................................................13

U.S. Const., Art. I, § 6 ...........................................................................1, 9

**Statute**

50 U.S.C. § 3091 .......................................................................................24

**Congressional Authorities**

H. Res. 660, 116th Cong. (2019) .............................................................2, 3

*Presidential Campaign Activities of 1972: Hearings Before the S. Select Comm. on Presidential Campaign Activities*, 93rd Cong. (1973) ............................21

U.S. Congress, House Committee on Banking, Finance, and Urban Affairs, *White House Contacts with Treasury/RTC Officials About "Whitewater"-Related Matters*, part 1, hearings, 103rd Cong., 2nd sess. (Washington: GPO, 1994) ...............................................24

U.S. Congress, Senate Committee on the Judiciary, *Inquiry into the Matter of Billy Carter and Libya*, hearings, 96th Cong., 2nd sess. (Washington: GPO, 1981)...................................24

U.S. Congress, Senate Select Committee on Secret Military Assistance to Iran and the Nicaraguan Opposition and the House Select Committee to Investigate Covert Arms Transactions with Iran, *Iran-Contra Investigation: Joint Hearings Before the House Select Committee to Investigate Covert Arms Transactions with Iran and the Senate Select Committee on Secret Military Assistance to Iran and the Nicaraguan Oppositions*, 100th Cong., 1st sess. (Washington: GPO, 1987) ...........................................................................24

*White House Contacts with Treasury/RTC Officials About "Whitewater"-Related Matters—Part 2*: Hearing Before the H. Comm. on Banking, Finance, and Urban Affairs, 103rd Cong. (1994) ........................................................................................21

**OLC Opinions**

*Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*,

38 Op. O.L.C. __, 2014 WL 10788678 (July 15, 2014) ...............................................15, 16, 23

*A Sitting President's Amenability to Indictment and Criminal Prosecution*,
    24 Op. O.L.C. 222, 2000 WL 33711291 (Oct. 16, 2000) .........................................................27

*Testimonial Immunity Before Congress of the Former Counsel to the President*,
    43 Op. O.L.C. __, 2019 WL 2315338 (May 20, 2019) .........................................15, 19, 20, 21

**Other**

Memorandum of Telephone Conversation, Telephone Conversation with President
    Zelenskyy of Ukraine (declassified Sept. 24, 2019) .................................................................22

Press Briefing by Acting Chief of Staff Mick Mulvaney, The White House (Oct. 17, 2019).......22

**INTRODUCTION**

The subpoena that gave rise to this lawsuit has been withdrawn, and it will not be reissued.  Accordingly, any injury that Plaintiff Charles Kupperman once alleged has been eliminated and will not recur.  This case is moot.  For that reason, and several others—including that Kupperman cannot proceed against the House of Representatives, the Speaker of the House, and the Chairs of three House committees—the House Defendants respectfully request that the Court grant their motion to dismiss.

Kupperman, the former Deputy National Security Advisor, filed suit seeking a declaration from this Court as to whether he should comply with a subpoena issued to him by the House Permanent Select Committee on Intelligence (HPSCI) in connection with the House's impeachment inquiry, or whether he should refuse to testify on the basis of the President's assertion that he is absolutely immune from Congressional process.  Kupperman's suit fails for many threshold reasons, any one of which independently requires dismissal of the House Defendants.

First, given the status of the House's impeachment inquiry, HPSCI has withdrawn the subpoena at issue here.  Kupperman has no injury, and because HPSCI will not reissue the subpoena, he can have no reasonable expectation of future injury.  Kupperman's case is thus moot and must be dismissed.

Second, even if this case were not moot, the House Defendants are constitutionally immune from Kupperman's suit.  There is no applicable waiver of the House Defendants' sovereign immunity, which bars this suit against them.  The Constitution's Speech or Debate Clause also absolutely immunizes the House Defendants.  *See* U.S. Const., Art. I, § 6, cl. 1.  As Kupperman acknowledges, the now-withdrawn subpoena was issued as part of the House's impeachment inquiry, pursuant to the House's "sole Power of Impeachment."  U.S. Const., Art.

I, § 2, cl. 5.  The subpoena's issuance was a legislative act protected by the Speech or Debate

Clause.  Indeed, in *Porteous v. Baron*, this Court had "little difficulty concluding" that actions

taken by Congressional defendants in an impeachment proceeding were "entitled to absolute

immunity under the Speech or Debate Clause."  729 F. Supp. 2d 158, 165 (D.D.C. 2010) (Leon,

J.).  That same reasoning requires dismissal of the House Defendants here.

Even if the Court were to reach the merits, it should still dismiss this case for failure to

state a claim.  Having rescinded his request for a declaration concerning the validity of HPSCI's

now-withdrawn subpoena, Kupperman's only claim concerns the validity of the Executive

Branch's absolute immunity theory.  That theory lacks any basis in law.  In the only judicial

opinion to have directly addressed the theory, Judge Bates—in a case without the jurisdictional

defects present here—deemed it "entirely unsupported by existing case law" and "virtually

foreclosed by the Supreme Court."  *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 99,

100 (D.D.C. 2008).  *Miers* is squarely on point.  The Executive Branch's absolute immunity

theory conflicts with decades-old precedent rejecting absolute immunity in similar contexts, and

impedes the House's urgent impeachment inquiry, violating the separation of powers.  Affirming

the Executive's absolute immunity theory would permit the President to shield his misconduct

from scrutiny even in an impeachment.  This Court should not allow the President to place

himself above the law.

For all of these reasons, or any one of them, the House Defendants request that the Court

dismiss this case.

## BACKGROUND

The House of Representatives is investigating whether to impeach the President.  *See,*

*e.g.*, H. Res. 660, 116th Cong. (2019).  Kupperman is the former Deputy National Security

Advisor and Assistant to the President, and he briefly served as Acting National Security

Advisor.  Compl. ¶ 1 (Oct. 25, 2019), ECF No. 1.  He is no longer an employee of the federal

government.  *See id.* ¶ 2.

On October 25, 2019, HPSCI issued a subpoena to Kupperman compelling him to appear

for a deposition on October 28, to "testify about his official duties in connection with the United

States' relations with Ukraine" as part of the House's impeachment inquiry.  *Id.* ¶ 1; *see id.*, Ex.

A (subpoena).  On the same day the subpoena was issued, the White House instructed

Kupperman "not to appear and testify in response to the subpoena," asserting a purported

"'constitutional immunity of current and former senior advisors to the President.'"  *Id.* ¶ 18; *see

id.*, Ex. B (letter from the White House Counsel to Kupperman's attorney, attaching a letter from

the Office of Legal Counsel (OLC) to the White House Counsel).

Also on October 25, Kupperman filed this suit, requesting that this Court declare

(1) whether HPSCI's subpoena "is authorized by, and valid under, House Rules," and

(2) whether "the President's assertion of immunity from Congressional process on behalf of

[Kupperman] is valid and binding on [him]."  *Id.*, Prayer for Relief ¶ A(1), (2).  Kupperman

asserted that his injury arose from his inability to "satisfy the competing demands of both the

Legislative and Executive Branches."  *Id.* ¶ 1.

Kupperman failed to appear at his deposition scheduled for October 28.  On October 31,

the House adopted House Resolution 660, which directed six House committees, including

HPSCI, "to continue their ongoing investigations as part of the existing House of Representatives

inquiry into whether sufficient grounds exist for the House of Representatives to exercise its

Constitutional power to impeach Donald John Trump, President of the United States of

America."  H. Res. 660, at 1.  Following the House's adoption of this resolution, Kupperman

notified the parties and this Court that "declaratory relief is no longer necessary" as to whether

HPSCI's subpoena was "authorized by, and valid under, House Rules." Notice at 1 (Nov. 4, 2019), ECF No. 20. Because Kupperman has withdrawn this claim, *see* Compl. ¶¶ 30-38, 45; *id.*, Prayer for Relief ¶ A(1), House Defendants do not address it here but reserve their right to address why that claim should also be dismissed should Kupperman attempt to reassert it. In any event, Kupperman has acknowledged that any such claim is foreclosed by *Trump v. Mazars USA, LLP*, 940 F.3d 710 (D.C. Cir. 2019). *See* Compl. ¶ 38. Accordingly, the only merits question here concerns the Executive Branch's absolute immunity theory. *See id.* ¶¶ 21-29.

On November 5, 2019, HPSCI withdrew the subpoena to Kupperman that is the subject of this suit. *See* House Defs.' Notice of Mootness, Ex. A (Nov. 6, 2019), ECF No. 22-1. In light of the status of the House's impeachment inquiry, the House Defendants will not reissue the subpoena to Kupperman.

## ARGUMENT

Kupperman's suit should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) because this Court lacks jurisdiction. First, HPSCI has withdrawn the subpoena to Kupperman and will not reissue it. That subpoena was the sole subject of Kupperman's suit; because it is no longer in force, this case is moot. Second, Kupperman has not identified—and cannot identify—a waiver of the House Defendants' sovereign immunity. Third, as the Supreme Court and this Court have held, the Speech or Debate Clause bars attempts like this one to sue Congressional defendants for legislative acts, *e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502-03 (1975), including in an impeachment, *see Porteous*, 729 F. Supp. 2d at 165.

"Federal courts are courts of limited jurisdiction," and the burden of establishing jurisdiction rests upon the party asserting it. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). A Rule 12(b)(1) motion "imposes on a court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Ha v. U.S. Dep't of Educ.*, 680 F.

Supp. 2d 45, 46 (D.D.C. 2010) (Leon, J.).  "For this reason, the Court may give a plaintiff's factual allegations closer scrutiny in resolving a Rule 12(b)(1) motion for lack of subject matter jurisdiction than a 12(b)(6) motion for failure to state a claim," *id.*, and "may consider materials outside the pleadings," *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

"Without jurisdiction the court cannot proceed at all in any cause," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quotation marks omitted), and this Court should dismiss this case for lack of jurisdiction.  Even if the Court had jurisdiction, however, the Court should still grant the House Defendants' motion to dismiss under Rule 12(b)(6).  As the only court to have considered the Executive Branch's absolute immunity theory correctly concluded, that theory has no basis in law.  *See Miers*, 558 F. Supp. 2d at 99-107.

## I.      This Court Lacks Jurisdiction Because This Case Is Moot

1.  Article III "restricts the authority of federal courts to resolving the legal rights of litigants in actual controversies." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (quotation marks omitted).  An Article III controversy "must be extant at all stages of review, not merely at the time the complaint is filed." *Id.* (quotation marks omitted).  Even where a suit presents a live controversy when filed, courts "must refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Nat'l Black Police Ass'n v. Dist. of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) (quotation marks and alterations omitted).

This case is moot.  HPSCI has withdrawn the disputed subpoena and Kupperman is therefore no longer subject to allegedly competing compulsory "demands of both the Legislative and Executive Branches," which is the sole injury he alleged.  Compl. ¶ 1.  Because Kupperman suffers no ongoing injury, it would be "impossible for [this Court] to grant any effectual relief"

to him, even if he prevailed. *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 609 (2013) (quotation marks omitted). A judgment detailing Kupperman's obligations regarding a nonexistent subpoena would not redress any harm to him and would be a quintessential "advisory opinion[] on abstract propositions of law" that Article III prohibits this Court from issuing. *Los Angeles Cty. v. Davis*, 440 U.S. 625, 633 (1979) (quotation marks omitted).

**2.** The theoretical possibility that the House Defendants could at some future date serve Kupperman with a new subpoena—which the House Defendants have confirmed they will not do—does not preserve an Article III controversy. A defendant's conduct will moot a case where "there is no reasonable expectation that the alleged violation will recur" and where the effects of the alleged violation have been "completely or irrevocably eradicated." *Nat'l Black Police Ass'n*, 108 F.3d at 349 (quotation marks omitted). As this Court has explained, "[w]here a defendant voluntarily ceases the allegedly illegal activity, dismissal is warranted so long as the behavior could not reasonably be expected to recur." *Doe v. Gates*, 828 F. Supp. 2d 266, 271 (D.D.C. 2011) (Leon, J.) (quotation marks omitted).

A case is moot where the government withdraws the challenged act or policy without any intent to revive it. For example, a challenge to a statute that is repealed during litigation is moot absent an affirmative indication that the statute will be reenacted. The Supreme Court has entertained challenges to repealed statutes only "where the governing body expressed an intent to re-enact the allegedly defective law." *Worth v. Jackson*, 451 F.3d 854, 861 (D.C. Cir. 2006); *see also Diffenderfer v. Cent. Baptist Church of Miami, Fla., Inc.*, 404 U.S. 412, 415 (1972) ("[R]elief is, of course, inappropriate now that the statute has been repealed.").

The D.C. Circuit has similarly explained that the "mere power to reenact a challenged law is not a sufficient basis on which a court can conclude" that a case survives; instead, there

must "be evidence indicating that the challenged law likely will be reenacted." *Nat'l Black Police Ass'n*, 108 F.3d at 349.  And in the context of a challenge to an agency order, this Court has found a case moot where the agency "rescinded the challenged order and there [wa]s no reasonable expectation that the order could have any future effect." *Mont. Shooting Sports Ass'n, Inc. v. Norton*, 355 F. Supp. 2d 19, 21 (D.D.C. 2004) (Leon, J.).

Here, there is no likelihood that the now-withdrawn subpoena will be reissued.  To the contrary, the House Defendants have represented that they *will not* reissue a subpoena to Kupperman.  This representation more than suffices to confirm that this case is moot.[1]  Although the D.C. Circuit has declined to dismiss cases as moot where the defendant "deliberate[ly] equivocat[es]" about its intentions, *Clarke*, 915 F.2d at 703, no such equivocation exists in the House Defendants' representation here.  If there were any doubt, the House Defendants' representation regarding their intentions "must be read in light of the presumption of legitimacy accorded to the Government's official conduct." *PETA v. U.S. Dep't of Agric. & Animal & Plant Health Inspection Serv.*, 918 F.3d 151, 157 (D.C. Cir. 2019) (quotation marks omitted); *see also Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) (noting that "government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants," and that "[w]ithout evidence to the contrary, [courts] assume that formally announced changes to official governmental policy are not mere litigation posturing").

---

[1] *See Gordon v. Lynch*, 817 F.3d 804, 807 (D.C. Cir. 2016) (case moot where "government counsel adopted at oral argument positions" making clear that the government would not proceed with challenged conduct); *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) (case moot where "the government at oral argument" formally stated that it would not proceed with the challenged conduct); *see also Barker v. Conroy*, 921 F.3d 1118, 1124 (D.C. Cir. 2019) (accepting representation of House General Counsel on behalf of the House of Representatives).

**3.**  Even if the Court were to deem it possible that Kupperman could be subjected to a subpoena at a future date, and that the Executive would again assert absolute immunity, this remote prospect would not give rise to a justiciable controversy.  *See Clarke*, 915 F.2d at 702 ("[Z]ero risk is not the test.").  Any challenge to a nonexistent subpoena would not be ripe.  Such a challenge would not present issues "fit for judicial review," *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 968 (D.C. Cir. 2011), because any consideration of Kupperman's obligations regarding a nonexistent subpoena would be an "opinion[] advising what the law would be upon a hypothetical state of facts," *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quotation marks omitted).

Moreover, Kupperman experiences no "hardship … [from] withholding court consideration," *Alcoa Power Generating*, 643 F.3d at 967, because he has not alleged that he suffers any residual injury following HPSCI's withdrawal of the subpoena.  To exercise jurisdiction anyway would undermine the judicial "interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (quotation marks omitted).  At the very least, there are compelling prudential reasons to refrain from awarding Kupperman the equitable relief of a declaratory judgment in these circumstances.  *See id.* at 386-90 (addressing prudential ripeness).

## II.  This Court Lacks Jurisdiction over the House Defendants Because Their Sovereign Immunity Has Not Been Waived

Kupperman's claim against the House Defendants is barred by sovereign immunity, under which "[t]he United States is protected from unconsented suit." *Shuler v. United States*, 531 F.3d 930, 932 (D.C. Cir. 2008) (quotation marks omitted).  "[S]overeign immunity extends to the United States Congress when it is sued as a branch of government." *McLean v. United States*, 566 F.3d 391, 401 (4th Cir. 2009) (citing *Keener v. Congress*, 467 F.2d 952, 953 (5th Cir.

1972)); *accord Cofield v. United States*, 64 F. Supp. 3d 206, 213-14 (D.D.C. 2014) (same); *see Rockefeller v. Bingaman*, 234 F. App'x 852, 855 (10th Cir. 2007) ("[S]overeign immunity forecloses … claims against the House of Representatives and Senate as institutions, and Representative Pearce and Senator Bingaman as individuals acting in their official capacities." (quotation marks omitted)).

A plaintiff seeking to sue the federal government must identify a waiver of sovereign immunity that is "unequivocally expressed in statutory text." *Lane v. Peña*, 518 U.S. 187, 192 (1996) (waiver "will not be implied"). Yet Kupperman has pointed to no such waiver, and there is none. *See, e.g.*, *Clark v. Library of Cong.*, 750 F.2d 89, 102-04 (D.C. Cir. 1984) (holding that monetary claims against the Librarian of Congress in his official capacity were barred by sovereign immunity). While sovereign immunity may not bar claims for "non-monetary, specific relief … where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority," *id.* at 102, Kupperman presents no such claim as to the House Defendants. As noted above, Kupperman has withdrawn his request for relief concerning the validity of HPSCI's subpoena under House Rules, and no longer alleges that any action of the House Defendants was unauthorized. There is no basis for holding that the House Defendants' sovereign immunity does not apply.

## III.    This Court Lacks Jurisdiction over the House Defendants Under the Speech or Debate Clause

**1.** The Speech or Debate Clause of the Constitution provides that "for any Speech or Debate in either House, [Members of Congress] shall not be questioned in any other Place." U.S. Const., Art. I, § 6, cl. 1. The Clause "insure[s] the historic independence of the Legislative Branch," which is "essential to our separation of powers," *United States v. Brewster*, 408 U.S. 501, 525 (1972), by "prevent[ing] intimidation of legislators by the Executive and accountability

9

before a possibly hostile judiciary," *Gravel v. United States*, 408 U.S. 606, 617 (1972).  As this Court has observed, "[t]he Speech or Debate Clause protects the independence and autonomy of the Legislative Branch from judicial intrusion."  *Porteous*, 729 F. Supp. 2d at 166.

As the Framers recognized, "legislative independence is imperiled" when a "civil action … creates a distraction and forces Members to divert their time, energy, and attention from their legislative tasks to defend the litigation."  *Eastland*, 421 U.S. at 503; *see Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir. 2015) ("The prospect of civil liability lessens the ability of the Members of the Congress to represent the interests of their constituents[.]" (quotation marks omitted)).  Where it applies, the Speech or Debate Clause confers "absolute immunity from civil suit."  *Rangel*, 785 F.3d at 23.  It protects legislators "not only from the consequences of litigation's results but also from the burden of defending themselves."  *Porteous*, 729 F. Supp. 2d at 163 (quoting *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967)).

"Without exception," the Supreme Court has "read the Speech or Debate Clause broadly to effectuate [these] purposes."  *Eastland*, 421 U.S. at 501-02 (collecting cases).  Although "the Clause speaks of 'Speech or Debate,' it extends further to all 'legislative acts'" by Members of Congress and their staffs.  *Rangel*, 785 F.3d at 23 (quoting *Doe v. McMillan*, 412 U.S. 306, 312 (1973)); *see Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080, 1085-86 (D.C. Cir. 2017) (The Clause "functions to immunize Members of Congress from civil or criminal liability arising from 'actions [falling] within the legislative sphere[.]'" (quoting *McMillan*, 412 U.S. at 312)).  The Supreme Court, in turn, has broadly defined "legislative acts" to include those acts that are

> an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the

consideration and passage or rejection of proposed legislation or *with respect to other matters which the Constitution places within the jurisdiction of either House*.

*Gravel*, 408 U.S. at 625 (emphasis added).

Consistent with this broad construction, the protections of the Clause are not abrogated by allegations that a legislator acted illegally or with malintent.  Rather, courts must assess the "nature of the act" to determine "whether, stripped of all considerations of intent and motive, [the challenged] actions [a]re legislative."  *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) ("Whether an act is legislative turns on the nature of the act itself[.]"); *see Porteous*, 729 F. Supp. 2d at 166 ("The focus is on the nature of the defendants' conduct more generally.  So long as the type of conduct he seeks to enjoin falls legitimately within the scope of legislative activity, it matters not whether the specific conduct is unlawful.").  Once the legislative-act test is met, that is "the end of the matter [for] … the courts."  *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 861 (D.C. Cir. 1988).  Such is the nature of Speech or Debate "absolute immunity, which is—in a word—absolute."  *Rangel*, 785 F.3d at 24.

Applying this standard, courts have repeatedly found Congressional investigative and fact-finding activities to be protected by the Clause.  In *Eastland*, for example, where a Congressional subpoena was challenged on First Amendment grounds, the Supreme Court held that "the Speech or Debate Clause provide[d] complete immunity."  421 U.S. at 507; *see id.* at 495.  "The acts of authorizing an investigation pursuant to which the subject materials were gathered, holding hearings where the materials were presented, [and] preparing a report" are likewise entitled to Speech or Debate immunity.  *McMillan*, 412 U.S. at 313; *see, e.g.*, *MINPECO, S.A.*, 844 F.2d at 860 ("Thus, the process by which a committee takes statements and prepares them for publication clearly qualifies as an activity within the legislative sphere.").  The same result obtains where such acts are taken in furtherance of impeachment proceedings.  *See,*

*e.g.*, *Porteous*, 729 F. Supp. 2d at 166 (Clause protects "the use of testimony to prepare for and conduct Congressional impeachment and removal proceedings").[2]

Actions by legislators in impeachment proceedings fall within the definition of "legislative acts" immune from suit precisely because "impeachment is viewed as a legislative activity in the sense that it is one of the 'other matters which the Constitution places within the jurisdiction of either House.'" *In re Request for Access to Grand Jury Materials Grand Jury No. 81-1, Miami*, 833 F.2d 1438, 1446 (11th Cir. 1987) (quoting *Gravel*, 408 U.S. at 625); *see, e.g., Porteous*, 729 F. Supp. 2d at 166 (Speech or Debate immunity "prevent[ed]" suit challenging use of testimony in Senate impeachment trial).[3]  The Speech or Debate Clause therefore "prevents [the Judiciary] from questioning Congress about actions taken in the impeachment process." *In re Request*, 833 F.2d at 1446.

**2.**  The above precedent compels the conclusion that the House Defendants are absolutely immune from this suit.  Kupperman seeks this Court's review of an act—specifically, the issuance by HPSCI of the now-withdrawn subpoena for his deposition testimony—taken as part of the House's impeachment inquiry.  But because impeachment is a "matter[] which the Constitution places within the jurisdiction of [the] House," *Gravel*, 408 U.S. at 625, the Speech or Debate Clause prohibits litigation against the House Defendants to determine what Kupperman's legal obligations were under the withdrawn subpoena, *see In re Request*, 833 F.2d

---

[2] *See also Hastings v. U.S. Senate, Impeachment Trial Comm.*, 716 F. Supp. 38, 42 (D.D.C.) (acts of Congressional staff in assisting "the Senators in conducting the [impeachment] hearings and disseminating the transcripts and committee report to Senators not on the committee" are "fully protected by the Speech and Debate Clause"), *aff'd*, 887 F.2d 332 (D.C. Cir. 1989) (per curiam).

[3] *See also Hastings*, 716 F. Supp. at 42 ("The Supreme Court has construed [the Speech or Debate Clause] broadly, and this Court must accordingly protect the legitimate activities of Senators acting within their constitutionally prescribed functions, including legislation and impeachment.")

at 1446; *see also Rangel*, 785 F.3d at 23 (Clause prohibited suit where court was asked to "review a congressional disciplinary proceeding—a legislative matter that the Constitution places within the jurisdiction of the House" (quotation marks and alterations omitted) (citing U.S. Const., Art. I, § 5, cl. 2)).  This result is also required by longstanding Supreme Court and D.C. Circuit precedent holding Congressional investigative and fact-finding efforts absolutely immune from challenge under the Clause.  *See, e.g.*, *Eastland*, 421 U.S. at 507; *MINPECO, S.A.*, 844 F.2d at 860; *see also Hastings*, 887 F.2d 332, at *1 ("[A]ppellants have not identified and we have not found any case in which the judiciary has issued injunctive or declaratory relief intercepting ongoing proceedings of the legislative branch.").

Given its similarities to this case, this Court's well-reasoned decision in *Porteous v. Baron* is instructive.  In *Porteous*, a suspended federal judge attempted to raise a Fifth Amendment challenge to the use, in his Senate impeachment trial, of sworn testimony that he had provided during the House's impeachment inquiry.  729 F. Supp. 2d at 160.  This Court reasoned that, because the "trial of impeachable offenses is, of course, a matter that the Constitution places within the *sole* jurisdiction of the Senate," the "consideration and use of such testimony by Members of Congress in the course of a Senate impeachment trial falls squarely within its legislative sphere."  *Id.* at 165 (citing U.S. Const., Art. I, § 3, cl. 6).  The Court accordingly had "little difficulty" concluding that Speech or Debate immunity applied.  *Id.*; *see id.* at 166 ("[B]ecause the use of testimony to prepare for and conduct Congressional impeachment and removal proceedings is conduct of the type that clearly falls within the legislative sphere, the Speech or Debate Clause prevents this Court from questioning, let alone enjoining, the [Congressional] defendants about their use of [the plaintiff's] … testimony, whether or not such use actually runs afoul of the Fifth Amendment.").

13

For Speech or Debate purposes, there is no meaningful difference between the circumstances in *Porteous* and those here.  As in *Porteous*, *see id.* at 165, Kupperman is challenging a legislative act by the House Defendants as part of their impeachment inquiry, which the Constitution places within their "sole" jurisdiction, U.S. Const., Art. I, § 2, cl. 5.  And, just as in *Porteous*, issuing a subpoena to Kupperman in an effort "to prepare for and conduct Congressional impeachment … clearly falls within the legislative sphere" covered by the Clause. 729 F. Supp. 2d at 166.

Thus, the "immunity afforded to the [House] [D]efendants by the Speech or Debate Clause, together with the already strong constitutional interests counseling against judicial interference with ongoing impeachment … proceedings in the [House], [mean] there is no sound basis for this Court to exercise its jurisdiction at this juncture." *Id.* at 166-67.

Kupperman has represented to the Court that he is no longer challenging the validity of HPSCI's now-withdrawn subpoena under the House Rules.  *See* Notice at 1 (Nov. 4, 2019), ECF No. 20.  Regardless, even if he were to reassert that claim, it would have no bearing on the applicability of the immunity afforded by the Speech or Debate Clause.  As the D.C. Circuit has emphasized, "[a]n act does not lose its legislative character simply because a plaintiff alleges that it violated the House Rules or even the Constitution." *Rangel*, 785 F.3d at 24 (citations omitted). Such an "argument—made in almost every Speech or Debate Clause case—has been rejected time and again." *Id.* (citing *Eastland*, 421 U.S. at 508-10 (collecting cases)).  As this Court observed in *Porteous*, "it would defeat the entire point of the Clause to subject a legislator to the burdens of [litigation] for the purpose of determining whether the legislator acted lawfully …[,] when the nature of the legislator's conduct is well within the normal bounds of legislative activity."  729 F. Supp. 2d at 165-66.

**IV.    The President's Directive That Kupperman Not Testify Has No Basis in Law**

Now that HPSCI has withdrawn the subpoena that it issued to Kupperman, and for all of the other reasons stated above, "the only function remaining to the [C]ourt is that of … dismissing" the House Defendants. *Steel Co.*, 523 U.S. at 94. If this Court were to reach the merits, however, it should join the only other court to have considered the issue and reject the Executive Branch's absolute immunity theory. *See Miers*, 558 F. Supp. 2d at 100.

**A.    No Legal Authority Supports Absolute Immunity for Presidential Advisors**

The Executive's theory of absolute immunity finds no support in the Constitution, federal statutes, or judicial precedent. In *Miers*, Judge Bates denied the Executive's contention that a former White House Counsel was absolutely immune from testifying before the House Committee on the Judiciary. *Id.* at 99-108. He found that the Executive's theory had no basis in law and declared that the former White House Counsel was required to testify. *Id.* at 108.

OLC has nonetheless continued to advise former and current senior White House advisors that they are absolutely immune from compelled Congressional testimony, stating that it "respectfully disagree[s] with the district court's conclusion in *Miers*." *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __, 2019 WL 2315338, at *10 (May 20, 2019); *see, e.g.*, *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. __, 2014 WL 10788678, at *7 (July 15, 2014) (similar). OLC's position has no more support in the law today than it did in 2008. As Judge Bates observed then, "[t]he Executive cannot identify a single judicial opinion that recognizes absolute immunity for senior presidential advisors in this or any other context. That simple yet critical fact bears repeating: the asserted absolute immunity claim here is entirely unsupported by existing case law." *Miers*, 558 F. Supp. 2d at 99.

15

Eleven years later, that fact remains unchanged, as OLC's recent letter deeming Kupperman absolutely immune demonstrates.  *See generally* Compl., Ex. B at 3-5.

Lacking any authority supporting its theory, OLC attempts to analogize to the Supreme Court's decision in *Gravel v. United States*, which held that Congressional aides are entitled to derivative immunity from testifying about legislative acts under the Speech or Debate Clause because they are "alter egos" of the Members they serve.  408 U.S. 606; *see* Compl., Ex. B at 3 (describing "the President's closest advisors … as his alter egos").  OLC reasons that if Congressional aides are entitled to immunity under *Gravel*'s interpretation of the Speech or Debate Clause, then senior Presidential advisors must share in any testimonial immunity the President has.  *See, e.g.*, *Immunity of the Assistant to the President*, 2014 WL 10788678, at *4.

This line of argument, however, "has been virtually foreclosed by the Supreme Court," *Miers*, 558 F. Supp. 2d at 100: the Supreme Court has refused to extend *Gravel*'s "alter ego" concept to Presidential advisors.  In *Harlow v. Fitzgerald*, the Court held that Presidential aides, unlike the President, are not absolutely immune from civil damages liability based on their official acts, rejecting the analogy to *Gravel* as "sweep[ing] too far."  457 U.S. 800, 810 (1982).  As the *Miers* court observed, "the Executive asks this Court to recognize precisely the type of blanket derivative absolute immunity that the Supreme Court declined to acknowledge in *Harlow*."  *Miers*, 558 F. Supp. 2d at 101.  Indeed, OLC's argument reads like the lone *dissent* in *Harlow*.  *See* 457 U.S. at 822-25, 828-29 (Burger, C.J., dissenting) (citing *Gravel*, 408 U.S. 606). "The derivative, 'alter ego' immunity that the Executive requests here … has been explicitly and definitively rejected."  *Miers*, 558 F. Supp. 2d at 101.

**B.      The Executive's Position Contravenes Precedent Rejecting Absolute Immunity in Similar Contexts**

**1.**  Not only is absolute testimonial immunity for Presidential advisors unsupported by any case law, but the very notion contravenes a long line of precedent rejecting Executive Branch claims of absolute *Presidential* immunity in closely analogous settings.  Most significantly, it has been well established, since 1807, that the President can be compelled to respond to subpoenas for documents, and courts have long denied the Executive's contention that the President enjoys an "absolute privilege" in that context.[4]

During the Watergate era, the Supreme Court and the D.C. Circuit definitively rejected the contention that the Executive has an absolute privilege from compulsory process, when President Nixon defied several subpoenas for audiotapes containing Presidential communications.  In *United States v. Nixon*, the President resisted a judicial subpoena requiring production of the tapes for use in a criminal trial, arguing that the constitutional separation of powers dictated that the President was absolutely privileged from responding to judicial compulsion.  418 U.S. at 686.  The Supreme Court disagreed, explaining that "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity … under all circumstances." *Id*. at 706.  The Court emphasized that "[t]he impediment that an absolute, unqualified privilege would place in the way of the primary constitutional duty of the Judicial

---

[4] *See United States v. Burr*, 25 F. Cas. 187, 191-92 (C.C. Va. 1807) (Marshall, C.J.) (President Jefferson could be compelled to produce documents based on a showing of need); *see also United States v. Nixon*, 418 U.S. 683, 705-07 (1974) (President cannot claim absolute privilege in response to judicial subpoena); *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 729-31 (D.C. Cir. 1974) (President cannot claim absolute privilege in response to Congressional subpoena).

Branch to do justice in criminal prosecutions." *Id.* at 707.  According to the Court, such a

doctrine

> would plainly conflict with the function of the courts under Art. III. … To read the
> Art. II powers of the President as providing an absolute privilege as against a
> subpoena essential to enforcement of criminal statutes on no more than a
> generalized claim of the public interest in confidentiality … would upset the
> constitutional balance of "a workable government" and gravely impair the role of
> the courts under Art. III.

*Id.*; *see In re Sealed Case*, 121 F.3d 729, 743 (D.C. Cir. 1997) (discussing *United States v.*

*Nixon*).

For similar reasons, the D.C. Circuit also denied President Nixon's claim of absolute

privilege over the tapes in response to a grand jury subpoena, refusing the President's

"invitations to refashion the Constitution" and noting that "[t]he Constitution mentions no

Executive privileges, much less any absolute Executive privileges." *Nixon v. Sirica*, 487 F.2d

700, 711, 715 (D.C. Cir. 1973); *see id.* at 713 ("[C]ounsel for the President can point to no case

in which a court has accepted the Executive's mere assertion of privilege as sufficient to

overcome the need of the party subpoenaing the documents.").

The D.C. Circuit also recognized that absolute privilege did not apply in response to a

subpoena for the tapes from the Senate Select Committee on Presidential Campaign Activities.

*Senate Select Comm.*, 498 F.2d at 731.  In addition, courts have denied claims of absolute

privilege over Presidential communications in civil litigation.  *See Dellums v. Powell*, 561 F.2d

242, 245-48 (D.C. Cir. 1977); *Sun Oil Co. v. United States*, 514 F.2d 1020, 1024 (Ct. Cl. 1975);

*cf. Clinton v. Jones*, 520 U.S. 681 (1997) (holding that the President is not absolutely immune

from a civil action arising from his personal conduct).

Courts have uniformly held that the President enjoys only a qualified privilege over

Presidential communications, which requires a case-by-case balancing of competing

constitutional values consistent with separation-of-powers principles.  *See, e.g.*, *United States v. Nixon*, 418 U.S. at 705-08; *Sirica*, 487 F.2d at 716-17.  In particular, "application of Executive privilege depends on a weighing of the public interest protected by the privilege against the public interests that would be served by disclosure in a particular case."  *Sirica*, 487 F.2d at 716.

Executive privilege, therefore, "can be overcome by an adequate showing of need" by a coequal branch.  *In re Sealed Case*, 121 F.3d at 745; *see Senate Select Comm.*, 498 F.2d at 731.  Thus, for example, the Supreme Court in *United States v. Nixon*, 418 U.S. at 711-13, and the D.C. Circuit in *Sirica*, 487 F.2d at 716-18, held that President Nixon's generalized interest in confidentiality must yield to the judiciary's overriding need for relevant evidence in specific criminal investigations or prosecutions.  Here, though repackaged as "absolute immunity," the Executive's theory is at bottom the same "absolute privilege" argument that courts already have rejected outright.  *See also* Compl. ¶ 29 ("[i]t is not clear whether OLC's extension of testimonial immunity to a congressional subpoena issued in support of an impeachment inquiry—a judicial proceeding—is consistent with Supreme Court precedent" (citing *United States v. Nixon*, 418 U.S. 683)).

**2.**  OLC's justifications for its proposed absolute testimonial immunity for senior Presidential advisors—which OLC admits is even "broader than[] executive privilege," *Testimonial Immunity Before Congress*, 2019 WL 2315338, at *2—all lack merit.

First, OLC defends its proposed immunity by relying on the "Executive Branch's strong interests in confidentiality."  *Id.* at *4; *see* Compl., Ex. B at 3.  But, as discussed above, ample Supreme Court and D.C. Circuit precedent makes clear that such generalized confidentiality concerns regarding Executive Branch communications are properly addressed through a case-specific assertion of executive privilege and weighing of competing interests, rather than through

19

blanket immunity.  As the Supreme Court held in *United States v. Nixon*, for example, "when the ground for asserting privilege as to subpoenaed materials … is based only on the generalized interest in confidentiality, it … must yield to the demonstrated, specific need for evidence."  418 U.S. at 713; *see also Harlow*, 457 U.S. at 807 (observing, in the civil damages context, that "[f]or executive officials in general, … our cases make plain that qualified immunity represents the norm[]" (collecting cases)).  Or as the D.C. Circuit acknowledged in *Sirica*, the Executive's interest in confidentiality "is an argument for recognizing Executive privilege … , not for making the Executive the judge of its own privilege."  487 F.2d at 715.  Accordingly, "a claim of absolute immunity from compulsory process cannot be erected by the Executive as a surrogate for the claim of absolute executive privilege already firmly rejected by the courts."  *Miers*, 558 F. Supp. 2d at 103.

Second, OLC argues that absolute immunity is required to protect "the independence and autonomy of the Presidency."  Compl., Ex. B at 3 (quotation marks omitted).  But decades of actual experience show that Congress's ability to question White House advisors—subject to assertions of qualified executive privilege, where valid—does not impair the Executive Branch in the performance of its assigned constitutional functions.  *See Loving v. United States*, 517 U.S. 748, 757 (1996).  Executive Branch officials frequently testify before Congress and often are called upon to explain or justify Executive Branch actions, without harm to the Executive's institutional interests.[5]  Far from an encroachment on the Executive, such transparency is a

---

[5] Although OLC also contends that historical practice supports its conclusion that Presidential advisors are absolutely immune from testifying before Congress, *see, e.g.*, *Testimonial Immunity Before Congress*, 2019 WL 2315338, at *5-10, that position is belied by the fact that "senior advisors to the President have often testified before Congress," both under subpoena and voluntarily.  *Miers*, 558 F. Supp. 2d at 102.  For example, several aides to President Nixon testified before the Senate Select Committee on Presidential Campaign

display of the "autonomy but reciprocity" among the branches that the Constitution envisions. *Mistretta v. United States*, 488 U.S. 361, 381 (1989) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)).

Third, OLC claims that the prospect of White House advisors having to testify before Congress would threaten "the independence and candor" of Executive Branch deliberations. Compl., Ex. B at 4; *see Testimonial Immunity Before Congress*, 2019 WL 2315338, at *4-5. The Supreme Court, however, addressed this very concern when it rejected the Executive's absolute privilege claim in *United States v. Nixon*, explaining that "[t]hese are the considerations justifying a *presumptive* privilege for Presidential communications." 418 U.S. at 708 (emphasis added) (concluding that a qualified privilege is sufficient to protect "the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking"). In addition, the Supreme Court has held that Presidential advisors are subject to civil suits for their official acts, *see Harlow*, 457 U.S. at 807-09, and "civil suits for money damages present a greater potential for such a chilling effect," *Miers*, 558 F. Supp. 2d at 101-02.

Fourth, and finally, OLC invokes *Harlow* in asserting that its absolute immunity theory "is strengthened" as to Kupperman because his "duties concerned national security," and because HPSCI "apparently seeks [his] testimony about the President's conduct of relations with a

---

Activities in connection with the Watergate investigation. *See, e.g., Presidential Campaign Activities of 1972: Hearings Before the S. Select Comm. on Presidential Campaign Activities*, 93rd Cong. 911-1094 (1973) (testimony of John Dean); *id.* at 2866-906, 3017-229 (testimony of H.R. Haldeman). Similarly, multiple White House aides testified before committees of the House and Senate during investigations related to the Madison Guaranty Savings and Loan Association, the Whitewater Development Corporation, and alleged campaign fund-raising abuses. *See, e.g., White House Contacts with Treasury/RTC Officials About "Whitewater"-Related Matters—Part 2: Hearing Before the H. Comm. on Banking, Finance, and Urban Affairs*, 103rd Cong., 7-96 (1994) (testimony of former White House Counsel Bernard Nussbaum); *id.* at 97-196 (testimony of former Chief of Staff Thomas F. McLarty).

foreign government."  Compl., Ex. B at 4; *see id.*, Ex. B at 4-5 (citing *Harlow*, 457 U.S. at 812 &

n.19).  Again, having withdrawn its subpoena, HPSCI is not compelling Kupperman's testimony

on *any* topic.  Regardless, OLC is incorrect.  As explained above, *Harlow* rejected a blanket

attempt to analogize Presidential advisors to the Congressional aides at issue in *Gravel*.  In that

way, *Harlow* accords with precedent holding that the "President's unique status under the

Constitution," the "singular importance of the President's duties," and the "sheer prominence of

the President's office" all "distinguish[] him from other executive officials," regardless of their

functions.  *Nixon v. Fitzgerald*, 457 U.S. 731, 750-51 (1982).[6]

    *Harlow* posited that national security advisors "might well" have a stronger claim to

absolute immunity from civil damages claims than other advisors.  457 U.S. at 812; *see id.* at 812

n.19 (any "analogy to *Gravel … would* be strongest" in such a case (emphasis added)).  But the

fact that confidentiality is generally paramount in "such sensitive areas as national security or

foreign policy," *id.* at 812, has no application here.  The White House has released substantial

information on the topics about which Kupperman might testify, including by declassifying the

Memorandum of Telephone Conversation from President Trump's July 25, 2019 call with

President Zelenskyy of Ukraine.[7]  Contrary to Kupperman's unadorned assertion, therefore, the

information HPSCI sought by means of its now-withdrawn subpoena cannot be fairly

characterized as generally "confidential."  Compl. ¶ 29.  Nor is it correct to describe the

---

[6] *See also Butz v. Economou*, 438 U.S. 478, 504 (1978) (no absolute immunity for
cabinet-level officials from civil suit for official acts); *In re Kessler*, 100 F.3d 1015, 1017 (D.C.
Cir. 1996) ("[F]or purposes of separation of powers, the President stands in an entirely different
position than other members of the executive branch.").

[7] *See* Memorandum of Telephone Conversation, Telephone Conversation with President
Zelenskyy of Ukraine (declassified Sept. 24, 2019), https://perma.cc/5CMZ-97TW; *see also*
Press Briefing by Acting Chief of Staff Mick Mulvaney, The White House (Oct. 17, 2019),
https://perma.cc/5SPF-9NWM.

information HPSCI's subpoena sought as "relating to …. national security communications," in conclusory fashion, *id.*, given evidence demonstrating that the President's conduct toward Ukraine had nothing to do with national security policy but instead concerned his personal political agenda.  It is therefore unlikely that Kupperman could ever "demonstrate that he was discharging [a] protected function when performing the act[s]" about which HPSCI's subpoena sought information, which *Harlow* requires.  457 U.S. at 813.

*Harlow* also requires an "official asserting" absolute immunity from civil damages liability to "show that the responsibilities of his office embraced a function so sensitive as to require a total shield from liability.  *Id.* at 812-13; *see also Immunity of the Assistant to the President*, 2014 WL 107886, at *2 (asserting that absolute immunity applies to "trusted members of the President's inner circle who customarily meet with the President on a regular or frequent basis … and upon whom the President relies directly for candid and sound advice" (quotation marks omitted)).  Yet Kupperman only served as Acting National Security Advisor for ten days and otherwise served in a less senior position in the White House for just over eight months. Compl. ¶ 1.  Kupperman certainly cannot assert absolute immunity by merely invoking "national-security concerns," which "must not become a talisman used to ward off inconvenient claims—a label used to cover a multitude of sins."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017) (quotation marks omitted).  That is particularly so here, where holding Kupperman absolutely immune from Congressional process could shield evidence of impeachable conduct by the President.  Indeed, *Harlow* concerned "suit[s] for civil damages," 457 U.S. at 802, not a Congressional investigation—and certainly not a House impeachment inquiry.  OLC has cited no authority extending *Harlow*'s suppositions about national security advisors to circumstances like these.

23

In any event, decades of history teach that Presidential advisors can testify to Congress about topics concerning national security and foreign policy with no apparent harm to the Presidency.  In 1980, then-White House Counsel Lloyd Cutler testified before the Senate to address alleged influence-peddling on behalf of Libya by President Carter's brother.[8]  And in 1987, former National Security Council staff member Oliver North and former Assistant to the President for National Security Affairs John Poindexter testified under subpoena about Iran-Contra.[9]

It bears noting that such testimony occurred against the backdrop of the National Security Act of 1947 which, as amended, requires the "President [to] ensure that the congressional intelligence committees are kept fully and currently informed of the intelligence activities of the United States."  50 U.S.C. § 3091(a)(1).  Pursuant to this requirement and otherwise, Congress—and HPSCI in particular—receives testimony from cabinet-level national security officials.  OLC has not adequately explained why a different rule should apply to Kupperman, a private citizen who previously served as Deputy National Security Advisor for well less than a year.

### C.    The Executive's Position Is Even Weaker as to Former Presidential Advisors

The argument for absolute immunity is weaker still as to former advisors.  The fact that Kupperman is a private citizen means that the President cannot delegate[e] … sensitive" national

---

[8] U.S. Congress, Senate Committee on the Judiciary, *Inquiry into the Matter of Billy Carter and Libya*, hearings, 96th Cong., 2nd sess. (Washington: GPO, 1981), p. 1195ff.  In 1994, Cutler again appeared before Congress, to discuss issues related to Whitewater.  U.S. Congress, House Committee on Banking, Finance, and Urban Affairs, *White House Contacts with Treasury/RTC Officials About "Whitewater"-Related Matters*, part 1, hearings, 103rd Cong., 2nd sess. (Washington: GPO, 1994), p. 12ff.

[9] U.S. Congress, Senate Select Committee on Secret Military Assistance to Iran and the Nicaraguan Opposition and the House Select Committee to Investigate Covert Arms Transactions with Iran, *Iran-Contra Investigation: Joint Hearings Before the House Select Committee to Investigate Covert Arms Transactions with Iran and the Senate Select Committee on Secret Military Assistance to Iran and the Nicaraguan Oppositions*, 100th Cong., 1st sess. (Washington: GPO, 1987), p. 1ff.

security functions to him, *Harlow*, 457 U.S. at 812 n.19, and that he can no longer "perform[] …

functions vital to the national interest," *id.* at 812, eliminating any possible rationale for absolute

immunity based on the nature of his former duties.  More generally, OLC claims that testifying

before Congress would distract Presidential advisors from their duties, *see* Compl., Ex. B at 3,

but those concerns are absent in the case of former advisors like Kupperman.  Testifying before

Congress will not impede his ability to facilitate Executive Branch functions; he no longer has

any.  The fact that OLC nonetheless insists that former advisors are absolutely immune on the

same terms as current advisors, *see id.*, Ex. B at 5 ("it is inconsequential that Mr. Kupperman is

now a private citizen"), reveals the startling breadth of OLC's theory.

In any event, now that Kupperman has left the Executive Branch, the President lacks

authority to issue orders to him.  The White House's letter instructing Kupperman not to comply

with his now-withdrawn subpoena cites no binding authority—constitutional, statutory, or

otherwise—supporting the President's claimed power to direct a former official to disobey

Congress.  *See* Compl., Ex. B.  Absent such authority, the President had no power to order his

former advisor to do anything.  *See Medellin v. Texas*, 552 U.S. 491, 524 (2008) ("The

President's authority to act … 'must stem either from an act of Congress or from the Constitution

itself.'" (quoting *Youngstown*, 343 U.S. at 585).

**D.      Absolute Immunity Would Violate Separation-of-Powers Principles**

As in *United States v. Nixon*, the Executive's absolute immunity theory also threatens the

separation of powers when invoked in the context of compelled Congressional testimony,

particularly in an impeachment inquiry.  The Supreme Court has recognized that "the separation-

of-powers doctrine requires that a branch not impair another in the performance of its

constitutional duties." *Jones*, 520 U.S. at 701 (quoting *Loving*, 517 U.S. at 757); *see also Nixon

v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977).  If sanctioned, the Executive Branch's

absolute immunity theory would do precisely that by impeding the House's access to information relevant to its impeachment inquiry.  *See Miers*, 558 F. Supp. 2d at 103, 106 (warning that absolute testimonial immunity for Presidential advisors "would eviscerate Congress's historical oversight function," and that "Congress's legitimate interest in inquiry could be easily thwarted"); *see also Sirica*, 487 F.2d at 715 ("If the claim of absolute privilege was recognized, its mere invocation by the President or his surrogates could deny access to all documents in all the Executive departments to all citizens and their representatives, *including Congress*[.]" (emphasis added)).

In an impeachment inquiry concerning the President, the House's need for information is at its zenith.  The House is discharging what is arguably its most consequential constitutional duty: investigating serious allegations that the President has abused the powers of his office, and evaluating whether to impeach—a responsibility that the Constitution assigns to the House alone. U.S. Const., Art. I, § 2, cl. 5; *see Senate Select Comm.*, 498 F.2d at 732.  During Watergate, Judge Sirica described "an impeachment investigation involving the President of the United States" as "a matter of the most critical moment to the Nation," noting that "[i]t would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on all the pertinent information."  *In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to the House of Representatives*, 370 F. Supp. 1219, 1230 (D.D.C. 1974).  But the House's ability to conduct an "unswervingly fair" impeachment inquiry, *id.*, will be impaired if it cannot obtain the important testimony it should have to thoroughly examine the President's misconduct.

Moreover, absolute testimonial immunity for Presidential advisors is particularly inappropriate where, as here, the investigation at issue concerns impeachment of the President

and the purported doctrine is invocable by the President himself to shield proof of his wrongdoing.  The Executive's position would allow the President to hinder the House's investigative power by blocking access to key evidence relevant to his own misdeeds.  Where Presidential advisors witness potentially unlawful activities, the Executive's position would effectively place the President above the law, including the constitutionally prescribed impeachment process.

OLC has long taken the position that the President cannot be prosecuted for crimes while in office, citing impeachment as the appropriate mechanism to ensure that the President will remain accountable for misconduct during such time.  *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 257, 2000 WL 33711291, at *27 (2000).[10]  The Executive's contention that the President is both immune from criminal prosecution *and* able to order his former advisors to refuse to provide testimony in an impeachment investigation would allow the President to obstruct the very constitutional process that OLC relies on to assert that immunity from prosecution is tolerable.

## CONCLUSION

The House Defendants respectfully request that this Court dismiss this action.

---

[10] *Cf. Jones*, 520 U.S. at 696 ("With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment."); *Nixon v. Fitzgerald*, 457 U.S. at 757 (recognizing that, even though Presidents are absolutely immune from civil suits for official misconduct, "[t]here remains the constitutional remedy of impeachment" to hold the President accountable).

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (DC Bar No. 253492)
 *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
 *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854)
 *Associate General Counsel*
Josephine Morse (DC Bar No. 1531317)
 *Associate General Counsel*
Adam A. Grogg (DC Bar No. 1552438)
 *Assistant General Counsel*
OFFICE OF GENERAL COUNSEL[*]
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, DC  20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

*Counsel for the House Defendants*

November 14, 2019

---

[*] The Office of General Counsel wishes to acknowledge the assistance of law clerks Christine Coogle, a student at The George Washington University Law School, Lily Hsu, a student at The George Washington University Law School, and Nate King, a student at The Catholic University of America, Columbus School of Law, in preparing this brief.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHARLES M. KUPPERMAN, *Plaintiff*, v. UNITED STATES HOUSE OF REPRESENTATIVES, *et al.*, *Defendants*. | No. 19-cv-3224 (RJL) |

**[PROPOSED] ORDER**

Upon consideration of the House Defendants' Motion to Dismiss (Nov. 14, 2019), any responses thereto, and the entire record herein, it is hereby

**ORDERED** that the House Defendants' motion is **GRANTED**; and it is further

**ORDERED** that this case is **DISMISSED**.

**SO ORDERED**.

_____
Date

_____
U.S. District Judge