**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CHARLES M. KUPPERMAN, | ) | |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) | Civil Action No. 19-3224 (RJL) |
| UNITED STATES HOUSE OF REPRESENTATIVES, *et al.*, | ) ) ) | |
| *Defendants,* | ) ) | |
| THE HONORABLE PAUL D. IRVING, in his official capacity as Sergeant-at-Arms of the United States House of Representatives, The United States Capitol, Room H-124 Washington, D.C.  20515 | ) ) ) ) ) ) | |
| *Proposed Defendant.* | ) ) ) | |

**CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

Charles J. Cooper, Bar No. 248070
Michael W. Kirk, Bar No. 424648
J. Joel Alicea, Bar No. 1022784
Shelby Baird[*]

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC  20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
Email: ccooper@cooperkirk.com

November 27, 2019

*Counsel for Plaintiff Charles M. Kupperman*

[*]D.C. Bar Application Pending; Admitted in Pennsylvania

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ................................................................................................................1

STATEMENT .......................................................................................................................1

ARGUMENT ........................................................................................................................3

I.     DR. KUPPERMAN'S SUIT IS NOT MOOT. ................................................. 3

     A.     The House Defendants' Voluntary Cessation of
           Allegedly Unlawful Conduct Does Not Moot Dr. Kupperman's Suit. ...................3

     B.     Dr. Kupperman's Suit Is Not Moot Because a Live Controversy
           Exists on Whether He Could Be Held in Contempt for His
           Conduct While the Subpoena Was Outstanding. ......................................................8

     C.     Prudential Ripeness Considerations Do Not
           Preclude this Court from Considering Dr. Kupperman's Suit. ..............................10

II.    DR. KUPPERMAN HAS STANDING. ........................................................... 11

     A.     Defendants Have Caused Dr. Kupperman To Be At
           Substantial Risk of Violating His Constitutional Oath of Office. .........................13

     B.     Defendants Have Placed Dr. Kupperman At Substantial Risk of
           the Reputational Harm That Comes With Being Held in Contempt. ....................19

     C.     Defendants Have Placed Dr. Kupperman At
           Substantial Risk of Being Fined for Contempt. .....................................................23

III.   DR. KUPPERMAN'S SUIT IS NOT BARRED BY SOVEREIGN IMMUNITY ...........29

IV.   DR. KUPPERMAN'S SUIT AGAINST THE PRESIDENT
     IS NOT BARRED BY ABSOLUTE IMMUNITY. ............................................................35

V.    DR. KUPPERMAN'S SUIT AGAINST THE HOUSE DEFENDANTS
     IS NOT BARRED BY THE SPEECH OR DEBATE CLAUSE. .....................................43

     A.     The Speech or Debate Clause Does Not Immunize the
           Sergeant-at-Arms for Enforcing the Challenged Subpoena ...............................44

B. The Speech or Debate Clause Does Not Preclude Suit When the Real Parties in Interest Are the Two Co-Equal Political Branches of Our Government.............................................................................................48

VI. DR. KUPPERMAN STATES A CAUSE OF ACTION. ...................................................51

CONCLUSION..............................................................................................................................54

## **TABLE OF AUTHORITIES**

**Cases**      **Page**

*Akron Bd. of Ed. v. State Bd. of Ed. of Ohio*, 490 F.2d 1285 (6th Cir. 1974)................16

*Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011)......................................................52

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013)........................................................7

*Am. Bar Ass'n v. Fed. Trade Comm'n*, 636 F.3d 641 (D.C. Cir. 2011) ..........................7

*Am. Petroleum Inst. v. EPA*, 683 F.2d 382 (D.C. Cir. 2012).......................................10

*\*Anderson v. Dunn*, 6 Wheat. (19 U.S.) 204 (1821)........................................24, 25, 26

*\*Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015)...................53, 54

*Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017) ............................................12

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) ..................21, 22, 28

*Barker v. Conroy*, 921 F.3d 1118 (D.C. Cir. 2019) .................................................12

*Becker v. Fed. Election Comm'n*, 230 F.3d 381 (1st Cir. 2000)...................................13

*Bell v. Hood*, 327 U.S. 678 (1946)........................................................................53

*Bender v. Williamsport Area School District*, 475 U.S. 534 (1986)..............................18

*\*Board of Educ. of Central School District No. 1 v. Allen*,
    392 U.S. 236 (1968)...................................................................................16

*Board of Educ. of Mt. Sinai Union Free Sch. Dist. v. New York State*
    *Teachers Ret. Sys.*, 60 F.3d 106 (2d Cir. 1995) ...........................................16

*California v. Texas*, 457 U.S. 164 (1982) ...............................................................30

*Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192 (D.C. Cir. 2011)........................13

*Chamber of Commerce of U.S. v. Reich*, 57 F.3d 1099 (D.C. Cir. 1995)......................10

*Citizens for Responsibility & Ethics in Washington v. Trump*,
    302 F. Supp. 3d 127 (D.D.C. 2018)............................................................38

*City of Houston v. HUD*, 24 F.3d 1421 (D.C. Cir. 1994) ...........................................10

*City of Jersey City v. Consol. Rail Corp.*, 668 F.3d 741 (D.C. Cir. 2012) ....................28

*City of S. Lake Tahoe v. California Tahoe Reg'l Planning Agency*,
    449 U.S. 1039 (1980)................................................................................18

*City of S. Lake Tahoe v. California Tahoe Reg'l Planning Agency*,
    625 F.2d 231 (9th Cir. 1980) ....................................................................18

*City of S. Miami v. Desantis*, 2019 WL 4752038 (S.D. Fla. Sept. 30, 2019) ................16

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)................................................13

*\*Clarke v. United States*, 705 F. Supp. 605 (D.D.C. 1988)...................................17, 18

*Clarke v. United States*, 915 F.2d 699 (D.C. Cir. 1990) ................................. 7, 8, 9, 17

*Clarke v. United States*, 886 F.2d 404 (D.C. Cir. 1989) ................................................ 17

*\*Clinton v. City of New York*, 524 U.S. 417 (1998) ...................................................... 39

*Cole v. Richardson*, 405 U.S. 676 (1972) ...................................................................... 15

*Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013) ................... 33

*\*Commercial Union Ins. Co. v. United States*, 999 F.2d 581 (D.C. Cir. 1993) ................ 30, 52

*Committee on Judiciary, U.S. House of Representatives v. Miers*,
558 F. Supp. 2d 53 (D.D.C. 2008) ................................................... 11, 24, 33, 54

*Common Cause v. Biden*, 748 F.3d 1280 (D.C. Cir. 2014) ........................................... 48

*Consolidation Coal Co. v. Fed. Mine Safety & Health Review Comm'n*,
824 F.2d 1071 (D.C. Cir. 1987) .................................................................. 11

*Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) .......................................... 53

*Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) ......................................................... 17

*Davis v. FEC*, 554 U.S. 724 (2008) .............................................................................. 12

*Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597 (2013) ..................................................... 9

*Delaware Riverkeeper Network v. Fed. Energy Regulatory Comm'n*,
895 F.3d 102 (D.C. Cir. 2018) .................................................................... 53

*District of Columbia Ass'n of Chartered Pub. Schs. v. District of Columbia*,
930 F.3d 487 (D.C. Cir. 2019) .................................................................... 54

*Doe v. Fed. Democratic Republic of Ethiopia*, 851 F.3d 7 (D.C. Cir. 2017) ................ 37

*\*Doe v. McMillan*, 412 U.S. 306 (1973) ................................................................. 44, 47

*\*Dombrowski v. Eastland*, 387 U.S. 82 (1967) .................................................. 44, 45, 46

*Duberry v. District of Columbia*, 924 F.3d 570 (D.C. Cir. 2019) ................................ 12

*Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905 (D.C. Cir. 1985) ............................... 11

*Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491 (1975) ......................................... 49

*Epperson v. Arkansas*, 393 U.S. 97 (1968) ................................................................. 28

*\*Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003) .......................... 19, 20, 23

*\*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ................................................ 35, 42

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
561 U.S. 477 (2010) ................................................................................ 53

*\*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ............................................................................. 3, 4, 5

*Gravel v. United States*, 408 U.S. 606 (1972) ...................................................... 45, 46, 47

*Green v. Bock Laundry Mach. Co.*, 490 U.S. 504 ......................................................... 52

*Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973 (D.C. Cir. 2016)................................................6

*Hayburn's Case*, 2 Dallas (2 U.S.) 408 (1792)......................................................................25

*\*Hudson Savings Bank v. Austin*, 479 F.3d 102 (2007).................................................31, 32, 33

*Hutto v. Finney*, 437 U.S. 678 (1978)....................................................................................25

*In re Ctr. for Auto Safety*, 793 F.2d 1346 (D.C. Cir. 1986) .....................................................7

*In re Glob. Indus. Techs., Inc.*, 645 F.3d 201 (3d Cir. 2011).............................................39, 40

*In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998) ......................................................................15

*Jurney v. MacCracken*, 294 U.S. 125 (1935) ...........................................................................9

*Keach v. County of Schenectady*, 593 F.3d 218 (2d Cir. 2010)................................................20

*Kifafi v. Hilton Hotels Ret. Plan*, 701 F.3d 718 (D.C. Cir. 2012)..........................................6, 7

*\*Kilbourn v. Thompson*, 103 U.S. 168 (1880)...........................................................25, 44, 45

*Knox v. Service Employees Int'l*, 567 U.S. 298 (2012)..............................................................8

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ..........................12

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................11, 12, 13, 18

*Mackie v. Bush*, 809 F. Supp. 144 (D.D.C. 1993) ..................................................................39

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)............................................................1, 14

*McBryde v. Committee to Review Circuit Council Conduct & Disability Orders*20
    *of Judicial Conference of U.S.*, 264 F.3d 52 (D.C. Cir. 2001)............................................20

*McGrain v. Daugherty*, 273 U.S. 135 (1927) ........................................................................24

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007)....................................................23

*Meese v. Keene*, 481 U.S. 465 (1987) ...................................................................................19

*Meina Xie v. Tillerson*, 2017 WL 2656648 (D.D.C. 2017) ....................................................12

*Mississippi v. Johnson*, 4 Wall. (71 U.S.) 475 (1886) .......................................................35, 39

*Nat'l Ass'n of Home Builders v. Army Corps of Engineers*,
    417 F.3d 1272 (D.C. Cir. 2005)...........................................................................................10

*Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346 (D.C. Cir. 1997)......................4

*New Hampshire Right to Life Political Action Comm. v. Gardner*,
    99 F.3d 8 (1st Cir. 1996) ....................................................................................................28

*Newdow v. Bush*, 391 F. Supp. 2d 95 (D.D.C. 2005) .............................................................41

*\*Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010)................................................36, 37, 38, 39

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982)..............................................................................35

*Orangeburg, S.C. v. FERC*, 862 F.3d 1071 (D.C. Cir. 2017)..................................................12

*Ord v. District of Columbia*, 587 F.3d 1136 (D.C. Cir. 2009)............................................28, 29

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) .................................................29

*Payne Enterprises, Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988) ...............................6, 11

*Peick v. Pension Ben. Guar. Corp.*, 724 F.2d 1247 (7th Cir. 1983) ......................................16

*Pollack v. Hogan*, 703 F.3d 117 (D.C. Cir. 2012) .......................................................34

*Porteous v. Baron*, 729 F. Supp. 2d 158 (D.D.C. 2010) ..................................................51

*\*Powell v. McCormack*, 395 U.S. 486 (1969) ........................................................44, 46

*Pulphus v. Ayers*, 909 F.3d 1148 (D.C. Cir. 2018) ....................................................19

*Qassim v. Bush*, 466 F.3d 1073 (D.C. Cir. 2006) ......................................................7

*Rangel v. Boehner*, 20 F. Supp. 3d 148 (D.D.C. 2013) .................................................20

*Regents of Univ. of Minnesota v. NCAA*, 560 F.2d 352 (8th Cir. 1977).................................16

*Rodearmel v. Clinton*, 666 F. Supp. 2d 123 (D.D.C. 2009)............................................18

*Sanders v. Armour Fertilizer Works*, 292 U.S. 190 (1934) .............................................30

*Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005)..................................................29

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) .............................................31

*SerVaas Inc. v. Mills*, 661 F. App'x 7 (2d Cir. 2016) ..................................................20

*Smith v. Katzenbach*, 351 F.2d 810 (D.C. Cir. 1965) ..................................................31

*Smith v. Obama*, 217 F. Supp. 3d 283 (D.D.C. 2016) .................................................18

*Stockdale v. Hansard*, 9 Ad. & E. 1, 112 Eng.Rep. 1112 (K.B.1839).................................45

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).........................................10, 11

*\*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996).....................................33, 35, 37, 39

*True the Vote, Inc. v. Internal Rev. Serv.*, 831 F.3d 551 (D.C. Cir. 2016) ...........................4, 5

*Trump v. Mazars USA, LLP*, 940 F.3d 710 (D.C. Cir. 2019) .........................................25

*Turkish Coal. of America, Inc. v. Bruininks*, 678 F.3d 617 (8th Cir. 2012) ...........................19

*U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53 (D.D.C. 2015)..........................33

*U.S. House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8 (D.D.C. 2019) .........................33

*U.S. House of Representatives v. U.S. Dep't of Commerce*,
    11 F. Supp. 2d 76 (D.D.C. 1998)....................................................................33

*United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121 (D.C. Cir. 1977) ................................49

*\*United States v. Am. Tel. & Tel. Co.*, 551 F.2d 384 (D.C. Cir. 1976) .............................48

*\*United States v. Lee*, 720 F.2d 1049 (9th Cir. 1983) ...............................................20

*United States v. Oregon State Med. Soc.*, 343 U.S. 326 (1952) .......................................6

*United States v. Schrimsher*, 493 F.2d 842 (5th Cir. 1974)...........................................20

*United States v. U.S. House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983) ....................33

*United States v. W. T. Grant Co.*, 345 U.S. 629 (1953) .................................................6

*Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*,
    892 F.3d 332 (D.C. Cir. 2018) ..........................................................................12

*Wheaton Coll. v. Sebelius*, 703 F.3d 551 (D.C. Cir. 2012) ..........................................12

*Young v. Higbee Co.*, 324 U.S. 204 (1945) ....................................................................30

## Constitutions, Statutes and Rules

U.S. CONST.
    art. I, § 6 .........................................................................................................43
    art. III, §§ 1, 2 .................................................................................................41

5 U.S.C. § 3331 ..............................................................................................................14

28 U.S.C. § 1335 ............................................................................................................51

FED. R. CIV. P. 22(b) ......................................................................................................52

## Other Authorities

1 Steven S. Gensler, *Federal Rules of Civil Procedure, Rules and Commentary*
    (West 2019) .....................................................................................................52

13B Charles A. Wright & Arthur R. Miller, FED. PRAC. & PROC. JURIS. (3d ed.)
    § 3531.11.3 ......................................................................................................17
    § 3532.5 ...........................................................................................................28

3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION § 1838 (1833) ....................14

9 William Holdsworth, *A History of English Law* (3d ed. 1944) .................................40

Ari Shapiro, *Rep. Adam Schiff Reacts to Acting Director of National Intelligence's
    Testimony*, NPR (Sept. 26, 2019), https://n.pr/2QvLlPa .................................22

Brief for the United States, *Hudson Savings Bank*, 479 F.3d 102
    (No. 06-2043), 2006 WL 3888643 ..................................................................33

Chris Mills Rodrigo, *House Intel Dem: Giuliani could be held in inherent contempt
    if he ignores subpoena*, THE HILL (Sept. 30, 2019), https://bit.ly/2XeeBeE .........26

Clare Foran and Ashley Killough, *House votes to hold Barr, Ross in criminal contempt
    over census dispute*, CNN (July 17, 2019), https://cnn.it/37hCs1v ......................21

Cristina Marcos, *Pelosi: Lewandowski should have been held in contempt 'right
    then and there,'* THE HILL (Sept. 18, 2019), https://bit.ly/2CRd1WF ..................22

Dep. of Charles Kupperman, Permanent Select Comm. on Intel., joint with the Comm. On
    Oversight and Reform and the Comm. On Foreign Aff., 116 Cong. (Oct. 28, 2019),
    https://bit.ly/37JZoqg. .....................................................................................22

Elizabeth Thomas, *Democrats looking at imposing daily contempt fines on Trump officials,
    Rep. Adam Schiff says*, ABC NEWS (May 10, 2019), https://abcn.ws/37agUDQ ..................22

ERSKINE MAY, TREATISE ON THE LAW, PRIVILEGES, PROCEEDINGS AND USAGE OF PARLIAMENT (25th ed. 2019) .................................................................................26

Frank H. Easterbrook, *Textualism and the Dead Hand*, 66 GEO. WASH. L. REV. 1119 (1998) ...............................................................................14

HAROLD M. HYMAN, TO TRY MEN'S SOULS: LOYALTY TESTS IN AMERICAN HISTORY (1959).........................................................................................................14

Heather Cayble and Kyle Cheney, *Pelosi hints at contempt charges against multiple Trump associates*, POLITICO (May 9, 2019), https://politi.co/2rYgKzz .................................22

House Rule II, clause 3(a), Rules of the House of Representatives: One Hundred Sixteenth Congress 2 (Jan. 11, 2019), https://bit.ly/2DiQNNt. ................................................44

Jason Lemon, *Rashida Tlaib Says Democrats Had "Actual Serious Conversations" About Detaining Trump Officials*, NEWSWEEK (Oct. 13, 2019) .............................................26

Kylie Atwood and Jeremy Herb, *Democrats threaten NSC official with contempt as more depositions scheduled for next week*, CNN (Oct. 26, 2019), https://cnn.it/32YcEE7.........................................................................................................22

Letter from Joseph Story to Ezekiel Bacon (Nov. 19, 1842), *in* LIFE AND LETTERS OF JOSEPH STORY (William W. Story ed. 1851).......................................................15

Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1 (1963) ....................................................................................40, 42

Ludwik Ehrlich, "Proceedings Against the Crown (1216-1377)," *in* 6 *Oxford Studies in Social and Legal History* (Paul Vinogradoff ed., 1921) ...........................................40

Points and Authorities in Supp. of Pls.' Mot. for Summ. Judgment and in Opp. to Defs.' Mot. to Dismiss, *United States v. House of Representatives, et al.*, No. 82-3583 (1983)............................................................................................................21

Rachel Bade and Josh Dawsey*, "We've been very weak": House Democrats decry their oversight of Trump, push Pelosi on impeachment*, WASH. POST (Sept. 22, 2019), https://wapo.st/33JMBlf.....................................................................................................26

Sam Brodey, *Dems Torn Over How Much to Punish Rudy Giuliani for Ignoring Subpoena*, DAILY BEAST (Oct. 16, 2019), https://bit.ly/2OaYPNb .................................................26

*The ACA's Cost Sharing Reduction Program: Ramifications of the Administration's Decision on the Source of Funding for the CSR Program: Hearing Before the H. Subcmte. on Oversight and Investigations of the Energy and Commerce Cmte.*, 114th Cong. 30 (2016) (statement of Morton Rosenberg, Legislative Consultant)................27

TODD GARVEY, CONGRESS'S CONTEMPT POWER AND THE ENFORCEMENT OF CONGRESSIONAL SUBPOENAS: LAW, HISTORY, PRACTICE, AND PROCEDURE (2017)..............................24, 27, 44

TODD GARVEY, CONGRESSIONAL SUBPOENAS: ENFORCING EXECUTIVE BRANCH COMPLIANCE (2019)..........................................................................................................28

William Holdsworth, *The History of Remedies Against the Crown*, 38 L.Q. Rev. 141 (1922) ....................................................................................................41

viii

## INTRODUCTION

Both the House Defendants and the President have inundated this Court with a host of arguments for why the Court should not reach and resolve the merits of the Constitutional question raised by the conflicting commands presented by the issuance of the House subpoena to Dr. Kupperman and the President's instruction that Dr. Kupperman not appear and testify in response to the subpoena. But neither the House nor the President has an answer to our central submission on justiciability. Neither denies that this case presents an irreconcilable Constitutional conflict between the Executive and Legislative Branches of our Government. But if the Court accepts their entreaties to dismiss the case without reaching the merits, Dr. Kupperman will be forced to himself decide this grave Constitutional question. Neither the House nor the President has offered any explanation for why such a question should be decided by a private citizen rather than by the Judicial Department—the Branch entrusted by the Constitution with the duty "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

In the pages that follow, we demonstrate that each of the arguments submitted by the House Defendants and the President against reaching the merits is wrong.

## STATEMENT

Dr. Kupperman served as Deputy National Security Advisor and Assistant to the President from January 9, 2019, to September 20, 2019, and as the Acting National Security Advisor from September 10, 2019, to September 20, 2019. Complaint, Doc. 1, at ¶ 13 (Oct. 25, 2019). Dr. Kupperman performed his duties as a close personal advisor to President Trump, advising him with respect to national security policy toward Ukraine and coordinating national security policy among the relevant Executive Branch agencies. *Id.*

1

On Friday, October 25, 2019, the House Permanent Select Committee on Intelligence ("HPSCI") issued a subpoena to Dr. Kupperman, compelling him to appear before HPSCI, the House Committee on Foreign Affairs, and the House Committee on Oversight and Reform for a deposition on the following Monday, October 28, 2019. *Id.* at ¶¶ 14–15. The electronic message from Committee counsel transmitting the subpoena to Dr. Kupperman's counsel explained that "[t]he testimony shall be part of the House's impeachment inquiry and shared among the Committees, as well as with the Committee on the Judiciary as appropriate." Complaint Exhibit A, Doc. 1-1, at 1.

Because the subpoena seeks testimony concerning Dr. Kupperman's service as a senior advisor to the President, Dr. Kupperman's counsel provided the White House Counsel with a copy, requesting that White House Counsel notify him of the President's position on the subpoena. Complaint, Doc. 1, at ¶ 17. The White House Counsel, in a letter to Dr. Kupperman's counsel on October 25, 2019, informed Dr. Kupperman that the Office of Legal Counsel of the Department of Justice had "advised [him] that [Plaintiff] is absolutely immune from compelled congressional testimony with respect to matters related to his service as a senior adviser to the President." Complaint Exhibit B, Doc. 1-2, at 1. As a result, the White House Counsel notified Dr. Kupperman that "in order to protect the prerogatives of the Office of President today and in the future … the President directs Mr. Kupperman not to appear at the Committee's scheduled hearing on Monday, October 28, 2019." *Id.* at 2.

Dr. Kupperman filed this action on October 25, 2019, and it was assigned to this Court on October 28. On November 5, 2019, HPSCI withdrew its subpoena to Dr. Kupperman. *See* House Defendants' Notice of Mootness Exhibit A ("House Withdrawal Letter"), Doc. 22-1, at 1 (Nov. 6, 2019). The next day, the House Defendants moved to vacate the briefing schedule, arguing that

the matter is moot. *See* House Defendants' Notice of Mootness, Doc. 22 (Nov. 6, 2019). On

November 6, 2019, the Court denied that request in a telephonic status conference, instructing the

parties to address the mootness issue in their briefing on the motions to dismiss. *See* Transcript of

Nov. 6, 2019 Status Conference at 6–7.

On November 14, 2019, the defendants filed motions to dismiss the complaint. *See*

Defendant President Donald J. Trump's Motion to Dismiss or, In the Alternative, Motion for

Summary Judgment ("President MTD"), Doc. 40 (Nov. 14, 2019); House Defendants' Motion To

Dismiss ("House MTD"), Doc. 41 (Nov. 14, 2019). On November 27, 2019, Dr. Kupperman filed,

along with this brief, a motion pursuant to FED. R. CIV. P. 21 to join the Honorable Paul D. Irving,

in his official capacity as Sergeant-at-Arms of the United States House of Representatives, as an

additional House Defendant.

## ARGUMENT

### I.   DR. KUPPERMAN'S SUIT IS NOT MOOT.

#### A.   The House Defendants' Voluntary Cessation of Allegedly Unlawful Conduct Does Not Moot Plaintiff's Suit.

It is "well settled that 'a defendant's voluntary cessation of a challenged practice does not

deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth,

Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v.

Aladdin's Castle, Inc.,* 455 U.S. 283, 289 (1982)). To discourage gamesmanship, the Supreme

Court has emphasized that the test for establishing mootness after a defendant voluntarily abandons

its allegedly unlawful conduct is "stringent." *Id.* That test requires proof that "subsequent events

[have] made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be

expected to recur." *Id.* (emphasis added) (quoting *United States v. Concentrated Phosphate Export

Ass'n*, 393 U.S. 199, 203 (1968)). Moreover, the "'heavy burden of persua[ding]' the court that

the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.* (quoting *Concentrated Phosphate Export Ass'n*, 393 U.S. at 203) (alteration in *Friends of the Earth, Inc.*); *see also True the Vote, Inc. v. Internal Revenue Serv.*, 831 F.3d 551, 561 (D.C. Cir. 2016).

The House Defendants have not come close to meeting their "heavy burden." The House's letter withdrawing the subpoena said not one word suggesting that the subpoena would not be re-issued following dismissal of this case. To the contrary, the House Defendants wrote that they "expect" that Dr. Kupperman will "be guided by the decision in *McGahn*." *See* House Withdrawal Letter at 1. But as the House Defendants also acknowledged, the question to be decided in *McGahn* is whether an Executive assertion of "absolute immunity" on behalf of a close presidential advisor overrides a congressional subpoena. *Id.* Judicial resolution of that question is *only* relevant to Dr. Kupperman if he is subject to a House subpoena, like Donald McGahn. Unless the House Defendants anticipated that Plaintiff would once again face a congressional subpoena, they would have no reason to "expect" Plaintiff's conduct to change in light of the *McGahn* litigation. This plain indication that the subpoena to Dr. Kupperman may be re-issued forecloses House Defendants from carrying their "heavy burden" that it is "absolutely clear" that Plaintiff will not eventually be subpoenaed yet again. *Friends of the Earth*, 528 U.S. at 170. Rather, the House Defendants' letter provides strong "evidence indicating that the challenged [action] likely will be reenacted." *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997).

The House Defendants' intention is confirmed by their reminder to Dr. Kupperman that he "still has an opportunity to fulfill his solemn constitutional duty" to appear and testify before the House committees. House Withdrawal Letter, Doc. 22-1 at 2. Absent a subpoena, Dr. Kupperman has no duty—neither "solemn," nor "constitutional," nor otherwise—to appear and testify. It

necessarily follows that the House Defendants anticipate re-issuing the subpoena after this case is dismissed.

The House Defendants' carefully worded representations to this Court confirm that they cannot meet the high bar to show mootness in voluntary cessation cases. In their initial notice of mootness, they stated only that they had "no *current* intention to reissue" the subpoena. House Defendants' Notice of Mootness, Doc. 22, at 1 (emphasis added). In opposing Mr. Mulvaney's motion to intervene the House Defendants noted that "*given the status of the House's impeachment inquiry*, the House Defendants ha[d] determined that they will not reissue a subpoena to" Plaintiff. House Defendants.' Opposition to Motion To Intervene ("House Opposition To Mulvaney"), Doc. 29, at 1 (Nov. 11, 2019) (emphasis added). And in their motion to dismiss, they further assert, apparently based on their statement in the opposition to Mulvaney's motion to intervene, that "the House Defendants have represented that they will not reissue a subpoena to Kupperman." House MTD, Doc. 41, at 7.

While the House Defendants, through counsel, have now made statements asserting that the House may not reissue a subpoena against Plaintiff, the House Defendants have nevertheless failed to prove that "it [is] *absolutely clear* that the[ir] allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc.*, 528 U.S. at 189 (emphasis added). The clear discontinuity between the letter from the House Defendants themselves and their counsel's representations before this Court precludes the conclusion that the House Defendants have carried their "heavy burden" of demonstrating the "absolute" clarity demanded by the Supreme Court. The thrust of the House's letter was obvious: Dr. Kupperman is in the clear . . . for now. That assurance alone does not come close to satisfying the voluntary cessation doctrine. *See True the Vote, Inc.*, 831 F.3d at 563 ("A violation of right that is 'suspended until further

notice' has not become the subject of voluntary cessation, with no reasonable expectation of resumption, so as to moot litigation against the violation of rights. Rather, it has at most advised the victim of the violation—'you're alright for now, but there may be another shoe falling.'"). The letter's ominous subtext is that Plaintiff's relief is temporary because, at some point, the Committee fully expects Plaintiff to involuntarily come before the House. There is therefore no way one could reasonably read the letter to show, with the requisite *absolute* clarity, that Plaintiff cannot reasonably expect to receive another subpoena.

The post-letter assertions made by counsel for the House Defendants that they have determined that it is not in the House's interest—"given the status of House's impeachment inquiry"—to reissue a subpoena are simply not the kind of statements that establish mootness. It is a bedrock principle of the mootness doctrine that such bald assurances are not enough. For example, in the seminal mootness case *United States v. W. T. Grant Co.*, 345 U.S. 629 (1953), the defendant "disclaimed any intention" of reviving its allegedly wrongful conduct and the Supreme Court made clear that "[s]uch a profession does not suffice to make a case moot." *Id.* at 633. And the D.C. Circuit has, time and time again, rejected defendants' "meager" promises not to engage in the challenged conduct without additional, compelling evidence to back up the promise. *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 980 (D.C. Cir. 2016); *see also Kifafi v. Hilton Hotels Ret. Plan*, 701 F.3d 718, 725 (D.C. Cir. 2012); *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 491–92 (D.C. Cir. 1988). Mootness arises only where a defendant demonstrates a "changed attitude," consisting not "merely of pretensions or promises," but also an "overt and visible reversal of policy, carried out by extensive operations which have every appearance of being permanent." *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 334 (1952).

The House Defendants cannot credibly argue that they have a "changed attitude" about Plaintiff's suit. They continue to maintain that Plaintiff has a constitutional duty to testify and they expect him to be "guided" by the ultimate outcome of *McGahn*—a suit in which they vigorously argue that advisors like Dr. Kupperman *must* testify if subpoenaed by the Committee. *See In re Ctr. for Auto Safety*, 793 F.2d 1346, 1353 (D.C. Cir. 1986) ("[W]hen a complaint identifies official conduct as wrongful and the legality of that conduct is vigorously asserted by the officers in question, the complainant may justifiably project repetition . . . ." (quotation omitted)).

Moreover, the "meager" assurance offered by counsel that the House will not subpoena Dr. Kupperman in the future is clearly contingent; it is based entirely on the current "status of the House's impeachment inquiry." House Opposition to Mulvaney, Doc. 29 at 1. But promises centered on present circumstances provide cold comfort, particularly in the context of an impeachment inquiry that provides new and often unpredictable revelations on a daily basis. In this highly volatile context, the current prediction of counsel that the House Defendants will not subpoena Plaintiff again does not begin to carry the heavy burden of showing mootness. *See Kifafi*, 701 F.3d at 725 ("[D]efendant has given us little reason to think its intentions are a good predictor of reality.").

Often, a defendant's voluntary cessation is done "in order to avoid litigation" or "judicial review" altogether. *Am. Bar Ass'n v. Fed. Trade Comm'n*, 636 F.3d 641, 648 (D.C. Cir. 2011); *Qassim v. Bush*, 466 F.3d 1073, 1075 (D.C. Cir. 2006). That tactic, if unchecked, would permit a defendant to "manipulat[e] the judicial process" to "secur[e] freedom to 'return to his old ways.'" *Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990) (en banc) (quoting *W. T. Grant Co.*, 345 U.S. at 632); *see also Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (explaining that without the voluntary cessation doctrine, "a defendant could engage in unlawful conduct, stop

when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends").

The House Defendants here are arguably engaged in an even *worse* form of manipulation. Their voluntary cessation is not designed to avoid judicial review altogether. Rather, as the House's letter explicitly acknowledges, the purpose of the House Defendants' gambit is to ensure that the merits of this interbranch dispute is settled in *McGahn rather than by this Court*. *See* House Withdrawal Letter, Doc. 22-1 at 1. And, sure enough, just days ago the *McGahn* court issued precisely the favorable ruling that the House Defendants sought. *See* Memorandum Opinion, Doc. 46, *Comm. on the Judiciary v. McGahn,* No. 19-02379, (D.C. Cir. Nov. 25, 2019) ("*McGahn* Slip Op."). Plaintiff respectfully submits that the House Defendants' transparent attempt to manipulate the judicial process cannot, and should not, render this case moot. While courts must surely proceed with caution in imputing manipulative intent to other federal officials, *Clarke*, 915 F.2d at 705,[1] the evidence here sufficiently shows a reasonable probability that the House Defendants have sought to moot this case for strategic reasons. The voluntary cessation doctrine therefore applies.

> **B.      Dr. Kupperman's Suit Is Not Moot Because a Live Controversy Exists on Whether He Could Be Held in Contempt for His Conduct While the Subpoena Was Outstanding.**

Plaintiff's suit is not moot for a second, independent reason. "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."

---

[1] The House Defendants cite two cases in which the Court of Appeals has accepted government representations regarding future intent not to proceed with challenged conduct. *See* House MTD, Doc. 41, at 7 n.1. But those precedents are clearly inapposite because in neither did the government express any contradictory intent in other writings or statements. Here, however, the House's letter to Plaintiff clearly undermines the representations that the House Defendants have made through counsel to this Court.

*Knox v. Serv. Emps. Int'l*, 567 U.S. 298, 307 (2012) (internal quotation marks omitted). Although the House Defendants now represent to this Court that they have no intent to reissue a subpoena to Dr. Kupperman, they make no representation regarding how they intend to treat Plaintiff in light of his decision not to immediately comply with the prior subpoena. The House's letter to Dr. Kupperman intimates that the House Defendants view his conduct as an effort "to delay or otherwise obstruct the Committees' vital investigatory work." House Withdrawal Letter, Doc. 22-1, at 2. Regardless of whether Plaintiff is subject to a live subpoena, the House Defendants have given *no* assurance that they will not punish him for his decision not to immediately comply with the prior subpoena. And the Supreme Court has made clear that "a live controversy continues to exist" when there is a real "possibility of some remedy for a proven past violation." *Decker v. N.W. Envtl. Def. Ctr.*, 568 U.S. 597, 609–10 (2013). That possibility exists here.

It is well settled that Congress's inherent contempt authority includes not just the power to coerce individuals to comply with existing congressional demands, but also to *punish* those who have defied Congress, even when the act of non-compliance no longer threatens the legislative process. *See Jurney v. MacCracken*, 294 U.S. 125, 152 (1935). And, as described below, various Members of the House have expressed serious interest in wielding Congress's inherent contempt power to advance the present impeachment inquiry. *See infra* Part II.C. While some Members have raised the prospect of inherent contempt only to secure compliance with extant congressional commands, others have made statements that arguably evince more punitive aims. *See id.* (collecting statements). The House Defendants' silence regarding Plaintiff's liability for his past allegedly "obstruct[ive]" conduct therefore falls well short of proffering a "formal legal concession of the existence of a complete defense" against a future inherent contempt proceeding. *Clarke*, 915 F.2d at 702. A sufficiently live controversy therefore exists, thus foreclosing mootness.

9

### C.   Prudential Ripeness Considerations Do Not
   Preclude this Court from Considering Plaintiff's Suit.

Finally, the House Defendants argue that even if Plaintiff's case is not constitutionally moot, his claim nevertheless does not present a "justiciable controversy" because it is not prudentially ripe. House MTD, Doc. 41, at 44. For starters, it is not clear whether the "prudential ripeness" factors cited by the House Defendants should have any role in this Court's justiciability analysis. As the Supreme Court recently reiterated, to the extent that courts are asked to deem claims nonjusticiable "on grounds that are 'prudential,' rather than constitutional, that request is in some tension with [the Court's] recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quotations omitted). In any event, the prudential ripeness factors—the "fitness of the issues for judicial decision" and "the extent to which withholding a decision will cause hardship to the parties," *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (quotation marks omitted)—do not favor dismissal here.

First, the "fitness of an issue for judicial decision depends on whether it is purely legal," and "whether consideration of the issue would benefit from a more concrete setting." *Nat'l Ass'n of Home Builders v. Army Corps of Eng'rs*, 417 F.3d 1272, 1281 (D.C. Cir. 2005). Purely legal questions are "presumptively [fit] for judicial review." *City of Houston v. HUD*, 24 F.3d 1421, 1431 (D.C. Cir. 1994). The constitutional dispute between the House and President is indeed purely legal and the answer to the legal question here will not become clearer in a more concrete setting, if there is such a setting. Nor have the House Defendants shown that "deferring consideration might eliminate the need for [judicial] review altogether." *Chamber of Commerce of U.S. v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995). In fact, the very existence of the *McGahn*

litigation shows that judicial review of this question is already underway at the behest of House Defendants themselves.

Second, because Plaintiff's suit presents a "purely legal question," for which neither the House Defendants nor this Court "has a significant interest in postponing review," this Court "need not proceed" to consider the hardship to Plaintiff by deferring review. *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 915, 918 (D.C. Cir. 1985); *see also Consolidation Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 824 F.2d 1071, 1082 (D.C. Cir. 1987) ("[W]hen there are no interests favoring postponement of review, there can be no prudential reason to require the petitioner to demonstrate an additional quantum of injury caused by deferring review."). Because "nothing would be gained by postponing [this issue's] resolution," *Payne Enterprises, Inc.*, 837 F.2d at 492, either for this Court or for the House Defendants, "[i]t is enough that [Plaintiff] show that [he] has suffered sufficient hardship to pass the Article III threshold," *Consolidation Coal Co.*, 824 F.2d at 1081. As described below, Plaintiff has satisfied the requirements of Article III. *See infra* Part II. Ripeness therefore poses no additional barrier to judicial review. *See Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 65 n.10 (D.D.C. 2008).

## II.   DR. KUPPERMAN HAS STANDING.

"The irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citations and quotation marks omitted). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (quotation marks omitted); *see also Attias v. Carefirst, Inc.*, 865 F.3d 620, 626–27 (D.C. Cir. 2017). Second, the plaintiff must demonstrate causation: "the injury has to be fairly . . . trace[able] to the

challenged action of the defendant." *Lujan*, 504 U.S. at 560 (quotation marks omitted). Because "[p]roximate causation is not a requirement of Article III standing," *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014), there can be multiple causes of the same cognizable injury, *see Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017) (collecting authorities). Finally, there must be a showing of redressability: "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation marks omitted). While "analytically distinct" from causation, redressability and causation "are closely related[,] like two sides of a coin." *Duberry v. District of Columbia*, 924 F.3d 570, 581 (D.C. Cir. 2019) (alteration in original).

At the pleading stage, "plaintiffs are required only to state a *plausible* claim that each of the standing elements is present." *Attias*, 865 F.3d at 625 (quotation marks omitted) (emphasis added). In making that assessment, courts may consider facts outside the complaint. *See Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 340 (D.C. Cir. 2018); *Meina Xie v. Tillerson*, 2017 WL 2656648 at *5 (D.D.C. 2017) (Leon, J.). However, "standing is assessed at the time of filing." *Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012); *see also Lujan*, 504 U.S. at 570 n.5. Thus, contrary to the President's assertions, *see* President MTD, Doc. 40 at 11–12, 16, while the House Defendants' withdrawal of their subpoena against Dr. Kupperman might be relevant to assessing *mootness*, *see supra*, it has no bearing on whether Dr. Kupperman had *standing* at the outset of this litigation. *See Davis v. FEC*, 554 U.S. 724, 733–36 (2008) (holding that plaintiff had standing to bring a future-injury challenge based on facts as they existed at the time the complaint was filed, even though subsequent events negated his threatened injury, and instead analyzing those subsequent events under a mootness framework); *Barker v. Conroy*, 921 F.3d 1118, 1125 (D.C. Cir. 2019) (disregarding a key post-complaint factual

assertion by the defendant in holding that standing existed); *Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011).

That is presumably why the House Defendants (correctly) focus exclusively on mootness when addressing the ostensible relevance of the withdrawn subpoena. *See Becker v. Fed. Election Comm'n*, 230 F.3d 381, 387 n.3 (1st Cir. 2000). Accordingly, the standing analysis below assumes "the facts existing when the complaint [was] filed," *Lujan*, 504 U.S. 569 n.4, when there was a subpoena pending against Dr. Kupperman, *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 426 (2013) (Breyer, J., dissenting) (observing that facts arising after the complaint "are irrelevant, for we assess standing as of the time a suit is filed").

Although the President argues at length that Dr. Kupperman lacks standing based on the threat of prosecution for contempt by the Executive Branch or based on the threat of a civil enforcement suit, *see* President MTD, Doc. 40, at 13–15, 16–25, Dr. Kupperman does not press those arguments here. Rather, Dr. Kupperman has standing based on three independent cognizable injuries: (1) the substantial risk that, if he is required to decide the constitutional question himself, he will err and thus violate his oath of office; (2) the substantial risk of reputational damage as a result of being held in contempt; and (3) the substantial risk of being fined under the House's inherent contempt authority. Defendants have not yet addressed either of the first two injuries. All three injuries are caused by the actions of both the President and the House Defendants, and all three injuries would be redressed by a declaratory judgment issued by this Court.

**A.     Defendants Have Caused Dr. Kupperman To Be At
Substantial Risk of Violating His Constitutional Oath of Office.**

Defendants have placed Dr. Kupperman at a substantial and imminent risk of violating his oath of office. Article VI of the U.S. Constitution states: "[A]ll executive and judicial Officers,

both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution." Federal law sets forth the oath that Dr. Kupperman took:

> "I, AB, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God."

5 U.S.C. § 3331.

From the beginning of the Republic, an oath of office has been seen as a critical guarantee of constitutional government. As George Washington said to John Hancock in 1777:

> From the first institution of civil government, it has been the national policy of every precedent State to . . . engage its members to the discharge of their duty by the obligation of some oath. Its force and happy influence have been felt in too many instances to need any arguments to support the policy or prove its utility . . . . An oath is the only substitute that can be adopted to supply the defect of principle.[2]

Justice Joseph Story emphasized that "[o]aths have a solemn obligation upon the minds of all reflecting men, and especially upon those, who feel a deep sense of accountability to a Supreme being."[3] Indeed, the seriousness of the constitutional oath of office "was an important part of Chief Justice Marshall's account of judicial review in *Marbury v. Madison*."[4] Chief Justice Marshall argued that judges were *required* by their oath to hold a statute unconstitutional if they believed it to be so:

> Why does a judge swear to discharge his duties agreeably to the constitution of the United States, if that constitution forms no rule for his government? If it is closed upon him, and cannot be inspected by him? If such be the real state of things, this

---

[2] Harold M. Hyman, To Try Men's Souls: Loyalty Tests in American History 80 (1959).

[3] 3 Joseph Story, Commentaries on the Constitution § 1838 (1833).

[4] Frank H. Easterbrook, *Textualism and the Dead Hand*, 66 Geo. Wash. L. Rev. 1119, 1122 (1998).

> is worse than solemn mockery. To prescribe, or to take this oath, becomes equally
> a crime.

*Marbury*, 5 U.S. (1 Cranch) at 180; *see also Cole v. Richardson*, 405 U.S. 676, 684 (1972). For

that reason, the D.C. Circuit has described the oath as "a solemn undertaking, a binding of the

person to the cause of constitutional government, an expression of the individual's allegiance to

the principles embodied in that document." *In re Lindsey*, 158 F.3d 1263, 1273 (D.C. Cir. 1998)

(per curiam). In Justice Story's words, public officials who take the oath "cannot forget or

repudiate [their] solemn obligations at pleasure."[5]

Like all executive officers, Dr. Kupperman swore the solemn oath required by the

Constitution and federal statute when he assumed the office of Deputy National Security Advisor.

Complaint, Doc. 1, at ¶¶ 2, 40. Forcing Dr. Kupperman to choose between obeying the subpoena

issued by the House or the President's instruction to Dr. Kupperman not to comply with it will

create a significant risk that Dr. Kupperman will choose incorrectly and will thus violate his oath

to "bear true faith and allegiance" to the Constitution. If Dr. Kupperman elects to testify but the

President had the constitutional authority to prevent his testimony, Dr. Kupperman would be

violating his oath by defying a Constitutional presidential order binding on him as the former

Deputy National Security Advisor. If Dr. Kupperman elects *not* to testify but the House had the

constitutional authority to compel his testimony, Dr. Kupperman would be violating his oath by

defying a Constitutional congressional subpoena directed at him by virtue of his former office.

Indeed, in their November 5, 2019, letter to Dr. Kupperman, the House Defendants

*acknowledged* that Dr. Kupperman's oath of office is at stake. *See* House Withdrawal Letter, Doc.

22-1 at 2 ("Dr. Kupperman still has an opportunity to fulfill his solemn constitutional duty.").

---

[5] Letter from Joseph Story to Ezekiel Bacon (Nov. 19, 1842), *in* LIFE AND LETTERS OF JOSEPH STORY 431 (William W. Story ed. 1851).

Without knowing which branch of the Federal Government has the lawful authority to prescribe his actions in this context, Dr. Kupperman is at imminent and substantial risk of violating his solemn oath of office by choosing an unconstitutional course of action. Under longstanding Supreme Court precedent, that is a cognizable injury for purposes of Article III.

In *Board of Education of Central School District No. 1 v. Allen*, 392 U.S. 236, 238 (1968), a New York law "requir[ed] local public school authorities to lend textbooks free of charge to all students in grades seven through 12; students attending private schools [were] included." The Board, believing that this statutory mandate violated the Establishment and Free Exercise Clauses, sued the state commissioner of education and sought a declaratory judgment. *Id.* at 240–41. In analyzing standing, the Supreme Court held:

> Appellees do not challenge the standing of appellants to press their claim in this Court. Appellants have taken an oath to support the United States Constitution. Believing § 701 to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step—refusal to comply with § 701—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a 'personal stake in the outcome' of this litigation.

*Id.* at 241, n.5. Thus, because the defendant had placed the Board in the position of potentially violating their constitutional oath, the Supreme Court held that the Board had standing.

The oath that the Board swore in *Allen* is the same oath that Dr. Kupperman swore, and just as being put at risk of violating that oath sufficed to establish standing in *Allen*, it suffices to establish standing here. *See also Bd. of Educ. of Mt. Sinai Union Free Sch. Dist. v. N.Y. State Teachers Ret. Sys.*, 60 F.3d 106, 112 (2d Cir. 1995); *Regents of Univ. of Minn. v. NCAA*, 560 F.2d 352, 363–64 (8th Cir. 1977), *abrogated on other grounds by NCAA v. Tarkanian,* 488 U.S. 179 (1988); *Peick v. Pension Ben. Guar. Corp.*, 724 F.2d 1247, 1260 & n.14 (7th Cir. 1983); *Akron Bd. of Ed. v. State Bd. of Ed. of Ohio*, 490 F.2d 1285, 1291 (6th Cir. 1974); *City of S. Miami v.*

*DeSantis*, 2019 WL 4752038, at \*15 (S.D. Fla. Sept. 30, 2019); 13B Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris. § 3531.11.3 (3d ed. 2019). Nor can there be any doubt that Defendants caused Dr. Kupperman's injury, since they issued the conflicting commands that have placed him on the horns of his constitutional dilemma. And this injury will be fully redressed by a declaratory judgment clarifying Dr. Kupperman's constitutional obligations.

Significantly, this would not be the first time that this Court has held that public officials had standing based on the risk of being forced to violate their oaths. In *Clarke v. United States*, Congress enacted a law conditioning all of D.C.'s federal funds on the City Council's passage of a statute providing that the city's human rights law did *not* require religious educational institutions to disburse funds or benefits to groups "promoting, encouraging, or condoning any homosexual act, lifestyle, [etc.]." 705 F. Supp. 605, 607 (D.D.C. 1988). The council members sued the United States, raising several constitutional challenges to the statute. The Court, in an opinion by Judge Lamberth, held that the plaintiffs had standing under *Allen*: "Because Congress has conditioned all District funds on the Council's vote, the Council members must either vote in a way which they believe violates their oaths, or face almost certain loss of their salaries and staffs as well as water, police and fire protection." *Id.* at 608.[6] The same reasoning applies here and establishes Dr. Kupperman's standing to sue Defendants who have placed him at imminent and substantial risk of violating his oath.

It is true that the Fifth and Ninth Circuits have essentially disregarded *Allen*'s oath-of-office-injury holding, *see Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) (citing *Finch v.*

---

[6] A three-judge panel of the D.C. Circuit affirmed Judge Lamberth's opinion. *See Clarke v. United States*, 886 F.2d 404, 417 (D.C. Cir. 1989). The en banc D.C. Circuit subsequently vacated the panel and district court opinions based on *Munsingwear* mootness. *Clarke v. United States*, 915 F.2d 699, 708 (D.C. Cir. 1990).

*Mississippi State Medical Ass'n., Inc.*, 585 F.2d 765 (5th Cir. 1978)); *City of S. Lake Tahoe v. California Tahoe Reg'l Planning Agency*, 625 F.2d 231, 237–38 (9th Cir. 1980), but as Justice White observed in criticizing those two courts, *Allen* remains binding Supreme Court precedent, *see City of S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 449 U.S. 1039, 1039 (1980) (White, J., dissenting from the denial of certiorari). Indeed, as Judge Lamberth noted in *Clarke*, the Supreme Court "reaffirmed *Allen*" in *Bender v. Williamsport Area School District*, 475 U.S. 534, 544 n.7 (1986), which post-dated *City of South Lake Tahoe* and *Finch*. *See Clarke*, 705 F. Supp. at 608 n.4. Moreover, the principal concern that motivated the Fifth and Ninth Circuits to reject oath-of-office standing was that such an injury, if not properly limited, risked allowing every state or federal officer to challenge laws that they regard as unconstitutional. *See City of S. Lake Tahoe*, 625 F.2d at 237; *Finch*, 585 F.2d at 773. But there is no such risk in *this* case because here, unlike in *Crane*, *Finch*, and *City of South Lake Tahoe*, the oath-of-office injury to the plaintiff is *particularized*; after all, Defendants have issued conflicting directives to Dr. Kupperman *by name*. Dr. Kupperman therefore has an injury—the risk of violating his oath—that is specific *to him*, not a "generalized grievance" about the constitutionality of a law. *Lujan*, 504 U.S. at 575.[7]

The President and the House Defendants have each ordered Dr. Kupperman to take an action that, were he to perform it, would place him at substantial risk of violating his constitutional oath. Under *Allen* and *Clarke*, that is a cognizable injury, and this Court can and should redress it

---

[7] Although two judges of this Court have previously rejected oath-of-office standing, they were correct to do so under the facts of those two cases. As both judges explained, in neither case was *the plaintiff himself* required to take an unconstitutional action, *see Smith v. Obama*, 217 F. Supp. 3d 283, 295–96 (D.D.C. 2016), *order vacated, appeal dismissed*, 731 F. App'x 8 (D.C. Cir. 2018); *Rodearmel v. Clinton*, 666 F. Supp. 2d 123, 130–31 (D.D.C. 2009), which distinguished those cases from *Allen* (and, of course, from this case).

by issuing a declaratory judgment. Dr. Kupperman therefore has standing based on his oath of office.

**B.      Defendants Have Placed Dr. Kupperman At Substantial Risk of the Reputational Harm That Comes With Being Held in Contempt.**

Quite apart from Dr. Kupperman's oath-based injury, Defendants have placed Dr. Kupperman at substantial and imminent risk of injury to his reputation. It is well-established that "injury to reputation can constitute a cognizable injury sufficient for Article III standing." *Foretich v. United States*, 351 F.3d 1198, 1211 (D.C. Cir. 2003); *see Meese v. Keene*, 481 U.S. 465, 472– 77 (1987). As relevant here, where a branch of the Federal Government affixes an "inherently stigmatizing" label to an individual, the individual has standing to challenge that action. *Pulphus v. Ayers*, 909 F.3d 1148, 1154 (D.C. Cir. 2018); *see also Turkish Coal. of Am., Inc. v. Bruininks*, 678 F.3d 617, 622 (8th Cir. 2012). Because being labeled a contemnor is inherently stigmatizing, Dr. Kupperman has standing to bring this lawsuit to prevent Defendants from causing him to be held in contempt.

The D.C. Circuit's decision in *Foretich* is directly on point. In that case, Eric Foretich had been accused by his ex-wife of sexually abusing their daughter, Hilary. 351 F.3d at 1203. In response, Congress enacted the Elizabeth Morgan Act, which prohibited Foretich, from "secur[ing] visitation with his daughter without first obtaining Hilary's consent." *Id.* at 1204. Foretich challenged the statute on multiple grounds, including the Bill of Attainder Clause. *Id.* In assessing his standing, the D.C. Circuit observed that "reputational injury that derives directly from government action will support Article III standing to challenge that action." *Id.* at 1214. The Court of Appeals went on to hold that Foretich had standing: "[T]he Elizabeth Morgan Act harmed [Foretich's] reputation by embodying a congressional determination that he is a child abuser and a danger to his own daughter," *id.* at 1213, and "a decision declaring the Act unlawful would make

clear that Congress was wrong to pass judgment on Dr. Foretich and wrong to single him out for punishment on the basis of that judgment. In doing so, a declaratory judgment in Dr. Foretich's favor would give redress for his reputational injuries," *id.* at 1216; *see also McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of Judicial Conference of U.S.*, 264 F.3d 52, 56–57 (D.C. Cir. 2001) (district court judge had standing to challenge public reprimand due to reputational injury).

Just as in *Foretich*, the Legislative Branch threatens to "pass judgment" on Dr. Kupperman and "single him out" for opprobrium by holding him in contempt. *Foretich*, 351 F.3d at 1216. This "congressional determination" that Dr. Kupperman has unlawfully defied the People's elected representatives would injure Dr. Kupperman's reputation. *See Rangel v. Boehner*, 20 F. Supp. 3d 148, 160 (D.D.C. 2013) ("it is beyond peradventure that being censured by the U.S. House of Representatives concretely and particularly harms a sitting Member's reputation"), *aff'd*, 785 F.3d 19 (D.C. Cir. 2015). Indeed, it is widely recognized that being held in contempt is a cognizable injury because it harms the contemnor's reputation. *See, e.g.*, *SerVaas Inc. v. Mills*, 661 F. App'x 7, 9 (2d Cir. 2016); *United States v. Lee*, 720 F.2d 1049, 1054 (9th Cir. 1983); *United States v. Schrimsher*, 493 F.2d 842, 844 (5th Cir. 1974); *see also Keach v. County of Schenectady*, 593 F.3d 218, 223–26 (2d Cir. 2010) (collecting authorities demonstrating that Courts of Appeals, including the D.C. Circuit, generally hold that standing exists, due to reputational harm, when a judge formally reprimands an attorney, even if no monetary sanction is applied). And just as in *Foretich*, a declaratory judgment would provide redress by "mak[ing] clear that Congress [would be] wrong to pass judgment on Dr. [Kupperman] and wrong to single him out for punishment on the basis of that judgment." *Foretich*, 351 F.3d at 1216; *see also McBryde*, 264 F.3d at 56–57.

Indeed, the Department of Justice (DOJ) has previously advanced the same standing argument that Dr. Kupperman does in this case. In *United States v. House of Representatives*, DOJ argued that the House's contempt citation for Environmental Protection Agency Administrator Anne Gorsuch was sufficient to confer standing on her to sue the House:

> Indeed, even if she is never prosecuted by the Executive, the House's contempt citation, in and of itself, more than amply establishes the immediacy of this controversy. The House vote represents a formal determination by a co-equal branch of our government that the head of an Executive agency has failed to comply with the law. That citation thus stands as an accusation by the House of Representatives that an Executive officer has committed a criminal act in discharging her official duties as Administrator of the EPA . . . . These injuries are all concrete, direct and immediate and can only be redressed through judicial resolution.

Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendants' Motion to Dismiss at 24–25, *United States v. House of Representatives*, No. 82-3583, 556 F. Supp. 150 (1983).

Of course, in the case of Administrator Gorsuch, the House had already voted to hold the official in contempt, but that does not affect the analysis in this future-injury case, since there can be no serious doubt that, at the time of the filing of this lawsuit, there was a "credible threat" that House Defendants *would* hold Dr. Kupperman in contempt if he followed the President's order not to testify. *See Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979); Complaint, Doc. 1, at ¶ 2. Indeed, only three months prior to the filing of the complaint, the House of Representatives had in fact *voted* to hold the Attorney General and Secretary of Commerce in contempt for not complying with House subpoenas.[8] Defendant Schiff has routinely threatened to

---

[8] Clare Foran and Ashley Killough, *House votes to hold Barr, Ross in criminal contempt over census dispute*, CNN (July 17, 2019), https://cnn.it/37hCs1v.

hold other Executive Branch officials in contempt,[9] and so has Defendant Pelosi.[10] In fact, only

hours after the filing of the complaint in this case, Defendant Schiff *admitted* that Dr. Kupperman,

in particular, was at risk of being held in contempt,[11] and when Dr. Kupperman did not appear,

Defendant Schiff expressly threatened to "consider Dr. Kupperman's defiance of the subpoena as

evidence in a future contempt proceeding." Dep. of Charles Kupperman, Permanent Select Comm.

on Intel., joint with the Comm. On Oversight and Reform and the Comm. On Foreign Aff., 116

Cong. (Oct. 28, 2019), https://bit.ly/37JZoqg. Notwithstanding the time-of-filing rule, this Court

may take into account these admissions in the same way that it takes into account a defendant's

post-complaint factual admissions in pleadings or briefs when assessing standing. These threats,

in addition to the actual *holding* of Cabinet-level officers in contempt only a few months ago, more

than suffice to show that the risk of reputational injury to Dr. Kupperman was neither "imaginary

[n]or speculative." *United Farm Workers*, 442 U.S. at 298.

That injury, in turn, is caused by both the President and the House Defendants. Obviously,

the House Defendants are the parties who actually subpoenaed Dr. Kupperman and are empowered

to hold Dr. Kupperman in contempt, and their credible threats to use that power is a cause of Dr.

Kupperman's injury. But the President is *also* a cause of Dr. Kupperman's injury, since it was the

President's order directing Dr. Kupperman not to testify that placed him between a rock and a hard

---

[9] *See, e.g.*, Ari Shapiro, *Rep. Adam Schiff Reacts to Acting Director of National Intelligence's Testimony*, NPR (Sept. 26, 2019), https://n.pr/2QvLlPa; Elizabeth Thomas, *Democrats looking at imposing daily contempt fines on Trump officials, Rep. Adam Schiff says*, ABC NEWS (May 10, 2019), https://abcn.ws/37agUDQ.

[10] Cristina Marcos, *Pelosi: Lewandowski should have been held in contempt 'right then and there,'* THE HILL (Sept. 18, 2019), https://bit.ly/2CRd1WF; Heather Cayble and Kyle Cheney, *Pelosi hints at contempt charges against multiple Trump associates*, POLITICO (May 9, 2019), https://politi.co/2rYgKzz.

[11] Kylie Atwood and Jeremy Herb, *Democrats threaten NSC official with contempt as more depositions scheduled for next week*, CNN (Oct. 26, 2019), https://cnn.it/32YcEE7.

22

place. If the House Defendants had not subpoenaed Dr. Kupperman and had not presented a credible threat of contempt, he could have refrained from testifying without risking injury to his reputation in the form of contempt. If the President had not instructed Dr. Kupperman not to testify, Dr. Kupperman would have complied with the subpoena, thereby remaining free of the threat of contempt.

Both the President and the House Defendants, then, were necessary to causing Dr. Kupperman's injury: the substantial and imminent risk of being held in contempt and suffering reputational harm. The House Defendants pointed the sword of contempt at Dr. Kupperman, but the President exposed Dr. Kupperman to its thrust. *See Orangeburg*, 862 F.3d at 1080 ("To be sure, NCUC—a non-party—is a key player in the causal story. But the existence of, perhaps, an equally important player in the story does not erase FERC's role."). Because "[a] declaratory judgment that the government's actions were unlawful will consequently provide meaningful relief" to Dr. Kupperman's imminent reputational injury, *Foretich*, 351 F.3d at 1214, he has standing to sue both the President and the House Defendants.

C.    **Defendants Have Placed Dr. Kupperman At Substantial Risk of Being Fined for Contempt.**

Although the imminent risk of being held in contempt by the House would, by itself, suffice for Article III standing, Dr. Kupperman also has standing because Defendants have placed him at imminent and substantial risk of being fined for contempt under the House's inherent contempt authority. There is no doubt that being fined, or being threatened with a fine, is a cognizable injury under Article III. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). Because there is a credible threat that the House will fine Dr. Kupperman for contempt, he has standing.

House Defendants have three ways of enforcing a subpoena against Dr. Kupperman: "(1) referral to the U.S. Attorney for prosecution of a criminal contempt of Congress charge; (2)

detention [or fines] and prosecution pursuant to Congress's inherent contempt authority; or (3) a civil action to enforce the subpoena in a federal district court." *Miers*, 558 F. Supp. 2d at 75. "In comparison with the other types of contempt proceedings, inherent contempt has the distinction of not requiring the cooperation or assistance of either the executive or judicial branches. The House or Senate can, on its own, conduct summary proceedings and cite the offender for contempt."[12] "Thus, the witness can be imprisoned for a specified period of time as punishment, or for an indefinite period (but not, at least by the House, beyond the end of a session of the Congress) until he agrees to comply."[13]

Congress first exercised its inherent contempt authority as far back as 1795,[14] and "from 1857-1934 Congress relied on its inherent contempt power almost exclusively, despite the availability of the criminal [contempt] statute."[15] The Supreme Court has repeatedly held that Congress has such inherent contempt authority under the Constitution. *See McGrain v. Daugherty*, 273 U.S. 135, 182 (1927); *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 228 (1821).

Of course, one might think that it is "unlikely that Congress could dispatch the Sergeant-at-Arms to arrest and imprison an Executive Branch official who claimed executive privilege," *Miers*, 558 F. Supp. 2d at 76 (quoting *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act,* 10 U.S. Op. Off. Legal Counsel 68, 86 (1986)), but that says nothing about whether Congress could and would impose *monetary fines* as part of its inherent contempt authority. Although the Supreme Court has never directly

---

[12] Todd Garvey, *Congress's Contempt Power and the Enforcement of Congressional Subpoenas: Law, History, Practice, and Procedure*, CONG. RES. SER. 12 (2017), https://bit.ly/2OLAk9H, (hereinafter CONGRESS'S CONTEMPT POWER).

[13] *Id.* at 11.

[14] *Id.* at 4–5.

[15] *Id.* at 17–18 n.124.

decided whether Congress has the inherent power to enforce its subpoenas with monetary fines, it is clear that Congress possesses such authority. When the Supreme Court first affirmed Congress's inherent contempt authority, it held that the authority only extended so far as "the least possible power adequate to the end proposed." *Anderson*, 19 U.S. (6 Wheat.) at 230–31 (emphasis omitted). In *Anderson*, imprisonment was thought to be the minimal power adequate to dealing with any "contumacious" individuals, but the Court did not rule out "other inflictions" that are essentially "commutation[s] for confinement." *Id.* at 231. And if arresting and throwing an individual *in prison* is permissible, then surely *fining* an individual must be, since a fine will often be "the least possible power adequate to" enforcing a subpoena. *Id.*; *cf. Hutto v. Finney*, 437 U.S. 678, 691 (1978) (describing fines as a "less intrusive power" compared with imprisonment). Perhaps that is why the Supreme Court, in *Kilbourn v. Thompson*, expressly referred to "the power of punishment in either House *by fine* or imprisonment." 103 U.S. 168, 190 (1880) (emphasis added).

The argument in favor of the House's power to levy fines is particularly strong when the House "exercises the judicial power of . . . preferring articles of impeachment," *Kilbourn*, 103 U.S. at 191; *see also Hayburn's Case*, 2 U.S. (2 Dallas) 408, 410 n.* (1792) (describing Congress, "in whom no judicial power of any kind appears to be vested, but the important one relative to impeachments"); *Trump v. Mazars USA, LLP*, 940 F.3d 710, 754 (D.C. Cir. 2019) (Rao, J., dissenting) ("The original meaning confirms that Congress acts in an exceptional judicial capacity when exercising impeachment powers."). The Supreme Court has said that "[w]here the question of such impeachment is before either body acting in its appropriate sphere on that subject, we see no reason to doubt the right to compel the attendance of witnesses, and their answer to proper questions, in the same manner and by the use of the same means that courts of justice can in like cases." *Kilbourn*, 103 U.S. at 190. And, of course, levying fines to enforce compliance with a

subpoena is a traditional and inherent judicial power. *See Anderson*, 19 U.S. (6 Wheat) at 227–28 (describing inherent judicial power to levy fines in furtherance of a court's legitimate activities); *see also* ERSKINE MAY, TREATISE ON THE LAW, PRIVILEGES, PROCEEDINGS AND USAGE OF PARLIAMENT ¶ 11.27 (25th ed. 2019) ("The House of Lords in its capacity as a court of record has had power to inflict fines, either in substitution for, or in addition to, committal.").

In light of this history, it is no surprise that members of the House—including Defendant Schiff—have stated that the House has the inherent power to levy fines against subpoenaed witnesses as part of the House's inherent contempt power *and have threatened to use that power*. For example, on May 10, 2019, Defendant Schiff stated:

> Much as I like the visual of [throwing people in jail], I think it's far more practical to consider levying individual fines on the person—not the office—until they comply . . . . You could fine someone $25,000 a day until they comply. You can do that.[16]

His fellow member of the House Permanent Select Committee on Intelligence, Congressman Mike Quigley, has likewise threatened the use of inherent contempt: "I think at this point the House would be willing to go forward with inherent contempt at least in terms of fining people."[17] Several other members of the House have made similar statements and threats.[18] The President is simply

---

[16] Thomas, *Democrats looking at imposing daily contempt fines*, *supra*.

[17] Chris Mills Rodrigo, *House Intel Dem: Giuliani could be held in inherent contempt if he ignores subpoena*, THE HILL (Sept. 30, 2019), https://bit.ly/2XeeBeE.

[18] *See, e.g.*, Sam Brodey, *Dems Torn Over How Much to Punish Rudy Giuliani for Ignoring Subpoena*, DAILY BEAST (Oct. 16, 2019), https://bit.ly/2OaYPNb (" 'This is another example of why the House needs to revisit inherent contempt,' said Rep. Gerry Connolly (D-VA) of Giuliani. 'We need to enforce our own subpoenas. We can and we should.' "); Jason Lemon, *Rashida Tlaib Says Democrats Had "Actual Serious Conversations" About Detaining Trump Officials*, NEWSWEEK (Oct. 13, 2019), https://bit.ly/2OjBsSW (" 'With regard for inherent contempt, I've been for that all along,' Garemendi said in an interview with CNN. 'I think that if they come and they simply refuse to answer questions, I think it's time to call in the sergeant at arms, march them off to a little jail, which we do happen to have in one of the rooms of the Capitol.' "); Rachel Bade and Josh Dawsey, *"We've been very weak": House Democrats decry their oversight of Trump, push Pelosi on impeachment*, WASH. POST (Sept. 22, 2019), https://wapo.st/33JMBlf ("On Friday,

incorrect, therefore, when he asserts that "the House has nowhere suggested reviving [the use of inherent contempt]." President MTD, Doc. 40, at 15.

The President points out that Congress has not used its inherent contempt authority since 1935, *see id.*, but that is primarily because, at least during the intervening period, "criminal contempt was more expeditious and an effective threat."[19] Indeed, for much of that period, "the very threat of a contempt vote was sufficient to elicit compliance" from Executive Branch officials, so the possibility of using inherent contempt did not even arise.[20] *See McGahn*, Slip Op. at 56 (lack of Federal court decisions regarding the enforcement of congressional subpoenas over the course of several decades proved no more than that "the Executive branch wisely picked its battles"). Moreover, while Congress has not actually had to resort to its inherent contempt power recently, it has *threatened* to use that power—and to good effect. "For example, Senator Sam Ervin, when serving as Chairman of the Senate Select Committee on Presidential Campaign Activities, invoked the inherent contempt power several times to encourage compliance with the Committee's requests

---

Judiciary members pressed Nadler to invoke Congress's long-dormant inherent contempt authority that would allow Congress to jail or fine people for defying subpoenas, an idea he supports, according to people familiar with his thinking."); *id.* (" 'Our side says it's legally questionable, it hasn't been used in forever, and blah, blah, blah,' said Rep. Steve Cohen (D-Tenn.), a member of the panel . . . . 'I say do it,' he continued. 'Let them argue in court that they take the position that it's legally questionable. We back off of everything! We've been very weak.' " (quotation marks omitted)); *id.* (" 'We need to develop other tools because our tools are not working,' said Rep. Ted Lieu (D-Calif.), a Judiciary panel member who is co-chair of the Democratic Policy and Communications Committee . . . . Lieu, who was also in the Judiciary panel's 'emergency meeting' on Friday, has also backed the idea of using inherent contempt.").

[19] *The ACA's Cost Sharing Reduction Program: Ramifications of the Administration's Decision on the Source of Funding for the CSR Program: Hearing Before the H. Subcmte. on Oversight and Investigations of the Energy and Commerce Cmte.*, 114th Cong. 30 (2016) https://bit.ly/2OmpMie (statement of Morton Rosenberg, Legislative Consultant) (hereinafter Rosenberg Statement); CONGRESS'S CONTEMPT POWER, *supra*, at 12.

[20] Rosenberg Statement, *supra*, at 13.

for information during its investigation of the Nixon Administration."[21] And while the President seems to doubt whether the inherent contempt power could be used against Executive Branch officials, it has, in fact, been used against them in the past.[22] "Lack of enforcement of a clearly applicable [power] . . . is a slender reason for denying [judicial] review." 13B CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. JURIS. § 3532.5 (3d ed.); *see Epperson v. Arkansas*, 393 U.S. 97, 102 (1968) (holding that jurisdiction existed even though statute had never been enforced and was "more of a curiosity than a vital fact of life"). And it has no persuasive force where, as here, the power in question has been repeatedly sustained by the Supreme Court, exercised numerous times by Congress before 1935, held in abeyance only due to its inconvenience and lack of necessity since 1935, and repeatedly and loudly trumpeted *this year* by prominent members of the House, including by Defendant Schiff.

Under Supreme Court precedent, the foregoing is more than enough to demonstrate a "credible threat of prosecution" in the form of inherent contempt. *United Farm Workers*, 442 U.S. at 298 (holding that standing existed even though the statute had never been enforced against the conduct at issue—and the government insisted it might never be—because the statute clearly applied to the conduct and the government had not disavowed enforcement); *N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996) ("credible threat" test "is quite forgiving. *Babbitt* illustrates how readily one can meet it."). Indeed, even under the higher bar for

---

[21] Todd Garvey, *Congressional Subpoenas: Enforcing Executive Branch Compliance*, CONG. RES. SER., 16 (Mar. 25, 2019), https://bit.ly/35EdJCG.

[22] *Id.* at 30–31; *see also id.* at 30 ("Although rare, the inherent contempt power has been used to detain executive branch officials, including for non compliance with a congressional subpoena."). The President also asserts that executive privilege would bar the use of inherent contempt against a member of the Executive Branch, *see* President MTD, Doc. 40, at 15 n.4, but that argument "is about the merits . . . and has nothing at all to do with whether [Dr. Kupperman] has Article III standing," *City of Jersey City v. Consol. Rail Corp.*, 668 F.3d 741, 746 (D.C. Cir. 2012).

standing established by the D.C. Circuit in future-injury cases, the singling out of Dr. Kupperman via subpoena places this case squarely within the category of cases in which the D.C. Circuit has found standing. *See Ord v. District of Columbia*, 587 F.3d 1136, 1143 (D.C. Cir. 2009) ("special priority"—i.e., the singling out the plaintiff in the statute—"is sufficient to establish imminence").[23] Thus, Dr. Kupperman is injured by the significant and imminent risk of being fined for contempt of Congress.

This injury, in turn, was caused by both the President and the House Defendants. As discussed above, the President has placed Dr. Kupperman at imminent and substantial risk of contempt by ordering him not to testify. At the same time, the House Defendants are the ones who actually have the power to hold Dr. Kupperman in contempt and fine him, and there is a credible threat that they will do so. Thus, the President and the House Defendants each contribute to Dr. Kupperman's injury: the very real risk of being fined for contempt. And, for the same reason, that injury would be fully redressed by a declaratory judgment from this Court making clear which branch of the Federal Government has the constitutional authority to direct Dr. Kupperman's actions in this context.

**III.     DR. KUPPERMAN'S SUIT IS NOT BARRED BY SOVEREIGN IMMUNITY.**

Both the House Defendants and the President assert that Plaintiff's suit may not proceed against either branch because of the federal government's sovereign immunity from suit. *See*

---

[23] Although Plaintiff clearly meets the D.C. Circuit's more-demanding test for future-injury challenges, he also reserves the right to argue, in subsequent proceedings, that the D.C. Circuit's version of the test is contrary to Supreme Court precedent and should be overruled. *See Ord*, 587 F.3d at 388–95 (Brown, J., dissenting in part) (criticizing D.C. Circuit test as being contrary to Supreme Court precedent); *Parker v. District of Columbia*, 478 F.3d 370, 375 (D.C. Cir. 2007) (similar); *Seegars v. Gonzales*, 396 F.3d 1248, 1253–54 (D.C. Cir. 2005) (similar).

President MTD, Doc. 40, at 10; House MTD, Doc. 41 at 8-9. This argument is unavailing for at two separate reasons.

1.      Plaintiff's suit is analogous to the traditional equitable tool of interpleader, "which permits a plaintiff threatened with rival claimants to the same debt or legal duty to bring an interpleader action before the institution of the independent suits." *California v. Texas*, 457 U.S. 164, 167 (1982) (per curiam). When assessing jurisdictional questions raised by interpleader actions, the federal courts look to the substance of the action, rather than the formal structure of the interpleader. For example, when a party brings an interpleader whose cause of action is not created by federal law, one might think that the federal courts lack federal-question jurisdiction under 28 U.S.C. § 1331. But, as the D.C. Circuit has held, that is not the case. Rather, interpleader, like a declaratory judgment action, "stake[s] the federal court's jurisdiction on 'a defense to a claim that would raise a federal question and that defendant could have asserted in a coercive action.'" *Commercial Union Ins. Co. v. United States*, 999 F.2d 581, 585 (D.C. Cir. 1993) (quoting *Bell & Beckwith v. United States*, 766 F.2d 910, 912 (6th Cir. 1985)). And, like in a declaratory judgment action, "federal jurisdiction exists if such jurisdiction would have existed in a coercive action by the defendant." *Id.* (quoting *Bell & Beckwith*, 766 F.2d at 914). Therefore, the Court of Appeals has permitted interpleader actions to proceed when, for instance, the United States could have brought a coercive action under a federal statute, thereby securing federal-question jurisdiction. *Id.*

This focus on substance over form coheres with the principles and priorities of equity, from which interpleader was created. *See Young v. Higbee Co.*, 324 U.S. 204, 209 (1945) ("Equity looks to the substance and not merely to the form."); *see also Sanders v. Armour Fertilizer Works*, 292 U.S. 190, 199 (1934) ("Suits for interpleader . . . were familiar to equity when the Constitution

was adopted . . . ." (quotation omitted)). And this same interest in substance over form also undergirds much of the courts' sovereign immunity jurisprudence. *See, e.g.*, *Smith v. Katzenbach*, 351 F.2d 810, 813 (D.C. Cir. 1965) (explaining that sovereign immunity does not apply to an official "threatening to act unconstitutionally" because "his action is deemed the action of the Government in form, but not in substance").

The intersection of these two pragmatically minded doctrines is best demonstrated in the First Circuit's decision in *Hudson Savings Bank v. Austin*, 479 F.3d 102 (2007). There, a bank held a mortgage belonging to an individual who owed money to both Massachusetts and the federal government because of various tax delinquencies. *Id.* at 104. The bank filed an interpleader action in state court, naming both Massachusetts and the United States as defendants. *Id.* at 105. After the federal government removed the action to federal court, Massachusetts invoked its sovereign immunity under the Eleventh Amendment, which bars virtually any suit brought by a private party in a federal court against an unconsenting state. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996).

The First Circuit recognized that it was strictly true that the bank—a private party—had sued Massachusetts and was the putative plaintiff. The Court of Appeals nevertheless held that Massachusetts was not entitled to assert its sovereign immunity because the suit, in substance, was between the United States and Massachusetts. Because of the nature of interpleader, "the defendants are not antagonistic to the plaintiff but, rather, are pitted against each other." *Hudson Sav. Bank*, 479 F.3d at 107. The court also found three features of the suit "especially important": (1) the bank had claimed no entitlement to the stake and sought "nothing beyond a discharge from further liability"; (2) "no private party had asserted any claim of entitlement to the stake"; and (3) the sum of the sovereigns' claims exceeded the value of the stake, such that the bank could not

31

satisfy the demands of both sovereigns. *Id.* In light of these three facts, the court characterized the interpleader "in practical effect, as a straightforward dispute between the Commonwealth and the United States," and held that such a "dispute between two sovereigns unquestionably would fall outside the purview of the Eleventh Amendment." *Id.*

As for the bank's continuing involvement in the litigation, the First Circuit recognized that because the bank had no claim to the stake, its presence was no "more than a fiction of 'the elementary mechanics of captions and pleadings,'" that the court was required to ignore for Eleventh Amendment purposes. *Id.* (quoting *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 270 (1997)). Moreover, the court's focus on the relationship between Massachusetts and the United States, rather than between the bank and the sovereigns, was consonant with the practice of "treat[ing] an interpleader action as a de facto suit between the claimants to the stake (even though, nominally, they were the defendants in the action)." *Id.* at 107–08. The court's intensely practical approach to the assertion of sovereign immunity was all the more persuasive because "interpleader is an equitable mechanism, and courts should not hesitate to 'eliminat[e] those technical restraints on the device that are not founded on adequate policy considerations.'" *Id.* at 108 (quoting 7 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FED. PRAC. & PROC. JURIS. § 1704, at 541 (3d ed. 2001)).

We respectfully submit that the First Circuit's analysis in *Hudson Savings Bank* is compelling and should guide this Court's consideration of sovereign immunity here. Dr. Kupperman's suit, which is closely analogous to interpleader, shares the same three features as *Hudson Savings Bank* that justify treating the case as, in practical effect, one between the House Defendants and the President: (1) Plaintiff has no stake in the litigation beyond discharging his lawful obligation to whichever Branch holds the correct legal view on the merits; (2) all of the

parties in interest are presumptively clothed with the sovereign authority of the United States; and (3) Plaintiff cannot satisfy the competing demands of both Branches. *See id.* at 107. As the Department of Justice itself argued in *Hudson Savings Bank*, the contention "that [a sovereign] cannot be forced to 'defend' th[e] interpleader action brought by a private citizen in federal court exalts form over substance." Brief for the United States, *Hudson Sav. Bank*, 479 F.3d 102 (No. 06-2043), 2006 WL 3888643. The federal government's position in *Hudson Savings Bank* was correct then, and it should prevail here again: settled principles of equity require the Court to focus on the *substance* of the dispute over the President's assertion of testimonial immunity and treat this case as a de facto suit between the House Defendants and the President.

Sovereign immunity does not protect one Branch of the federal sovereign from suit by another. Indeed, we have not found any instance in which either Congress or the Executive branch has even *asserted* sovereign immunity in the context of interbranch litigation. *See, e.g.*, *U.S. House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8 (D.D.C. 2019); *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53 (D.D.C. 2015); *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013); *Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008); *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76 (D.D.C. 1998); *United States v. U.S. House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983).

2.      In the alternative, sovereign immunity does not shield either the House Defendants or the President from suit because of the nature of their alleged acts. As the House Defendants acknowledge, "sovereign immunity does not apply as a bar to suits alleging that an officer's actions were unconstitutional." *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) (citing *Larson v.*

*Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949)); *see* House MTD, Doc. 41, at 9 (citing *Clark v. Library of Cong.*, 750 F.2d 89, 102 (D.C. Cir. 1984)).

Inexplicably, however, the House Defendants also assert that Dr. Kupperman "presents no such [constitutional] claim as to the House Defendants." *Id.* That stingy interpretation of Plaintiff's complaint is manifestly mistaken. Dr. Kupperman made clear in his complaint that were the President's assertion of testimonial immunity lawful, any decision to "appear and testify in obedience to the House Defendants' subpoena would unlawfully impair the President in the exercise of his core national security responsibilities." Complaint, Doc. 1, at ¶ 2. Likewise, if the President's assertion of immunity exceeded his Article II authority, Plaintiff alleged that "an erroneous judgment to abide by the President's assertion of testimonial immunity would unlawfully impede the House from carrying out one of its most important core Constitutional responsibilities, 'the sole Power of Impeachment.'" *Id.* (quoting U.S. CONST. art. I, § 2, cl. 5).

Clearly, therefore, Plaintiff alleged that both the House Defendants by their subpoena and the President by his contrary directive had issued conflicting orders to Plaintiff. And either the House Defendant's subpoena or the President's directive *necessarily* infringed on the opposing branch's constitutional authority, therefore exceeding the constitutional power delegated to the offending branch. Moreover, because reasonable arguments can, and have, been made on both sides of the merits issue, Plaintiff can credibly allege that *either* the House Defendants or the President have invaded his legal rights through an unconstitutional act. The merits question of *which* Branch has acted unconstitutionally only goes to the *content* of Plaintiff's rights, *not* to whether either Branch has sovereign immunity from equitable relief. *See Pollack v. Hogan*, 703 F.3d 117, 121 (D.C. Cir. 2012). Because Plaintiff's complaint alleges that *some* federal official's

conduct necessarily violates the Constitution, sovereign immunity does not bar his declaratory judgment action.

## IV.    DR. KUPPERMAN'S SUIT AGAINST THE PRESIDENT IS NOT BARRED BY ABSOLUTE IMMUNITY.

The President argues that, presumably as a matter of constitutional law, Dr. Kupperman is categorically barred from suing the Chief Executive. *See* President MTD, Doc. 40 at 8–10. But "[i]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Nixon v. Fitzgerald*, 457 U.S. 731, 793–94 (1982). While the doctrine may "forbid judicial interference with the exercise of Executive *discretion*," *Mississippi v. Johnson*, 71 U.S (4 Wall.) 475, 499 (1886) (emphasis added), the dispute between the House Defendants and the President has nothing to do with how the Executive should exercise his "discretion." It instead concerns the foundational question whether the President even *has* the discretion to assert testimonial immunity in this context. In other words, the dispute really asks whether, in light of the meaning of Article II, the President has a "ministerial duty" to withdraw his assertion of testimonial immunity. *Id.* at 498. And while it remains an open question whether the federal courts may issue injunctive relief against a President for failure to perform a ministerial duty, *see Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion); *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996), there is no reason why non-coercive declaratory relief may not issue, resolving the question whether the assertion of immunity here was in fact within the President's discretion.

A ministerial duty is one "that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." *Swan*, 100 F.3d at 977; *see also Johnson*, 71 U.S. (4 Wall.) at 498 (describing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), as involving a ministerial duty of the Secretary of State to deliver a commission). Assuming the

President's claim of absolute testimonial privilege must give way to a congressional subpoena in support of an impeachment inquiry, he has no constitutional authority to order Dr. Kupperman to decline to testify.

Largely eliding this traditional distinction between executive discretion and ministerial duties, the President leans heavily on *Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010), to support his claim of absolute immunity from the federal courts' equitable jurisdiction. In *Newdow*, the Court of Appeals held that a group of plaintiffs seeking to challenge the religious elements of presidential inaugural ceremonies lacked standing to seek injunctive relief against the Chief Justice of the United States, the entities that organize the inauguration ceremonies, and clergymen speakers. In reaching that conclusion, the majority in *Newdow* also remarked along the way that "courts do not have jurisdiction to enjoin [the President]" and asserted that federal courts "have never submitted the President to declaratory relief." *Id.* at 1013. But despite all the weight that the President places on *Newdow*, the Court's statements there are both inapposite and non-precedential, and its factual claim that the President has never been subjected to declaratory relief is demonstrably wrong.

First, the *Newdow* dictum is inapposite. The Court simply stated that the religiosity of an inaugural ceremony was "a decision committed to the *executive* discretion of the President" and that a federal "court—whether via injunctive or declaratory relief—does not sit in judgment of a President's *executive* decisions." *Id.* at 1012 (emphases added). This assertion regarding the President's exercise of executive discretion does not address, let alone resolve, whether the President can be subject to the federal courts' equitable authority when the question is whether the President *has* the discretion he claims, rather than his exercise of acknowledged discretionary executive powers. For example, compare *Newdow* to *Swan*. In the latter case, the plaintiff alleged

that the President had "violated a duty to comply with removal restrictions" contained in a congressional statute and a duty "not [to] interfere with" the plaintiff's officeholding until a successor had been lawfully appointed. 100 F.3d at 977. The court of appeals observed, in no uncertain terms, that "[t]his duty, if it exists, is ministerial and not discretionary, for the President is bound to abide by the requirements of duly enacted and otherwise constitutional statutes." *Id.*

The House Defendants' merits arguments here are far more like those alleged against the President in *Swan* than in *Newdow*. Just as the President has no discretion on whether "to abide by the requirements of duly enacted or otherwise constitutional statutes," he likewise has no discretion on whether to abide by Congress's lawful investigatory subpoenas absent a valid claim of executive immunity. In contrast, the organization of the President's own inauguration implicates precisely the "judgment, planning, or policy decisions" that exemplify executive discretion. *Swan*, 100 F.3d at 977 (quoting *Beatty v. Washington Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988)). Indeed, the *Newdow* majority pointedly remarked that "[t]he inaugural ceremony is a peculiar institution, the whole of which is subject to the President's or President-elect's discretion." 603 F.3d at 1011. There is nothing "peculiar" about the President's duty to refrain from asserting testimonial privileges if the Constitution requires that such assertions must give way to a congressional subpoena issued in support of an impeachment inquiry.

Second, *Newdow*'s statements about the relationship between the federal courts and the President are dicta and have no binding effect on this Court. *See Doe v. Fed. Democratic Republic of Ethiopia*, 851 F.3d 7, 10 (D.C. Cir. 2017) ("Binding circuit law comes only from the holdings of a prior panel, not from its dicta." (quoting *Gersman v. Grp. Health Ass'n*, 975 F.2d 886, 897 (D.C. Cir. 1992))). The *Newdow* plaintiffs did not join President Obama as a defendant in their challenge to the statement of "so help me God" in the oath of office because they conceded that

37

"[t]he President cannot be denied the prerogative of making such a religious reference . . . because doing so would abrogate his First Amendment rights." 603 F.3d at 1010. As then-Judge Kavanaugh explained in his dissent from the majority's standing analysis, the plaintiffs "acknowledge[d] that a President on his or her own might still say 'so help me God' even if those words are not part of the official oath recited by the Chief Justice." *Id.* at 1015 n.2 (Kavanaugh, J., concurring in the judgment). It was therefore clear to then-Judge Kavanaugh that "plaintiffs d[id] not seek to constrain a President's choice of what he or she says at the Inaugural ceremonies, whether during the oath or the Inaugural Address," and instead challenged only "the inclusion of 'so help me God' in the official Presidential oath articulated by the Chief Justice in a public ceremony, as well as the Inaugural prayers delivered by the selected clergy during that public ceremony." *Id.*

Rather than merely assess whether the plaintiffs had standing even if the President were free to say and do what he pleased at the inaugural ceremony, the *Newdow* majority went a step further and commented on whether the court could, if asked, enjoin the President or issue a declaratory judgment against him. But the plaintiffs never asked the court in *Newdow* to exercise jurisdiction over the President and steadfastly maintained, on the merits, that the court *could not* restrict the President's speech during an inaugural ceremony. *See id.* at 1010, 1011. The majority's discussion of its authority to issue injunctive or declaratory relief against the President was therefore completely unnecessary to the disposition of the case, as then-Judge Kavanaugh clearly intimated.

Third, the *Newdow* majority clearly erred in declaring that federal courts "have never submitted the President to declaratory relief." *Id.* at 1013. That is simply not true. In fact, the Court of Appeals "*has* issued a declaratory judgment directly against the President." *Citizens for Responsibility & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 139 (D.D.C. 2018) (citing

*Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 615 (D.C. Cir. 1974)), *aff'd*, 924 F.3d 602 (D.C. Cir. 2019); *see also Swan*, 100 F.3d at 978 (explaining that the court in *National Treasury Employees Union* even "asserted the authority to issue" an *injunction* against the President to perform a ministerial duty, but refrained from doing so for prudential reasons); *cf. Mackie v. Bush*, 809 F. Supp. 144, 148 (D.D.C. 1993) (enjoining the President from removing certain members of the Postal Service Board of Governors), *vacated on grounds of mootness sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993). Even the President admits that a declaratory judgment against the President would not be unprecedented. *See* President MTD, Doc. 40, at 9 n.1.

More importantly, the Supreme Court itself – in a case post-dating both *Franklin* and *Swan* – has affirmed a declaratory judgment issued directly against the President. In *Clinton v. City of New York*, 524 U.S. 417 (1998), the court affirmed a district court's declaratory judgment, which ran against the President, that "the Line Item Veto Act is unconstitutional and that the [President's] particular cancellation was invalid." *Id.* at 425 n.9. The Court carefully noted also that "neither set of plaintiffs sought injunctive relief against the President." *Id.* But *City of New York* confirmed that a President may be subjected to a declaratory judgment whenever his exercise of authority violates a constitutional command that leaves him no discretion.

*Newdow*'s discussion of *City of New York* could be read to restrict the availability of declaratory relief "solely to cases of judicial review of legislation." *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 213 n.30 (3d Cir. 2011) (en banc). *But see Johnson*, 71 U.S. (4 Wall) at 500 (stating that federal courts could not, as of 1866, entertain suits seeking injunctions "to prevent the execution of an unconstitutional act of Congress"). But "[n]othing in *Clinton* itself warrants that limitation," *id.* and the *Newdow* majority did not actually endorse it either. While *Newdow* characterized *City of New York* as "a basic case of judicial review of legislation," 603 F.3d at 1012,

its central point was that the claim at issue targeted "a decision committed to the executive discretion of the President," rather than the President's "statutory power," as was implicated in *City of New York*. *Id.*; *see also In re Glob. Indus. Techs., Inc.*, 645 F.3d at 213 n.30. But, as discussed above, the House Defendants' challenge to the President's assertion of testimonial privilege for himself and his close advisors *denies* that the President's discretionary executive power encompasses that authority. The *Newdow* plaintiffs, meanwhile, *conceded* that the inaugural ceremony is a "peculiar institution, the whole of which is subject to the President's . . . discretion." *Id.* at 1011. Again, just as this case resembles *Swan*, so does it resemble *City of New York*, and *Newdow* is not to the contrary.

It is also worth stepping back to put the President's claim of absolute immunity from judicial process into historical perspective: He essentially argues for *greater* immunity from judicial process than the English Crown ever asserted before the Founding. Even the Crown was not beyond the authority of equity. To be sure, the King had to consent to any claim against him, but this notion of "consent" did not depend on the King's fiat. Rather, it hinged on the foundational principle that "the king, as the fountain of justice and equity, could not refuse to redress wrongs when petitioned to do so by his subjects." 9 WILLIAM HOLDSWORTH, A HISTORY OF ENGLISH LAW 8 (3d ed. 1944).

Although the Crown could not generally be sued *eo nomine* in its own courts without its consent, "when it was necessary to sue the Crown *eo nomine* consent apparently was given as of course." Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 HARV. L. REV. 1, 1 (1963). Indeed, the old expression, "the King can do no wrong," never meant that the King was above the law. Rather, "it meant that the king must not, was not allowed, not entitled, to do wrong." Ludwik Ehrlich, *Proceedings Against the Crown (1216-1377)*, *in* 6 OXFORD STUDIES

IN SOCIAL AND LEGAL HISTORY 42 (Paul Vinogradoff ed., 1921). And, therefore, "equity entertained some suits against the Crown." Jaffe, *supra*, at 6. The President, like the King, must submit himself to equity jurisdiction when he is alleged to have done wrong.

The President's assertion of absolute immunity against suit makes even less sense once one considers how the President occupies an entirely different place in our constitutional order than the Crown occupied in England before the Founding. The English courts could not entertain suits against the Crown without the King's consent "because they were *his* Courts, and no lord could be sued in his own Court." William Holdsworth, *The History of Remedies Against the Crown*, 38 L.Q. Rev. 141, 142 (1922) (emphasis added). The federal courts are *not* the President's courts; they are not the products of his prerogative and they are not created by him to administer *his* justice. Rather, they are the creations of the Constitution and Congress, and they are vested with the "judicial Power" to decide "all Cases, in Law and Equity, arising under this Constitution." U.S. CONST. art. III, §§ 1, 2. The President has offered no reason to think that a declaratory judgment resolving Plaintiff's suit in equity falls outside of this great Article III power.

Moreover, this case uniquely calls for this Court to reject the President's claim of absolute immunity. A claim of immunity of the sort pressed by the President here usually has little bearing on the disposition of a case. *See Newdow v. Bush*, 391 F. Supp. 2d 95, 106 (D.D.C. 2005) ("For all the broad language in the Supreme Court decisions regarding this question, this Court is unable to find a case in which the actual disposition turned on the inability of the courts to issue an injunction against . . . the Executive."). The federal courts can almost always avoid enjoining or issuing declaratory relief directly against a President because, in most cases, a plaintiff's injury "can be rectified by injunctive relief against subordinate officials." *Swan*, 100 F.3d at 978. Even Justice Scalia, to date the most strident defender on the Supreme Court of presidential immunity

from judicial remedies, cautioned that his position did not "in any way suggest[] that Presidential action is *unreviewable*." *Franklin*, 505 U.S. 788, 828 (Scalia, J., concurring in part and concurring in the judgment). Instead, "[r]eview of the legality of Presidential action can *ordinarily* be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Id.* (emphasis added); *see also id.* at 802–03 (plurality opinion) (noting that "*in general*, 'th[e] court has no jurisdiction of a bill to enjoin the President in the performance of his official duties" (emphasis added) (quoting *Johnson*, 71 U.S. (4 Wall.) at 501)).

This case is anything but ordinary. The President's order to Dr. Kupperman and his continued assertion of absolute testimonial immunity for his close advisors "requires no aid of subordinate officials." *Swan*, 100 F.3d at 979. Only the President possesses the claimed testimonial immunity, and only his erroneous invocation of that purported immunity is capable of injuring Dr. Kupperman. Therefore, Plaintiff cannot "substantially redress his injury" by obtaining relief against the President's subordinate officials, *id.*, as every Justice to address the question has assumed an injured claimant may do in the ordinary case. Indeed, the whole point of extending the President's testimonial immunity from congressional inquiry to his immediate White House advisors—his "alter egos"—is that there are no subordinate officials standing between these advisors and the President. If the President's assertion of testimonial immunity exceeds his authority under Article II, then Plaintiff's *only* relief can be obtained against the President himself, rather than against his subordinates. And if Englishmen could maintain claims against the Crown "when it was *necessary* to sue the Crown *eo nomine*," Jaffe, *supra*, at 1 (first emphasis added), Plaintiff is certainly entitled to seek relief against the President when it is *necessary* to address his injury.

Finally, it is important to emphasize that Dr. Kupperman is not here seeking an injunction against the President. He has sued only for declaratory relief against either the House Defendants or the President and is not asking the Court to exercise its coercive powers against a coordinate branch of government. Therefore, should this Court agree with the House Defendants on the merits, it will simply declare the President's assertion of immunity invalid while still giving the President the opportunity to participate in the suit and defend his conduct. While declaratory relief against the President is surely a serious matter that should not be pursued lightly, *see Swan*, 100 F.3d at 976 n.1, the unique separation-of-powers concerns that exist when a court is asked to enjoin the President simply do not apply here. The President has thus failed to show that he is absolutely immune from suit seeking a declaration of this Court determining the validity of his assertion of testimonial immunity.

## V.  DR. KUPPERMAN'S SUIT AGAINST THE HOUSE DEFENDANTS IS NOT BARRED BY THE SPEECH OR DEBATE CLAUSE.

The Speech or Debate Clause provides: "For any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other place." U.S. CONST. art. I, § 6, cl. 1. The House Defendants argue that because the House issued the subpoena as part of its impeachment inquiry, it falls within the legislative activity shielded by the Clause, and thus may not "be questioned" in this Court. But the case law cited by House Defendants does not help them in this context for two reasons: (1) the Clause does not immunize the Sergeant-at-Arms for his role in enforcing the challenged subpoena; and (2) the D.C. Circuit has distinguished legislative immunity precedent where, as here, the real parties in interest are the two co-equal political Branches of our Government.

A.   **The Speech or Debate Clause Does Not Immunize the
Sergeant-at-Arms for Enforcing the Challenged Subpoena.**

Dr. Kupperman has moved to join Paul D. Irving in his official capacity as the Sergeant-at-Arms of the House as a Defendant. *See* Plaintiff's Motion to Add the Honorable Paul D. Irving as Co-Defendant. The Sergeant-at-Arms is the chief law enforcement and protocol officer of the House, and House Rules charge him with the duty to "execute the commands of the House, and all processes issued by authority thereof . . . ." House Rule II, clause 3(a), *Rules of the House of Representatives: One Hundred Sixteenth Congress* 2 (Jan. 11, 2019), https://bit.ly/2DiQNNt. Historically, the Sergeant-at-Arms has played a pivotal role in the House's exercise of its inherent contempt power by arresting and detaining individuals who refused to comply with congressional subpoenas.[24] And as the chief law enforcement officer, the Sergeant-at-Arms also enforces any monetary fines the House could levy under its inherent contempt power.[25]

The Supreme Court has consistently held that the Speech or Debate Clause does not bar judicial review of a Congressional employee's non-legislative actions even if taken in furtherance of express Congressional orders. *See e.g., Kilbourn v. Thompson*, 103 U.S. 168, 202–05 (1880); *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967) (per curiam); *Powell v. McCormack*, 395 U.S. 486, 505–06 (1969); *Doe v. McMillan*, 412 U.S. 306, 315 (1973). "[A]lthough an action against a Congressman may be barred by the Speech or Debate Clause, legislative employees who participated in the unconstitutional activity are responsible for their acts." *Powell*, 395 U.S. at 503. A challenge to the constitutionality of a subpoena that the Sergeant-at-Arms may seek to enforce falls squarely within this category.

---

[24] *See* CONGRESS'S CONTEMPT POWER, *supra*, at 10–11.

[25] *See e.g., id.* at 11–12 (explaining the basis for Congress's power to fine recalcitrant witnesses).

In *Kilbourn v. Thompson*, Hallet Kilbourn challenged the constitutionality of a House Resolution ordering his arrest and imprisonment for contempt after he refused to comply with a subpoena issued by a House investigating committee. *See* 103 U.S. at 200. Kilbourn sued the Speaker of the House, members of the committee, and the Sergeant-at-Arms for false imprisonment. *See id.* at 170. The Supreme Court concluded that the Speech or Debate Clause provided the members with legislative immunity even though the House resolution authorizing Kilbourn's arrest was unconstitutional. *See id.* at 200–04. The Court noted that while the members voted for the resolution, they did not participate in Kilbourn's arrest or confinement. *See id.* at 200. However, the Court permitted the case to go forward against the Sergeant-at-Arms, who executed the warrant for his arrest. *See id.* at 202. In support of its conclusion, the Court favorably quoted *Stockdale v. Hansard*, 9 Ad. & E. 1, 112 Eng. Rep. 1112 (K.B.1839): "So if the speaker by authority of the House order an illegal act, though that authority shall exempt him from question, his order shall no more justify the person who executed it than King Charles's warrant for levying ship-money could justify his revenue officer," *id.* As the Court in a later case summarized the *Kilbourn* holding:

> In *Kilbourn*, the Speech or Debate Clause protected House Members who had adopted a resolution authorizing Kilbourn's arrest; that act was clearly legislative in nature. But the resolution was subject to judicial review insofar as its execution impinged on a citizen's rights as it did there. That the House could with impunity order an unconstitutional arrest afforded no protection for those who made the arrest.

*Gravel v. United States*, 408 U.S. 606, 618 (1972).

The Court reaffirmed the principle that the Speech or Debate Clause does not shield Congressional employees from liability for non-legislative (in *Kilbourn*, unconstitutional) actions in several modern cases. In *Dombrowski v. Eastland*, the Court held that the Speech or Debate

45

Clause protected the chairman of a Senate subcommittee but not the subcommittee counsel in a civil action alleging the two conspired with state officials to unlawfully seize plaintiff's property and records. *See* 387 U.S. at 83. The Court explained that while there was no evidence that the Senator was involved in "any activity that could result in liability," there was a sufficient factual dispute as to the counsel's involvement to allow further proceedings. *Id.* at 84–85.[26]

Likewise, the Court concluded in *Powell v. McCormack* that the Clause shielded members of Congress, but not the Sergeant-at-Arms, Clerk, or Doorkeeper of the House in an action challenging the constitutionality of a resolution excluding a member-elect from taking his seat in the House. 395 U.S. at 504–06. The member-elect and some voters in his district sued the House employees for actions taken in furtherance of the allegedly unconstitutional resolution: the Clerk "threatened to refused to perform the service for [him] to which a duly elected Congressman is entitled," the Sergeant-at-Arms refused to pay his salary, and the Doorkeeper threatened to deny him admission to the House chamber. *Id.* at 493. Despite the House's efforts to distinguish the two cases, the Court concluded that *Kilbourn* and *Dombrowski* were dispositive, and the plaintiffs were "entitled to maintain their action against House employees and to judicial review of the propriety of the decision to exclude" the member-elect. *Id.* at 506.

Finally, the Court reaffirmed this rationale in *Doe v. McMillan*. The Court held that while the Speech or Debate Clause barred suit against Congressional committee members and related Congressional staff to the extent they engaged in legislative acts of compiling, referring to the

---

[26] The Court has explained, in dicta, that while "no prior case has held that Members of Congress would be immune if they executed an invalid resolution by themselves carrying out an illegal arrest, or if, in order to secure information for a hearing, themselves seized the property or invaded the privacy of a citizen," neither the Member nor their aides "should be immune from liability or questioning in such circumstances" because such acts are not essential to legislating. *Gravel v. United States*, 408 U.S. 606, 621 (1972).

Speaker, and voting on the publication of the challenged report, immunity did not extend "to [the]

persons who, with authorization from Congress, distribute[d] materials which allegedly infringe[d]

upon the rights of individuals." 412 U.S. at 312, 314–16. The Court explained:

> Members of Congress are themselves immune for ordering or voting
> for a publication going beyond the reasonable requirements of the
> legislative function, … but the Speech or Debate Clause no more
> insulates legislative functionaries carrying out such nonlegislative
> directives than it protected the Sergeant at Arms in *Kilbourn v.*
> *Thompson* when, at the direction of the House, he made an arrest
> that the courts subsequently found to be "without authority."

*Id.* at 315 (citations omitted) (quoting *Kilbourn*, 103 U.S. at 200)). As a result, the Court concluded

that the Clause did not "immunize those who publish and distribute otherwise actionable materials

beyond the reasonable requirements of the legislative function." *Id.* at 315–16.

Well-established Supreme Court precedent thus demonstrates that the Speech or Debate

Clause does not extend to allegations of unconstitutional, non-legislative actions taken by

Congressional employees. Challenges to the constitutionality of employees' actions—rather than

those of members—do not hinder or threaten legislative activity, thereby protecting one of the

main purposes of the Speech or Debate Clause. *See id.* at 505–06; *see also Gravel*, at 408 U.S. at

620–21 ("[*Kilbourn*, *Dombrowksi*, and *Powell*] reflect a decidedly jaundiced view towards

extending the Clause so as to privilege illegal or unconstitutional conduct beyond that essential to

foreclose executive control of legislative speech or debate and associated matters such as voting

and committee reports and proceedings.").

Dr. Kupperman's suit against the Sergeant-at-Arms is no different. He seeks a declaratory

judgment as to the constitutionality of the House subpoena in light of the President's assertion of

absolute immunity over his testimony. Complaint, Doc. 1, at ¶ 49. "The causal connection between

the named officer[] and the specific injuries alleged [is] obvious," as House Rules entrust the

issuance of process to the Sergeant-at-Arms and Dr. Kupperman faces enforcement from the Sergeant-at-Arms under the House's inherent contempt power if he does not comply. *See Common Cause v. Biden*, 748 F.3d 1280, 1284 (D.C. Cir. 2014). Although the House has threatened but not yet taken such action, this suit presents the same issue as *Kilbourn*. And just as the Supreme Court has reaffirmed the principles allowing Kilbourn to proceed in his action against the Sergeant-at-Arms in that case, this Court should likewise allow Dr. Kupperman's suit.

> **B.      The Speech or Debate Clause Does Not Preclude Suit When the Real Parties in Interest Are the Two Co-Equal Political Branches of Our Government.**

D.C. Circuit precedent also demonstrates that the clash between the two co-equal political Branches of Government—the real parties in interest here—precludes the Speech or Debate Clause from immunizing the House subpoena from review. In *United States v. American Telephone & Telegraph Co.*, 551 F.2d 384 (D.C. Cir. 1976), the Justice Department sought an injunction prohibiting AT&T from complying with a House subcommittee subpoena regarding an investigation into warrantless national security wiretaps. The Chairman of the House Committee on Interstate and Foreign Commerce sought and was granted leave to intervene as a defendant on his own behalf and on behalf of the Committee and the House. *Id*. at 391. He argued the executive branch could not interfere with its subpoena power under the Speech or Debate Clause. *See id*. The court suggested that the legislative immunity recognized in prior case law may not be "absolute in the context of a conflicting constitutional interest asserted by a coordinate branch of the government," explaining that "[t]his distinction is suggested by the dictum in *United States v. Nixon* that the case might be very different if the President claims a 'need to protect military, diplomatic, or sensitive national security secrets . . . .' " *Id*. (quoting *U. S. v. American Tel. & Tel. Co.*, 418 U.S. 683, 706 (1974)).

The Court of Appeals initially remanded the case for settlement negotiations, but revisited the Speech or Debate question when the negotiations failed. *See United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121 (D.C. Cir. 1977). The House again argued that the Clause, as interpreted in *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491 (1975), barred judicial review of the subpoena, but the D.C Circuit rejected that argument, holding that "the Clause does not and was not intended to immunize congressional investigatory actions from judicial review. Congress' investigatory power is not, itself, absolute." *Id*. at 129. The Court then considered the House's argument that "the court can act only if AT&T itself initiates a challenge to the subpoena [by defying it and defending a contempt citation]; so long as AT&T merely awaits a court ruling on the Executive's challenge," the House argued, "the court must abstain." *Id*. The Court rejected this argument, explaining that "[i]t would be strange indeed if the Constitution made judicial consideration available to one who defies the legislature outright, but not to one like AT&T, who seeks an orderly resolution." *Id*. In sum, the D.C. Circuit rejected the submission that "Congress' investigatory power is absolute," *id*. at 130, holding instead that in cases in which both the Executive and the Legislative Branches assert constitutionally derived immunities, "claims of either … branch that its determination of the propriety of its acts is conclusive" must be rejected. *Id*. at 127.

Dr. Kupperman's case is materially indistinguishable from *AT&T*. As in that case, here the evidence that the Executive asserts is immune from congressional subpoena is in the hands of a third party, and as a result "the Executive is not in a position to assert its claim of constitutional right by refusing to comply with a subpoena," depriving the Executive of the ability to simply withhold production. *Id*. at 129. As in that case, Dr. Kupperman "seeks an orderly resolution" of the Constitutional conflict, and for this reason, the means "by which [he] here achieves judicial consideration of his challenge is not properly subject to reproach as exalting form over substance."

49

*Id*. Of course, in *AT&T*, the Executive brought the action against AT&T seeking an injunction barring compliance with the subpoena whereas here Dr. Kupperman brought the action against the President (and the House Defendants) seeking a declaratory judgment. But that is a distinction without a difference because a declaratory judgment action in this context is simply the mirror image of an enforcement action by the Executive.

It is true that the *AT&T* Court noted that the "members of the Subcommittee are not, themselves, made defendants in a suit to enjoin implementation of the subpoena," *id*., apparently distinguishing cases in which House Members are named as defendants involuntarily in the complaint from cases, like *AT&T*, where they voluntarily intervene as defendants in order to defend the House's rights. Accordingly, it may be the case that the House Defendants other than the Sergeant-at-Arms could insist upon their dismissal on Speech or Debate Clause grounds, but that would not prevent the Court from proceeding to judgment on Dr. Kupperman's declaratory judgment action against the President and the Sergeant-at-Arms. And because Dr. Kupperman takes no position on the merits of the constitutional dispute between the House and the President, this course would simply leave the Legislative Branch without its own voice in the litigation, apart from the Sergeant-at-Arms, to present the arguments in favor of the validity of its subpoena. That is why the House routinely intervenes in cases, like *AT&T*, where the Executive seeks an injunction against the third party recipient of a subpoena seeking evidence over which the Executive asserts its own immunity. *See, e.g.*, Consent Motion to Intervene, Doc. 12, *Trump v. Mazars USA, LLP*, No. 19-1136 (D.D.C. Apr. 26, 2019) (consent motion permitting House Oversight Committee to intervene to present House's arguments in suit brought by President against recipient of House subpoena in which the Committee argued it "has a significant interest in ensuring compliance with its subpoenas").

The fact that the House issued the subpoena in support of impeachment proceedings also does not change this analysis. Relying heavily upon *Porteous v. Baron*, 729 F. Supp. 2d 158 (D.D.C. 2010), the House argues that the Speech or Debate Clause bars this suit because Dr. Kupperman "is challenging a legislative act by the House Defendants as part of their impeachment inquiry, which the Constitution places within their 'sole' jurisdiction." House MTD, Doc. 41 at 14 (citation omitted). But the House, by focusing exclusively on its impeachment powers, ignores the unique, broader context of Dr. Kupperman's suit—that he is caught between co-equal political branches asserting constitutional authority over his testimony. As both *AT&T* opinions suggest, the Speech or Debate Clause's grant of absolute immunity for members of Congress does not apply under these circumstances. This Court did not have the opportunity to consider the implication of competing constitutional claims of the Executive and Legislative branches in *Porteous*, as it involved a challenge by a federal judge to the procedures in his Senate impeachment trial. *See* 729 F. Supp. 2d at 160. And in considering the constitutional interests of judicial restraint with regard to that impeachment proceeding, this Court explained that "it [was] not as if Judge Porteous ha[d] no forum in which to voice his constitutional objection to the use of his immunized testimony," as the Senate could "grant the relief" he sought. *Id.* at 166. Because no such forum is available to Dr. Kupperman, judicial resolution of this momentous constitutional question is necessary.

## VI.   <u>DR. KUPPERMAN STATES A CAUSE OF ACTION.</u>

The President also argues that Plaintiff has failed to state a cause of action because his suit does not qualify as an interpleader action contemplated under either Federal Rule of Civil Procedure 22 or the Federal Interpleader Statute, 28 U.S.C. § 1335. *See* President MTD, Doc. 40,

at 42–44.[27] This argument is deeply confused. It evinces both a mischaracterization of Plaintiff's complaint and a misunderstanding of blackletter civil procedure.

At the outset, interpleader is not a cause of action. It is a "joinder mechanism." 1 Steven S. Gensler, *Federal Rules of Civil Procedure, Rules and Commentary* (West 2019); *see also Commercial Union Ins. Co. v. United States*, 999 F.2d 581, 584 (D.C. Cir. 1993) (describing interpleader as a "procedural device"). The character of interpleader is all the more evident because Rule 22 notes that it "supplements – and does not limit – the joinder of parties allowed by Rule 20." FED. R. CIV. P. 22(b).

Dr. Kupperman has not brought his suit as an interpleader action, but rather has simply described it as one sounding "in the nature of interpleader," Complaint, Doc. 1, at 2, to emphasize that Plaintiff initiated this action as a disinterested party, seeking only to satisfy his legal obligation to either the House Defendants or the President, both of whom could otherwise bring a coercive action against him to enforce what they assert are their legal rights. In this sense, Plaintiff's suit is analogous to interpleader, but it is not a strict interpleader action. Nor need it be. Rather, Plaintiff's declaratory judgment action resembles interpleader because both mechanisms "enable a defendant to precipitate a plaintiff's suit in order to avoid multiple liability or other inconvenience." *Commercial Union Ins. Co.*, 999 F.2d at 585 (quoting *Bell & Beckwith v. United States*, 766 F.2d 910, 912 (6th Cir. 1985)); *see also Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 510 n.7

---

[27] The President also argues that Plaintiff cannot state a cause of action under the Declaratory Judgment Act. *See* President MTD, Doc. 40, at 44. Plaintiff does not dispute that the Declaratory Judgment Act itself does not provide an independent cause of action, and only expands the range of remedies available in the federal courts. *See Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011). But as explained below, Plaintiff's cause of action is premised on the inherent equity jurisdiction of the federal courts to address claims that federal entities violate the Constitution.

("Declaratory judgment and interpleader actions . . . may invert expected designations of plaintiff and defendant").

Missing the mark entirely, the President overlooks the obvious source of Plaintiff's cause of action: the traditional equitable powers of the federal courts to resolve *constitutional* disputes. Time and time again, "[t]he Supreme Court has recognized an implied action for prospective relief against allegedly unconstitutional actions by federal officials." *Del. Riverkeeper Network v. Fed. Energy Regulatory Comm'n*, 895 F.3d 102, 107 (D.C. Cir. 2018). For instance, in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), the Court noted the existence of an implied cause of action "as a general matter" to challenge federal governmental action as violating the Constitution. *Id.* at 491, n.2; *see also Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (explaining that equitable relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally"); *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution.").

If there had been any doubt regarding the source of the cause of action to sue federal officials for violating the Constitution, the Court resolved it several years ago in *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015). There, the Court rejected the argument that the Supremacy Clause of the Constitution itself conferred a right of action to seek injunctive relief against the enforcement of preempted state legislation. In reaching that conclusion, the Court explained that the Clause could not be the source of relief because the Court had long held that federal courts could enjoin not only "violations of federal law by state officials" but also "violations of federal law by federal officials." *Id.* at 1384 (citing *Am. Sch. Of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)). Instead, the Court made clear, "[t]he ability to sue to

enjoin unconstitutional actions by state and federal officers is the creation of courts of equity." *Id.* at 1384. In other words, Plaintiff's cause of action "arise[s] under federal common law." *D.C. Ass'n of Chartered Pub. Schs. v. District of Columbia*, 930 F.3d 487, 493 (D.C. Cir. 2019); *see also Armstrong*, 135 S. Ct. at 1384 (calling such injunctive relief a "judge-made remedy"); *cf. Miers*, 558 F. Supp. 2d at 94 (holding that cause of action existed under the Constitution).

This case falls squarely within this body of federal common law. Dr. Kupperman is under conflicting commands of the political branches of the Federal Government, and one of those orders *must* give way; that is, one of the competing demands exceeds the constitutional authority of its author. Either the House's subpoena must give way to the President's Article II testimonial immunity or the President's assertion of immunity exceeds his Article II authority and impedes the House's lawful investigation pursued under its Article I impeachment power. *See* Complaint, Doc. 1, at ¶ 2. One thing about this interbranch dispute is clear: It cannot be that *both* the House Defendants and the President are acting constitutionally. And because Dr. Kupperman does not know which Branch's competing command is entitled to prevail, he has an equitable cause of action against both.

## CONCLUSION

For the reasons stated above, the Court should deny the House Defendants' and President's motions to dismiss, and enter Declaratory relief on the merits.

November 27, 2019                              Respectfully submitted,


                                              /s/ Charles J. Cooper
                                              Charles J. Cooper, Bar No. 248070
                                              Michael W. Kirk, Bar No. 424648
                                              J. Joel Alicea, Bar No. 1022784
                                              Shelby Baird[*]

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC  20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Plaintiff Charles M. Kupperman*

*D.C. Bar Application Pending; Admitted
     in Pennsylvania