**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

CHARLES M. KUPPERMAN,

       *Plaintiff*,

  v.

UNITED STATES HOUSE OF
    REPRESENTATIVES, *et al.*,

       *Defendants*.

</td><td>

No. 19-cv-3224 (RJL)

</td></tr>
</table>

**HOUSE DEFENDANTS' MEMORANDUM OF LAW RESPONDING TO
PRESIDENT TRUMP'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.    ALL DEFENDANTS AGREE THAT THIS CASE IS MOOT ...................................... 2

II.   KUPPERMAN IS NOT ABSOLUTELY IMMUNE FROM CONGRESSIONAL PROCESS ................... 4

      A.    The Executive Branch Interests Purportedly Protected by Absolute Immunity
             for Presidential Advisors Are Minimal ................................................................. 7

            1.    Presidential Advisors Do Not Enjoy Absolute Immunity from
                 Compelled Congressional Testimony ......................................................... 7

            2.    The Availability of a Qualified Privilege, Where Valid, Sufficiently
                 Protects Executive Branch Confidentiality Concerns .............................. 10

            3.    Compelled Testimony from Presidential Advisors Does Not Encroach
                 on Executive Branch Prerogatives ............................................................ 12

            4.    Presidential Advisors Have Testified Before Congress Throughout
                 History Without the Consequences the Executive Suggests ..................... 15

      B.    The House's Interest in Performing Its Constitutional Functions Far Outweighs
             the Executive Branch's Interests in Absolute Immunity ...................................... 18

      C.    President Trump Lacks Authority to Order Former Officials to Defy
             Congressional Subpoenas .................................................................................... 21

CONCLUSION ................................................................................................................. 23

# TABLE OF AUTHORITIES

## Cases

*Bean LLC v. John Doe Bank*,
291 F. Supp. 3d 34 (D.D.C. 2018) ......................................................................11

*Blumenthal v. Drudge*,
186 F.R.D. 236 (D.D.C. 1999)...........................................................................22

*Brown v. Glines*,
444 U.S. 348 (1980).........................................................................................22

*Clarke v. United States*,
915 F.2d 699 (D.C. Cir. 1990) ............................................................................3

*Clinton v. Jones*,
520 U.S. 681 (1997)....................................................................................5, 13

\* *Comm. on the Judiciary v. McGahn*,
No. 19-2379, 2019 WL 6312011 (D.D.C. Nov. 25, 2019) ............................................ *passim*

\* *Comm. on the Judiciary v. Miers*,
558 F. Supp. 2d 53 (D.D.C. 2008) ...........................................................4, 5, 10, 16

*Comm. on Oversight & Gov't Reform v. Holder*,
979 F. Supp. 2d 1 (D.D.C. 2013) .........................................................................4

*Dellums v. Powell*,
561 F.2d 242 (D.C. Cir. 1977)............................................................................5

*Forrester v. White*,
484 U.S. 219 (1988)..........................................................................................8

*Gravel v. United States*,
408 U.S. 606 (1972)..........................................................................................8

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982)......................................................................................7, 8

*In re Kessler*,
100 F.3d 1015 (D.C. Cir. 1996) ..........................................................................7

*McGehee v. Casey*,
718 F.2d 1137 (D.C. Cir. 1983) .........................................................................22

*McGrain v. Daugherty*,
273 U.S. 135 (1927).........................................................................................2

*Medellin v. Texas,*
    552 U.S. 491 (2008)................................................................21

*Mistretta v. United States,*
    488 U.S. 361 (1989)................................................................12

*Nixon v. Adm'r of Gen. Servs.,*
    433 U.S. 425 (1977)..............................................................5, 12

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982)........................................................7, 8, 9, 20

* *Nixon v. Sirica,*
    487 F.2d 700 (D.C. Cir. 1973).........................................5, 6, 10, 19

*NLRB v. Noel Canning,*
    573 U.S. 513 (2014)................................................................17

*In re Report & Recommendation of June 5, 1972 Grand Jury,*
    370 F. Supp. 1219 (D.D.C. 1974) ...............................................19

*Riley v. Nat'l Fed'n of the Blind,*
    487 U.S. 781 (1988)................................................................21

*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997) ..................................................22

* *Senate Select Comm. on Presidential Campaign Activities v. Nixon,*
    498 F.2d 725 (D.C. Cir. 1974) ....................................................5

*Snepp v. United States,*
    444 U.S. 507 (1980)................................................................22

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998)...................................................................4

*Trump v. Mazars USA, LLP,*
    940 F.3d 710 (D.C. Cir. 2019) ..................................................17

*U.S. House of Representatives v. U.S. Dep't of Commerce,*
    11 F. Supp. 2d 76 (D.D.C. 1998)..................................................4

*United States v. AT&T, Inc.,*
    551 F.2d 384 (D.C. Cir. 1976) ....................................................4

*United States v. Burr,*
    25 F. Cas. 187 (C.C.D. Va. 1807).................................................5

*United States v. Marchetti*,
466 F.2d 1309 (4th Cir. 1972) ............................................................22

\* *United States v. Nixon*,
418 U.S. 683 (1974) ............................................................ *passim*

*Watkins v. United States*,
354 U.S. 178 (1957) ............................................................13, 15, 21

*Whitney v. California*,
274 U.S. 357 (1927) ............................................................21

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ............................................................21

**U.S. Constitution and Statutes**

U.S. Const., Art. I, § 2 ............................................................2, 18

U.S. Const., Art. II, § 2 ............................................................15

2 U.S.C. § 194 ............................................................3

**Legislative Materials**

*Jefferson's Manual*, H. Doc. No. 115-177 (2019) ............................................................19

*Pardon of Richard M. Nixon, and Related Matters: Hearing Before the Subcomm. on Criminal Justice of the H. Comm. on the Judiciary*, 93d Cong. (1974) ............................................................15

*Riddick's Senate Procedure: Precedents and Practices* (1992) ............................................................19

*Sitting Presidents & Vice Presidents Who Have Testified Before Congressional Committees*, U.S. Senate (2017) ............................................................15

U.S. Congress, House Committee on Armed Services, *Inquiry into the Alleged Involvement of the Central Intelligence Agency in the Watergate and Ellsberg Matters*, hearings, 94th Cong., 1st sess. (Washington: GPO, 1975) ............................................................16, 17

U.S. Congress, House Committee on Banking, Finance, and Urban Affairs, *White House Contacts with Treasury/RTC Officials About "Whitewater"-Related Matters, Part 1*, hearings, 103rd Cong., 2nd sess. (Washington: GPO, 1994) ............................................................16

U.S. Congress, House Committee on Government Reform and Oversight, *White House Compliance with Committee Subpoenas*, hearings, 105th Cong., 1st sess. (Washington: GPO, 1998) ............................................................16

U.S. Congress, House Committee on Government Reform, *Controversial Pardon of International Fugitive Marc Rich*, hearings, 107th Cong., 1st sess. (Washington: GPO, 2001) .............................................................................16, 17

U.S. Congress, Senate Committee on the Judiciary, *Inquiry into the Matter of Billy Carter and Libya, Vol. I*, hearings, 96th Cong., 2nd sess. (Washington: GPO, 1981) ...........................................................................................16

U.S. Congress, Senate Select Committee on Presidential Campaign Activities, *Presidential Campaign Activities of 1972, Book 1*, hearings, 93rd Cong., 1st sess. (Washington: GPO, 1973) ...........................................................................................17

U.S. Congress, Senate Select Committee on Presidential Campaign Activities, *Presidential Campaign Activities of 1972, Book 3*, hearings, 93rd Cong., 1st sess. (Washington: GPO, 1973) ...........................................................................................17

U.S. Congress, Senate Special Committee to Investigate the Whitewater Development Corporation and Related Matters, *Investigation of Whitewater Development Corporation and Related Matters, Vol. II*, hearings, 104th Cong., 1st sess. (Washington: GPO, 1997) .......................................................................16

## Other Authorities

*Debates in the Several State Conventions on the Adoption of the Federal Constitution* (John Elliot ed., 1881) ........................................................................19

*A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (2000) .........................................................................................20

Charles L. Black, *Impeachment: A Handbook* (1998) ................................................19

## INTRODUCTION

The House Defendants and Defendant President Donald J. Trump agree that this case is moot and that this Court should dismiss the complaint for that reason.  While President Trump, represented by the Department of Justice (DOJ), raises various other arguments why this Court lacks jurisdiction, the Court need not address those additional proposed grounds for dismissal, given that no case or controversy survives the House Defendants' withdrawal of the subpoena to Plaintiff Charles M. Kupperman and House Defendants' decision that it will not be reissued.

Because this case is moot, this Court should not consider DOJ's argument that the President may assert absolute immunity to prevent Kupperman from complying with the now-withdrawn subpoena.  But if the Court were to consider that argument, the Court should reject it for the same reasons another judge of this Court rejected the same argument earlier this week. *See Comm. on the Judiciary v. McGahn*, — F. Supp. 3d —, No. 19-cv-2379 (KBJ), 2019 WL 6312011, at *34-46 (D.D.C. Nov. 25, 2019), *appeal filed*, No. 19-5331 (D.C. Cir.).

Presidential aides—and Presidents themselves—have testified before Congress throughout our Nation's history, and the Supreme Court and the D.C. Circuit have repeatedly rejected claims to absolute Presidential immunity.  DOJ's arguments with respect to Kupperman—who no longer works in the White House and who served as Acting National Security Advisor for only ten days—are far weaker than the immunity claims that courts have already rejected.  Courts have repeatedly refused to authorize the Executive to be the sole judge of its own privilege, recognizing that the case-by-case application of settled privilege doctrines adequately protects Executive autonomy.  The same reasoning compels the same result here.

Allowing the President to thwart Congressional inquiries would upend the separation of powers and impair Congress in the performance of its constitutional functions.  The "power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative

function." *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).  That power is at its peak when the

House is exercising its "sole Power of Impeachment."  U.S. Const., Art. I, § 2, cl. 5.  It is

inconceivable that the same Constitution that gives the House the power to impeach a sitting

President requires the House to exercise that power with anything but comprehensive

information about the President's misconduct.  A President with unchecked power to obstruct his

own impeachment by preventing individuals with relevant information from speaking to

Congress would be a President who is above the law.

DOJ's absolute immunity claim is particularly wrongheaded as to *former* Presidential

aides like Kupperman.  The President has no authority to prevent private citizens from speaking

to Congress, and DOJ's claimed authority to prevent Kupperman from speaking about matters of

pressing public concern raises serious First Amendment concerns given Kupperman's

willingness to comply with the subpoena but for the President's directive.  Again, however, there

is no basis for this Court to resolve these merits questions because this case is plainly moot.

## ARGUMENT

### I.    ALL DEFENDANTS AGREE THAT THIS CASE IS MOOT

The House Defendants and DOJ agree that this case is moot because the subpoena at

issue has been withdrawn and will not be reissued.[1]  This Court should dismiss the case for that

reason without addressing any other issues.

In addition to contending that the case is moot, DOJ claims that Kupperman lacked

standing to challenge the subpoena even before it was withdrawn because the threat of future

enforcement of the subpoena was too remote to give rise to an Article III injury.  Because the

---

[1] *See* House Defs.' Mot. to Dismiss (House Defs.' Mot.) at 5-8 (Nov. 14, 2019), ECF No. 41; President Trump's Mot. to Dismiss or, in the Alternative, for Summ. J. (DOJ Mot.) at 25-26 (Nov. 14, 2019), ECF No. 41.

case would be moot even assuming Kupperman once had standing, the Court need not address whether Kupperman ever had standing.  But if the Court addresses that question, the House Defendants note the following regarding DOJ's arguments.

*First*, DOJ argues that Kupperman faces no impending threat of a contempt prosecution for defying the subpoena because the Executive Branch would decline to bring such a prosecution.  DOJ Mot. at 13-15.  When a witness summoned by the House fails to appear to testify, the matter is normally referred to the appropriate U.S. Attorney, "whose duty it shall be to bring the matter before the grand jury for its action."  2 U.S.C. § 194.  But given that the subpoena to Kupperman has been withdrawn, the House Defendants will not initiate contempt proceedings against Kupperman or refer his case for prosecution.  Furthermore, the House Defendants do not dispute that the Executive Branch is unlikely, on its own initiative, to prosecute Kupperman in the circumstances of this case.  *See Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) (holding that the possibility of future prosecution was too remote to preserve a live controversy where the Executive disavowed an intent to prosecute and stated that the plaintiff would have "a complete and adequate defense to any prosecution").

*Second*, DOJ argues that the House is unlikely to exercise its inherent contempt powers to sanction Kupperman for defying the now-withdrawn subpoena.  DOJ Mot. at 15.  The House possesses the inherent authority to arrest and detain contumacious subpoena recipients.  But the House Defendants will not exercise that contempt power against Kupperman—via arrest by the Sergeant-at-Arms, via the imposition of monetary fines, or via any other mechanism—for having defied a subpoena that has since been withdrawn and will not be reissued.

*Third*, DOJ argues that Kupperman does not face a threat of a civil enforcement suit initiated by the House Defendants.  DOJ Mot. at 16-25; *see also id.* at 44.  In pressing this claim,

DOJ recapitulates the arguments that the Executive Branch has made in other litigation in which House committees have filed suit to obtain information or testimony from the Executive.[2]  As discussed at length in the House's briefs in those cases, DOJ's arguments regarding standing, subject-matter jurisdiction, and the applicable cause of action are incorrect.[3]  Those arguments cannot be reconciled with precedent, *see United States v. AT&T, Inc.*, 551 F.2d 384 (D.C. Cir. 1976), and they have been rejected by every court to have considered them, *see McGahn*, 2019 WL 6312011, at *16-34; *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 21 (D.D.C. 2013); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 71 (D.D.C. 2008); *see also U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76 (D.D.C. 1998).

But this Court need not consider those arguments here.  Kupperman does not face the threat of a civil enforcement suit brought by the House for the simple reason that the House Defendants have withdrawn the subpoena and will not reissue it.  The House Defendants will not bring a civil suit to enforce a subpoena that they have withdrawn.

## II.  KUPPERMAN IS NOT ABSOLUTELY IMMUNE FROM CONGRESSIONAL PROCESS

For the reasons stated above and all those set forth in House Defendants' motion to dismiss, *see* House Defs.' Mot. at 4-14, this Court lacks jurisdiction.  "Without jurisdiction the court cannot proceed at all in any cause," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quotation marks omitted); dismissal is required.  Yet were the Court to reach the merits, it should deny DOJ's motion for summary judgment and affirm that Kupperman would be

---

[2] *See, e.g.*, Def.'s Mot. for Summ J., *McGahn*, No. 19-cv-2379 (D.D.C. Oct. 1, 2019), ECF No. 32; Defs.' & Defs.-Intervenors' Mot. to Dismiss, *Comm. on Ways & Means v. Dep't of the Treasury*, No. 19-cv-1974 (D.D.C. Sept. 6, 2019), ECF No. 44.

[3] *See, e.g.*, Pl.'s Opp'n to Def.'s Mot. for Summ J., *McGahn*, No. 19-cv-2379 (D.D.C. Oct. 16, 2019), ECF No. 37; Pl.'s Opp'n to Mot. to Dismiss, *Comm. on Ways & Means*, No. 19-cv-1974 (D.D.C. Sept. 23, 2019), ECF No. 55.

legally obligated to testify before the Committee pursuant to a duly issued subpoena.  *See* House Defs.' Mot. at 15-27.

The theory of absolute immunity that DOJ presses here is an invention of the Executive Branch that has never been accepted by any court.  Most recently—earlier this week—DOJ's absolute immunity theory was rejected by Judge Brown Jackson.  *See McGahn*, 2019 WL 6312011, at *34-45.  In 2008, it was rejected by Judge Bates.  *See Miers*, 558 F. Supp. 2d at 99-107.  Even before that, in a series of decisions dating back more than two centuries, courts repeatedly rejected claims of Presidential immunity similar to the claim that DOJ advances here. The courts held that the President is not entitled to blanket immunity from criminal subpoenas, *see, e.g.*, *United States v. Nixon* (*Nixon*), 418 U.S. 683 (1974); *Nixon v. Sirica* (*Sirica*), 487 F.2d 700 (D.C. Cir. 1973) (en banc); *United States v. Burr*, 25 F. Cas. 187 (C.C.D. Va. 1807) (Marshall, C.J.); from subpoenas in civil litigation, *see Dellums v. Powell*, 561 F.2d 242 (D.C. Cir. 1977); or from private actions, even while the President is in office, concerning private conduct, *see Clinton v. Jones*, 520 U.S. 681 (1997); *see also Nixon v. Adm'r of Gen. Servs.* (*Nixon v. GSA*), 433 U.S. 425 (1977) (rejecting challenge by former President to legislation concerning Presidential documents).

As particularly relevant here, the D.C. Circuit has rejected a claim of absolute Presidential immunity with respect to a Congressional subpoena like the now-withdrawn subpoena in this case.  *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 729-31 (D.C. Cir. 1974) (en banc).  The D.C. Circuit explained that Presidential communications are entitled to a presumption of confidentiality, but that this presumption is to be evaluated on a case-by-case determination and can be overcome if the material sought is

required for "the responsible fulfillment of the [Congressional] Committee's functions."  *Id.* at 731.

Even in the context of requests for information from the President himself, therefore, it is settled that "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege." *Nixon*, 418 U.S. at 706.  Instead, "application of Executive privilege depends on a weighing of the public interest protected by the privilege against the public interests that would be served by disclosure in a particular case."  *Sirica*, 487 F.2d at 716.

DOJ engages with essentially none of this precedent.  Instead, DOJ quotes the language that the courts have used to justify a *qualified* immunity and treats that language as if it supports the *absolute* immunity that courts have in fact repeatedly rejected.  DOJ's assertion of absolute immunity in this case therefore fails for the same reasons it has failed in prior cases.  Requiring Executive Branch officials to comply with Congressional subpoenas subject to application of a qualified privilege, where appropriate, would not impair Executive interests.  By contrast, excusing Executive Branch officials from Congressional compulsion, particularly in the context of an impeachment investigation, would interfere with the House's exercise of its core Article I functions.

As Judge Brown Jackson recently held, "not only [does] the principle of absolute testimonial immunity for senior-level presidential aides ha[ve] no foundation in law, but [it] also … conflicts with key tenets of our constitutional order."  *McGahn*, 2019 WL 6312011, at *36.  And because Kupperman is now a private citizen, the President has no authority to prevent him from testifying before Congress should he wish to do so.

### A.   The Executive Branch Interests Purportedly Protected by Absolute Immunity for Presidential Advisors Are Minimal

The Executive Branch invokes various interests that it claims support its sweeping theory of absolute immunity, but none applies here.  Indeed, DOJ's arguments that Kupperman is entitled to absolute immunity are far weaker than the arguments for immunity rejected by the Supreme Court and the D.C. Circuit in cases involving the President himself.

### 1.   Presidential Advisors Do Not Enjoy Absolute Immunity from Compelled Congressional Testimony

DOJ's argument proceeds from the premise that "the President himself is absolutely immune from testimonial compulsion by Congress."  DOJ Mot. at 31.  DOJ then posits that the President's "immediate advisors must share in his absolute immunity."  *Id*. at 36.  As to DOJ's premise, no court has held that the President himself has an absolute right to defy a subpoena to testify before Congress, and the courts have rejected similar immunity claims in the context of requests for documents.  But this Court need not address DOJ's premise, because whatever immunity the President possesses from testimonial compulsion, that immunity is not shared by Presidential advisors.

There is a "constitutional distinction between the President himself and subordinate officers in the executive branch."  *In re Kessler*, 100 F.3d 1015, 1017 (D.C. Cir. 1996).  "[F]or purposes of separation of powers, the President stands in an entirely different position than other members of the executive branch."  *Id.*  Any immunity the President enjoys flows from his "unique status under the Constitution," which "distinguishes him from other executive officials." *Nixon v. Fitzgerald* (*Fitzgerald*), 457 U.S. 731, 750 (1982).  For example, in *Fitzgerald*, the Supreme Court held that the President himself has immunity from civil damages liability for his official acts "[b]ecause of the *singular importance* of the President's duties."  *Id.* at 751 (emphasis added); *see id.* at 749-50.

7

The Supreme Court has declined to extend the President's categorical immunity from civil damage suits to Presidential advisors.  In *Harlow v. Fitzgerald* (*Harlow*), the Court reasoned that "the recognition of absolute [civil] immunity for all of a President's acts in office derives in principal part from factors unique to his constitutional responsibilities and station." 457 U.S. 800, 811 n.17 (1982).  The Court explained that "[s]uits against other officials— including Presidential aides—generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself."  *Id*.  Indeed, the Court in *Harlow* specifically rejected the very argument that DOJ makes in this case—that *Gravel v. United States*, 408 U.S. 606 (1972), dictates the "conclusion that the President's immediate advisors must share in his absolute immunity from compelled congressional testimony."  DOJ Mot. at 35-36; *see Harlow*, 457 U.S. at 810.

It is precisely because the President's "immunity … is based on the President's 'unique position in the constitutional scheme'" that "it does not extend indiscriminately to the President's personal aides."  *Forrester v. White*, 484 U.S. 219, 225 (1988) (quoting *Fitzgerald*, 457 U.S. at 749).  The President employs dozens of close advisors, none of whom is indispensable to the functioning of the Executive Branch in the same manner as the President.  Requiring Presidential advisors to testify before Congress would not undermine "the effective functioning of government."  *Fitzgerald*, 457 U.S. at 751.  To the contrary, compliance with Congressional requests for information is substantially less distracting to Presidential aides than the threat of personal damages liability that the Supreme Court has already declined to extend beyond the President himself.  "[T]he proposition that senior-level presidential aides are entitled to absolute testimonial immunity has no principled justification[.]"  *McGahn*, 2019 WL 6312011, at *40.

DOJ concedes that *Harlow* forecloses blanket immunity for Presidential aides.  DOJ Mot. at 35.  DOJ nonetheless points to language in *Harlow* suggesting that immunity from civil damages suits could apply to a narrow category of "aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy" when necessary "to protect the unhesitating performance of functions vital to the national interest."  *Id.* at 35 (quoting *Harlow*, 457 U.S. at 812).  But no court has in fact extended Presidential immunity to such aides, even in the civil damages context, which is "very different" from these circumstances.  *See McGahn*, 2019 WL 6312011, at *40 & n.31.  In any event, DOJ misconstrues *Harlow*, which made clear that absolute immunity cannot be justified by the "mere fact of high station."  457 U.S. at 812.  DOJ's argument here—that absolute immunity applies to the "President's immediate advisors," DOJ Mot. at 34—advances the same broad standard that the Court in *Harlow* rejected.

The overbreadth of DOJ's theory is illustrated by the President's invocation of absolute immunity with respect to Kupperman, who served as Acting National Security Advisor for ten days and otherwise served in a less senior position in the White House for just over eight months.  DOJ's arguments that Kupperman's former duties qualify him for absolute immunity are insufficient on their face.  For example, DOJ claims that Kupperman travelled with the President "on multiple occasions" and met with him "several times per week."  *See* DOJ Mot. at 37.  But the Supreme Court in *Harlow* rejected absolute immunity for a Presidential aide who "worked from an office immediately adjacent to the oval office," giving him "almost daily contact with the President."  457 U.S. at 804 & n.6.  DOJ further argues that Kupperman is entitled to absolute immunity on account of his position as "deputy to the National Security Advisor," DOJ Mot. 36, but the Court in *Harlow* refused to extend immunity to a "Counselor to the President, a position accorded Cabinet status," 457 U.S. at 802 n.1.  It cannot be correct that Cabinet-level

officials must comply with Congressional subpoenas but that less senior White House staffers are absolutely immune.  *See McGahn*, 2019 WL 6312011, at *45 (concluding that "absolute immunity does not exist," "whether the aides in question are privy to national security matters, or work solely on domestic issues").

## 2.    The Availability of a Qualified Privilege, Where Valid, Sufficiently Protects Executive Branch Confidentiality Concerns

DOJ invokes generalized concerns about confidentiality to support the President's absolute immunity claim.  But the Supreme Court has long held that such concerns are properly addressed through the case-by-case assessment of a qualified privilege rather than an absolute immunity from process.  *Nixon*, 418 U.S. 683; *see McGahn*, 2019 WL 6312011, at *41 n.32 (when providing information to Congress, even senior Presidential aides with national security duties would "have the right to withhold information on the grounds of an applicable privilege, where appropriate," such that absolute immunity is unjustified).  "[A] claim of absolute immunity from compulsory process cannot be erected by the Executive as a surrogate for the claim of absolute executive privilege already firmly rejected by the courts."  *Miers*, 558 F. Supp. 2d at 103 (emphasis omitted).

DOJ repeatedly claims that absolute immunity is necessary to protect "the President's constitutionally protected interests in confidentiality" and his ability to "obtain sound and candid advice."  DOJ Mot. at 34, 40.  As the House Defendants have explained, however, *see* House Defs.' Mot. at 20, *Nixon* made clear that when the ground asserted for privilege over information "is based only on the generalized interest in confidentiality, it … must yield to the demonstrated, specific need for evidence," 418 U.S. at 713.  The President's interest in confidentiality "is an argument for recognizing Executive privilege … , not for making the Executive the judge of its own privilege."  *Sirica*, 487 F.2d at 715.

In rejecting the President's absolute privilege theory in favor of a qualified privilege, the Supreme Court in *Nixon* considered at length the very interests that the Executive Branch now claims can be protected only through absolute immunity.  *See* 418 U.S. at 711 (qualified, rather than absolute, privilege satisfies "a President's generalized interest in confidentiality"); *id.* at 708 (qualified, rather than absolute, privilege is sufficient to protect "the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking").  If disclosure of the material at issue in *Nixon*—tape recordings of the President's candid Oval Office conversations with his closest advisors—did not unduly threaten the President's interest in confidentiality, then no greater threat is posed by disclosure of a Presidential advisor's after-the-fact description of such conversations.  Just as in *Nixon*, "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." *Id.* at 706.

DOJ argues that a qualified privilege is insufficient to protect Executive confidentiality interests because a Presidential advisor, under questioning from Congress, might "inadvertently reveal sensitive information."  DOJ Mot. at 41.  This concern is misguided.  Congress frequently receives privileged and classified information and knows how to adequately safeguard such material.  *See, e.g.*, *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 40 (D.D.C. 2018) (Leon, J.).  Officials such as the directors of National Intelligence, the Central Intelligence Agency, the National Security Agency, and the FBI regularly testify in open sessions of Congress without divulging the Nation's most sensitive secrets, despite testifying on the very topics that those secrets encompass.  Numerous witnesses have already testified pursuant to the House's impeachment inquiry regarding matters relating to national security.  Although this testimony

supports allegations of Presidential misconduct, DOJ does not suggest that this testimony has jeopardized national security.

> **3.** **Compelled Testimony from Presidential Advisors Does Not Encroach on Executive Branch Prerogatives**

DOJ's remaining arguments rest on the erroneous premise that compelling Presidential advisors to testify before Congress impermissibly "encroach[es]" on Executive authority.  *See* DOJ Mot. at 30.  In rejecting a comparable claim to Presidential immunity, the Supreme Court has disclaimed this "archaic view of the separation of powers as requiring three airtight departments of government."  *Nixon v. GSA*, 433 U.S. at 443 (quotation marks omitted); *see Mistretta v. United States*, 488 U.S. 361, 381 (1989) ("our constitutional system imposes upon the Branches a degree of overlapping responsibility").

DOJ asserts that Congressional questioning would interfere with the President's "ability to discharge his duties with the advice and assistance of his closest advisers."  DOJ Mot. at 33. To the extent DOJ is claiming that pulling Presidential advisors away from their duties to testify before Congress would disrupt the President's ability to perform his Article II functions, those concerns are not present in the case of *former* advisors like Kupperman, who left the White House in September of this year.  The President no longer relies on Kupperman's counsel, and testifying before Congress will not take Kupperman away from the business of advising the President or otherwise impede his ability to facilitate Executive Branch functions.  *See McGahn*, 2019 WL 6312011, at *42 (former officials "no longer have proximity to power").

DOJ claims that compelling a Presidential advisor's testimony would allow Congress to "exert undue influence over the President's decision-making" by "demanding that his advisors justify or explain Executive actions and decisions."  DOJ Mot. at 33.  But Congress's "broad" power of inquiry "encompasses inquiries concerning the administration of existing laws,"

"includes surveys of defects in our social, economic or political system," and "comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste." *Watkins v. United States*, 354 U.S. 178, 187 (1957). Such inquiries require that Congress be able to obtain information from the Executive Branch, subject to any valid assertions of qualified privilege.

This is not "public spectacle," DOJ Mot. at 39, but rather public accountability—which serves a critical function in our system of balanced powers and has been the norm for decades. *See* House Defs.' Mot. at 24.[4] Congress's well-established power of inquiry means that Executive Branch officials should expect to testify "about the operations of their offices." *McGahn*, 2019 WL 6312011, at *40 n.31. Because "Congress brings in witnesses … to provide the Legislature with the information that it needs to perform" its constitutional functions, "the idea that having to testify truthfully about the inner workings of government is a threat that would actually be sufficient to prevent key public servants from competently performing as assistants to the President seems anomalous." *Id.* at *42.

Likewise, DOJ is incorrect to claim that a Presidential advisor's appearance before Congress would "promote a perception of Presidential subordination to Congress." DOJ Mot. at 33. The exercise of Congress's constitutional functions does not render the Executive subordinate to Congress; it instead reflects the checks and balances intended by the Framers. *See*

---

[4] DOJ appears to draw a distinction between the routine testimony of Cabinet members and the testimony of Presidential advisors. *See* DOJ Mot. at 29. But many Cabinet members over the years, such as Alexander Hamilton, William H. Seward, and Robert F. Kennedy, served as extremely close advisors to Presidents. Henry Kissinger served as Secretary of State and National Security Advisor simultaneously during the Nixon Administration. *Biographies of the Secretaries of State: Henry A. (Heinz Alfred) Kissinger (1923-)*, Dep't of State, https://perma.cc/AG8N-F4KV. DOJ does not explain why requiring Presidential advisors to testify regarding executive decisions would "exert undue influence" on the President any more than similar testimony by Cabinet members. DOJ Mot. at 33.

*Jones*, 520 U.S. at 703 ("As Madison explained, separation of powers does not mean that the branches 'ought to have no *partial agency* in, or no *controul* over the acts of each other.'" (quoting *The Federalist No. 47*, at 325-26 (J. Cooke ed., 1961)); *Nixon*, 418 U.S. at 707 ("In designing the structure of our Government and dividing and allocating the sovereign power among three co-equal branches, the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence."). DOJ's contention is no more correct in this context than it was in *Nixon*, in which the Court compelled the Executive Branch to disclose information necessary to aid in its Article III functions. 418 U.S. at 714. Compulsion of necessary information from a separate branch did not create a perception of Executive subordination in *Nixon*, and it would not do so here.

The Executive Branch's interests in withholding testimony are particularly diminished in this case, where the House Defendants sought to question Kupperman about Presidential misconduct. Although the Constitution grants the President a wide range of Executive authority, it does not grant him the power to abuse that authority or to carry out Executive functions corruptly. To the extent that the President has abused his office, disclosure of that abuse would protect rather than undermine constitutional principles. DOJ does not explain how Congress's ability to question Kupperman about Presidential misconduct would have an impermissibly coercive effect on the President's performance of his legitimate Article II functions. And although DOJ cites various OLC opinions to support its aggressive claim of absolute immunity, none of those opinions attempts to explain how absolute immunity for the President could comport with Congress's responsibilities in an impeachment inquiry.

Finally, DOJ asserts that "compulsory testimonial process" could be used "to harass or retaliate against the President's immediate advisors" in an effort "to improperly influence or interfere with Presidential decision-making."  DOJ Mot. at 40.  But DOJ does not allege that the subpoena issued to Kupperman was intended to harass or retaliate, nor could any such allegation be sustained.  The House Defendants are conducting a time-sensitive impeachment inquiry into the President's official conduct, and they sought testimony from Kupperman, who may have witnessed impeachable conduct by the President.  DOJ's hypothetical concern that harassment could occur in some future case does not support a sweeping recognition of absolute immunity from all Congressional subpoenas.  As the Supreme Court has made clear, "every reasonable indulgence of legality must be accorded to the actions of a coordinate branch of our government."  *Watkins*, 354 U.S. at 204.

### 4.     Presidential Advisors Have Testified Before Congress Throughout History Without the Consequences the Executive Suggests

Although DOJ describes the "testimonial immunity of the President's immediate advisors" as an "unbroken tradition," DOJ Mot. at 29, history shows the opposite.

Presidents Abraham Lincoln, Woodrow Wilson, and Gerald Ford all testified before Congress while in office.[5]  President Ford testified before the House to explain his personal decision-making process regarding his exercise of the pardon power, an authority assigned solely to the President in Article II of the Constitution.  *Pardon of Richard M. Nixon, and Related Matters: Hearing Before the Subcomm. on Criminal Justice of the H. Comm. on the Judiciary*, 93d Cong. 90 (1974) (statement of President Ford); *see* U.S. Const., Art. II, § 2, cl. 1.

---

[5] *See Sitting Presidents & Vice Presidents Who Have Testified Before Congressional Committees*, U.S. Senate (2017), https://perma.cc/J2HH-X5WG.

Many close Presidential advisors, including sitting and former White House Counsels, have testified before Congress, particularly when Presidential misconduct was at issue.  For example, in 1973 and 1974, former White House Counsel Chuck Colson testified before Congress multiple times regarding Watergate.[6]  As House Defendants have noted, *see* House Defs.' Mot. at 24, in 1980, then-White House Counsel Lloyd Cutler testified before the Senate concerning alleged influence-peddling on behalf of Libya by President Carter's brother.[7]  In 1994, Cutler again appeared before Congress to discuss issues related to Whitewater.[8]  In 1995, former White House Counsel Bernard Nussbaum also appeared before the Senate to discuss Whitewater.[9]  In 1997, then-White House Counsel Charles Ruff testified before the House about White House compliance with Congressional subpoenas related to allegations of campaign-finance violations.[10]  In 2001, former White House Counsel Jack Quinn testified before the House about President Clinton's use of his pardon power.[11]

---

[6] U.S. Congress, House Committee on Armed Services, *Inquiry into the Alleged Involvement of the Central Intelligence Agency in the Watergate and Ellsberg Matters*, hearings, 94th Cong., 1st sess. (Washington: GPO, 1975), pp. 586ff, 1053ff.

[7] U.S. Congress, Senate Committee on the Judiciary, *Inquiry into the Matter of Billy Carter and Libya, Vol. I*, hearings, 96th Cong., 2nd sess. (Washington: GPO, 1981), p. 1195ff.

[8] U.S. Congress, House Committee on Banking, Finance, and Urban Affairs, *White House Contacts with Treasury/RTC Officials About "Whitewater"-Related Matters, Part 1*, hearings, 103rd Cong., 2nd sess. (Washington: GPO, 1994), p. 12ff.

[9] U.S. Congress, Senate Special Committee to Investigate the Whitewater Development Corporation and Related Matters, *Investigation of Whitewater Development Corporation and Related Matters, Vol. II*, hearings, 104th Cong., 1st sess. (Washington: GPO, 1997), pp. 1201ff., 1326ff.

[10] U.S. Congress, House Committee on Government Reform and Oversight, *White House Compliance with Committee Subpoenas*, hearings, 105th Cong., 1st sess. (Washington: GPO, 1998), p. 219ff.

[11] U.S. Congress, House Committee on Government Reform, *Controversial Pardon of International Fugitive Marc Rich*, hearings, 107th Cong., 1st sess. (Washington: GPO, 2001), p. 309ff.

Many Presidential advisors, including White House Counsels and national security officials, have testified under compulsion. *See Miers*, 558 F. Supp. 2d at 102 ("[S]enior advisors to the President have often testified before Congress subject to various subpoenas dating back to 1973."). During Watergate, former White House Counsel John Dean, former Chief of Staff H.R. Haldeman, and former Chief Advisor to the President for Domestic Affairs John Ehrlichman testified before Congress under subpoena.[12] In 1987, former National Security Advisor Oliver North and former Assistant to the President for National Security Affairs John Poindexter testified under subpoena about Iran-Contra. *See* House Defs.' Mot. at 24 & n.9. And in 2001, former White House Counsel Beth Nolan and former Chief of Staff John Podesta appeared before Congress pursuant to a subpoena to testify about President Clinton's use of the pardon power.[13]

There is accordingly a well-established history of Presidential advisors, including those with national security duties, testifying before Congress without in any way imperiling the President's ability to fulfill his Article II functions. *Cf. NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (looking to history to inform consideration of separation of powers claim); *Trump v. Mazars USA, LLP*, 940 F.3d 710, 735 (D.C. Cir. 2019) (same, noting that "a court would be foolish to ignore th[e] branches' prior pattern of conflict" or "cooperation" in deciding a separation of powers claim). The frequency with which senior White House advisors have testified before Congress illustrates that the Executive Branch's practice has often been not to

---

[12] *Inquiry into the Alleged Involvement of the Central Intelligence Agency in the Watergate and Ellsberg Matters* at p. 867ff; U.S. Congress, Senate Select Committee on Presidential Campaign Activities, *Presidential Campaign Activities of 1972, Book 1*, hearings, 93rd Cong., 1st sess. (Washington: GPO, 1973), pp. 75ff; U.S. Congress, Senate Select Committee on Presidential Campaign Activities, *Presidential Campaign Activities of 1972, Book 3*, hearings, 93rd Cong., 1st sess. (Washington: GPO, 1973), pp. 911ff.

[13] *Controversial Pardon of International Fugitive Marc Rich* at p. 309ff.

stand in the way of these advisors' testimony, particularly during significant Congressional

investigations of Presidential misconduct.  Many of the same purported risks that the Executive

Branch claims undergird its absolute immunity theory—such as the purported appearance of

subservience, being asked to explain Executive decisions, and threats to confidentiality—are

equally present when the testimony is voluntary.  The fact that none of these examples involved

a *judicially enforced* Congressional subpoena simply underscores that prior Presidential

administrations have been more prepared to abide by their obligations to Congress than this one.

### B. The House's Interest in Performing Its Constitutional Functions Far Outweighs the Executive Branch's Interests in Absolute Immunity

Denying the President absolute immunity would not interfere with Executive Branch

prerogatives.  By contrast, the President's claim of absolute immunity "would upset the

constitutional balance of 'a workable government,'" *Nixon*, 418 U.S. at 707, and gravely impair

the functions of Congress.

In *Nixon*, the Supreme Court rejected the Executive's assertion of absolute privilege over

Presidential communications because "[t]he impediment that an absolute, unqualified privilege

would place in the way of the primary constitutional duty of the Judicial Branch to do justice in

criminal prosecutions would plainly conflict with the function of the courts under Art. III."  *Id.*

As the Court explained, withholding crucial evidence would impermissibly impair the Judicial

Branch's truth-seeking function, leading to "a partial or speculative presentation of the facts" and

threatening "[t]he very integrity of the judicial system and public confidence in the system."  *Id.*

at 709.

The *Nixon* Court's reasoning applies with particular force here.  The House's power of

testimonial compulsion is at its height during the constitutional impeachment process.  In

exercising its "sole Power of Impeachment," U.S. Const., Art. I, § 2, cl. 5, the House must gather

necessary information, determine whether impeachment is warranted, and, if so, draft and vote

on specific articles of impeachment.  Historically, once the House has adopted articles of

impeachment, Members of the House have then served as impeachment managers during the

Senate trial, presenting evidence relevant to the Senate's consideration of whether removal is

warranted.[14]

When it was in force, the subpoena to Kupperman sought information related to "a matter

of the most critical moment to the Nation, an impeachment investigation involving the President

of the United States."  *In re Report & Recommendation of June 5, 1972 Grand Jury*, 370 F.

Supp. 1219, 1230 (D.D.C. 1974).[15]  Just as federal courts need information to carry out their

exclusive Article III functions, the House needs access to all relevant facts during its

impeachment inquiry.  That need supersedes the President's generalized confidentiality interest.

*See Nixon*, 418 U.S. at 711; *Sirica*, 487 F.2d at 715 (rejecting absolute privilege claim in

response to grand jury subpoena); *In re Report & Recommendation*, 370 F. Supp. at 1230 (in the

---

[14] *See* 3 *Farrand's* Records 162 ("With regard to impeachments, the Senate can try none but such as will be brought before them by the [H]ouse of [R]epresentatives." (James Wilson)); *Jefferson's Manual* §§ 607-609, H. Doc. No. 115-177, at 325-29 (2019) (role of House impeachment managers); *Riddick's Senate Procedure: Precedents and Practices* 865 (1992), https://perma.cc/474G-N28M ("Once the House of Representatives has voted to impeach an officer of the Government … the Senate is informed that managers on the part of the House of Representatives have been named 'to conduct the impeachment against' such official and that the managers are directed to carry to the Senate the articles agreed upon by the House.").

[15] *See* 4 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* (*Elliot's Debates*) 44 (John Elliot ed., 1881) (The Impeachment Clause "empowers the House of Representatives, which is the grand inquest of the Union at large, to bring great offenders to justice." (Archibald Maclaine)); 4 *Elliot's Debates* 113 (The impeachment "power is lodged in those who represent the great body of the people, because the occasion for its exercise will arise from acts of great injury to the community, and the objects of it may be such as cannot be easily reached by an ordinary tribunal." (James Iredell)); *see also* Charles L. Black, *Impeachment: A Handbook* 5-6 (1998) (The Constitution's two-stage impeachment and removal procedure is "analogous, obviously, to the two stages in traditional English and American criminal law—'indictment' (or charge) by the grand jury, and 'trial' by another jury.").

impeachment context, "[i]t would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on all the pertinent information"). DOJ tellingly does not attempt to argue that there are other ways for the House Defendants to obtain relevant information during an impeachment. DOJ simply maintains that the House, and the people House Members represent, should be content to do without.

The need to preserve the integrity of the constitutional process for considering impeachment is particularly acute given that the Executive Branch has opined that a sitting President cannot be criminally prosecuted, making Congress the last line of defense against Presidential misconduct. *See A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 257-58 (2000). If the President could deprive the House of information required for its impeachment inquiry into his own misconduct, the President could potentially thwart his accountability for that conduct.

A President with the power to obstruct his own impeachment through absolute immunity would be a President who is "above the law." *McGahn*, 2019 WL 6312011, at *45. Indeed, the Supreme Court in *Fitzgerald* dismissed the contention that immunizing the President from civil liability placed him "above the law" precisely *because* "[t]he remedy of impeachment demonstrates that the President remains accountable under law for his misdeeds in office." 457 U.S. at 758 n.41; *see also A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. at 257 (it is "the constitutionally specified impeachment process" that "ensures that [this] immunity would not place the President 'above the law'"). Maintaining the integrity of, and public confidence in, the primary method of holding the President accountable for misconduct while in office is a quintessential situation in which the Executive's

"generalized interest in confidentiality … must yield to" the competing interests of a coequal branch. *Nixon*, 418 U.S. at 713.

### C.      President Trump Lacks Authority to Order Former Officials to Defy Congressional Subpoenas

The President cannot prevent Kupperman from testifying before Congress should he choose to do so.  Kupperman correctly acknowledges that, when it was in effect, the disputed subpoena imposed a legal obligation on him.  Compl. ¶¶ 1-2; *see Watkins*, 354 U.S. at 187-88. But Kupperman is incorrect in asserting that the President's directive that Kupperman defy the subpoena was a "competing" legal demand.  Compl. ¶ 1.  As House Defendants have explained, even setting aside the invalidity of DOJ's absolute immunity theory, the President's directive was unauthorized.  *See* House Defs.' Mot. at 25.  "The President's authority to act … 'must stem either from an act of Congress or from the Constitution itself.'"  *Medellin v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)).  The Executive Branch has not cited any constitutional or statutory provision authorizing the President to direct citizens to defy Congressional subpoenas.  No such authority exists.

Concluding that the President could prevent citizens from speaking to Congress would raise serious First Amendment concerns given that Kupperman has stated his willingness to comply with the subpoena but for the President's directive.  The Framers "eschewed silence coerced by law," and "they amended the Constitution so that free speech and assembly should be guaranteed."  *Whitney v. California*, 274 U.S. 357, 376-77 (1927) (Brandeis, J., concurring). "[T]he First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say."  *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796-97 (1988).  Accepting DOJ's assertion that the President may entirely block Kupperman from answering Congress's call for information about matters of pressing public

concern would substantially interfere with Kupperman's right to free speech.  *See McGahn*, 2019 WL 6312011, at *44 ("[A]s citizens of the United States, current and former senior-level presidential aides have constitutional rights, including the right to free speech, and they retain these rights even after they have transitioned back into private life.").

In evaluating restrictions on the speech of *current* government officials, the Supreme Court and the D.C. Circuit have required a showing that any restriction protects "'a substantial government interest unrelated to the suppression of free speech'" and that the restriction is "narrowly drawn to 'restrict speech no more than is necessary.'"  *McGehee v. Casey*, 718 F.2d 1137, 1141 (D.C. Cir. 1983) (quoting *Brown v. Glines*, 444 U.S. 348, 354-55 (1980)).  But DOJ's proposed restriction—a complete prohibition on the speech of certain current and former aides when the President chooses to invoke absolute immunity—would allow the President to impose a prior restraint on speech he fears would be personally damaging.  And DOJ's absolute immunity theory is plainly not narrowly tailored given that the Presidential communications privilege can be invoked on a question-by-question basis.  *See* DOJ Mot. at 28.

DOJ's claim to immunity is considerably weaker as to *former* employees like Kupperman.  Neither Kupperman nor DOJ has alleged that Kupperman remains subject to any contractual agreement restricting his speech.  *Cf. Snepp v. United States*, 444 U.S. 507, 509-11 (1980).  The President "may not censor" Kupperman's speech on unclassified matters, "'contractually or otherwise.'"  *McGehee*, 718 F.2d at 1141 (quoting *United States v. Marchetti*, 466 F.2d 1309, 1313 (4th Cir. 1972)); *see id.* ("The government has no legitimate interest in censoring unclassified materials.").  And the President may seek to invoke the Presidential communications privilege over specific aspects of any testimony Kupperman might offer.  *See In*

22

*re Sealed Case*, 121 F.3d 729, 744-45 (D.C. Cir. 1997); *Blumenthal v. Drudge*, 186 F.R.D. 236, 241-42 (D.D.C. 1999).

Tellingly, although DOJ argues at length that Kupperman would face no consequences from House Defendants by *defying* the now-withdrawn subpoena, *see* DOJ Mot. at 10-25, DOJ is silent as to whether Kupperman would face consequences from the President were he to *comply* with the subpoena.  That silence suggests the obvious—the President's directive is not backed by the force of law, and the President could not take any action against Kupperman for simply complying with Congress's request for testimony.

In *McGahn*, Judge Brown Jackson recognized the consequences of accepting any claim to the contrary.  At oral argument in that case, when DOJ counsel was asked whether the President's claimed "power" to invoke the absolute immunity of Presidential advisors "is limited to such aides' communications with Congress in particular, or also extends to preventing his aides from speaking to anyone else (e.g., the media) even after their departure from the White House, counsel indicated that while the Executive branch has 'not taken a position on that,' [the Executive] was 'definitely not disclaiming that.'"  2019 WL 6312011, at *44.  "This single exchange—which brings to mind an Executive with the power to oversee and direct certain subordinates' communications for the remainder of their natural life—highlights the startling and untenable implications of DOJ's absolute testimonial immunity argument, and also amply demonstrates its incompatibility with our constitutional scheme."  *Id.*

## CONCLUSION

The House Defendants respectfully request that this Court dismiss this action.

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (DC Bar No. 253492)
 *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
 *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854)
 *Associate General Counsel*
Josephine Morse (DC Bar No. 1531317)
 *Associate General Counsel*
Adam A. Grogg (DC Bar No. 1552438)
 *Assistant General Counsel*
William E. Havemann (VA Bar No. 86961)
 *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL[*]
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, DC  20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

*Counsel for the House Defendants*

November 27, 2019

---

[*] The Office of General Counsel wishes to acknowledge the assistance of law clerks Christine Coogle, a student at The George Washington University Law School, Lily Hsu, a student at The George Washington University Law School, and Nate King, a student at The Catholic University of America, Columbus School of Law, in preparing this brief.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHARLES M. KUPPERMAN,<br><br>   *Plaintiff*,<br><br> v.<br><br>UNITED STATES HOUSE OF<br>  REPRESENTATIVES, *et al.*,<br><br>   *Defendants*. | No. 19-cv-3224 (RJL) |

## HOUSE DEFENDANTS' RESPONSE TO PRESIDENT TRUMP'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

For the reasons explained by the House Defendants in their motion to dismiss and in their brief in response to Defendant President Donald J. Trump's motion for summary judgment, this Court should deny President Trump's motion for summary judgment as moot after dismissing this case for lack of jurisdiction. Nonetheless, pursuant to LCvR 7(h)(1), the House Defendants respond as follows (underlined text) to Defendant Trump's Statement of Material Facts Not in Dispute (Nov. 14, 2019), ECF No. 40-1:

1. Plaintiff Charles M. Kupperman ("Dr. Kupperman") served as Deputy National Security Advisor from January 9, 2019, to September 20, 2019. Decl. of Matthias J. Mitman ("Mitman Decl.") (filed herewith) ¶ 10.

- Undisputed.

2. Dr. Kupperman also served as Acting National Security Advisor from September 10, 2019, to September 20, 2019, after Mr. Bolton's departure from office. *Id.*

- Undisputed.

3.   The National Security Advisor is a senior aide in the Executive Office of the President who serves as the principal in-house advisor to the President on domestic, foreign, economic, and military issues, whether discrete or far-reaching, affecting national security.  *Id.* ¶ 7.

- Defendant Trump has not defined "senior aide."  Undisputed that the National Security Advisor advises the President, but that is not a material fact under Fed. R. Civ. P. 56.

4.   The Deputy National Security Advisor is a direct report to the National Security Advisor who works in close operational proximity to the President.  *Id.* ¶ 8.

- Defendant Trump has not defined "close operational proximity."  Undisputed that the Deputy National Security Advisor is a direct report to the National Security Advisor, but that is not a material fact under Fed. R. Civ. P. 56.

5.   Like the National Security Advisor, the Deputy National Security Advisor holds the title of Assistant to the President, which designates him or her as one of the President's most senior aides.  *Id.* ¶ 9.

- Defendant Trump has not defined "most senior aides."  Undisputed that the Deputy National Security Advisor holds the title of Assistant to the President, but that is not a material fact under Fed. R. Civ. P. 56.

6.   During his tenure as Deputy National Security Advisor, Dr. Kupperman was the sole deputy to then-National Security Advisor Bolton, and thus Dr. Kupperman's portfolio as Deputy National Security Advisor included all issues of national security arising during his tenure, and was not limited to specific subsets of issues or particular geographic areas.  *Id.* ¶ 11.

- House Defendants lack information to independently assess what issues Kupperman's portfolio comprised.  Undisputed that, during his tenure as Deputy National Security Advisor, Kupperman was the sole deputy to then-National Security Advisor Bolton, but that is not a material fact under Fed. R. Civ. P. 56.

7.   Dr. Kupperman spent the majority of his time as Deputy National Security Advisor advising or preparing advice for the President, and ensuring appropriate implementation of the President's decisions by responsible agencies and officials.  *Id.* ¶ 12

- House Defendants lack information to independently assess this assertion which, in any event, is not a material fact under Fed. R. Civ. P. 56.

8.   With rare exceptions, during Dr. Kupperman's tenure, all national-security issues presented to the President for decision would first be raised with both then-National Security Advisor Bolton and Dr. Kupperman, as the Deputy National Security Advisor, for assessment of the relevant facts, information, and policy considerations, and formulation of appropriate advice. *Id.* ¶ 13.

- House Defendants lack information to independently assess this assertion which, in any event, is not a material fact under Fed. R. Civ. P. 56.

9.   Dr. Kupperman was responsible for amassing and integrating information and advice from all pertinent Executive Branch agencies and officials, and making recommendations to NSA Bolton and/or the President, on virtually all issues of national security requiring decision-making by the President.  *Id.*

- House Defendants lack information to independently assess this assertion which, in any event, is not a material fact under Fed. R. Civ. P. 56.

10. He was also frequently tasked with responsibility for communicating the President's decisions to responsible Executive Branch agencies and officials, and ensuring thereafter that the President's directives were appropriately implemented in a coordinated fashion and in harmony with U.S. law and policy and national-security objectives.  *Id.*

- <u>House Defendants lack information to independently assess this assertion which, in any event, is not a material fact under Fed. R. Civ. P. 56.</u>

11. As Deputy National Security Advisor, Dr. Kupperman met with the President multiple times per week, generally to advise on national-security issues, and he regularly participated in Oval Office meetings pertaining to foreign policy.  *Id.* ¶ 14.

- <u>House Defendants lack information to independently assess this assertion which, in any event, is not a material fact under Fed. R. Civ. P. 56.</u>

12. Dr. Kupperman was also one of approximately a half-dozen close aides generally present at the President's meetings with foreign leaders and on Head of State calls, and he was a central participant in the Presidential briefings that often preceded such communications.  *Id.* ¶ 15.

- <u>House Defendants lack information to independently assess this assertion which, in any event, is not a material fact under Fed. R. Civ. P. 56.</u>

13. Dr. Kupperman regularly attended meetings of the National Security Council Principals Committee (the Cabinet-level interagency forum for the consideration of national-security policy issues) also attended by the President's senior-most advisors, including Cabinet Secretaries, and National Security Council Meetings chaired by the President.  *Id.* ¶ 16.

- <u>House Defendants lack information to independently assess this assertion which, in any event, is not a material fact under Fed. R. Civ. P. 56.</u>

14. Dr. Kupperman also chaired meetings of the Deputies Committee, the senior subcabinet forum for consideration of national-security policy issues, regularly attended by the Deputy Secretaries of State, Treasury, Defense, Energy, and Homeland Security, and the Deputy Attorney General.  *Id.*

- House Defendants lack information to independently assess this assertion which, in any event, is not a material fact under Fed. R. Civ. P. 56.

15. As National Security Advisor, Mr. Bolton typically traveled at least once per month and usually for multiple days at a time.  *Id.* ¶ 17.  When Mr. Bolton traveled, Dr. Kupperman stepped directly into his shoes and served as the President's primary point of contact on all national security matters.  *Id.*  During these occasions, Dr. Kupperman met with the President with increased frequency and attended the Presidential Daily Brief on intelligence matters.  *Id.*

- House Defendants lack information to independently assess this assertion which, in any event, is not a material fact under Fed. R. Civ. P. 56.

16. Dr. Kupperman also traveled internationally with the President on multiple occasions, including when Mr. Bolton was traveling separately.  *Id.*

- House Defendants lack information to independently assess this assertion which, in any event, is not a material fact under Fed. R. Civ. P. 56.

17. On October 25, 2019, the House Permanent Select Committee on Intelligence ("HPSCI") issued a subpoena to Dr. Kupperman directing him to appear at a deposition before the Committee on October 28, 2019, "as part of the House's impeachment inquiry" into matters relating to foreign policy with Ukraine.  Complaint, Ex. A, ECF No. 1-1 at 2.

- Undisputed that HPSCI issued a subpoena to Kupperman on October 25, 2019, directing him to appear at a deposition before HPSCI on October 28, as part of the

House's impeachment inquiry.  Disputed that the scope of the House's impeachment inquiry is limited to "matters relating to foreign policy with Ukraine."  *See, e.g.*, H. Res. 660, 116th Cong. (2019); H. Rep. No. 116-266 (2019).

18. On October 25, 2019, the President, through counsel and on advice of the Department of Justice Office of Legal Counsel ("OLC")[,] [declared] that Dr. Kupperman is absolutely immune from compelled congressional testimony with respect to matters related to his service as a senior advisor to the President, [and] directed Dr. Kupperman not to appear at the October 28 deposition.  *Id.* Ex. B, ECF No. 1-2 at 2-3.

- Undisputed.

19. Dr. Kupperman did not appear at the October 28 deposition.  *See* ECF No. 22 ¶ 1. The deposition has not been rescheduled.

- Undisputed.

20. HPSCI withdrew the subpoena to Dr. Kupperman that is the subject of this suit on November 5, 2019, *id.* ¶ 2; *see also* ECF No. 22-1 at 2, and the House Defendants subsequently notified the Court that they "have determined that they will not reissue a subpoena to Kupperman," ECF No. 29 at 1.  Accordingly, no consequences have befallen Dr. Kupperman— or are reasonably likely to befall him—as a result of his failure to appear at the scheduled deposition.

- Undisputed that HPSCI withdrew the subpoena to Kupperman on November 5, 2019, and that House Defendants will not reissue it; and, accordingly, that House Defendants will not initiate contempt proceedings against Kupperman or refer him for prosecution under 2 U.S.C. § 194 concerning the now-withdrawn subpoena; will not exercise the House's power of inherent contempt against Kupperman—via arrest by

the Sergeant-at-Arms, via the imposition of monetary fines, or via any other

mechanism—concerning the now-withdrawn subpoena; and will not bring a civil suit

against Kupperman to enforce the now-withdrawn subpoena.  Otherwise, outside any

allegations in Kupperman's complaint—and none seem relevant—House Defendants

lack information to independently assess the full range of "consequences" that may

have "befallen Dr. Kupperman … as a result of his failure to appear at the scheduled

deposition," but that is not a material fact under Fed. R. Civ. P. 56.

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (DC Bar No. 253492)
  *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
  *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854)
  *Associate General Counsel*
Josephine Morse (DC Bar No. 1531317)
  *Associate General Counsel*
Adam A. Grogg (DC Bar No. 1552438)
  *Assistant General Counsel*
William E. Havemann (VA Bar No. 86961)
  *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

*Counsel for the House Defendants*

November 27, 2019