**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
)
CHARLES M. KUPPERMAN,                    )
)
                         *Plaintiff*,       )
)
                  v.                             )        No. 1:19-cv-03224 (RJL)
)
UNITED STATES HOUSE OF                   )
    REPRESENTATIVES, *et al.*,               )
)
                  *Defendants*.         )
———————————————————————)

**DEFENDANT PRESIDENT DONALD J. TRUMP'S**
**MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE**
**TO THE HOUSE DEFENDANTS' MOTION TO DISMISS**

Dated:  November 27, 2019

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

JAMES J. GILLIGAN
Special Litigation Counsel

ANDREW M. BERNIE (DC Bar No. 995376)
CRISTEN HANDLEY (MO Bar No. 69114)
STEVEN A. MYERS (NY Bar No. 4823043)
SERENA M. ORLOFF (CA Bar No. 260888)
Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone:  (202) 514-3358
Fax:           (202) 616-8470
E-mail:       james.gilligan@usdoj.gov

*Counsel for President Trump*

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ....................................................................................................................1

ARGUMENT............................................................................................................................4

A.     The Testimonial Immunity of Immediate Presidential Advisors Is Supported, Not
       "Foreclosed," by *Harlow v. Fitzgerald*.............................................................................. 5

B.     The Testimonial Immunity of Immediate Presidential Advisors is Necessary to
       Protect the Autonomy and Independence of the Presidency ........................................... 13

C.     Absolute Testimonial Immunity Is Not Inconsistent With the Executive's Qualified
       Immunity Against Evidentiary Process ........................................................................... 14

D.     Dr. Kupperman Remains Immune From Compelled Congressional Testimony About
       Matters Concerning His Official Duties Even Though He No Longer Serves as an
       Immediate Advisor to the President................................................................................. 18

E.     Congress's Inability to Compel Testimony from the President's Immediate Advisors
       Does Not Impair the Performance of Its Article I Functions........................................... 20

CONCLUSION.......................................................................................................................24

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Allen v. Wright*,
  468 U.S. 737 (1984)......................................................................................................... 2

*Barnes v. Kline*,
  759 F.2d 21 (D.C. Cir. 1985) ......................................................................................... 2

*Blumenthal v. Drudge*,
  186 F.R.D. 236 (D.D.C. 1999).................................................................................... 20

*Butz v. Economou*,
  438 U.S. 478 (1978)...................................................................................................... 10

*Cheney v. U.S. Dist. Ct. for D.C.*,
  542 U.S. 367, 384 (2004)................................................................................ 16, 18, 23

*Comm. on the Judiciary, U.S. House of Reps. v. Miers*,
  558 F. Supp. 2d 53 (D.D.C. 2008) ....................................................................... 5, 6, 7

*\*Gravel v. United States*,
  408 U.S. 606 (1972)................................................................................................ 5, 7, 24

*\*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982).............................................................................................. *passim*

*In re Kessler*,
  101 F.3d 1015 (D.C. Cir. 1996) ..................................................................................... 9

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ............................................................................ *passim*

*INS v. Chadha*,
  462 U.S. 919 (1983)...................................................................................................... 22

*Nat. Res. Def. Council, Inc. v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988)..................................................................................... 22

*Nixon v. Admin. of Gen. Servs.*,
  433 U.S. 425 (1977)...................................................................................................... 22

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982)............................................................................................. *passim*

**PAGE(S)**

*Nixon v. Sirica*,
    487 F.2d 700 (D.C. Cir. 1973) ........................................................................ 15, 22

*Raines v. Byrd*,
    521 U.S. 811 (1997) ............................................................................................... 2

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
    498 F.2d 725 (D.C. Cir. 1974) ................................................................ 18, 21, 22

*U.S. House of Reps. v. Mnuchin*,
    379 F. Supp. 3d 8 (D.D.C. 2019) ......................................................................... 2

*United States v. AT&T*,
    551 F.2d 384 (D.C. Cir. 1977) ...................................................................... 14, 23

*United States v. Chen*,
    99 F.3d 1495 (9th Cir. 1996) ............................................................................. 20

*United States v. Nixon*,
    418 U.S. 683  (1974) .................................................................................. 11, 16, 22

*United States v. Windsor*,
    570 U.S. 744 (2013) .............................................................................................. 1

**OTHER AUTHORITIES**

Archibald Cox, *Executive Privilege*,
    122 U. Pa. L. Rev. 1383 (1974) ................................................................... 11, 23

Corwin, *The President: Office and Powers 1787-1957* (4th ed. 1957) .................................... 4, 5

Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs,
    from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel,
    Re: Power of Congressional Committee to Compel Appearance or Testimony of
    "White House Staff" (Feb. 5, 1971) ...................................................................... 1

*Assertion of Executive Privilege with Respect to Clemency Decision*,
    23 Op. O.L.C. 1, 4 (1999) .................................................................................. 14

*Iran-Contra Investigation: Joint Hearings Before the House Select House Defendants to
    Investigate Covert Arms Transactions with Iran and the Senate Select House Defendants
    on Secret Military Assistance to Iran and the Nicaraguan Oppositions*,
    H.R. Rep. No. 100-433 (1987) ............................................................................ 14

*\*Immunity of the Assistant to the President and Dir. of the Office of Political
    Strategy & Outreach from Cong. Subpoena*,
    38 Op. O.L.C. ___, Slip. Op. 1-2 (July 15, 2014) ................................. 10, 11, 12, 17

**PAGE(S)**

*Testimonial Immunity Before Congress of the Former Counsel to the President*,
   43 Op. O.L.C. ___, Slip Op. 5 (May 20, 2019) ................................................................ *passim*

*Pub. Papers of President Jimmy Carter* 1420 (July 24, 1980) .................................................... 14

*See Pub. Papers of Pres. William Jefferson Clinton* 403 (March 8, 1994) ................................ 14

*Pub. Papers of Pres. William Jefferson Clinton* 1304 (July 23, 1994) ....................................... 14

*The Federalist No. 51* (James Madison) ........................................................................................ 2

*The Federalist No. 58* (James Madison) ...................................................................................... 23

*The Federalist No. 78* (Alexander Hamilton) ............................................................................... 2

## INTRODUCTION

It has been consistently affirmed by Presidents of both political parties that Congress's implied power to summon witnesses does not extend to the President's senior-most White House advisors. This view dates back to the beginning of the Executive Office of the President and was first articulated by Assistant Attorney General William Rehnquist in a 1971 memorandum. *See* Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff" (Feb. 5, 1971). It sounds in basic separation-of-powers principles, respect for the President as Congress's constitutional equal rather than its underling, and the attendant recognition that, while Congress's implied power to issue subpoenas might be broad, that implied authority must yield to the equally fundamental necessity of ensuring the proper functioning of the Presidency by shielding the President and his closest advisors from congressional interrogation. Upending that balance—a balance that has been maintained for over two centuries of our Republic—would require an extraordinary legal justification. The House Defendants have not offered one, nor have the only two decisions in history (one in 2008, the other just days ago) in which judges have ordered an immediate advisor to the President to appear before a committee of the House of Representatives.[1] There is simply no basis to suddenly furnish the House with a new tool to wield against the Executive Branch in the "Constitution's entirely anticipated political arm wrestling." *United States v. Windsor*, 570 U.S. 744, 791 (2013) (Scalia, J., dissenting).

This case does not present occasion to confront this issue, however, because Dr. Kupperman has no basis to ask this Court whether he is obligated to honor the President's well-

---

[1] Because of the recent issuance and length of *Committee of the Judiciary, United States House of Representatives v. McGahn*, No. 19-cv-2379 (KBJ), Mem. Op. (D.D.C. Nov. 25, 2019), the President will fully address the impact of that decision in his December 4, 2019, reply.

founded directive that he not testify.  Of course he is.  And there are numerous, basic jurisdictional problems with his request that this Court opine on the legal basis for that direction.

Foremost, judicial intervention in disputes between the President and Congress has been virtually unknown in American history, as such interventions are inconsistent with the Constitution's animating principle that the surest safeguard for liberty is to equip the co-equal branches of government with "the necessary constitutional means and personal motives to resist encroachments of the others."  *The Federalist* No. 51 (James Madison).  Judicial resolution of disputes between the elected branches threatens to undermine the Framers' careful allocation of power, which is why the Constitution does not assign that role to the courts.  *See Raines v. Byrd*, 521 U.S. 811, 828 (1997); *Barnes v. Kline*, 759 F.2d 21, 54-57 (D.C. Cir. 1985) (Bork, J., dissenting).  And as the Supreme Court has explained, use of the judicial power to "plunge[ ]" the courts "into … bitter political battle[s] being waged" between the political Branches, *Raines*, 521 U.S. at 827, would also "damag[e] the public confidence that is vital to the functioning of the judicial branch," *id.* at 833 (Souter & Ginsburg, JJ., concurring), and place the long-term independence of the judiciary at risk, *see U.S. House of Reps. v. Mnuchin*, 379 F. Supp. 3d 8, 10–11 (D.D.C. 2019) (citing *The Federalist No. 78* (Alexander Hamilton)), thus diminishing "[t]he irreplaceable value of the [judicial] power … [to protect] the constitutional rights and liberties of individual citizens." *Raines*, 521 U.S. at 828-29.  In light of these "overriding and time-honored concern[s] about keeping the Judiciary's power within its proper constitutional sphere," *id.* at 820, this Court must reject, as "[in]consistent with [our] system of separated powers," Dr. Kupperman's invocation of its authority to resolve a fundamentally political dispute between the President and the House of Representatives.  *Allen v. Wright*, 468 U.S. 737, 752 (1984).

Dr. Kupperman's request for declaratory relief concerning his obligation to comply with the House Defendants' now-withdrawn subpoena suffers from an array of additional jurisdictional

defects beyond that fundamental one. *See* Mem. of Pts. & Auths. in Supp. of Def. President Donald J. Trump's Mot. to Dismiss or, in the Alt., for Summ. J., ECF No. 40 ("Pres.'s Mem."), at 8-25, 42-45. First, the Court lacks jurisdiction to issue declaratory relief against the President, the only Executive Branch defendant named in this suit. Second, Dr. Kupperman has established no concrete injury on which to predicate Article III standing. He disclaims any personal stake in whether he is required to testify or not, and faces no risk of future criminal liability for following the President's directive. Nor does Dr. Kupperman face any appreciable risk that the House Defendants would (or could) exert their long dormant inherent contempt authority to enforce a withdrawn subpoena that they have foresworn any intent to re-issue. A civil suit to enforce the subpoena is also implausible, and would be nonjusticiable regardless. Finally, even if jurisdiction lay here, Dr. Kupperman lacks a cause of action, whether in interpleader, or pursuant to the Declaratory Judgment Act.

For their part, the House Defendants identify a number of additional grounds on which they conclude that Dr. Kupperman's claim against them is jurisdictionally barred. These include mootness, with which the President concurs, *see* Pres.'s Mem. at 25-26; House Defs.' Mem. at 5-8, as well as their asserted immunity from suit due to the Constitution's Speech or Debate Clause, U.S. Const., Art. I, § 6, cl. 1, and sovereign immunity. *See generally* Mem. of Law in Supp. of House Defs.' Mot. to Dismiss, ECF No. 41 ("House Defs.' Mem.") at 8-14. Because all Defendants agree that the Court lacks jurisdiction to resolve this dispute, the President takes no position—and thus does not endorse or rebut—the latter two jurisdictional defenses raised by the House Defendants.

The bottom line is that Dr. Kupperman has properly honored the President's directive, has suffered no adverse consequences as a result, and will suffer no adverse consequences in the future. There is simply no basis for this Court to review the propriety of that Presidential order. But

should the Court nonetheless pass on the immunity the President has invoked, it should issue a declaratory judgment that Dr. Kupperman was and remains absolutely immune from a subpoena attempting to compel him to testify before Congress, or its committees, about matters concerning his duties as Deputy National Security Advisor and Assistant to the President.

## ARGUMENT

Recognizing that the House's implied power to compel testimony does not reach to the President's inner circle of advisors has a strong basis in historical tradition and fundamental separation-of-powers principles that prevent one branch of the federal government from undermining the authority or functions of another. *See* Pres.'s Mem. at 29-31. As one commentator observed in the 1950s: The "prerogative of Congress" to "inform themselves through committees of inquiry on subjects that fall within their legislative competence and to hold in contempt recalcitrant witnesses before such committees" has "always been regarded as limited by the right of the President to have his subordinates refuse to testify either in court or before a committee of Congress concerning matters of confidence between them and himself." Corwin, *The President: Office and Powers 1787-1957*, at 116 (4th ed. 1957). Just as a House of Congress cannot summon the President himself to appear before it whenever that House chooses, a House of Congress thus cannot require that the President's immediate advisors submit to congressional interrogation either. *Id.* at 31-32. This small coterie of senior aides are those who meet with the President on a regular or frequent basis, and who advise and assist him in the performance of his constitutionally assigned duties, particulary in the arena of national security and foreign affairs.

Absent immunity, congressional committees could wield their implied power to compel testimony against the President's immediate advisors as a means of supervising the President's actions, of harassing advisors so as to influence their official conduct (or the President's), and of retaliating against the President for actions with which a committee or its members disagree. Thus,

4

compelling immediate Presidential advisors to testify before Congress would risk significant congressional encroachment on the President's discharge of his duties, while creating the perception—and, frankly, the reality—of Presidential subordination to the Legislative Branch.  *Id.* at 32-33.  In addition, compelling immediate Presidential advisors to submit to interrogation by congressional committees would create unacceptable risks of coerced or inadvertent disclosures of confidential Presidential communications, which could deter Presidential advisors from sharing unpopular advice or discussing controversial matters with the President.  The President would accordingly be deprived of the full and frank advice essential to informed and effective discharge of his myriad sensitive and vital duties as the chief constitutional officer of the Executive Branch. *Id.* at 34-35.  Dr. Kupperman, as Deputy National Security Advisor and Assistant to the President, qualifies as an immediate Presidential advisor to whom absolute testimonial immunity about matters concerning his duties in office applies.  *Id.* at 36-39.

The House Defendants dispute the testimonial immunity of the President's immediate advisors as unsupported in the law, contrary to precedent, and an impediment to the House's impeachment inquiry concerning Ukraine.  House Defs.' Mem. at 2, 15.  The House Defendants and, respectfully, the principal decision on which they rely—the stayed district court decision in *Committee on the Judiciary, United States House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008)—misconstrue applicable precedent and fail to properly analyze the fundamental separation-of-powers principles discussed above.

### A. The Testimonial Immunity of Immediate Presidential Advisors Is Supported, Not "Foreclosed," by *Harlow v. Fitzgerald.*

As the President has explained, the immunity of immediate Presidential advisors from congressional testimonial process is supported by the same "alter ego" analysis that the Supreme Court relied on in *Gravel v. United* States, 408 U.S. 606, 616-17 (1972), when it extended Speech

or Debate Clause immunity to legislative aides. *See* Pres.'s Mem. at 35-36.  Citing *Miers*, the
House Defendants argue that reliance on *Gravel* as precedent for the testimonial immunity of
Presidential advisors is "virtually foreclosed" by *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).
House Defs.' Mem. at 16 (quoting *Miers*, 558 F. Supp. 2d at 100).  According to the House
Defendants, *Harlow*, in "h[olding] that Presidential aides … are not absolutely immune from civil
damages liability based on their official acts," "refused to extend *Gravel's* 'alter ego' concept to
Presidential advisors." *Id.* at 29; *see also Miers,* 558 F. Supp. 2d at 100-02.  But the House
Defendants and *Miers* both misread *Harlow*, and they draw exactly the wrong conclusion from the
Supreme Court's decision.

**1.**  The issue presented in *Harlow* was whether "*every* Presidential subordinate based in
the White House" was entitled to absolute immunity from suit for damages, 457 U.S. at 809
(emphasis added), and the Court decided only "that Presidential aides, like Members of the
Cabinet, *generally* are entitled only to a qualified immunity, *id.* (emphasis added). *See also id.* at
811 ("The *undifferentiated extension* of absolute 'derivative' immunity to the President's aides …
could not be reconciled with the 'functional' approach that has characterized the [Court's]
immunity decisions.") (emphasis added).  But an "undifferentiated extension" of absolute
immunity to "every Presidential subordinate based in the White House" is not what is claimed
here.  Absolute testimonial immunity is limited to the President's *immediate* advisors, the members
of the trusted inner circle with whom the President customarily meets on a *regular or frequent
basis*, who "assist[ ] him on a daily basis in the formulation of executive policy and resolution of
matters affecting the military, foreign affairs, and national security and other aspects of his
discharge of his constitutional responsibilities." *Testimonial Immunity Before Congress of the
Former Counsel to the President*, 43 Op. O.L.C. ___, Slip Op. 5 (May 20, 2019),
https://www.justice.gov/olc/opinion/file/1215066/download ("*Testimonial Immunity of the*

*Former Counsel*").  That small circle of close aides excludes the vast majority of "Presidential subordinate[s] based in the White House." *Harlow*, 457 U.S. at 809.[2]

    *Harlow*, properly understood, supports the extension of absolute testimonial immunity to the President's immediate advisors, and it points to *Gravel*, moreover, as precedent for doing so. Far from "explicitly and definitively reject[ing]" absolute immunity for the President's advisors, House Defs.' Mem. at 16 (quoting *Miers*, 558 F. Supp. 2d at 101), the Court in *Harlow* acknowledged that "[f]or aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy, absolute immunity might well be justified to protect the unhesitating performance of functions vital to the national interest."  457 U.S. at 812.  That conclusion was consistent, as the Court noted, with its "functional approach" to questions of immunity.  *See Harlow*, 457 U.S. at 807 ("For officials whose special functions … require[ ] complete protection from suit, we have recognized the defense of 'absolute immunity.'"); *Nixon v. Fitzgerald*, 457 U.S. 731, 747, 749-50 (1982) (same).  Notably, the Court also cited *Gravel* as support for the conclusion that "some aides are assigned to act as Presidential 'alter egos' in the exercise of functions for which absolute immunity is essential for the conduct of the public business."  *Harlow*, 457 U.S. at 812 n.19 (citing *Gravel*, 408 U.S. at 616-17, 620).  Indeed, the Court left open the door for the *Harlow* petitioners, on remand, to make a showing that the functions of their respective offices required an exemption from liability "of absolute scope."  *Id.* at 813.

    That showing has been made in this case, notwithstanding the House Defendants' attempt to denigrate Dr. Kupperman's position as "less senior," House Defs.' Mem. at 23.  Dr. Kupperman, as Deputy National Security Advisor and Assistant to the President, was responsible for preparing

---

    [2] Thus, the House Defendants are misguided when they argue that *Harlow* "rejected a blanket attempt to analogize Presidential advisors to the Congressional aides at issue in *Gravel*."  House Defs.' Mem. at 22.  As discussed, the President does not suggest that testimonial immunity extends on a wholesale basis to all Presidential subordinates who work in the White House.

and providing advice to directly to both the President and National Security Advisor John Bolton on virtually all issues of national security requiring the President's attention that arose during Dr. Kupperman's tenure.   He was also frequently responsible for ensuring that the President's decisions were implemented by responsible agency officials in a coordinated, lawful, and effective manner.   *See* Pres.'s Mem. at 37-38 (citing Decl. of Matthias Mitman, ECF No. 40-2, ¶¶ 12-13). To carry out these responsibilities he met with the President multiple times per week, and regularly attended Oval Office meetings, on issues pertaining to national security and foreign policy.   *Id.* ¶ 14.   There are few advisors, if any, in whom a President places greater trust and confidence to carry out "responsibilities of utmost discretion and sensitivity," *Fitzgerald*, 457 U.S. at 749-50, than President Trump placed in Dr. Kupperman.   The "vital functions" that Dr. Kupperman performed as the President's alter ego in matters of national security are tasks requiring "unhesitating performance," for which absolute immunity against compelled congressional testimony is a necessary guarantee.   *Harlow*, 457 U.S. at 812 & n.19.

**2.**   Even though the House Defendants appear to recognize (as they must) that their implied power to compel testimony does not reach the President, they claim they can nonetheless summon his senior advisors with abandon because those advisors do not share the President's "'unique status under the Constitution,'" do not have have duties of comparably "'singular importance,'" and do not occupy positions of the same "'sheer prominence.'"   House Defs.' Mem. at 22 & n.6 (quoting *Fitzgerald*, 457 U.S. at 750-51).   While the House Defendants are certainly correct that they cannot hale the President before Congress, they are incorrect that their authority is plenary when it comes to his senior staff.

Foremost, *Harlow* itself implicitly rejects this argument by holding that certain Presidential advisors performing vital functions on his behalf *could be* entitled to the same immunity from civil damages actions that the President himself enjoys.   457 U.S. at 812-13.

And beyond *Harlow*, fundamental sepation-of-powers principles lead to the same conclusion.   Just as the President himself must be immune from compelled congressional testimony to protect the autonomy of his office, and the confidentiality of its communications, *see* Pres.'s Mem. at 30-31, so too for his immediate advisors.   Otherwise, compelled interrogation of his close advisors at the whim of congressional committees—on terms and conditions they would unilaterly determine—would just as effectively undermine the President's independence as would compelling the President himself to appear and testify.   *See id.* at 32-34.   So too, it would undermine the confidentiality required for the effective performance of the President's many vital functions.   *Id.* at 34-35.   It is therefore insufficient to observe, as the House Defendants do, that the President is constitutionally distinct from "journeyman level" officials such as "assistant secretar[ies]" or an FDA Commissioner, *see In re Kessler*, 101 F.3d 1015, 1017-18 (D.C. Cir. 1996) (cited by House Defs.' Mem. at 22 n.6).   The President's immediate advisors perform unique functions, essential to the effective discharge of the President's own constitutionally assigned duties, that differ from those of other Executive Branch officials.   Pres.'s Mem. at 31-32; *see Harlow*, 457 U.S. at 807-08, 810-11 (discussing the Court's "functional approach" to questions of immunity).   Thus, testimonial immunity is extended to this core group of advisors not in disregard of the President's unique constitutional status, but as a necessary means of supporting it.[3]

---

[3]   In reaching the conclusion that Presidential aides generally are entitled only to qualified immunity from suit, the *Harlow* Court also reasoned that blanket extension of absolute immunity to all White House aides could not be reconciled with the Court's holding in *Butz v. Economou*, 438 U.S. 478 (1978), that Members of the Cabinet enjoy only qualified immunity from suit.   457 U.S. at 808-09.   But for purposes of testimonial immunity, the President's immediate advisors are distinguishable in all pertinent respects from Members of the Cabinet.   The heads of Executive departments are entrusted with responsibility for the enforcement of Federal laws enacted by Congress and the administration of Federal agencies created by Congress, and rightly may be called to account to Congress for their performance in office.   The President's immediate advisors, however, exercise no administrative or enforcement authority of their own, and instead act solely to advise and assist the President in the performance of his duties.   No equivalent justification lies for calling them to account to Congress for the manner in which they perform that unique function.

**3.**  The House Defendants also maintain that *Harlow* does not support the application of absolute immunity to Dr. Kupperman because they are seeking evidence "that the President's conduct toward Ukraine had nothing to do with national security policy but instead concerned his personal agenda."  House Defs.' Mem. at 23.  That argument misunderstands the purpose and justification of testimonial immunity.  Whether or not the House Defendants purport to be interested in directly questioning Dr. Kupperman about "sensitive areas" of responsibility entrusted to him, *Harlow*, 457 U.S. at 812, is irrelevant.  The limitation on their implied authority to compel testimony that exempts senior Presidential advisors does not turn on the particular topics that a committee states beforehand it wants to ask about.  Once a Presidential aide appears before a committee to give testimony, that aide can be subjected to "a wide range of unanticipated and hostile questions about highly sensitive deliberations and communications," regardless of what the committee may have said beforehand about intended topics of examination.  *Testimonial Immunity of the Former Counsel*, at 6 (quoting *Immunity of the Assistant to the President and Dir. of the Office of Political Strategy & Outreach from Cong. Subpoena*, 38 Op. O.L.C. ___, Slip. Op. 1-2 (July 15, 2014) ("*Immunity of the Assistant to the President*"), https://www.justice.gov/sites/default/ /files/opinions/attachments/2014/07/25/simas-immunity-final_1.pdf.).  Testimonial immunity is a necessary safeguard against that risk.

Moreover, it should not be overlooked that *Harlow* arose in the context of a civil suit for money damages.  *See* 457 U.S at 802.  The immunity analysis here, however, must take into account the greater threat to the President's autonomy and confidentiality that is posed by congressional demands for the testimony of immediate Presidential advisors.  *See Fitzgerald*, 457 U.S. at 754 (in each case where separation-of-powers concerns are raised, "a court … must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch"); *United States v. Nixon*, 418 U.S. 683, 711-12

10

(1974); *In re Sealed Case*, 121 F.3d 729, 742 (D.C. Cir. 1997).  Congress—particularly when one or both Houses is held by political opponents of the President—has a far greater incentive to wield its subpoena authority as a cudgel to interfere with the proper functioning of the Presidency than do civil litigants pursuing monetary damages.

As the Office of Legal Counsel has thus explained, "the separation of powers concerns that underlie the need for absolute immunity from congressional testimonial compulsion are not present to the same degree in civil lawsuits brought by third parties[,]" in which courts, acting as neutral arbiters applying impartial procedural rules, offer assurances against irrelevant, argumentative, harassing, and other abusive forms of questioning and inquiry that cannot be counted on at congressional hearings.  *Immunity of the Assistant to the President*, at 5-6; *see also Testimonial Immunity of the Former Counsel*, at 13-14 (citing Archibald Cox, *Executive Privilege*, 122 U. Pa. L. Rev. 1383, 1429 (1974) (as compared to civil litigation "[t]he need to protect aides and subordinates from reprisals … is a thousand-fold greater in the case of congressional hearings, which are often the preserves of individual Senators and Congressmen not all of whom are invariably characterized by judicious self-restraint")).[4]  Thus, while *Harlow* provides support for absolute immunity from congressional testimonial process for immediate Presidential advisors, it does not define its limits.[5]

---

[4] As OLC observed, in congressional inquiries into Executive Branch activities, which, unlike damages suits against Presidential advisors, are commonplace, "committee[s] [are] both … interested part[ies] and the presiding authorit[ies], asking [the] questions … setting the rules for the proceeding[s] and judging whether witness[es] ha[ve] failed to comply with [them]," heightening risks that presidential advisors will be subjected "to coercion and harassment," that a perception of Presidential subordination will develop, and that confidential Presidential communications may be disclosed.  *Immunity of the Assistant to the President*, at 6.

[5] To the extent the House Defendants mean to suggest that Dr. Kupperman should be denied immunity because they wish to question him about potentially "impeachable conduct by the President," House Defs.' Mem. at 23, the suggestion lacks merit.  In *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974), the D.C. Circuit

**4.**   Finally, the House Defendants argue that *Harlow* is not supportive of testimonial immunity in this case because "[t]he White House has released substantial information on the topics about which [Dr.] Kupperman might testify."   House Defs.' Mem. at 22.   This is not an argument against testimonial immunity so much as an argument that the immunity has been waived.   But even on those terms, the argument is wrong.   It sorely undervalues the constitutionally based interests in Presidential confidentiality that testimonial immunity is meant to protect, and disregards the President's interests in the autonomy and independence of his office.   As the D.C. Circuit has held, the release of a document or other information protected by one or more executive privileges (such as the presidential communications privilege) "only waives [executive] privileges for the document or information specifically released, and not for related materials."   *In re Sealed Case*, 121 F.3d at 741.   Accordingly, the Executive Branch's disclosure of information pertinent to the House's impeachment inquiry concerning Ukraine does not generally waive the President's interests in the confidentiality of advice and assistance he received from Dr. Kupperman on matters involving Ukraine or any other issue of national-security policy.   Moreover, as discussed, "[t]he immunity from compelled congressional testimony implicates fundamental separation of powers principles that are separate from the confidentiality of specific information."   *Testimonial Immunity of the Former Counsel*, at 17.   "The constitutional interest in protecting the autonomy

---

rejected the argument that the "presumption of privilege" attaching to tape recordings of conversations between the President and one of his aides was defeated by the President's alleged involvement in "criminal conduct."   *See also In re Sealed Case*, 121 F.3d at 746 (observing that a party seeking to overcome the presidential communications privilege "seemingly must always provide a focused demonstration of need, even when there are allegations of misconduct by high-level officials") (discussing both *Senate Select Committee* and *U.S. v. Nixon*).   If allegations of Presidential misconduct are insufficient to overcome the qualified privilege for presidential communications, then *a fortiori* they are insufficient to overcome the absolute testimonial immunity of the President's immediate advisors.   Both are intended, and necessary, to vindicate separation-of-powers principles concerning the proper allocation of power and influence between the Executive and Legislative Branches that transcend the political turmoils of any given moment.

and independence of the Presidency remains the same," regardless of whether specific pieces of information have already been made public.  *Id.*

### B.  The Testimonial Immunity of Immediate Presidential Advisors is Necessary to Protect the Autonomy and Independence of the Presidency.

The House Defendants next take the position that the testimonial immunity of the President's immediate advisors is unnecessary to protect the Presidency's autonomy and independence.  They assert that "Executive Branch officials frequently testify before Congress … without harm to the Executive's institutional interests."  House Defs.' Mem. at 20-21, 24.  But the fundamental concern here relates to *compelled* testimony, and none of the examples cited by the House Defendants in which immediate Presidential advisors had been served with congressional subpoenas involved a *judicially enforced* subpoena.  Testimony pursuant to an injunction enforcing a congressional subpoena—something that has never occurred in our Constitution's nearly 230-year history—is obviously very different than an official appearing before Congress as part of the accommodation process between the Branches following the issuance of a subpoena.[6]

---

[6] The senior Presidential advisors who have testified before Congress after being served with subpoenas did so, for the most part, under agreements reached between the Executive Branch and Congress, including those noted by the House Defendants, House Defs. Mem. at 20-21 n.5, 24. *See Testimonial Immunity of the Former Counsel*, at 9 n.12 (describing accommodation between President Nixon and the Senate Watergate Select Committee for voluntary closed-session and later public testimony by John Dean, H.R. Haldeman, and John Ehrlichman); *Iran-Contra Investigation: Jt. Hrgs.Before the House Select Comm. to Investigate Covert Arms Transactions with Iran and the Senate Select Comm. on Secret Military Assistance to Iran and the Nicaraguan Oppositions*, H.R. Rep. No. 100-433 (1987) (preface) (noting that President Reagan waived executive privilege and ordered unrestricted cooperation with the special Iran/Contra Committee before which Oliver North and John Poindexter testified).  Similarly, in 1980 Lloyd Cutler, then Counsel to President Carter, testified before the Senate Judiciary Committee regarding Billy Carter's lobbying on behalf of the Libyan government pursuant to instructions by President Carter. *See* Pub. Papers of President Jimmy Carter 1420 (July 24, 1980).  And in 1994 Cutler, Bernard Nussbaum, and Thomas F. McLarty, then senior aides to President Clinton, gave testimony to committees investigating the "Whitewater" matter pursuant to a decision by President Clinton to cooperate with Congress's investigation.  *See* Pub. Papers of Pres. William Jefferson Clinton 403 (March 8, 1994); Pub. Papers of Pres. William Jefferson Clinton 1304 (July 23, 1994).  Far from disavowing testimonial immunity, President Clinton later directed Counsel to the President Beth

The reality is that disputes over the testimony of close Presidential advisors traditionally have always been settled through the constitutionally required accommodation process.  *See Testimonial Immunity of the Former Counsel*, at 12 ("Presidents have occasionally made senior advisers available to accommodate congressional requests, even while defending their legal authority to decline such requests.").  But the lesson this history teaches about the fundamental difference between accommodation and subjugation is apparently lost on the House Defendants. The political branches' "long history of settlement of disputes that seemed irreconcilable" demonstrates that "compromise worked out between the branches"—not compulsion by courts— remains the approach "most likely to meet [the political branches'] essential needs and the country's constitutional balance."  *United States v. AT&T*, 551 F.2d 384, 394 (D.C. Cir. 1976). Abandoning the tradition of mutual accommodation in favor of compelled public interrogation of Presidential advisors at the command of congressional committees, on terms entirely of the committees' choosing, would place "compulsory power" in the hands of Congress to exert authority and influence over the President's conduct of his duties that the Constitution did not intend Congress to wield.  *See Testimonial Immunity of the Former Counsel*, at 5.  It would also undermine the confidentiality necessary to the effective functioning of the Presidency, *see* Pres.'s Mem. at 34, and it would forever alter the balance of power between the elected branches that has served the country well for over 200 years.

## C.  Absolute Testimonial Immunity Is Not Inconsistent With the Executive's Qualified Immunity Against Evidentiary Process.

**1.**  The House Defendants next maintain that recognizing the testimonial immunity of immediate Presidential advisors contravenes precedent holding that the President can be compelled

---

Nolan not to appear in response to a subpoena from the House Committee on Government Reform and Oversight, a decision supported by an opinion from Attorney General Reno.  *Assertion of Exec. Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999).

to respond to *document* subpoenas, and that Presidential communications enjoy only qualified protection from discovery.  House Defs.' Mem. at 17-19.  They principally rely on *U.S v. Nixon*, *Senate Select Committee,* and *Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) (en banc) (per curiam), all of which involved subpoenas to the President for tape recordings and documents concerning meetings and discussions of his with others, but not testimony.  The courts in these cases, therefore, did not confront demands that the President or his immediate advisors appear before committees of Congress and subject themselves to questioning on terms and in a manner wholly of Congress's choosing.

Thus, in balancing "the constitutional weight of the interest[s] to be served" by disclosure against "the dangers of intrusion on the authority and functions of the Executive Branch[,]" *Fitzgerald*, 457 U.S. at 754, these Courts did not have to take into account the principal threats to Presidential autonomy and confidentiality that compelled congressional testimony by the President or his immediate advisors would pose—potential congressional harassment, coercion, and undue influence on Executive decision-making, perceived subordination of the President to the Legislature, and heightened risk that the confidentiality of sensitive information (and hence the caliber of Executive deliberations and decision-making) will be compromised.  *See* Pres.'s Mem. at 33-35.  Because the courts in these cases did not have to consider the unique "dangers of intrusion on the authority and functions of the Executive Branch[,]" *Fitzgerald*, 457 U.S. at 754, that are posed by compelled congressional testimony of immediate Presidential advisors, these cases simply do not speak to the issue here.

The case on which the House Defendants most heavily rely, *U.S. v. Nixon*, makes clear for additional reasons that it does not control.  *Nixon* concerned a criminal trial subpoena for tapes and other documents memorializing Presidential conversations and meetings.  418 U.S. at 687-88.  In holding that the President was entitled only to a qualified privilege against the production of these

materials, the Court stressed that it was "address[ing] only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials[,]" and not the need for evidence in civil litigation, or the conflict between the President's "confidentiality interest and congressional demands for information[.]" *Id.* at 712 n.19.  The Court emphasized that an absolute privilege to "withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts."  *Id.* at 712-13; *see also id.* at 708-09 ("The need to develop all relevant facts in the [criminal justice] system is both fundamental and comprehensive.").

Noting this express criminal-justice limitation on the scope of *Nixon's* holding, both the Supreme Court and the D.C. Circuit have held, in turn, that the balance struck in that case does not dictate the outcome of the separation-of-powers calculus in other contexts.  In *Cheney v. United States District Court for the District of Columbia*, the Court explained that because "the need for information in the criminal context is 'much weightier'" than in civil actions, civil discovery requests "d[o] not share the urgency or significance of the criminal subpoena requests in *Nixon*." 542 U.S. 367, 384 (2004).  Similarly, in *In re Sealed Case* (also cited by the House Defendants), the D.C. Circuit, after noting the limits of *Nixon's* holding, 121 F.3d at 743, underscored that its decision on the scope of the Presidential communications privilege in judicial proceedings in no way affected "the scope of the privilege in the congressional-executive context," where "the institutional needs of Congress and the President [must] be balanced[,]" *id.* at 753.

**2.**  In a similar vein, the House Defendants suggest that the separation-of-powers concerns to which compelled congressional testimony of the President's immediate advisors would give rise can be addressed "through a case-specific assertion of executive privilege and weighing of competing interests" on a question-by-question basis.  House Defs.' Mem. at 19-20.  But that simply

is not so.  First, the option of invoking executive privilege offers no protection against the use of compulsory process to harass or retaliate against the President's immediate advisors in an effort to improperly influence or interfere with Presidential decision-making, thus encroaching on the independence and autonomy of the Presidency.  *Immunity of the Assistant to the President*, at 3.

Second, reliance on executive privilege to decline to answer specific questions at a committee hearing would be insufficient even to eliminate threats to the President's constitutionally protected interests in confidentiality, as discussed above.  The theoretical ability to invoke executive privilege offers at best a flimsy and uncertain safeguard against disclosures of confidential information during the crucible of a committee hearing.  Presidential advisors could be asked "a wide range of unanticipated and hostile questions" about highly delicate matters, and "[i]n the heat of the moment, without the opportunity for careful reflection," might inadvertently reveal sensitive information.  *Testimonial Immunity of the Former Counsel* at 6.  "[E]ven the prospect of compelled interrogation by a potentially hostile congressional committee about confidential communications with the President … could chill presidential advisers from providing unpopular advice or from fully examining an issue[,]" *id.*, thus impeding the flow of information and advice that the President requires for sound decision-making and effective governance.[7]

What is more, given the predictably high frequency with which questions posed to immediate  Presidential advisors would intrude on matters falling within the scope of executive privilege, each appearance by a senior Presidential advisor could entail scores of individual claims of privilege, presumably to be resolved, at least in the House Defendants' estimation, by the federal

---

[7]  *See also Senate Select Committee*, 498 F.2d at 729-30 (observing that the confidentiality necessary to the Presidential decision-making process could be threatened even by case-by-case judicial weighing of the claimed need for confidentiality against countervailing public interests of the moment).

courts via yet more suits litigating those privilege invocations. That vision of recurrent inter-Branch litigation over claims of executive privilege is at war with the Supreme Court's stern admonition in *Cheney* that the "constitutional confrontation[s] between the … branches" occasioned by assertions of executive privilege "should be avoided whenever possible." 542 U.S. at 389-90 (cleaned up).[8]

### D.   Dr. Kupperman Remains Immune From Compelled Congressional Testimony About Matters Concerning His Official Duties Even Though He No Longer Serves as an Immediate Advisor to the President.

The House Defendants next argue that the case for testimonial imunity is "weaker" as applied to a former advisor such as Dr. Kupperman, House Defs.' Mem. at 24, but that position merely reflects their failure to appreciate the separation-of-powers principles that give rise to the immunity in the first place. As the President has explained, the spectacle of former advisors summoned before committees to account for advice or assistance they gave the President while still in office could just as effectively promote a perception of Executive subordination to the Legislative Branch as compelled interrogation of current advisors. And knowledge that

---

[8] The claim of absolute testimonial immunity asserted here is neither a "repackaged" version of nor a "surrogate for" the claim of absolute executive privilege rejected in *U.S. v. Nixon*. *See* House Defs.' Mem. at 19, 20. As discussed, immunity for the President's immediate advisors against congressionally compelled testimony serves constitutionally based interests in Presidential autonomy and independence, as well as interests in the confidentiality of Presidential decision-making that are peculiarly threatened by the spectre of Congress wielding its implied power to compel testimony against the President's inner circle—none of which can be adequately protected by individualized claims of executive privilege. At the same time, however, the scope of the immunity is actually much narrower than executive privilege, not "broader," as the House Defendants suggest, *id.* at 19. Testimonial immunity can be invoked only on behalf of the President's immediate advisors—the select few with whom the President meets on a regular or frequent basis to obtain their advice and assistance in the discharge of his constitutional duties—thus ensuring that the immunity "extend[s] no further than its justification would warrant." *Harlow*, 457 U.S. at 811. In contrast, executive privileges such as the presidential communications privilege may be asserted much more broadly over communications "authored or solicited and received" not only by immediate Presidential advisors, but also by members of those advisors' staffs. *In re Sealed Case*, 121 F.3d at 752.

Presidential advisors, upon leaving office, could be subjected to politically hostile and accusatory interrogation for their service to the President would have a chilling effect on their conduct of vital functions requiring "unhesitating performance[,]" *Harlow*, 457 U.S. at 812. *See also* Pres.'s Mem. at 39. Equally so, the prospect that immediate Presidential advisors could be questioned about confidential advice they gave the President as soon as they leave office would diminish the candor and quality of the advice they offer him. *See id.* at 40. *See generally Testimonial Immunity of the Former Counsel*, at 15-16.

The counter-arguments of the House Defendants require little attention. They maintain that because Dr. Kupperman, as a former Presidential advisor, no longer performs functions of vital national interest, "any possible rationale for absolute immunity based on the nature of his former duties" has been eliminated. House Defs.' Mem. at 25. That contention simply ignores the detrimental impact that Congress's ability to compel testimony by former advisors would have on the performance of current advisors' duties while still in office. The House Defendants also remark that compelling former advisors would not distract them from their duties to the President because, as former advisors, they no longer have any. *Id.* While "[i]t is true that the President does not have the same need for the daily advice and assistance of his former advisers," the pillars on which this limitation on Congress's implied subpoena power is based—separation-of-powers principals protecting the autonomy and confidentiality essential to the effective functioning of the Presidency—"remain just as strong." *Testimonial Immunity of the Former Counsel*, at 16.

Finally, the House Defendants argue that the President lacks authority to issue orders to a former Executive Branch employee such as Dr. Kupperman, and thus "ha[s] no power to direct [him] to disobey Congress." House Defs.' Mem. at 25. That is a non-sequitur. Dr. Kupperman brought this action seeking "a declaratory judgment from this Court as to whether he is lawfully obligated to comply with [the] subpoena issued [to him] by the House Defendants." Compl. at 2.

Regardless of the of the President's directive, he is not required to testify because as a matter of law Congress cannot compel him to do so. The House Defendants are also wrong, in any event, that a President cannot instruct a former advisor to refrain from testifying before Congress about matters concerning his official duties while in office. It is well established in analogous contexts that ex-employees—including government employees—are obligated to preserve, when so directed, the confidentiality of privileged information. *See Blumenthal v. Drudge*, 186 F.R.D. 236, 241-242 (D.D.C. 1999) (noting that plaintiff, a former Presidential advisor, "ha[s] an obligation to preserve the presidential communications privilege long enough for the President to invoke it if he so desires"); *see also United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) (former employees must keep their former employers' confidences). The same principle applies here, and it was therefore perfectly appropriate for the President to instruct Dr. Kupperman that he should rely on the immunity attaching to him, and refrain from testifying.

### E. Congress's Inability to Compel Testimony from the President's Immediate Advisors Does Not Impair the Performance of Its Article I Functions.

Finally, the House Defendants attempt to turn the tables by arguing that absolute testimonial immunity for immediate Presidential advisors "threatens the separation of powers" by "impeding the House's access to information relevant to its impeachment inquiry." House Defs.' Mem. at 25-26. But that is wrong, as this immunity is itself fundamental to the proper functioning of the separation of powers. The President cannot effectively do his job as President unless he is secure in knowing that his senior-most aides share in his immunity from compelled congressional interrogation under any circumstances.

The House Defendants' appeal is particularly unmoving here, given that they have withdrawn their subpoena for Dr. Kupperman and indeed have pledged to take no additional steps to secure his testimony. To put it mildly, it is difficult to see how it would "threaten the separation

of powers" for this Court to recognize testimonial immunity for a witness the House is no longer

even trying to compel to testify.  Nor have the House Defendants offered any specific factual basis

for the Court to find that Dr. Kupperman is an essential witness in their current inquiry.  The natural

conclusion for the Court is thus that he is not.[9]

      The House Defendants nevertheless suggest that their need for Dr. Kupperman's testimony

must be considered at its "zenith" simply because they are investigating allegations of misconduct

by the President and evaluating whether to impeach him.  House Defs.' Mem. at 26.  But that

sweeping statement of general purpose says nothing about whether Dr. Kupperman's specific

testimony is necessary.  To the extent the House's asserted need is ever relevant—and to be clear,

such need could never overcome the fundamental immunity principle at stake—the analysis would

turn on "*the extent to which* [the actions of another branch] prevent[ ] [the first branch] from

accomplishing [that] constitutionally assigned function[ ]."  *Nixon v. Ad'r of Gen. Servs.*, 433 U.S.

---

   [9]  The foregoing observations also go to show that even if immediate Presidential advisors enjoyed only a form of qualified testimonial immunity, then the President still would be entitled to judgment as a matter of law.  Although no court has considered what showing by Congress would be necessary to overcome an assertion of qualified testimonial immunity by a Presidential advisor, the D.C. Circuit's decision in *Senate Select Committee* suggests a possible approach.  The Court of Appeals held there that the plaintiff committee could overcome the President's assertion of Executive privilege against a subpoena for tape recordings of his conversations with his Counsel only by showing that "the subpoenaed evidence is demonstrably critical to the responsible fulfillment of [its investigatory] functions."  498 F.2d at 731.  Noting that the President had already released redacted transcripts of the taped conversations at issue, the Court of Appeals declined to enforce the committee's subpoena, because the committee could neither state in specific terms why the transcripts were "deficient" for its needs, nor point to any "specific legislative decisions that [could ]not responsibly be made" without access to the tapes.  *Id.* at 732-33.  Given the more varied and serious threats that compelled congressional testimony of immediate Presidential advisors poses to the autonomy and effective functioning of the Presidency, the standard articulated and applied in *Senate Select Committee* represents the least that the House Defendants should be required to show, under a hypothetical form of qualified immunity, before a court compelled Dr. Kupperman to testify about his official duties.  The House Defendants fail to meet even that minimally acceptable test, having offered not a word of explanation as to why other sources of information are "deficient" in meeting their needs, or why the decisions with which they have been tasked "cannot responsibly be made" unless they have access to testimony from Dr. Kupperman specifically, 498 F.2d at 732-33.

425, 443 (1977) (emphasis added); *U.S. v. Nixon*, 418 U.S. at 711-12 ("[W]e must weigh the importance of the general privilege of confidentiality of Presidential communications … against *the inroads* of such a privilege on the fair administration of criminal justice.") (emphasis added). The circumstances of this case dispel the notion that recognizing this basic limit on Congress's implied subpoena authority would deprive Congress of information essential to its impeachment function, or any of its other constitutionally assigned functions.

Beyond the particulars of this proceeding, the House's possession of ample constitutional tools to work its will on the Executive makes clear that there is no need to furnish it with a new power to compel testimony from the President's closest aides.  Among other powers, Congress can withhold certain funds from the Executive Branch, decline to enact legislation, or enact legislation (including appropriations) that the Executive Branch disfavors.  "Congressional control over appropriations and legislation is an excellent guarantee that the executive will not lightly reject a congressional request for information, for it is well aware that such a rejection increases the chance of getting either no legislation or undesired legislation." *Nixon v. Sirica*, 487 F.2d at 778 (Wilkey, J., dissenting).  *See INS v. Chadha*, 462 U.S. 919, 955 n.19 (1983) ("The Constitution provides Congress with abundant means to oversee and control" Executive Branch agencies.); *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 319 (D.C. Cir. 1988) ("It scarcely bears more than passing mention that the most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives."); *The Federalist* No. 58 (James Madison) ("Th[e] power over the purse may, in fact, be regarded as *the most complete and effectual weapon* with which any constitution can arm the immediate representatives of the people, for obtaining *a redress of every grievance*, and for carrying into effect every just and salutary measure" (emphases added)).  Unlike the courts, which have no means of securing testimony or evidence from reluctant

parties without compulsory process, Congress has available to it a variety of means by which to elicit the cooperation of the Executive Branch with its investigative efforts.

Thus far in our history, those tools have been more than sufficient to ensure that Congress can perform its constitutional role. The political Branches traditionally have been capable of resolving their differences over access to information and testimony—even testimony by the President's immediate advisors—through the accommodation process. *See AT&T*, 551 F.2d at 394 ("The legislative and executive branches have a long history of settlement of disputes that seemed irreconcilable."); *Testimonial Immunity of the Former Counsel*, at 7-12; Cox, *Executive Privilege*, 122 U. Pa. L. Rev. at 1431 (noting that history "contains little evidence that the nation has suffered from the want of legal power to compel the President to satisfy the demands of Congress to information in the Executive Branch. *Congress has powerful political weapons*" (emphasis added)). In light of this history, the House Defendants' arguments furnish no basis on which to conclude that compulsory process for the testimony of the President's immediate advisors is imperative to the functions of the Legislative Branch.

The history of inter-branch accommodation, taken together with the ample political tools available to Congress, and the circumstances of this case, also reveals the House Defendants' extravagant claim that extending testimonial immunity to the President's closest aides places him "above the law," House Defs.' Mem. at 27, to be "rhetorically chilling but wholly unjustified." *Fitzgerald*, 457 U.S. at 758 & n.41; *see also Cheney*, 542 U.S. at 382 (respect for the "unique position" occupied by the Office of the President in the Constitutional scheme does not mean that "the President is above the law"). Recognizing that the House Defendants cannot forcibly compel Dr. Kupperman's testimony does not place the President "above the law" any more than Speech or Debate Clause immunity for congressional staff allows Members of Congress to "stand above the law." *Gravel*, 408 U.S. at 615. The testimonial immunity at issue is strictly limited, as

explained, to the core group of advisors with whom the President meets on a regular or frequent basis, and does not include department heads or other Executive Branch officials.  *See* Pres.'s Mem. at 61 n.14.  The occasions on which the testimonial immunity of this small circle of individuals would deprive Congress of information critical to its legislative, oversight, or impeachment functions, that is available from no other sources, and which Congress has no other means of securing, would be rare indeed.  The House Defendants have not succeeded in demonstrating that this is one of those rare occasions.

## CONCLUSION

For the reasons stated above and in the President's initial memorandum, the Court should dismiss this case or, in the alternative, enter summary judgment upholding the President's invocation of absolute immunity as to Dr. Kupperman.

Dated:  November 27, 2019

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

 */s/  James J. Gilligan*
JAMES J. GILLIGAN
Special Litigation Counsel

ANDREW M. BERNIE (DC Bar No. 995376)
CRISTEN HANDLEY (MO Bar No. 69114)
STEVEN A. MYERS (NY Bar No. 4823043)
SERENA M. ORLOFF (CA Bar No. 260888)
Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone:  (202) 514-3358
Fax:        (202) 616-8470
E-mail:     james.gilligan@usdoj.gov

*Counsel for President Trump*