**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

CHARLES M. KUPPERMAN,

    *Plaintiff,*

  v.

U.S. HOUSE OF REPRESENTATIVES,
 *et al.*,

    *Defendants.*

  )
  )
  )
  )
  )
  )
  )  No. 1:19-cv-03224 (RJL)
  )
  )
  )
  )
  )

---

## REPLY IN SUPPORT OF DEFENDANT PRESIDENT DONALD J. TRUMP'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Dated:  December 4, 2019

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

JAMES J. GILLIGAN
Special Litigation Counsel

ANDREW M. BERNIE (DC Bar No. 995376)
CRISTEN HANDLEY (MO Bar No. 69114)
STEVEN A. MYERS (NY Bar No. 4823043)
SERENA M. ORLOFF (CA Bar No. 260888)
Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Tel:  (202) 514-3358
Fax:  (202) 616-8470
E-mail: james.gilligan@usdoj.gov

*Counsel for the President*

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................5

I.  THE COURT LACKS SUBJECT-MATTER JURISDICTION. ...................................... 5

    A.  This Suit is Barred by Presidential and Sovereign Immunity. ............................... 5

        1.  Courts Cannot Enter Declaratory Relief Against the President. ................ 5

        2.  Dr. Kupperman Identifies No Waiver of Sovereign Immunity
             That Could Permit This Suit. ...................................................................... 7

             a.  Dr. Kupperman's "Analogy" to Interpleader Cannot
                  Defeat the United States' Sovereign Immunity. ............................ 7

             b.  The *Larson-Dugan* Exception to Sovereign Immunity
                  Does Not Apply. ............................................................................ 8

    B.  Dr. Kupperman Lacks Standing........................................................................ 9

        1.  Dr. Kupperman's Oath-of-Office Theory Fails. ...................................... 10

        2.  Dr. Kupperman's Reputational Injury Theory Fails................................. 13

        3.  Dr. Kupperman Faces No Credible Threat of Inherent Contempt........... 16

    C.  This Case is Moot. ......................................................................................... 18

III.  DR. KUPPERMAN LACKS A CAUSE OF ACTION. ................................................. 19

II.  DR. KUPPERMAN IS IMMUNE FROM PROCESS COMPELLING HIM TO
    TESTIFY TO CONGRESS ABOUT HIS OFFICIAL DUTIES. ................................... 21

    A.  The Absolute Immunity of Immediate Presidential Advisors from
        Congressional Testimonial Process is Supported by Fundamental
        Separation-of-Powers Principals and Applicable Precedent................................. 21

    B.  Case-by-Case Assertions of Qualified Executive Privilege Are Not a
        Substitute for Testimonial Immunity ................................................................. 24

**PAGE**

C. Congressional Testimonial Compulsion of the President's Immediate Advisors Would Threaten the Autonomy and Independence of the Presidency. ........................................................................................................... 27

D. The Testimonial Immunity of the President's Immediate Advisors Does Not Impermissibly Impair the House Defendants' Performance of Their Article I Functions. .............................................................................................. 30

E. The President Properly Instructed Dr. Kupperman That He Should Comply With the President's Invocation of Testimonial Immunity..................... 32

CONCLUSION.......................................................................................................................... 33

# TABLE OF AUTHORITIES

*The authorities upon which we chiefly rely are marked with asterisks.*

**CASES**                                                           **PAGE(S)**

*Al-Aulaqi v. Obama,*
   727 F. Supp. 2d 1 (D.D.C. 2010) ........................................................................... 7

*Armstrong v. Exceptional Child Center, Inc.,*
   135 S. Ct. 1378 (2015) ........................................................................................ 19

*Babbitt v. United Farm Workers,*
   442 U.S. 289 (1979) ............................................................................................ 15

*Bender v. Williamsport Area School District,*
   475 U.S. 534 (1986) ............................................................................................ 10

*Board of Education v. Allen,*
   392 U.S. 236 (1968) ...................................................................................... 10, 11

*Bowsher v. Synar,*
   478 U.S. 714 (1986) ............................................................................................ 22

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ...................................................................................... 15, 16

*Clarke v. United States,*
   705 F. Supp. 605 (D.D.C. 1988) ......................................................................... 11

*Clinton v. City of New York,*
   524 U.S. 417 (1998) .............................................................................................. 5

*Clinton v. Jones,*
   520 U.S. 681 (1997) ............................................................................................ 22

*Cole v. Richardson,*
   405 U.S. 676 (1972) ............................................................................................ 13

*Committee on the Judiciary, United States House of Representatives v. McGahn,*
   No. 19-cv-2379, 2019 WL 6312011 (D.D.C. Nov. 25, 2019) .......................... *passim*

*Committee on the Judiciary, United States House of Representatives v. Miers,*
   558 F. Supp. 2d 53 (D.D.C. 2008) .................................................................. 1, 29

*Crane v. Johnson,*
   783 F.3d 244 (5th Cir. 2015) ............................................................................... 10

PAGE(S)

*Doe v. Gates*,
   828 F. Supp. 2d 266 (D.D.C. 2011) ....................................................................... 19

*Dorsey v. U.S. Dep't of Labor*,
   41 F.3d 1551 (D.C. Cir. 1994) ............................................................................... 8

*\*Drake v. Obama*,
   664 F.3d 774 (9th Cir. 2011) .......................................................................... 10, 13

*Fla. Audubon Soc. v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) ........................................................................... 14, 15

*Foretich v. United States*,
   351 F.3d 1198 (D.C. Cir. 2003) ............................................................................ 14

*Forrester v. White*,
   484 U.S. 219 (1988) .............................................................................................. 22

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ....................................................................................... 5, 6, 22

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) .............................................................................................. 20

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) .............................................................................................. 32

*Goodman v. FCC*,
   182 F.3d 987 (D.C. Cir. 1999) .............................................................................. 33

*\*Gravel v. United States*,
   408 U.S. 606 (1972) ..................................................................................... 21, 22, 24

*Green v. DOJ*,
   392 F. Supp. 3d 68 (D.D.C. 2019) ........................................................................ 15

*\*Grupo Mexicano de Desarrollo, S.C. v. All. Bond Fund., Inc.*,
   527 U.S. 308 (1999) .............................................................................................. 20

*\*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) ...................................................................................... *passim*

*Harrington v. Bush*,
   553 F.2d 190 (D.C. Cir. 1977) .............................................................................. 12

*Hudson Savings Bank v. Austin*,
   479 F.3d 102 (1st Cir. 2007) ................................................................................... 7

**PAGE(S)**

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ............................................................................... 25

*Lane v. Franks*,
    573 U.S. 228 (2014) .............................................................................................. 32

*Lovitky v. Trump*,
    No. 19-1454, 2019 WL 3068344 (D.D.C. July 12, 2019) ...................................... 5

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................ 14, 15

*McGrain v. Daugherty*,
    273 U.S. 135 (1927) ................................................................................................ 1

*McManus v. Dist. of Columbia*,
    530 F. Supp. 2d 46 (D.D.C. 2007) .......................................................................... 8

*\*Mississippi v. Johnson*,
    71 U.S. (4 Wall) 475 (1866) ........................................................................ 5, 6, 22

*Mistretta v. United States*,
    488 U.S. 361 (1989) .................................................................................... 20, 22, 30

*NBC-USA Hous., Inc. v. Twenty-Six Donovan*,
    674 F.3d 869 (D.C. Cir. 2012) .............................................................................. 18

*Newdow v. Bush*,
    391 F. Supp. 2d 95 (D.D.C. 2005) .......................................................................... 5

*\*Newdow v. Roberts*,
    603 F.3d (D.C. Cir. 2010) ............................................................................... 2, 5, 6

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ..................................................................................... 6, 22, 25

*Nixon v. GSA*,
    433 U.S. 425 (1977) ........................................................................................ 30, 31

*Nixon v. Sirica*,
    487 F.2d 700 (D.C. Cir. 1973) ........................................................................ 24, 26

*Pollack v. Hogan*,
    703 F.3d 117 (D.C. Cir. 2012) ............................................................................ 8, 9

*Powers v. Ohio*,
    499 U.S. 400 (1991) .............................................................................................. 33

**PAGE(S)**

*Pub. Citizen v. DOJ,*
    491 U.S. 440 (1989)................................................................................ 6

*\*Raines v. Byrd,*
    521 U.S. 811 (1997)................................................................................ 11

*Samuels v. Mackell,*
    401 U.S. 66, 70 (1971)............................................................................ 20

*Senate Select Committee on Presidential Campaign Activities v. Nixon,*
498 F.2d 725 (D.C. Cir. 1974)...............................................................24, 25

*\*Smith v. Obama,*
    217 F. Supp. 3d 283 (D.D.C. 2016).......................................... 11, 12, 13

*Susan B. Anthony List v. Driehaus,*
    134 S. Ct. 2334 (2014)............................................................................ 15

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996)............................................................... 5

*Tri-State Hosp. Supply Corp. v. United States,*
    341 F.3d 571 (D.C. Cir. 2003)............................................................... 8

*United States v. AT&T, Inc.,*
    551 F.2d 384 (D.C. Cir. 1976)............................................................... 28

*United States v. AT&T, Inc.,*
    567 F.2d 121 (D.C. Cir. 1977)............................................................... 28

*United States v. Nixon,*
    418 U.S. 683 (1974)...................................................................... *passim*

*Zaidan v. Trump,*
    317 F. Supp. 3d 8 (D.D.C. 2018).......................................................... 7

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017)............................................................................ 20

## U.S. CONSTITUTION

U.S. Const. art. I, § 1............................................................................... 1

U.S. Const., art. II, § 3 ............................................................................ 22

U.S. Const., art. II, § 4 ............................................................................ 22

PAGE(S)

**CONGRESSIONAL AUTHORITIES**

Cong. Research Serv., *Cong.'s Contempt Power and the Enforcement of
Cong. Subpoenas* (2017) ................................................................................. 17, 19

U.S. Cong., House Comm. on Gov't Reform and Oversight, *White House Compliance with
Comm. Subpoenas*, hearings, 105th Cong., 1st sess. (Washington: GPO, 1998) ................... 28

U.S. Cong., House Comm. on Gov't Reform, *Controversial Pardon of International Fugitive
Marc Rich, hearings,* 107th Cong., 1st sess. (Washington: GPO, 2001) ................................ 28


**EXECUTIVE AUTHORITIES**

*Attempted Exclusion of Agency Counsel from Congressional Depositions of
Agency Employees,*
43 Op. O.L.C. ___, Slip Op. 1-2, 5-11 (May 23, 2019) ......................................................... 26

*Testimonial Immunity Before Cong. of the Former Counsel to the President*,
43 Op. O.L.C. ___, Slip. Op. 5 (May 20, 2019) ................................................... 23, 25, 27, 29

*Immunity of the Assistant to the President and Dir. of the Office of Political
Strategy & Outreach from Cong. Subpoena*,
38 Op. O.L.C. ___, Slip. Op. (July 15, 2014) ......................................................... 24, 25, 29


**OTHER AUTHORITIES**

*Pub. Papers of Pres. Richard M. Nixon* (Apr. 17, 1973)................................................................27

Edward S. Corwin, *The President: Office and Powers 1787-1957* (4th ed. 1957) ....................... 1

Curtis A. Bradley & Trevor W. Morrison, *Historical Gloss and the Separation of Powers,*
126 HARV. L. REV. 411 (2012) .............................................................................................. 20

## INTRODUCTION

The "legislative Powers" that the Constitution grants to Congress, U.S. Const. art. I, § 1, do not include a "'general' power to inquire into private affairs and compel disclosures." *McGrain v. Daugherty*, 273 U.S. 135, 173 (1927). Although an "implied" power "to secure needed information" "with enforcing process" is an "attribute of [Congress's] power to legislate," *id.* at 161, 175, that power is an "auxiliary" one that exists only as "necessary and appropriate to make [Congress's] express powers effective," *id.* at 173. Moreover, Congress's implied power of inquiry has "always been regarded as limited by the right of the President to have his subordinates refuse to testify … before a committee of Congress concerning matters of confidence between them and himself." Corwin, *The President:  Office and Powers 1787-1957*, at 116 (4th ed. 1957). That constitutional limit on Congress's power is well grounded in both the unbroken history of our Republic and established separation-of-powers principles that safeguard the effective functioning of the Presidency against attempted congressional encroachment.

Only very recently has this established understanding of the Constitution's allocation of authority and influence been called into question—first in *Committee on the Judiciary, United States House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008), a decision quickly stayed by the D.C. Circuit and ultimately settled pending appeal, and most recently in *Committee on the Judiciary, United States House of Representatives v. McGahn*, 2019 WL 6312011 (D.D.C. Nov. 25, 2019), a decision the D.C. Circuit promptly administratively stayed pending appellate review. Order, *Comm. on the Judiciary of the U.S. House of Representatives v. McGahn*, No. 19-5331 (D.C. Cir. Nov. 27, 2019), Doc. No. 1818063. For the reasons previously discussed and elaborated upon below, we respectfully disagree with these two decisions, neither of which is binding on this Court. At this point, there is no basis for Dr. Kupperman to question the President's directive that he not testify, nor any basis for him to ask this Court for its views on whether that

directive had a sound legal basis.  His attempt to nonetheless solicit the Court's views is both jurisdictionally barred and fails for lack of a cause of action.  *See* Mem. of Pts. & Auths. in Supp. of Def. President Donald J. Trump's Mot. to Dismiss or, in the Alt., for Summ. J. ("Pres.'s Mem."), ECF No. 40.  Accordingly, the President's motion to dismiss or, in the alternative, for summary judgment should be granted.

*First*, Dr. Kupperman's claims against the President fail because the President is not properly subject to declaratory relief, and because this lawsuit is barred by sovereign immunity.  Whatever the practices of thirteenth-century English courts, *see* Consolidated Mem. of Law in Opp. to Defs.' Mots. to Dismiss, ECF No. 45 ("Kupperman Opp.") at 40, the D.C. Circuit has been made clear that "[a] court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions," *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010).  And Dr. Kupperman may not defeat the United States' sovereign immunity by analogy to interpleader—a doctrine that he concedes does not apply here, *see* Kupperman Opp. at 52—or by invoking the *Larson-Dugan* doctrine absent allegations that the President has actually acted unconstitutionally.

*Second*, Dr. Kupperman lacks standing.  Dr. Kupperman does not dispute that he has no personal stake in how the Court resolves the merits, and he expressly disclaims any argument that he faces either future criminal liability or the threat of a future civil enforcement suit by the House. Dr. Kupperman instead principally claims standing based on a perceived risk of violating his oath of office.  But this oath-of-office theory rests uneasily with the Supreme Court's modern standing jurisprudence, and has been rejected by multiple courts.  And even assuming "oath-of-office" standing remains viable in some contexts, it is inapplicable here both because Dr. Kupperman disclaims any independent belief as to what his oath requires (such that he does not believe he is violating it by abiding the directive to not testify), and because Dr. Kupperman faces no concrete

injury from following the directive not to testify.  Dr. Kupperman also asserts that he faces a risk of reputational injury if the House holds him in contempt.  But putting aside that there is no prospect that the Executive Branch would actually prosecute such a contempt, the prospect of a contempt citation is wholly speculative rather than "certainly impending" as the law requires.  Nor has Dr. Kupperman established any credible basis to conclude that a congressional contempt citation in these circumstances would have any effect on his reputation whatsoever, much less a judicially cognizable one.  Finally, Dr. Kupperman asserts that he is at substantial risk of being fined under the House's inherent contempt authority, but Congress has not pursued inherent contempt in nearly a century, and appears to have *never* purported to impose a fine using this authority.  Dr. Kupperman's risk of facing this long-dormant sanction is nonexistent.

*Third*, even if Dr. Kupperman somehow had standing at the time this action commenced, his challenge is now moot.  The date of Dr. Kupperman's scheduled deposition has come and gone with no consequence to Dr. Kupperman.  The House Defendants have withdrawn the subpoena issued to him, and appear to have unequivocally pledged to not reissue that subpoena.  There is thus no live controversy between the parties, assuming there ever was one.

*Fourth*, even if the Court has jurisdiction, Dr. Kupperman has no cause of action.  Dr. Kupperman concedes in his opposition brief that neither the Declaratory Judgment Act nor interpleader principles provide him a cause of action against the President.  He instead relies solely on "the traditional equitable powers of the federal courts to resolve constitutional disputes." Kupperman Opp. at 53.  But Dr. Kupperman cannot rely on the "traditional" powers of the courts of equity, because there is no tradition at equity of entering declaratory judgments at all, much less of enforcing any right even remotely similar to his asserted right to "know which Branch's competing command is entitled to prevail."  *Id.* at 54.  The precedents he invokes involve allegations of unconstitutional conduct by federal officials and are irrelevant both because they do

not involve the same cause of action Dr. Kupperman is pressing, and because he has not alleged unconstitutional conduct by any Defendant.

*Finally*, if the Court nonetheless reaches the merits of the immunity question, the President is entitled to summary judgment.  Congress's implied power of inquiry to carry out its legislative functions does not encompass authority to compel testimony from the President's immediate advisors about their official duties.  The House Defendants' arguments to the contrary, *see* House Defs.' Mem. of Law Responding to President Trump's Mot. to Dismiss or, in the Alt., for Summ. J., ECF No. 47 ("House Defs.' Resp."), are largely repetitive of contentions made in their opening brief that the President has now rebutted, *see generally* Def. President Donald J. Trump's Mem. of Pts. & Auths. in Resp. to the House Defs.' Mot. to Dismiss, ECF No. 48 ("Pres.'s Resp."), and rely heavily on the recent (and recently stayed) decision in *McGahn*.  But *McGahn* simply "adopt[ed] [*Miers*'] absolute testimonial immunity analysis in full," 2019 WL 6312011, at *36, thereby incorporating the same errors into its own analysis that the President has already identified in *Miers*.  To the extent the *McGahn* court added to that analysis, it faulted the doctrinal foundations of the immunity at issue simply because they did not emerge fully formed in the first Executive Branch memorandum to address them, *id.* at *37-39; purported to draw conclusions concerning the scope and application of the immunity based on implausible hypotheticals (in which Congress summons senior White House advisors to ask about the décor), *id.* at *41; and engaged only with its own misperceptions of the separation-of-powers principles—Presidential autonomy, independence, and confidentiality—on which the absolute testimonial immunity of the President's immediate advisors is based, *id.* at *42-44.  The President's invocation of Dr. Kupperman's testimonial immunity should accordingly be sustained.

## ARGUMENT

## I.  THE COURT LACKS SUBJECT-MATTER JURISDICTION.

### A.  This Suit is Barred by Presidential and Sovereign Immunity.

Dr. Kupperman's claims against the President must be dismissed because (1) the President is not subject to declaratory relief, and (2) Dr. Kupperman has not identified a waiver of sovereign immunity that would permit this suit.  *See* Pres.'s Mem. at 8-10.  Dr. Kupperman's arguments to the contrary are wrong.

#### 1.  Courts Cannot Enter Declaratory Relief Against the President.

The D.C. Circuit has made clear that courts cannot enter declaratory relief against the President.  *See Newdow*, 603 F.3d at 1013; *Swan v. Clinton*, 100 F.3d 973, 976 n.1 & 977 (D.C. Cir. 1996); *see also, e.g., Lovitky v. Trump*, 2019 WL 3068344, at *10 (D.D.C. July 12, 2019); *Newdow v. Bush*, 391 F. Supp. 2d 95, 106-07 (D.D.C. 2005).  *See generally* Pres.'s Mem. at 8-9.[1]

Dr. Kupperman's principal argument to the contrary is that declaratory judgments are available with respect to the President's ministerial obligations.  *See* Kupperman Opp. at 35.  But this is misplaced for multiple reasons.  First, Dr. Kupperman's Complaint contains no allegation that the President has violated a ministerial obligation; he alleges only that the political branches have expressed conflicting views of *his* legal obligations.  Second, *Mississippi v. Johnson*, 71 U.S. (4 Wall) 475, 501 (1866), only suggested—but never held—that ministerial duties might constitute an exception to the rule against relief directing the President's actions.  71 U.S. at 478.  Third, a

---

[1]   The President previously acknowledged that in 1974, the D.C. Circuit once approved a declaratory judgment against the President.  *See* Pres.'s Mem. at 9 n.1 (explaining that that decision predated the decisions in *Franklin*, *Swan*, and *Newdow*).  As for *Clinton v. City of New York*, 524 U.S. 417 (1998), cited in Kupperman Opp. at 39, that case was a challenge to the Line Item Veto Act, and the relief issued was a declaratory judgment that the statute was unconstitutional.  *See Newdow*, 603 F.3d at 1012 (describing *City of New York* as a "basic case of judicial review of legislation").  The President was also not the only defendant in that case; also named were two Cabinet secretaries and the Director of the Office of Management and Budget.  *City of New York* has nothing to do with declaratory relief running to the President alone concerning his official acts.

ministerial duty is one in "which nothing is left to discretion." *Id.* at 498.  Here, by contrast, determining whether absolute testimonial immunity applies, and if so whether to assert it, requires ample "exercise of judgment." *Id*. at 499.  It is immaterial that making unfounded assertions of immunity would be improper, because President Johnson in *Mississippi* likewise was prohibited from enforcing the statutes at issue if they were unconstitutional. *Id.* at 498.

Plaintiff further suggests that the D.C. Circuit's decision in *Newdow*, 603 F.3d at 1002, is both (1) "non-precedential" and (2) "wrong."  Kupperman Opp. at 36.  As to the former contention, the Circuit's statement that courts do not enter declaratory relief against the President was not *dicta*; it was a key component of the Court's holding that the plaintiff's injury was not redressable. As to the latter, that is a question left for the Supreme Court or the D.C. Circuit sitting en banc. And because the D.C. Circuit has made clear that "[a] court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions," *Newdow*, 603 F.3d at 1012, this Court should not conclude otherwise based on Dr. Kupperman's account of the practices in English courts in the thirteenth century.  *See* Kupperman Opp. at 40-41.

Finally, even if it might theoretically be possible to subject the President to declaratory relief, the Supreme Court has repeatedly held that, in light of separation-of-powers concerns, an express statement is required before a generally available cause of action may be asserted against the President. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (Administrative Procedure Act); *Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982) (*Bivens* and other implied causes of action).  That principle of constitutional avoidance is dispositive here.  *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 466-67 (1989); *see also infra* Part III (explaining that there is no implied cause of action in equity for these circumstances).

### 2.   Dr. Kupperman Identifies No Waiver of Sovereign Immunity That Could Permit This Suit.

Even if the President could be subjected to declaratory relief, Dr. Kupperman would also need to identify a waiver of the United States' sovereign immunity in order to maintain this suit. *See, e.g.*, *Zaidan v. Trump*, 317 F. Supp. 3d 8, 22 (D.D.C. 2018); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 41 (D.D.C. 2010).  He has not done so.

### a.   Dr. Kupperman's "Analogy" to Interpleader Cannot Defeat the United States' Sovereign Immunity.

Dr. Kupperman first attempts to defeat the United States' sovereign immunity on the theory that this action is "analogous" to an interpleader action.   *See* Kupperman Opp. at 30.   Dr. Kupperman principally relies upon a First Circuit case, *Hudson Savings Bank v. Austin*, 479 F.3d 102 (1st Cir. 2007), which held that the Eleventh Amendment did not bar a federal interpleader action commenced by a bank against a State and the United States.   The Court instead treated the case as a "straightforward dispute between the Commonwealth and the United States."   *Id.* at 107.

Dr. Kupperman's analogy fails, though, as he rightly acknowledges that this is not an interpleader case.   Kupperman Opp. at 52 ("Dr. Kupperman has not brought his suit as an interpleader action . . . .").   And that makes sense:   in a real interpleader action, each defendant claims access to the same limited fund and seeks judicial relief at the expense of the other defendant.   *See* Pres.'s Mem. at 42-43.   In *Hudson Savings Bank*, for example, "two sovereigns ha[d] asserted conflicting claims against a limited fund that is to be disbursed by interpleader." 479 F.3d at 104.   Each defendant *wanted* a judicial resolution of its claim; each sovereign defendant simply wanted "to have the relative priority of its claims determined in its own courts."   *Id.* Whether rightly or wrongly, the First Circuit thus described the case as effectively a "straightforward dispute between the Commonwealth and the United States."   *Id.* at 107.   Indeed, as the First Circuit explained, in a true interpleader action, "the stakeholder" (*i.e.*, the party to

7

which Dr. Kupperman analogizes himself) "should be dismissed immediately following its deposit of the stake into the registry of the court." *Id.* at 107.

This case is entirely different. This is hardly a "straightforward dispute" between the House Defendants and the President, as neither asserts a claim to any "stake," neither wants judicial resolution in any court, and inter-branch suits are not traditionally justiciable. Just as sovereign immunity bars a plaintiff from suing the United States Government absent its express consent, so too it bars Dr. Kupperman from forcing components of the United States Government to sue each other against their will.[2]

### b. The *Larson-Dugan* Exception to Sovereign Immunity Does Not Apply.

Dr. Kupperman further contends that sovereign immunity does not apply because he is alleging constitutional violations. *See* Kupperman Opp. at 33-35. Under the so-called *Larson-Dugan* doctrine, sovereign immunity is sometimes held not to apply to suits alleging that an executive officer has acted beyond his constitutional authority. *See, e.g.*, *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012). As the President has explained, however, Dr. Kupperman's Complaint makes no allegation that the President has acted unconstitutionally, *see* Pres.'s Mem. at 10 n.2, and Dr. Kupperman cannot amend that Complaint through his opposition to the President's motion to dismiss, *McManus v. Dist. of Columbia*, 530 F. Supp. 2d 46, 74 n.25 (D.D.C. 2007).

---

[2] Finally, it bears underscoring that Dr. Kupperman's attempt to defeat the United States' sovereign immunity by "analogy" contravenes black-letter law, for waivers of the federal government's sovereign immunity must be express, and are strictly construed. *See, e.g., Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003) ("[W]aiver of sovereign immunity must be unequivocally expressed in the statutory text and strictly construed, in terms of its scope, in favor of the sovereign.") (internal quotation marks and citation omitted); *Dorsey v. U.S. Dep't of Labor*, 41 F.3d 1551, 1555 (D.C. Cir. 1994) (similar).

What Dr. Kupperman instead alleges is that he is "uncertain" whether the President's invocation of absolute immunity was lawful. *See* Compl. ¶ 20. That is not an allegation that the *President* has acted unconstitutionally. *Larson-Dugan* does not apply.[3]

## B. Dr. Kupperman Lacks Standing.

In addition to the bars of presidential and sovereign immunity, this novel action cannot proceed because, as Dr. Kupperman's opposition brief itself confirms, he lacks Article III standing. As previously noted, Dr. Kupperman has made clear that he has no independent interest in providing or not providing testimony, and likewise has no interest in *how* the Court resolves the merits question that he urges the Court to reach. Pres.'s Mem. at 11. Dr. Kupperman's opposition does not dispute any of this. And although the Complaint raised the specter of "potential criminal liability for contempt of Congress," Compl. ¶ 2, the President explained that such a prosecution is both factually implausible and legally impossible, Pres.'s Mem. at 13-15, such that Dr. Kupperman now "does not press" it, Kupperman Opp. at 13.[4] Dr. Kupperman likewise disclaims any argument "based on the threat of a civil enforcement suit" by Congress. *Id.*

Dr. Kupperman instead makes three different standing arguments: (1) that absent judicial relief, he is "at a substantial and imminent risk of violating his oath of office"; (2) that he faces a substantial and imminent risk of reputational injury if the House holds him in contempt; and (3) that he faces an imminent and substantial risk of being fined under the House's inherent contempt authority. *Id.* at 13-29. Even setting aside that the subpoena has been withdrawn and the House Defendants have represented that it will not be re-issued, these arguments fail.

---

[3] Dr. Kupperman's invocation of *Pollack v. Hogan*, 703 F.3d 117, 121 (D.C. Cir. 2012), cited in Kupperman Opp. at 34, misses the mark. In that case, the plaintiff actually alleged that the named federal defendant had violated her constitutional rights. *See Pollack*, 703 F.3d at 121. The President's point is not that Dr. Kupperman has not proven such a violation here, but that he has not even alleged one.

[4] The House Defendants "do not dispute that the Executive Branch is unlikely, on its own initiative, to prosecute Kupperman in the circumstances of this case." House Defs.' Resp. at 3.

## 1. Dr. Kupperman's Oath-of-Office Theory Fails.

Dr. Kupperman's lead argument is that he has standing based on a risk of violating his oath of office. Kupperman Opp. at 13-19. To support this argument, Dr. Kupperman relies principally on *Board of Education v. Allen*, 392 U.S. 236 (1968). But this theory fails at the outset for the basic reason that Dr. Kupperman faces no obligation—based on his oath or otherwise—with respect to a withdrawn subpoena that the House Defendants have represented will not be re-issued. Whatever the right answer on the merits, there is thus no extant obligation that could even conceivably implicate Dr. Kupperman's oath. But this argument would fail regardless.

For one thing, *Allen* was decided 51 years ago, its discussion of plaintiffs' standing was set forth in a footnote, and standing was not even *contested* by either party before the Supreme Court in that case. *See id.* at 241 n.5. Although the case is plainly distinguishable for the reasons discussed below, it warrants emphasis at the outset that the Supreme Court does not appear to have relied upon any oath-of-office standing theory in the many decades since,[5] and it is doubtful that this theory is viable under the Supreme Court's modern standing jurisprudence—as the Fifth and Ninth Circuits have recognized. *See Crane v. Johnson*, 783 F.3d 244, 253 (5th Cir. 2015) (plaintiffs lacked standing because "the agent's subjective belief that complying with [an immigration-related] Directive will require him to violate his oath is not a cognizable injury"); *Drake v. Obama*, 664 F.3d 774, 780 (9th Cir. 2011) (stating that "an oath taker's claims are, under contemporary jurisprudence, abstract constitutional grievances insufficient to meet the requirements of Article III" (quotation marks omitted)). Although Dr. Kupperman criticizes these

---

[5] Dr. Kupperman's contention that the Supreme Court reaffirmed *Allen*'s oath-of-office holding in *Bender v. Williamsport Area School District*, 475 U.S. 534 (1986), *see* Kupperman Opp. at 18, is erroneous. In *Bender*, the Supreme Court held that a school board member did not have standing to appeal a district decision and merely observed in a footnote that the member also did "not have standing on the rationale employed in" *Allen*. 475 U.S. at 545 n.7. Finding a rationale inapplicable renders moot any need to decide, much less reaffirm, its validity.

decisions, *see* Kupperman Opp. at 17-18, Judge Kollar-Kotelly recently found "persuasive the opinions of various Courts of Appeal that have questioned whether such 'oath taker' standing would still be considered sufficiently 'concrete' under modern Supreme Court standing precedent" (although Judge Kollar-Kotelly found that the claim failed in any event and thus did not definitively decide the issue). *Smith v. Obama*, 217 F. Supp. 3d 283, 294 (D.D.C. 2016), *vacated as moot*, 731 F. App'x 8 (D.C. Cir. 2018).[6]

As these cases recognize, "oath-taker standing" is difficult to reconcile with modern standing principles. This lawsuit shows why. In order to have standing, Dr. Kupperman must allege a "*personal injury*" that is "legally and judicially cognizable," and the dispute must be one "traditionally thought to be capable of resolution through the judicial process." *Raines v. Byrd*, 521 U.S. 811, 818-19 (1997). *Raines* recognized that "the italicized words . . . are the key ones." *Id.* at 819. And as we previously explained, Pres.'s Mem. at 11, although Dr. Kupperman expresses concern about the implications of this matter for the separation-of-powers between Congress and the Executive Branch, those concerns do not implicate any injury that is personal to Dr. Kupperman. Indeed, in *Raines*, the principal dissent cited *Allen*'s oath-of-office holding, 521 U.S. at 841 (Breyer, J., dissenting), but the majority did not even discuss it (much less endorse it).

But this Court need not decide whether oath-of-office standing is *ever* viable, because, even if it is, it is plainly inapplicable here. In *Allen*, the Supreme Court held that members of a school board had standing to challenge a statute where those board members had "taken an oath to support the United States Constitution" and "[b]elieving [the statute] to be unconstitutional, they [were]

---

[6] Dr. Kupperman identifies a single decision from this district accepting an oath-of-office standing argument, but that decision is over thirty years old, and addressed oath-of-office standing only briefly in an alternative holding. *See Clarke v. United States*, 705 F. Supp. 605, 607 (D.D.C. 1988), *vacated*, 915 F.2d 699 (D.C. Cir. 1990). And in that case, the plaintiffs faced a concrete risk of future injury—"risking expulsion from their jobs" if they refused to enforce a law they believed was unconstitutional, *id.*, a circumstance that is not present here.

in the position of having to choose between violating their oath and taking a step—refusal to comply with [the statute]—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts." 392 U.S. at 241 n.5.  In other words, the *Allen* plaintiffs:  (1) actually believed that the statute at issue violated their oath (to the Constitution); and (2) faced concrete injury if they acted on that belief (expulsion from office and a reduction in state funding for their districts).

Neither of these circumstances exists here.  First, Dr. Kupperman disclaims any independent belief as to what his oath requires—he simply wants the Court to supply an answer. But as Judge Kollar-Kotelly explained in *Smith*, "[i]n *Allen* and its progeny, plaintiffs firmly believed and alleged that the actions they would be required to take violated their oaths."  217 F. Supp. 3d at 295.  By contrast, the plaintiff in *Smith* sought only "an independent determination of this matter from the Court, because he want[ed] to be able to continue fighting without confronting the dilemma imposed upon him."  *Id.* (internal quotation marks and citation omitted).  That was insufficient because "[i]f there is one concept to be gained from the Supreme Court decisions on standing, it is that a litigant . . . must have a stake in the controversy at issue, i.e., he himself must perceptibly win or lose depending on the outcome."  *Id.* (quoting *Harrington v. Bush*, 553 F.2d 190, 209 (D.C. Cir. 1977)).  Dr. Kupperman's situation is on all fours with the plaintiff in *Smith*— he does not seek to vindicate his own view of the law and he has no stake in what the Court decides on the merits should it reach them.

Second, unlike the plaintiffs in *Allen*—who faced concrete harm in the form of likely expulsion from office and reduced funds for their districts—Dr. Kupperman plainly faces no concrete injury from following the President's directive not to testify pursuant to the invocation of Dr. Kupperman's absolute immunity from testimonial compulsion.  Like the military-service member in *Drake*, he has "an available course of action which subject[ed] him to no concrete

12

adverse consequences—he c[ould] obey the orders of the Commander–in–Chief." 664 F.3d at 780

(cleaned up).  Indeed, these consequences are critical to a proper understanding of *Allen*.  *See*

*Athanson v. Grasso*, 411 F. Supp. 1153, 1157–58 (D. Conn. 1976) (concluding that plaintiffs in

*Allen* had standing not merely because of their oath but because they were in danger of expulsion

from office at the hands of the defendant if they did not obey the statute).  The plaintiffs in *Allen*

faced a concrete injury (removal from office) if they engaged in their desired but proscribed

conduct, and a plaintiff's Article III injury in bringing a pre-enforcement challenge to a law

proscribing conduct in which it wishes to engage does not in any way depend on the plaintiff's

*subjective motive* for why it wishes to engage in the conduct that the challenged statute proscribes.[7]

In short, Dr. Kupperman asks the Court to accept a theory of injury that is highly dubious

under any circumstance and to extend that theory far beyond even the limited judicial authority

recognizing it.  This Court should decline that invitation.

### 2.    Dr. Kupperman's Reputational Injury Theory Fails.

Dr. Kupperman's second standing argument rests on his allegation that Defendants have

placed him at a "substantial and imminent risk of injury to his reputation" by placing him at risk

of being held in contempt of Congress.  Kupperman Opp. at 19.  In making this argument, Dr.

Kupperman relies on cases holding that *actual* government actions can constitute a sufficient

---

[7] Finally, although the Court need not reach the issue here—since Dr. Kupperman would not have standing in any event—it is simply incorrect for Dr. Kupperman to claim that he would be "at a substantial and imminent risk of violating his oath of office" absent judicial relief.  Kupperman Opp. at 13.  An oath to "support" the Constitution does not "involve[ ] nebulous, undefined responsibilities for action in some hypothetical situations," but "mean[s] simply a commitment to abide by our constitutional system."  *Cole v. Richardson*, 405 U.S. 676, 683-84 (1972).  Dr. Kupperman may fulfill that obligation by following the President's directive on the basis of a formal Office of Legal Counsel opinion that he is absolutely immune from compelled testimony concerning his official duties.  Just as Dr. Kupperman cannot constitutionally be punished for abiding by that directive, *see* Pres.'s Mem. at 14, it is also not a violation of his oath of office.  *Cf. Smith*, 217 F. Supp. 3d at 293 (explaining that service member's oath could not "plausibly be read to *require* Plaintiff to disobey his orders," and following his orders in good faith "would have neither subjected Plaintiff to discipline, nor been unlawful").

reputational injury for Article III standing.  *See id.* at 19-20 (citing, *e.g.*, *Foretich v. United States*, 351 F.3d 1198, 1213-14 (D.C. Cir. 2003)).  Even assuming that an *actual* contempt citation would supply the requisite Article III injury—even though such a contempt could never be prosecuted by the Executive Branch and even though it is difficult to see what reputational harm such a citation could possibly impose on a former Executive Branch official heeding a constitutionally based directive from the President to not testify—there has been no contempt citation at all in this case. Any potential reputational injury from the (now nonexistent) possibility of future contempt is thus entirely speculative and insufficient for Article III purposes.

Most fundamentally, Dr. Kupperman fails to show how these speculative allegations support suing *the President*—who plays absolutely no role in whatever civil contempt proceedings the House might pursue.  Dr. Kupperman argues, in essence, that because the President instructed him not to testify, the President is responsible for any contempt by the House (and thus whatever reputational harm that would supposedly impose).  *See* Kupperman Opp. at 22-23.  But a plaintiff must show that a claimed injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party who is not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992);[8] *see also Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 670-71 (D.C. Cir. 1996) (en banc) (rejecting standing when injury "rests on the independent acts of third parties").  Here, the House determines whether and when to issue a contempt citation—a process in which the President plays no role.  And indeed, unless Dr. Kupperman can overcome the House Defendants' Speech and Debate immunity, any judgment on the merits would not even redress this asserted potential injury, as the House Defendants would not be bound by the Court's decision and could presumably still hold Dr. Kupperman in contempt.

---

[8] While *Lujan* referenced third-parties not before the court, the D.C. Circuit has referred more broadly to "the independent acts of third parties." *Fla. Audubon Soc.*, 94 F.3d at 671.  This makes sense; whether there is standing should not depend on whether the plaintiff has served a defendant he would not otherwise have authority to sue.

In any event, it is well-established that, in order for a future injury to be cognizable under Article III, the "threatened injury must be *certainly impending* to constitute injury in fact and that allegations of *possible* future injury are not sufficient."[9]  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks and citation omitted); *see also Fla. Audubon Soc.*, 94 F.3d at 663 ("A plaintiff must also show that the particularized injury is at least imminent in order to reduce the possibility that a court might unconstitutionally render an advisory opinion by 'deciding a case in which no injury would have occurred at all.'") (quoting *Lujan*, 504 U.S. at 564 n.2).  Here, even at the time this case was filed, Dr. Kupperman could not demonstrate "certainly impending" future injury.  Dr. Kupperman marshals only two pieces of evidence to the contrary, and neither is persuasive.

First, he notes that last summer the House voted to hold the Attorney General and Commerce Secretary in contempt.  *See* Kupperman Opp. at 21.  But those proceedings occurred in a dramatically different factual context involving still-ongoing disputes over information and were aimed at Senate-confirmed Cabinet officers, rather than an assistant to the President.  The fact that certain individuals were held in contempt in one context does not mean that different individuals would necessary be held in contempt in all contexts; indeed, the Supreme Court has rejected such extrapolation as insufficient to establish standing.  *See City of Los Angeles v. Lyons*, 461 U.S. 96, 106 (1983) (mere possibility that plaintiff might be held in a chokehold is insufficient for standing, even if others had been held in a chokehold, absent evidence "that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter").

---

[9] Dr. Kupperman relies on *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979) for the proposition that injury must simply not be "imaginary [n]or speculative."  Kupperman Opp. at 22 (alteration in original).  But this doctrine only applies in the context of a "statute that contemplates criminal liability," *Green v. DOJ*, 392 F. Supp. 3d 68, 81 (D.D.C. 2019), where there is a "credible threat of prosecution," *id.* (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014)).  Here, there is no prospect of a "credible threat of prosecution," *see* Pres.'s Mem. at 13-15, and Dr. Kupperman does not argue otherwise.

Second, Dr. Kupperman points to statements from Defendant Schiff supposedly showing that Dr. Kupperman "was at risk of being held in contempt." Kupperman Opp. at 22. But again, the sheer *possibility* of future contempt proceedings is not sufficient for Article III standing. *Clapper*, 568 U.S. at 409. Dr. Kupperman would need to show that contempt was not merely theoretically possible, but "certainly impending."

### 3.    Dr. Kupperman Faces No Credible Threat of Inherent Contempt.

Dr. Kupperman's final standing theory posits that the House could fine him for contempt under its "inherent contempt" authority. Kupperman Opp. at 23-29. Initially, this theory suffers from the same defect as the previous one: unless Dr. Kupperman can overcome the House Defendants' Speech and Debate Act immunity, any decision from this Court would not redress this potential injury since it would not bind the House Defendants.

But even putting that point aside, this argument cannot be taken seriously. Dr. Kupperman appears to agree that there is no credible threat that the House will seek to *arrest and detain him* under its asserted inherent contempt authority. Kupperman Opp. at 24. And although Dr. Kupperman asserts that the unlikelihood of such a scenario "says nothing about whether Congress could and would impose *monetary fines* as part of its inherent contempt authority," *id.*, Dr. Kupperman does not dispute that neither chamber of Congress has attempted to use *any* asserted inherent contempt authority since 1935.[10]

_____

[10] Dr. Kupperman dismisses this near-century of disuse, insisting that Congress simply found it unnecessary to exercise any inherent contempt authority because of the availability of criminal contempt. Kupperman Opp. at 27. But disputes between the Executive and Legislative branches over access to information have arisen since the beginning of the Republic, Pres.'s Mem. at 17-18, and they have assuredly not been resolved through criminal-contempt prosecutions. Indeed, OLC has concluded for decades across multiple Administrations that Executive Branch officials *cannot* be prosecuted for assisting the President in asserting immunity or a constitutionally based privilege, as the President directed Dr. Kupperman to do here. *See id.* at 14.

Contrary to Dr. Kupperman's argument, the House's attempted resort to monetary fines under a theory of inherent contempt is even more implausible than the House's attempted use of the Sergeant-at-Arms to arrest and imprison him. As Dr. Kupperman notes, the Supreme Court has never decided whether Congress even has inherent authority to enforce its subpoenas with monetary fines, *see* Kupperman Opp. at 24-25—a practice that would have no precedent in American history. As the Congressional Research Service noted two years ago, "we are not aware of, and could not locate, *any precedent* for Congress imposing a fine in the contempt context." Cong. Research Serv., Cong.'s Contempt Power and the Enforcement of Cong. Subpoenas 10 (2017) ("*Cong.'s Contempt Power*") (emphasis added), https://fas.org/sgp/crs/misc/RL34097.pdf.

Moreover, since there is quite literally no historical pedigree for Congress attempting to impose such fines,[11] it is far from clear how Congress could enforce such fines even if it had the power to pursue them. Unlike detention, which the Sergeant-of-Arms might be able to implement, Congress has no obvious mechanism to seize Dr. Kupperman's property. And any civil enforcement action would face numerous problems if Congress attempted it, including, *inter alia*, the general absence of justiciability for Congressional subpoena-enforcement suits generally, *see* Pres.'s Mem. at 16-25, and the compelling arguments against congressional application of whatever inherent contempt authority it possesses to Executive Branch witnesses acting in reliance on an OLC opinion to preserve an assertion of Presidential immunity, *id.* at 13-15 & n.4.

Finally, Dr. Kupperman cites various sources for the proposition that a lack of prior enforcement of a *clearly applicable* statute or other authority may not preclude standing under certain circumstances, Kupperman Opp. at 28, but this proposition does not help him here. Simply put, Dr. Kupperman asserts that he faces an "imminent and substantial risk" of facing a process

---

[11]    Dr. Kupperman cites instead the power *of courts* to issue such fines as well as the supposed authority of the House of Lords. *See* Kupperman Opp. at 25-26.

(inherent contempt) that Congress has not used in any form since President Franklin Roosevelt's first term; and of being subjected to a remedy (monetary fines) that Congress has *never imposed*, that the Supreme Court has never held Congress could impose, and that Congress may not have any practical mechanism to enforce—all in relation to a subpoena that seeks testimony that the Executive Branch has long and consistently stated cannot be compelled and that, in any event, has been withdrawn.[12]

Dr. Kupperman does not face a credible threat of being the first person in American history fined under the supposed inherent contempt authority that he attributes to the House.

### C.  This Case is Moot.

In any event, even if Dr. Kupperman somehow had Article III standing at the outset, intervening events have mooted this case.  Over a month has passed since Dr. Kupperman was scheduled to testify; no apparent consequences have befallen him for failing to comply with the subpoena; the subpoena has since been withdrawn; and the House Defendants have unequivocally stated that "they will not reissue a subpoena to Kupperman."  Mem. in Supp. of House Defs.' Mot. to Dismiss, ECF No. 41 ("House Defs.' Mem.") at 7.  These "intervening event[s]" eradicate any controversy between the parties, assuming one existed in the first place.  *See NBC-USA Hous., Inc. v. Twenty-Six Donovan*, 674 F.3d 869, 873 (D.C. Cir. 2012).  For that reason, too, Dr. Kupperman's suit should be dismissed.

Dr. Kupperman attempts to escape this conclusion by invoking the voluntary-cessation doctrine, and arguing that there is an ongoing controversy based on his fear that the House

---

[12] Dr. Kupperman also cites public statements from roughly a half-dozen members of Congress raising the possibility of pursuing or exploring the possibility of inherent contempt.  Kupperman Opp. at 26-27 & nn.16-18.  These statements—none of which appear to discuss Dr. Kupperman, and many of which are not even specific to potential fines—do not, in light of the considerations above, create a credible threat that the full House will attempt to fine Dr. Kupperman over a since-withdrawn subpoena.

Defendants may subject him to inherent contempt proceedings—which, as discussed *supra*, Part I.B.3, the House Defendants have never suggested they would do and which neither chamber of Congress has done to anyone in nearly a century—regarding his failure to comply with the withdrawn subpoena.  As stated previously, the President cannot vouch for the House Defendants' representation that they will not reissue a subpoena to Dr. Kupperman, Pres.'s Mem. at 26, but the House's challenged conduct does not seem "reasonably . . . expected to recur," *Doe v. Gates*, 828 F. Supp. 2d 266, 271 (D.D.C. 2011), where, as here, the House has given repeated assurances to the contrary, which they have made to this Court as a basis for dismissing the Complaint and are thus bound by and would be judicially estopped from disclaiming.

Moreover, while the House Defendants have not similarly confirmed that they will not attempt to hold Dr. Kupperman in inherent contempt, their silence does not create a credible threat, particularly given that, again, Congress has not asserted that power since the 1930s.  *See Cong.'s Contempt Power*, *supra*, at 10.  The extremely remote possibility of the House reviving its "long dormant," *id.*, inherent contempt power is insufficient to overcome mootness.

## II.  DR. KUPPERMAN LACKS A CAUSE OF ACTION.

Even if Dr. Kupperman could overcome all the jurisdictional obstacles to hearing this case, his claims against the President would still fail because he lacks a cause of action.  Dr. Kupperman recognizes that he does not have a cause of action under the Declaratory Judgment Act, and he concedes that interpleader does not apply here.  Kupperman Opp. at 52 & n.27.  He instead claims that he has an implied equitable cause of action to sue the President, but that is incorrect.

"The power of federal courts of equity to enjoin unlawful executive action," *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1384-85 (2015), may be exercised only when "the relief . . . requested . . . was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrolo, S.C. v. All. Bond Fund., Inc.*, 527 U.S. 308, 319 (1999).  Indeed, historical context is

central in determining whether "traditional equitable powers" apply, particularly given the "separation-of-powers" concerns with judicially creating novel relief, much less against officials of co-ordinate Branches.  *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017); *Grupo Mexicano*, 527 U.S. at 327-29, 332 (observing that courts' equitable powers do "not include the power to create remedies previously unknown to equity jurisprudence" and concluding that no cause of action existed because "the English courts of equity did not actually exercise" the power asserted); *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (noting that "traditional ways of conducting government . . . give meaning to the Constitution"); *see also* Curtis A. Bradley & Trevor W. Morrison, *Historical Gloss & the Separation of Powers*, 126 Harv. L. Rev. 411 (2012).

Here, there is simply no historical pedigree—much less a strong tradition in equity—of courts entering declaratory judgments to adjudicate pseudo-interpleader suits against the President and Congress by former Executive Branch officials.  Indeed, declaratory judgments are "a statutory remedy rather than a traditional form of equitable relief," *Samuels v. Mackell*, 401 U.S. 66, 70 (1971), which, though similar to equitable remedies, were not available until the Declaratory Judgment Act was passed and thus are not a traditional form of equitable relief.

Moreover, not one of the cases Dr. Kupperman cites in support of his equitable argument involved a context even remotely similar to this one; rather, they illustrate the generalized understanding that federal courts of equity may in some circumstances issue relief for unconstitutional actions by federal officials.  *See, e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *see also Armstrong*, 135 S. Ct. at 1384.  But *Grupo Mexicano* flatly forecloses analysis at such a high level of generality, as the Supreme Court carefully distinguished between claims by evaluating the precise historical context.  527 U.S. at 330-32.  Moreover, Dr. Kupperman's argument in equity makes no sense on its face:  he describes his cause of action as one in equity "to resolve constitutional *disputes*" and cites cases involving

20

allegations of unconstitutional actions.  Kupperman Opp. at 53.  Yet Dr. Kupperman is asserting

neither a constitutional dispute between himself and any other party nor alleging any

unconstitutional conduct here.  Rather, as the President has repeatedly pointed out, Dr. Kupperman

expressly does not take a position on the merits of any government actor's conduct in this case,

but instead presents himself as a neutral subject of (once-but-no-longer) competing demands.

## III.  DR. KUPPERMAN IS IMMUNE FROM PROCESS COMPELLING HIM TO TESTIFY TO CONGRESS ABOUT HIS OFFICIAL DUTIES.

If the Court reaches the merits despite the above issues, it should hold that Dr. Kupperman

is absolutely immune from compelled congressional testimony about his official duties as Deputy

National Security Advisor and Assistant to the President.

### A.  The Absolute Immunity of Immediate Presidential Advisors from Congressional Testimonial Process is Supported by Fundamental Separation-of-Powers Principals and Applicable Precedent.

Fundamental separation-of-powers principles that protect the autonomy, independence,

and effective functioning of the Presidency necessitate the conclusion that Congress's implied

power of inquiry does not encompass compulsory interrogation of the President's closest advisors

about matters concerning their official duties.  *See* Pres.'s Mem. at 29-35.  That conclusion is well-

supported by analogous precedent, principally *Harlow v. Fitzgerald*, 457 U.S. 800, 812-13 (1982),

and *Gravel v. United States*, 408 U.S. 606, 616-17 (1972).  *See id.* at 35-36; Pres.'s Resp. at 5-7.

In their response, the House Defendants rely almost exclusively on arguments already refuted by

the President, or search in vain for persuasive support in *McGahn*.

The House Defendants repeat their argument that the President's immunity from compelled

congressional testimony is not shared by his advisors because "'the *singular importance* of the

President's duties'" stands him in an entirely different position than all other Executive Branch

officials.  House Defs.' Resp at 7 (quoting *Fitzgerald*, 457 U.S. at 751); *see also* House Defs.'

Mem. at 22 & n.6.  This argument fails because *Harlow* implicitly rejected it, 457 U.S. at 812-13,

21

and because it overlooks the fact that the testimonial immunity of the President's immediate advisors—those who act as his "alter egos" in carrying out essential Presidential functions, *see id.* at 812 n.19 (citing *Gravel*, 408 U.S. at 616-17)—is itself necessary to the effective performance of the President's "singular[ly] importan[t]" duties, *Fitzgerald*, 457 U.S. at 751.  Pres's Resp. at 8-9.[13]

The House Defendants also repeat their argument that in *Harlow* the Supreme Court refused to extend the President's immunity "'indiscriminately to the President's personal aides.'" House Defs.' Resp. at 8 (quoting *Forrester v. White*, 484 U.S. 219, 225 (1988)); *see also* House Defs.' Mem. at 22.  But as the President has observed more than once, the testimonial immunity asserted here is not "indiscriminate."  Rather, it is strictly limited to the trusted inner circle of advisors with whom the President customarily meets on a regular or frequent basis, whose special function is to "assist him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his

---

[13] Following the court's lead in *McGahn*, the House Defendants suggest that Congress's power to compel testimony from Executive Branch officials may extend *even to the President*, House Defs.' Resp. at 7; *see McGahn*, 2019 WL 6312011, at *39 & n.29, notwithstanding the complete absence of any historical practice by Congress of issuing testimonial subpoenas to the President. *See Mistretta*, 488 U.S. at 401 (traditional ways of conducting government give meaning to the Constitution); *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 351-52 (1941) ("[T]he want of assertion of power by those who presumably would be alert to exercise it . . . is significant in determining whether such power was actually conferred."); *NFIB v. Sebelius*, 567 U.S. 519, 549 (2012) ("[S]ometimes the most telling indication of a severe constitutional problem is the lack of historical precedent for Congress's action.") (opinion of Roberts, C.J.) (cleaned up).  According to the House Defendants and *McGahn*, the extraordinary proposition that a single committee of either House of Congress can summon the President to testify is supported by the Supreme Court's decisions in *United States v. Nixon*, 418 U.S. 683 (1974), and *Clinton v. Jones*, 520 U.S. 681 (1997). *See* House Defs.' Resp. at 5; *McGahn*, 2019 WL 6312011, at *39.  Those cases, however, involved the President's amenability to a subpoena *duces tecum* and to a civil suit for conduct in his *personal*—not official—capacity.  They are therefore inapt.  The President's immunity from congressional testimonial process is implicit in the Constitution's scheme, under which he "is responsible not to the Congress but to the people," *Bowsher v. Synar*, 478 U.S. 714, 722 (citing U.S. Const., art II, § 4), and has only a limited Constitutional obligation "from time to time [to] give to the Congress Information of the State of the Union[,]" U.S. Const., art. II, § 3. *See* Pres.'s Mem. at 31 & n.12.  The conclusion that the President cannot be compelled by Congress to testify is also supported by the longstanding precedent holding that the President cannot be "enjoin[ed] … in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. at 501; *see also Franklin*, 505 U.S. at 802.

discharge of his constitutional responsibilities." *See* Pres.'s Resp. at 6 (citing *Testimonial Immunity Before Cong. of the Former Counsel to the President*, 43 Op. O.L.C. ___, Slip. Op. 5 (May 20, 2019) ("*Testimonial Immunity of the Former Counsel*"), https://www.justice.gov/olc/opinion/file/1215066/download; Pres.'s Mem. at 31-32.

The House Defendants also mischaracterize arguments made by the President.  They observe correctly, so far as it goes, that *Harlow* "made clear that absolute immunity cannot be justified by the 'mere fact of high station.'" House Defs.' Resp. at 9 (quoting *Harlow*, 457 U.S. at 812).   But the President's invocation of immunity does not rest on the mere fact of Dr. Kupperman's position as an Assistant to the President, *cf. id.*   It is based on Dr. Kupperman's close working relationship with the President in which he provided critical advice and assistance to the President in the formulation and execution of Presidential policy on virtually every issue of national security that crossed the President's desk during Dr. Kupperman's time in office.  *See* Pres.'s Resp. at 7-8; Decl. of Matthias Mitman, ECF No. 40-2, ¶¶ 12-14.  Thus, the claim made here of his testimonial immunity is entirely in keeping with *Harlow's* holding that "aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy" may well be entitled to absolute immunity "to protect the unhesitating performance of functions vital to the national interest," 457 U.S. at 812.  The House Defendants do not even acknowledge the sensitive national-security functions that Dr. Kupperman performed on the President's behalf, much less attempt to explain why they are not sufficient, under *Harlow*, to merit testimonial immunity. *Compare* House Defs.' Resp. at 9 *with* Pres.'s Resp. at 7-8; Pres.'s Mem. at 37-38.[14]

---

[14]   The House Defendants do not dispute the facts concerning the duties performed by Dr. Kupperman as one of the President's immediate advisors.  *See* House Defs.' Resp. to President Trump's St. of Mat. Facts Not in Dispute, ECF No. 47-1, ¶¶ 4-16.  Accordingly, these facts should be deemed conceded for purposes of the President's summary judgment motion.  LCvR 7(h)(1).

The recent decision in *McGahn* adds nothing of substance to this analysis.  The *McGahn* court misread *Harlow* as unequivocally rejecting absolute immunity for all Presidential aides, *see McGahn,* 2019 WL 6312011, at *35, 40, when in fact, as the President has shown and even the House Defendants have grudgingly acknowledged, *Harlow* held—relying on *Gravel*, 408 U.S. at 616-17—that certain advisors "entrusted with discretionary authority" in sensitive realms such as national security and foreign policy may well be entitled to absolute immunity.  457 U.S. at 812-13 & n.19.  *See* Pres.'s Resp. at 7; House Defs.' Resp. at 9.  *McGahn's* failure even to acknowledge *Harlow's* exception for such advisors undercuts the court's conclusions in that case.

### B.  Case-by-Case Assertions of Qualified Executive Privilege Are Not a Substitute for Testimonial Immunity.

The House Defendants also continue to maintain that Congress's testimonial subpoena power must be construed to extend to immediate Presidential advisors because prior cases such as *United States v. Nixon*, 418 U.S. 683 (1974), *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974), and *Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) (en banc) (per curiam)—none of which involved testimonial subpoenas—have held that "a President's generalized interest in confidentiality" can be adequately protected through the assertion of Executive privilege on a case-by-case basis.  House Defs.' Resp. at 10-12.  The House Defendants are now joined in this view by *McGahn,* 2019 WL 6312011, at *36, 41-42, but the argument has not improved.  *See* Pres.'s Mem. at 40-41; Pres.'s Resp. at 14-18.

To reiterate, individual assertions of Executive privilege made after Presidential advisors have been compelled to appear are not a substitute for testimonial immunity.  *First*, the theoretical option of invoking Executive Privilege cannot prevent committees' abuse of compulsory testimonial process to harass or retaliate against the President (through his advisors) so as to insert themselves improperly into the Presidential decision-making process.  Pres's Resp. at 17 (citing *Immunity of the Assistant to the President and Dir. of the Office of Political Strategy & Outreach*

24

*from Cong. Subpoena*, 38 Op. O.L.C. ___, Slip. Op. 1-2 (July 15, 2014) ("*Immunity of the Assistant to the President*"), https://www.justice.gov/sites/default/files/opinions/attachments/2014/07/25/simas-immunity-final_1.pdf.); Pres.'s Mem. at 40.

*Second*, the confidentiality interest safeguarded by the testimonial immunity of immediate Presidential advisors is not merely the "generalized interest," *Nixon*, 418 U.S. at 713, that inheres in all privileged communications "authored or solicited" by Presidential aides and their staffs, *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). Rather, the interest at stake is the President's specific and compelling interest in his ability to obtain sound and candid advice from his closest advisors. *See Testimonial Immunity of the Former Counsel* at 5.

The President's confidentiality interests are at their pinnacle when communications with his trusted inner circle are concerned, yet because of their close operational proximity to the President and their frequent communication with him, in the absence of testimonial immunity, these advisors would become the most "easily identifiable target[s]" for intrusive congressional inquiries, *see Fitzgerald*, 457 U.S. at 753, creating risks peculiar to compelled congressional testimony that reliance on Executive privilege could not dependably mitigate. First is the risk that wide-ranging and antagonistic questions about highly sensitive deliberations could result in coerced or (absent time for reflection) inadvertent disclosures of highly sensitive and confidential information. *See Testimonial Immunity of the Former Counsel* at 6 (citing *Immunity of the Assistant to the President*, at 4). Second is the concern that even the prospect of interrogation by a potentially hostile committee could chill a President's advisors from providing complete and candid advice on sensitive or controversial issues, lest it be brought forcibly to light afterward under the stress of prolonged interrogation by the President's political adversaries in Congress. *See id.* (same); *see also Senate Select Comm.*, 498 F.2d at 729-30 (noting that even the prospect of case-by-case judicial evaluation of the need for confidentiality can undermine the guarantee of

confidentiality required for the Presidential decision-making process).   These risks are further heightened considering that Congress does not recognize the right of Executive Branch witnesses (as the *McGahn* court erroneously assumed, 2019 WL 6312011, at *42) to the assistance of government counsel regarding appropriate invocation of Executive privilege.   *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. ___, Slip Op. 1-2, 5-11 (May 23, 2019), https://www.justice.gov/olc/file/1215056/download.[15]

These are the paramount confidentiality interests served by the testimonial immunity of the President's immediate advisors, and not, as the *McGahn* court erroneously surmised, to "block[ ] testimony about *non*-protected subjects that are relevant to a congressional investigation," 2019 WL 6312011, at *41.   Nor does recognizing this immunity "'mak[e] the Executive the judge of its own privilege.'"   House Defs.' Resp. at 10 (quoting *Sirica*, 487 F.2d at 715).   The claim of absolute Executive privilege rejected in *Sirica*, and later in *U.S. v. Nixon*, was a claim that formal invocation of Executive privilege, "without more[,] disables the courts from inquiring by any means into whether the privilege is applicable to the subpoenaed evidence."   *Sirica*, 487 F.2d at 713; *see also*

---

[15] The House Defendants opine that if the disclosure in *Nixon* of Oval Office tape recordings "did not unduly threaten the President's interests in confidentiality, then no greater threat is posed by disclosure of a Presidential advisor's after-the-fact description of such conversations."   House Defs.' Resp. at 11.   Even accepting that arguable proposition at face value, it overlooks the fact that the President's interest in the confidentiality of communications with his advisors, which *Nixon* described as "fundamental to the operation of Government," 418 U.S. at 708, was pitted against and deemed outweighed by the intrusion on "the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions," *id.* at 707.   Moreover, the Court found little reason to expect that Presidential advisors would be "moved to temper the candor of their remarks" by the "infrequent occasions" on which they might be disclosed in a criminal trial.   *Id.* at 711-12. Here, by contrast, not only have the House Defendants failed to demonstrate a need for the compelled testimony of immediate Presidential advisors to effectively carry out their "basic functions," *id.* at 712-13; *see infra* at 31; Pres.'s Resp. at 20-24, the occasions for compelled testimony before congressional committees would be far more frequent than at criminal trials.   In addition, criminal trials are presided over by judges acting as neutral arbiters applying impartial procedural rules, and thus provide assurances against abusive questioning not present at committee hearings.   *Cf.* Pres.'s Resp. at 11.   Thus, greater protection for the confidentiality of the President's communications with his advisors is required here than was necessary in *Nixon*.

*U.S v. Nixon*, 418 U.S. at 689, 703 (same).   No such claim is made here of boundless and unreviewable Executive authority to withhold evidence.   Assuming an Article III case or controversy within the subject-matter jurisdiction of the federal courts, the courts would be able to consider whether a claim of testimonial immunity made on behalf of a particular individual fell within the scope of the immunity, thus ensuring that the immunity "extend[s] no further than its justification would warrant."  *Harlow*, 457 U.S. at 811.

Neither the House Defendants, nor the court in *McGahn*, has identified a constitutionally sound basis for construing Congress's own "generalized interest" in obtaining information relevant to its Article I functions as a sufficient basis on which to override the acute confidentiality interest that attaches specifically to the President's communications with his closest advisors.   Neither separation-of-powers principles, nor the traditional usage of Congress's implied subpoena power, supports such a result.

### C. Congressional Testimonial Compulsion of the President's Immediate Advisors Would Threaten the Autonomy and Independence of the Presidency.

The House Defendants also continue to maintain that Congress's implied power of compulsory testimonial process can be construed to extend to the President's closest advisors without threatening the autonomy and effective functioning of the Presidency, *see generally* House Defs.' Resp. at 12-18, and in support of this position continue to cite prior occasions when the President voluntarily allowed senior advisors who had been summoned by Congress to testify.  *See id.* at 15-18; Pres.'s Resp. at 13-14 & n.6.[16]   The House Defendants, now joined by the *McGahn*

---

[16]   In their response, the House Defendants add former White House Counsels Charles Colson, Charles Ruff, and Jack Quinn to their earlier list of testifying officials, *see* House Defs.' Mem. at 20-21, 24; House Defs.' Resp. at 16.  Like the other witnesses the House Defendants identify, *see* Pres.'s Resp. at 13 n.6, these individuals testified pursuant to voluntary authorization by the President.  Mr. Colson testified pursuant to the same accommodation reached between President Nixon and the Senate Watergate Select Committee under which John Dean, H.R. Haldeman, and John Ehrlichman all testified.  *See* Pub. Papers of Pres. Richard M. Nixon 299 (Apr. 17, 1973); *Testimonial Immunity of the Former Counsel* at 9 n.2.  In 1997, Mr. Ruff, then Counsel to President

court, interpret this history of *willing* inter-Branch cooperation and compromise as evidence that senior Presidential advisors could be *compelled* to testify without "imperiling the President's ability to fulfill his Article II functions," baldly asserting that the risks to Presidential autonomy and independence are just as great when advisors testify voluntarily. House Defs.' Resp. at 17, 18; *McGahn,* 2019 WL 6312011, at *42.

To the contrary, the history of congressional testimony by senior Presidential advisors reflects the healthy give-and-take of the accommodation process through which the political Branches, in a "spirit of dynamic compromise" and respect for each other's genuine needs, *United States v. AT&T, Inc.* ("*AT&T II*"), 567 F.2d 121, 127 (D.C. Cir. 1977), have traditionally settled their informational disputes. *See* Pres.'s Resp. at 14. If power were suddenly placed in the hands of Congress's dozens of committees to compel senior Presidential advisors to appear and testify at times and under conditions of the committees' own choosing, the scales would be dramatically tilted, *see United States v. AT&T, Inc.* ("*AT&T I*"), 551 F.2d 384, 394 (D.C. Cir. 1976), the committees' incentives to accommodate the interests of the Executive Branch would be drastically diminished, and the Constitution's intended allocation of power and influence between the elected Branches would be permanently set awry. *See AT&T II*, 567 F.2d at 123.[17]

---

Clinton, appeared voluntarily before the House Committee on Government Reform and Oversight, as did other senior White House officials who testified at that hearing. *See U.S. Cong., House Comm. on Gov't Reform and Oversight, White House Compliance with Comm. Subpoenas*, hearings, 105th Cong., 1st sess. (Washington: GPO, 1998), p. 196 (testimony of Lanny Breuer, Special Counsel to President Clinton). In 2001, former White House Counsel Jack Quinn testified in his capacity as private counsel to Marc Rich, not in his capacity as former Counsel to President Clinton. *See U.S. Cong., House Comm. on Gov't Reform, Controversial Pardon of International Fugitive Marc Rich*, hearings, 107th Cong., 1st sess. (Washington: GPO, 2001), pp. 43-47, 309.

[17]    The House Defendants' disclaimer of any intention to use the subpoena issued to Dr. Kupperman "to harass or retaliate," House Defs.' Resp. at 15, misses the point. Compelling close Presidential advisors to testify before Congress would license congressional committees, whenever they are so inclined, to "wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain."

In a similar vein, the *McGahn* court remarked that, in the decade since the decision in *Miers,* a "'wholesale compulsion by Congress of testimony from senior presidential advisors'" has not materialized.  *McGahn,* 2019 WL 6312011, at *43 (quoting *Miers*, 558 F. Supp. 2d at 102).  But that fact merely attests to the continued vitality of the accommodation process and its success in meeting the respective needs of the political branches in a legal environment where no appellate court has authoritatively ruled that Congress may compel the testimony of senior Presidential advisors at will.  Were it otherwise, the temptation to set aside the accommodation process in favor of compulsion would only grow, the institutional habits of compromise and accommodation developed over the lifetime of our Republic would wither, and litigation of political disputes between the elected Branches would proliferate, all in detriment to the Constitutional order among all three branches that has prevailed for over 200 years.  *See* Pres.'s Resp. at 2.

The House Defendants also mistakenly assert that, in light of Congress's well established power of inquiry in furtherance of its oversight functions, Executive Branch officials "'should expect to testify 'about the operations of their offices,'" and the threat of being compelled to do so should not "'prevent [them] from competently performing as assistants to the President.'"  House Defs.' Resp. at 12-13 (quoting *McGahn,* 2019 WL 6312011, at *40 n.31, 42).  But the President's immediate advisors, unlike other Executive Branch officials such as Cabinet officers, are not responsible for the "operations of … offices," agencies, or departments created (and funded) by Congress, about which Cabinet officials routinely testify.  *See* Pres.'s Resp. at 9 n.3.  More critically, mere "competen[ce]," *McGahn*, 2019 WL 6312011, at *42, is not the benchmark of

---

*Testimonial Immunity of the Former Counsel* at 5.  Placing that power in a committee's grasp would "would risk significant congressional encroachment on, and interference with, the President's prerogatives and his ability to discharge his duties with the advice and assistance of his closest advisers," *id.*—and promote a perception of Presidential subordination to Congress, *Immunity of the Assistant to the President* at 3—regardless of a committee's stated good intentions in any given instance.

success to which a President should aspire—or be forced to accept—when what is required in the national interest is the "unhesitating performance" of the vital functions with which his senior advisors have been entrusted.  *Harlow*, 457 U.S. at 812.[18]

### D. The Testimonial Immunity of the President's Immediate Advisors Does Not Impermissibly Impair the House Defendants' Performance of Their Article I Functions.

The House Defendants also make a repeated effort to show that the testimonial immunity of immediate Presidential advisors "'upset[s] the constitutional balance'" by "gravely impair[ing] the functions of Congress."  House Defs.' Resp. at 18 (quoting *U.S. v. Nixon*, 418 U.S. at 707). Principally, they again rely on *U.S. v. Nixon*, *see id.* at 18-19, which held that a "generalized interest in [the] confidentiality" of Presidential communications could not sustain a claim of absolute Executive privilege when weighed against "[t]he impediment that [such a] privilege would place in the way of the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions[.]"  418 U.S. at 707, 713.  The House Defendants assert that their need for "access to all relevant facts during [their] impeachment inquiry" also supersedes the "President's generalized confidentiality interest," as in *Nixon.*  House Defs.' Resp. at 18-19.

---

[18] The House Defendants also ascribe to the President an "archaic view of the separation of powers as requiring three airtight departments of government," "operat[ing] in complete independence," disclaimed by the Supreme Court in *Nixon v. GSA*, 433 U.S. 425, 443 (1977), and *U.S. v. Nixon*, 418 U.S. at 704.  House Defs.' Resp. at 12, 14.  The distinctions between this case and *U.S. v. Nixon* are discussed at length herein.  *See also* Pres.'s Resp. at 15-16.  *Nixon v. GSA* held only that a statutorily prescribed process to screen Presidential documents for personal and privileged matter was not unduly disruptive of Executive Branch functions, because at all times "[t]he Executive Branch remain[ed] in full control of the Presidential materials." 433 U.S. at 444. That case has little to say about the appropriate balance of constitutional interests where one branch seeks to compel the disclosure of information from another.  At bottom, the testimonial immunity asserted here rests not on a view of the branches as "'entirely separate and distinct[,]'" but on fundamental separation-of-powers doctrine providing that each branch must be free from "'control or coercive influence'" by the others, so that the "'authority and independence'" of each may be preserved.  Pres.'s Mem. at 29 (quoting *Mistretta*, 488 U.S. at 380, 383-84).

But as discussed *supra*, at 25, the testimonial immunity of immediate Presidential advisors does not merely concern the confidentiality interest that inheres in privileged Presidential communications generally.  It specifically concerns the exceptionally heightened interest in the confidentiality of the President's communications with his closest personal advisors, together with the protection of Presidential autonomy and independence from encroachment by the Legislature. Hence, the constitutional interests supporting the testimonial immunity of senior Presidential aides are substantially weightier in aggregate than the generalized interest in confidentiality on which the claim of absolute Executive privilege was based in *U.S. v. Nixon.*

Looking to the other side of the scale, the House Defendants argue that their power of testimonial compulsion must be deemed "at its height during the constitutional impeachment process."  House Defs.' Resp. at 18.  They continue to overlook, however, that separation-of-powers analysis requires a court to weigh *the extent to which* the actions of one branch impair the performance of a function assigned by the Constitution to another, and not merely the importance attached in the abstract to that function.  *See* Pres.'s Resp. at 21-22 (citing *Nixon v. GSA*, 433 U.S. at 444 and *U.S. v. Nixon*, 418 U.S. at 711-12).

Thus *Nixon* held that upholding a claim of absolute Executive privilege "would gravely impair the role of the courts under Art[icle] III" because the availability of compulsory process to secure the production of evidence was "imperative to the function of courts" in criminal trials.  418 U.S. at 707, 709.  The House Defendants can make no comparable claim that compelling testimony from immediate Presidential advisors is "imperative" to their current (or any future) impeachment inquiry, where they have unilaterally withdrawn the subpoena issued to Dr. Kupperman, identified no information of importance (or even relevance) to their inquiry that can be obtained solely through testimony by the President's closest advisors, and the Constitution provides Congress,

unlike the courts, with numerous powerful political tools of legislation, and appropriation, that it can wield in informational disputes with the Executive.  Pres.'s Resp. at 22-24.

### E.  The President Properly Instructed Dr. Kupperman That He Should Comply With the President's Invocation of Testimonial Immunity.

Finally, the President appropriately advised Dr. Kupperman that he should rely on the President's invocation of immunity, and decline to testify, in light of the well-established principle that former employees (including former government employees) are obligated when directed to preserve the confidentiality of information that is subject to claims of privilege by their former employers.  *See* Pres.'s Resp. at 19-20.  The House Defendants, citing *McGahn*, now advance an argument that Presidential directives to former Executive Branch officials that they should not testify before Congress "raise serious First Amendment concerns."  House Defs.' Resp. at 21-23; *see McGahn,* 2019 WL 6312011, at *44.  This newly conceived argument lacks merit, and in any event is not properly before the Court.

Even if congressional testimony by Dr. Kupperman about his official duties as a Presidential advisor were equated with "speech [by] a citizen on a matter of public concern," "[a] public employee's sworn testimony is not categorically entitled to First Amendment protection[.]" *Lane v. Franks*, 573 U.S. 228, 242 (2014).  "[T]he next question [would be] whether the government ha[s] 'an adequate justification for treating the employee differently from any other member of the public' based on the government's needs as an employer.'"  *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  The overriding need to protect the autonomy and effective functioning of the Presidency, which are threatened by congressional testimonial compulsion of immediate Presidential advisors, is more than sufficient justification to direct former advisors, when immunity is invoked, that they should not testify in answer to congressional subpoenas.  That is all the more so in this case, where Dr. Kupperman, though willing to testify if required, has expressed no personal desire to do so.

The Court need not resolve this issue, however, because the House Defendants lack third-party standing to assert the legal rights or interests of Dr. Kupperman.  To establish third-party standing, "[1] [a] litigant must have suffered an 'injury-in-fact' . . . ; [2] the litigant must have a close relation to the third party; and [3] there must exist some hindrance to the third party's ability to protect his or her own interests."  *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991) (citation omitted).  The House Defendants do not satisfy these requirements.  They have suffered no cognizable Article III injury, for reasons the President already has set forth.  *See* Pres.'s Mem. at 17-20.  And even assuming their unilateral desire to obtain Dr. Kupperman's testimony could give rise to the kind of "close relationship" required for third-party standing, they certainly cannot satisfy the third requirement, of "a hindrance to [Dr. Kupperman's] ability to protect [his] own interests."  *See Singleton v. Wulff*, 428 U.S. 106, 115-16 (1976); *Goodman v. FCC*, 182 F.3d 987, 992-93 (D.C. Cir. 1999) (petitioner lacked standing to seek review of FCC order on behalf of absent radio licensees without showing the licensees "[were] unable to sue the Commission themselves").  That requirement is clearly unmet where Dr. Kupperman himself brought (and is vigorously litigating) this suit for the very purpose of vindicating his legal interests as he sees them.

## CONCLUSION

For the reasons stated herein and in the President's earlier briefs, the President's motion to dismiss or, in the alternative, for summary judgment, should be granted, and judgment entered in the President's favor as a matter of law.

Dated:  December 4, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director


 /s/ James J. Gilligan
JAMES J. GILLIGAN
Special Litigation Counsel

ANDREW M. BERNIE (DC Bar No. 995376)
CRISTEN HANDLEY (MO Bar No. 69114)
STEVEN A. MYERS (NY Bar No. 4823043)
SERENA M. ORLOFF (CA Bar No. 260888)
Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
P.O.  Box 883
Washington, D.C.  20044
Telephone:  (202) 514-3358
Fax:            (202) 616-8470
Email:         james.gilligan@usdoj.gov

*Counsel for the President*